IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

JARED WHEAT, JOHN
BRANDON SCHOPP, and HI-
TECH PHARMACEUTICALS,
INC.,

      Defendants.

No. 1:17-CR-0229-AT-CMS

**DEFENDANTS JARED WHEAT AND HI-TECH PHARMACEUTICALS,
INC.'S MOTION TO SUPPRESS EVIDENCE SEIZED PURSUANT TO
THE INITIAL SEARCH WARRANTS EXECUTED AT HI-TECH'S
PREMISES AND MEMORANDUM OF LAW IN SUPPORT**

COME NOW Defendants Jared Wheat and Hi-Tech Pharmaceuticals, Inc.

("Hi-Tech"), by and through their undersigned counsel, and pursuant to Fed. R.

Crim. Pro. 41(h), file this motion to suppress evidence seized pursuant to six

search warrants[1] executed on October 4, 2017, at Hi-Tech's business offices in

---

[1] There were six separate yet identical search warrants authorized for Hi-Tech's premises (listed as "Subject Location" 1 through 6). All six were issued on the basis of identical applications and affidavits. The search warrant for Subject Location 1 is attached to this motion as EXHIBIT A. The application and affidavit for this search warrant is attached as EXHIBIT B. This group of warrants and searches will be referred to as the "initial warrant" and "initial search" since the

Georgia. The warrants violated the Fourth Amendment to the Constitution and accordingly all evidence derived from the searches should be suppressed. Additionally, pursuant to Fed. R. Crim. Pro. 41(g), Hi-Tech's products seized pursuant to these unlawful warrants should be returned to Hi-Tech. In support of this request, Defendants respectfully show this Court the following:

## I.   INTRODUCTION

On the morning of October 4, 2017, federal agents arrived at Hi-Tech's business premises with facially overbroad search warrants permitting them to seize massive quantities of records, in every conceivable format, relating not only to the five allegedly "misbranded" products that the Government claimed contained anabolic steroids, but also allegedly relating to new crimes, wholly unsupported by any probable cause, included purportedly "adulterated" products, as well as tax documents. The warrants lacked particularity and permitted the agents to indiscriminately seize every document and image every computer at Hi-Tech, along with approximately $2 million worth of Hi-Tech's products, *including products that are not mentioned in the warrants*. Ignoring the fact that Hi-Tech is engaged in a business subject to extensive FDA regulation, *see* EXHIBIT B at ¶¶

---

Government obtained a second search warrant later that same day for DMAA containing products.

15-17, the warrants authorized the seizure of generic dietary supplement business documents. Further, despite having no provision or authority to gather attorney-client privileged documents set forth in the warrants, and knowing that Mr. Wheat and Hi-Tech were engaged in long-running legal disputes, including multiple high-profile lawsuits with DOJ, the FDA and FTC, the agents seized *every single legal-related document created since 2009 that they could find at Hi-Tech*.

When the well-recognized constitutional principles governing search and seizures are considered in light of these facts, it is clear that the Government lacked a legal basis for the initial search conducted on October 4, 2017. This was not a good faith effort to conduct a targeted investigation of specific wrongdoing, but rather, an ill-conceived expedition, conducted against a successful business the FDA has relentlessly pursued first in federal court through a civil *in rem* action, and now criminally, with the increasingly transparent intent to drive Hi-Tech and Mr. Wheat out of business before they can defend against the charges in this indictment. As set out in Defendants' previously filed motions, the Government has engaged in a pattern of overreaching, which, to date, includes the following: (1) seizing all the funds from Defendants' operating accounts pursuant to two

woefully inadequate warrant applications;[2] (2) seizing all of the contents of two Hi-Tech-related email accounts for an extended period of time, including attorney-client communications;[3] and (3) coercing Mr. Wheat and Hi-Tech to agree to cease manufacturing and selling DMAA containing products as a condition of Mr. Wheat's pretrial release, even though the indictment in this case does not involve DMAA in any way.[4]

In the instant motion, Defendants will show the Government's pattern of overreaching and violation of Defendants' constitutional rights extends to the initial search conducted on October 4, 2017, and that during the course of this search, the Government once again seized large quantities of indisputably privileged materials without any authority to do so. As such, evidence seized in the initial search should be suppressed. Furthermore, based on the troubling seizures of privileged communications by federal agents without court approval, Defendants respectfully submit that this Court should order a hearing into the Government's taint/privilege review process.

---

[2] *See* Defendants' "Emergency Motion for Release of Improperly Seized Funds," Doc. 36.

[3] *See* Defendants' "Motion to Suppress Evidence Seized Pursuant to the Search Warrants for Emails and Electronically Stored Information," Doc. 44.

[4] *See* Defendants' "Motion to Amend Conditions of Pretrial Release," Doc. 45. This motion also sets out the lengthy and contentious history between the Governemnt and Defendants. *Id.* at 6-16.

## II.   STATEMENT OF FACTS

In order to avoid duplication, Defendants respectfully refer the Court to the Defendants' previously filed motion to amend conditions of pretrial release, Doc. 45 at 6-16, which provides a summary of Hi-Tech's dietary supplement business and the lengthy history of the litigation between Hi-Tech and the Government that preceded the instant indictment. The facts that relate specifically to the initial search will be set out herein.

The charges in this case are limited to accusations that Hi-Tech, Mr. Wheat, and John Brandon Schopp: (1) forged documents known as "Certificates of Free Sale" and other audit reports; (2) marketed a *misbranded* drug (allegedly containing a cholesterol medication); (3) manufactured and distributed a *misbranded* controlled substance (allegedly an anabolic steroid); and (4) various related wire fraud, money laundering and forfeiture counts. Doc. 7.

The warrants for the initial search were authorized on September 28, 2017. EXHIBIT A at 1. The application for these warrants was supported by the affidavit of Special Agent Brian C. Kriplean of the FDA Office of Criminal Investigations ("FDA-OCI"). EXHIBIT B (the "Kriplean affidavit").[5] The affidavit described six

---

[5] As indicated in his affidavit, Agent Kriplean has been investigating Hi-Tech since at least August 2011. EXHIBIT B at ¶ 18.

"subject locations" that the Government wanted to search, all of which were "business premises" of Hi-Tech. *Id.* at ¶ 2. The affidavit's main focus was the alleged probable cause to believe that Hi-Tech was "manufacturing, marketing and distributing *misbranded* foods and/or drugs, some of which contain Schedule III controlled substances, namely, anabolic steroids." *Id.* at ¶¶ 3, 11, 46 (emphasis added).[6] In support of this allegation, the Kriplean affidavit describes two operations (one by undercover agents and the second by a cooperating source) in which the FDA purchased various "prohormones" from Hi-Tech allegedly containing Schedule III anabolic steroids. *Id.* at ¶¶ 20-28. The Kriplean affidavit further describes covert monitoring of Hi-Tech's business premises that occurred in late August 2017 and the types of evidence that the Government wanted to seize related to its investigation that Hi-Tech was marketing *misbranded* "prohormones" containing Schedule III anabolic steroids. *Id.* at ¶¶ 28-45. The Kriplean affidavit's

---

[6] Notably, neither the initial search warrant nor the Kriplean affidavit contain any reference to DMAA or the marketing of *adulterated* foods or drugs. Although neither of these documents submitted to the magistrate judge contain any basis to conclude that Hi-Tech was marketing *adulterated* foods or drugs (just as the indictment does not), Attachment B to the initial search warrant allowed the Government to seize any "*misbranded* or *adulterated* foods and/or drugs" that were "evidence, fruits and instrumentalities of violations of federal law." EXHIBIT A at 3 (emphasis added).

allegations were limited to five specific Hi-Tech products: 1-AD; 1-Testosterone; Androdiol; Superdrol; and Eqiubolin.

During the execution[7] of the search warrants, the Government seized or imaged every single computer hard drive and storage device (except for one and they bypassed that computer due to technical difficulties in the imaging process), as well as massive quantities of business records and documents that contained attorney-client privileged materials, including attorney bills with detailed legal strategies outlined therein, and tax records, business cards, correspondence with the FDA, lists of employees, and brochures describing Hi-Tech's on-going fight with the FDA regarding DMAA. *See* Third Declaration of Michelle Harris, attached to this motion as EXHIBIT D at ¶¶ 5-7.

### III.   ARGUMENT AND CITATION OF AUTHORITIES

### A.   THE FOURTH AMENDMENT IS NOT A MERE FORMALITY.

The Supreme Court has held that general warrants are prohibited by the Fourth Amendment:

> The problem [posed by the general warrant] is not that of intrusion per se, but of a general, exploratory rummaging in a person's

---

[7] There were at least 41 federal agents assigned to execute the search warrants in six different sites. *See* EXHIBIT E (operations plan for execution of initial search warrant). At least one was a IRS-CI agent, so it is not surprising that tax documents were seized. *See id.*

> belongings. . . . [T]he Fourth Amendment addresses the problem by requiring a 'particular description' of the things to be seized. This requirement 'makes general searches . . . . impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.'

*Andresen v. Maryland*, 427 U.S. 463, 480 (1976) (citations omitted) (alterations in source). As set forth below, the initial search warrant was a "general warrant" that should be suppressed.

### B.   THE INITIAL SEARCH WARRANT WAS OVERLY BROAD, LACKED PARTICULARITY AND WAS AN UNREASONABLE "GENERAL WARRANT."

#### 1.   The initial Search Warrant Is Overbroad and Should Be Suppressed.

"[A] warrant is overbroad if its 'description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based.'" *United States v. Lustyik*, 57 F. Supp. 3d 213, 228 (S.D.N.Y. 2014) (quoting *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013)). Despite the specific criminal conduct alleged in the Kriplean affidavit in support of the warrant, the initial warrant itself is a facially overbroad search warrant that permitted the federal agents to "rummage" through all of Hi-Tech's business files and seize every conceivable record, in every conceivable format "pertaining to any federal crime, or at least any information pertaining to the generic crime. . . that

was under investigation" in addition to numerous products and documents that had no connection whatsoever to the crime under investigation and are part of a legitimate business. *In re Grand Jury Proceedings*, 716 F.2d 493, 497-98 (8th Cir. 1983).

The probable cause in support of the initial warrant application was set out in the Kriplean affidavit, and was based on the central allegation that Hi-Tech was "manufacturing, marketing, and distributing *misbranded* foods and/or drugs, some of which contain Schedule III controlled substances, namely, anabolic steroids," which it "markets as 'prohormones.'" Exhibit B at ¶ 3 (emphasis added). Attachment B to the warrant, which specified items to be seized, included "evidence, fruits, instrumentalities of violations of federal law, including 21 U.S.C. § 331 and 21 U.S.C. § 841(a)(1)." *Id.* at ¶¶ 3-10.[8]

Here, while the probable cause set forth in the Kriplean affidavit clearly was connected to alleged misbranding/possession of steroids in five specific Hi-Tech products, the initial warrant authorized the seizure of broad general categories of

---

[8] The description of the specified federal offenses in Attachment B to the initial warrant is more general than the specified offenses listed on the face of the warrant itself, which specifies violations of 21 U.S.C. §§ 331(a), 333(a)(2), 333(k) and 841(a)(1). EXHIBIT A at 1. Regardless of which version controls, it is clear that there is not a shred of probable cause set forth in the initial warrant application for anything relating to the "adulteration" of dietary supplements.

documents, items/products, and electronic evidence in connection with a vastly expansive number of crimes aside from that which was set forth in the affidavit. EXHIBIT B at ¶¶ 9-16. Thus, the initial warrant is a prohibited general warrant under the Fourth Amendment. *United States v. Wey*, 2017 U.S. Dist. LEXIS 91138, at *40-41 (S.D.N.Y. June 13, 2017) (suppressing evidence seized pursuant to securities fraud warrants on the basis that the warrant lacked particularity and was overbroad).[9]

### 2. The Documents Listed in Attachment B to the Initial Warrant Lacked Any Nexus to the Proffered Probable Cause.

"[B]usiness records, although they may contain evidence of fraud, do not fall into the category of stolen or contraband goods." *United States v. Abrams*, 615 F.2d 541, 543 (1st Cir. 1980). Attachment B to the initial warrant is littered with expansive "catchall" categories of generic documents set forth in a laundry-list fashion without linkage to either any suspected criminal conduct or the five specific Hi-Tech products listed in the Kriplean affidavit. As a result, the

---

[9] A facially deficient warrant may not be cured by information laid out in the accompanying application. *See Groh v. Ramirez*, 540 U.S. 551, 557 (2004) ("[t]he fact that the application adequately described the things to be seized does not save the warrant from its facial invalidity" because the Fourth Amendment "by its terms requires particularity in the warrant").

paragraphs listing generic documents are overbroad and the scope of the warrant exceeded whatever probable cause was set forth in the warrant application.

For example, the initial warrant called for the seizure of every generic business document relating to the operation of a dietary supplement company, including:

- production records, batch records, recipes, product formulations, laboratory tests, certificates of content, certificates of analysis, certificates of free sale, GMP certifications, GMP audit reports . . commodity business brochures; supplier and customer lists; records of purchase from suppliers; application forms, documents, and literature regarding the FDA and/or State agency;[10] and any unopened mail addressed to or from the individuals/businesses mentioned herein.

- All labels, labeling, and advertisements pertaining to misbranded and/or adulterated foods and/or drugs, including magazines, videotapes, handouts, inserts, flyers, and other promotional material.

- all tax records, including summaries and schedules.[11]

---

[10] The rote listing of "State agency" further demonstrates how this was a generic list shoehorned into the overbroad general warrant, as there is not a single mention of any "State agency" in the Kriplean affidavit. *See* EXHIBIT B.

[11] Given DOJ's strict requirements for obtaining a search warrant in tax-related cases, *see United States Attorneys Manual* § 6-4.130 - Search Warrants, the inclusion of tax returns in Attachment B to the warrant without any nexus to tax-related offenses (or even the specified federal offenses listed in the warrants) is particularly troubling and demonstrates the magnitude of the constitutional violation here.

Attachment B to EXHIBIT A at ¶¶ 3-9. None of these categories have any specific connection to either the five Hi-Tech products listed in the Kriplean affidavit or the conduct alleged therein.

Given the narrow probable cause outlined in the Kriplean affidavit of only two separate and discrete alleged transactions over a year apart, *see* EXHIBIT B at ¶¶ 20-21, it is clear that the court "did not find that probable cause pervaded every aspect" of Hi-Tech's extensive dietary supplement business, which produces over 200 separate dietary supplements. *Voss v. Bergsgaard*, 774 F.2d 402, 404 & 406 (10th Cir. 1985) (holding that, even if allegedly fraudulent activity constitutes a large portion of business' activities, there is no justification for seizing records and documents relating to its legitimate activities). *See* Doc. 36-5 at ¶¶ 4-8. As such, the generic list set forth in the Exhibit B attachment to the warrant impermissibly broadened the scope of the search beyond the foundation of probable cause set forth in the initial warrant. *See Wey*, 2017 U.S. Dist. LEXIS 91138, at \*50 & n.3 (suppressing seizure of tax related documents where "neither tax fraud nor any other scheme involving . . . deductions was presented" to the magistrate judge); *see also United States v. Roche*, 614 F.2d 6, 7 (1st Cir. 1980) (affirming grant of

suppression where warrant impermissibly broadened scope of search beyond foundation of probable cause to search for business records).[12]

Moreover, in the context of a dietary supplement business that is regulated by the FDA, without any definition of what constitutes "misbranded" or "adulterated" foods and/or drugs, the documents in Attachment B to the warrant "provide no limitation at all" on the agents executing the warrant, as the warrant "encompassed virtually every document that one might expect to find in a [dietary supplement manufacturer's] office."*United States v. Leary*, 846 F.2d 592, 602 (10th Cir. 1988); *see United States v. Bentley*, 825 F.2d 1104, 1110 (7th Cir. 1987) ("When the probable cause covers fewer documents in a system of files, the warrant. . . must tell the officers how to separate the documents seized from others.").

A warrant may also be invalidated if the warrant itself does not "limit the items subject to seizure by reference to any relevant timeframe or dates of interest." *Wey*, 2017 U.S. Dist. LEXIS 91138, at *77; *see also United States v.*

---

[12] Furthermore, in his affidavit, Agent Kriplean, a special agent with FDA-OCI, failed to inform the magistrate judge that Hi-Tech has been inspected repeatedly by the FDA, and has not received a single "483 notice" (the FDA's notice of deficiency), which is exemplary when compared to the dietary supplement industry as a whole. *See* EXHIBIT D at ¶ 8. Given that Hi-Tech has a record of clean inspections, probable cause cannot exist to seize virtually any and all of Hi-Tech's products as either "adulterated" or "misbranded."

*Blake*, 868 F.3d 960, 974 (11th Cir. 2017) ("[W]arrants should have requested data only from the period of time during which [the defendant] was suspected of taking part in the prostitution conspiracy….").

Here, the initial warrant's overbreadth is further demonstrated by the fact that there were no designations or references to particular transactions, specific individuals, specific files, or *to a reasonably specific time*. *See Roche*, 614 F.2d at 7 n.1 (affirming grant of suppresson and noting, "we are concerned because the warrants were not limited to records generated in a stated period of time").[13] While the two discrete transactions outlined in the Kriplean affidavit are from August 2016 and September 2017, the agents seized documents *from as far back as 2008* – prior to the statute of limitations on any of the specified federal offenses or events articulated in the affidavit. EXHIBIT D at ¶ 6; EXHIBIT F (the Government's inventories of items seized pursuant to the initial warrant and subsequent DMAA focused warrant). Federal agents also seized meticulous bills from Defendants' attorneys from 2009 to the present describing in detail work performed – including billing entries setting forth legal strategy and advice provided to Defendants.

---

[13] Similarly, the overbreadth of the warrant is demonstrated further by the fact that the Government did not ask for authority or permission to collect photographs or video the subject premises, but the operational plan for the search warrants indicates that an agent was designated for those purposes. *See* EXHIBIT E.

EXHIBIT D at ¶ 5. They also seized other items beyond the scope of the initial warrant, such as business cards, correspondence with the FDA, lists of employees, and brochures describing Hi-Tech's ongoing fight with the FDA regarding DMAA. EXHIBIT D at ¶ 8; EXHIBIT F. Thus, because the initial warrant was overbroad, the warrant should be suppressed. *Klitzman, Klitzman and Gallaher v. Krut*, 744 F.2d 955, 960 (3d Cir. 1984) (finding warrants overbroad where "[i]n effect, the warrants authorized virtually a wholesale search and seizure of the business records of the firm").

### 3. The Initial Search Warrant Fails to Describe with Particularity What Was to be Seized.

The manifest purpose of the Fourth Amendment particularity requirement is to prevent the Framers' chief perceived evil: general searches. *See Nathan v. Lawton*, 1989 U.S. Dist. LEXIS 1398, at *21 (S.D. Ga. Jan. 18, 1989) (citing *Maryland v. Garrison,* 480 U.S. 79, 87 (1987)). A search conducted pursuant to a warrant that fails to conform to the particularity requirement will be held unconstitutional. *Id. See also United States v. Fuccillo*, 808 F.2d 173, 176 (1st Cir. 1987) ("warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized.").

Here, the initial warrant lacked particularity with respect to the "things to be seized" and permitted the agents to indiscriminately grab massive quantities of

documents, image every computer at Hi-Tech, and seize approximately $2 million of Hi-Tech's products *including products that are not mentioned or even described, in the initial warrant*.[14] EXHIBIT D at ¶¶ 4, 9-10. For example, the agents seized five products (Helladrol, Stanabol Depot, Metanabol, Estrogenex, and 1-Andro – among many other products) *that were not described in the initial warrant* and whose retail value is approximately $1 million. *Id.* at ¶ 9. Even more absurdly – and a clear indication of the Government's bad faith – the agents seized three products (Arimiplex, Dianabol, and Decabolin – with a retail value of approximately $1 million) that were not described in the warrant and that the Government *knew did not contain Schedule III prohibited steroids* because the FDA's own Forensic Chemistry Center confirmed such in lab testing in January 2017. *Id.* at ¶ 10 (listing the products improperly seized, their value, and attaching the January 30, 2017 lab report from the FDA Forensic Chemistry Center received from the Government in discovery).[15] Thus, as executed, this search took on the

---

[14] And, as will be discussed in Defendants' simultaneously filed motion relating to the second search warrant executed that same day, the agents seized DMAA containing products that were valued at nearly $19 million.

[15] *See* Second Declaration of Melissa L. Jampol, attached to this motion as EXHIBIT C, at TABLE FOUR (table listing certain products the Government seized that were neither mentioned nor described in either warrant (Helladrol, Stanabol Depot, Metanabol, Estrogenex and 1-Andro) and listing products neither mentioned nor described in the warrant that the FDA's testing confirmed were free

"character of the wide-ranging exploratory searches the Framers intended to prohibit." *Nathan*, 1989 U.S. Dist. LEXIS 1398, at *21 (S.D. Ga. Jan. 18, 1989) (citing *Garrison*, 480 U.S. at 87).

The initial warrant is also facially defective in that it "lacked the requisite specificity to allow for a tailored search of the defendant's electronic media." *United States v. Rosa*, 626 F.3d 56, 61 (2d Cir. 2010) (finding that the warrant provided the officers "with no guidance as to the type of evidence sought," and failed to "link that evidence to the criminal activity supported by probable cause"). Neither the Kriplean affidavit nor Attachment B to the initial warrant describes how the FDA-OCI and IRS-CI intended to distinguish computer-related information responsive to the warrant from unresponsive material. EXHIBIT B at ¶¶ 41-42 (computer searches); *id.* at ¶ 11. Yet, paragraph 11 of Attachment B to the initial warrant is comprised of a list *over four pages long* setting forth specifications that permitted the agents to search and seize the entirety of every

---

from Schedule III prohibited steroids (Arimiplex, Dianabol, and Decabolin)). All the information in TABLE FOUR was derived from the Government's inventories. EXHIBIT F. Note that there is only one inventory for each Subject Location cataloging the items seized pursuant to both the initial search warrant and the second search warrant, which was for DMAA containing products and paraphernalia. Thus, it is impossible to determine which search yielded what evidence. For purposes of this motion, based on the fact that the second search specifically targeted DMAA containing products, Defendants have assumed that all non-DMAA products and items were seized pursuant to the initial warrant.

computer or electronic storage device, regardless of file content, at Hi-Tech's business premises.[16] The overwhelming breadth of the generic computer search parameters set forth in the initial warrant, in and of themselves, merits a finding that the warrant violated the Fourth Amendment.

Finally, to the extent there is any doubt from the face of the warrant that it is unconstitutionally lacking in particularity, the federal agents' execution of the initial warrant conclusively demonstrates this to be true. Federal agents imaged at least 25 hard drives and many other computer towers and seized numerous USB drives amounting to terabytes and terabytes of total data collected. *See* EXHIBIT C at TABLE ONE (tables listing computers and other electronic items seized at the six subject locations); EXHIBIT F.

While only five different kinds of brand name dietary supplements were mentioned in the Kriplean affidavit, the agents seized products without regard to a connection to either the initial warrant or the affidavit. *Compare* EXHIBIT C at TABLE TWO (table listing all of the items and products seized by the agents at the six subject locations that are *not* specifically listed in the initial search warrant or

---

[16] As noted above, the initial warrant focused on two discrete transactions that occurred 13 months apart, yet the entirety of Hi-Tech's multi-million dollar business's computer infrastructure was seized pursuant to this general warrant. *See* EXHIBIT C at TABLE ONE (tables listing the numerous computers and other computer-related items seized at the six subject locations).

the Kriplean affidavit) *with* TABLE THREE (table listing all of the items and products seized by the agents at the six subject locations that are listed either in the initial search warrant or the Kriplean affidavit).[17]

### 4. The Initial Search Warrant Violated Defendant's Attorney-Client Privilege.

The true extent of the Government's general warrants here, as well as the Government's apparent disregard for Mr. Wheat and Hi-Tech's constitutional rights, is starkly demonstrated by the manner in which the Government appears to have deliberately transgressed Mr. Wheat's attorney-client privilege[18] through the execution of the search warrants without any regard for their intrusion into – and seizure of – documents that were patently subject to the attorney-client privilege, in violation of Mr. Wheat and Hi-Tech's Sixth Amendment rights. *See United States v. Blasco,* 702 F.2d 1315, 1329 (11th Cir. 1983) ("[A] communication between an attorney and his client that is protected by the common law attorney-client

---

[17] In addition to the problems created by the Government's inexplicable decision to combine the returns for the initial search warrant and the second, subsequent, search warrant for DMAA containing products, the Government's inventories do not contain page numbers and each inventory begins the list of enumerated items seized with "Item # 1," despite the fact that there are multiple inventories from multiple locations and, even more confusingly, multiple inventories from the same location, each likewise beginning with "Item # 1."

[18] References to "privileged materials" herein are intended to cover documents covered by either the attorney-client privilege or the attorney work-product doctrine.

privilege is also protected from government intrusion by the sixth amendment."). During the search, the agents seized detailed legal bills containing strategy and attorney-client correspondence containing legal advice going back to 2009 – years before the discrete conduct alleged in the Kriplean Affidavit. EXHIBIT D at ¶ 5.

The attorney-client privilege is the "oldest of the privileges for confidential communications know to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Documents reflecting attorney-client communications are entitled to special protection under the Fourth Amendment because of the "intrinsic high expectation of privacy" such documents enjoy. *United States v. Skeddle*, 989 F. Supp. 890, 894 (N.D. Ohio 1997) (quoting *OKC Corp. v. Williams*, 461 F. Supp. 540, 542 (N.D. Tex. 1978)). Documents within the scope of the attorney-client privilege are "zealously protected." 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2017 (1970).

A "purposeful intrusion" into the attorney-client relationship creates a presumption that there has been a "prejudicial effect on the reliability" of the litigation process. *Shillinger v. Hayworth*, 70 F.3d 1132, 1142 (10th Cir. 1996); *see also United States v. Orman*, 417 F. Supp. 1126, 1133 (D. Colo. 1976) (when a party accesses attorney-client protected documents, a "strong presumption" exists that the review of the protected information "causes incurable prejudice"). Such a

presumption is justified because "no other standard can adequately deter this sort of misconduct," and "'prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost.'" *United States v. Neill*, 952 F. Supp. 834, 840 (D.C. Cir. 1997). In fact, a defendant "need not prove that the prosecution actually used the information obtained" in order to establish a constitutional violation. *Briggs v. Goodwin*, 698 F.2d 486, 494 (D.C. Cir. 1983), *vacated on other grounds*, 712 F.2d 1444 (D.C. Cir. 1983).

Within the context of search warrants, it is well settled that the Government can seek prior approval by the authorizing court of a filter process to protect a potential defendant's privileges, either by highlighting the process for a privilege review protocol in the warrant application itself, or otherwise seeking court approval prior to the commencement of its documentary review, which in some cases has involved the appointment of a neutral third party, a special master.[19] *See United States v. Abell*, 914 F. Supp. 519 (S.D. Fla. 1995) (special master appointed by court); *Kiltzman*, 744 F.2d at 962 (noting that a special master could be

---

[19] DOJ accordingly recommends that, when agents seize electronic information or storage that contains legally privileged files, "a trustworthy third party must examine the [storage] to determine which files contain privileged material." *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations*, Office of Legal Education Executive Office for United States Attorneys, at 109 ("Electronic Crimes Manual").

appointed). Here, the Government apparently took neither of these steps and took matters into its own hands, despite full awareness that the documents and electronic evidence it sought to seize likely contained attorney-client communications. *Neill*, 952 F. Supp. at 841 (noting that there is a "presumption that tainted material was provided to the prosecution team"). While executing the initial warrant, there appears to have been a "taint" agent, who according to the operations plan was an unnamed IRS agent assigned to the execution of the initial warrant. *See* EXHIBIT E at (unnumbered page) 7. Yet, "taint teams present inevitable, and reasonably foreseeable risks to privilege, for they have been implicated in the past in leaks of confidential information to prosecutions. . . the government's fox is left in charge of the [Defendants'] henhouse, and may err by neglect or malice, as well as by honest differences of opinion." *In re Grand Jury Subpoenas*, 454 F.3d 511, 523-24 (6th Cir. 2006) (finding that the Government's use of a taint team was "inappropriate in the present circumstances" and appointing a special master). Here, while the Government clearly intended to seize Defendants' legal papers and planned for the use of a taint agent in advance of the search execution, *see* EXHIBIT E, this plan was not presented to the magistrate judge for approval, as is often the case in situations where the Government is aware that a target is represented by counsel. Indeed, all signs are pointing to a fox

guarding the henhouse because *every single legal post-2009 document at the subject premises was removed by federal agents, including numerous legal documents that have nothing whatsoever to do with the items listed in Attachment B to the initial warrant.* EXHIBIT D at ¶ 5. And there was apparently no provision at all put in place in either the Kriplean affidavit or Attachment B to the initial warrant to safeguard attorney-client privileged materials during the review of the numerous hard drives that were imaged at the subject premises. Based on information provided by the Government as of this date, there has been "no attempt to limit the seizure" of privileged materials during the execution of the search warrants in this matter, and the Government has taken "not one step to minimize the extent of the search or to prevent the invasion of the [Defendants'] privacy guaranteed by the attorney-client privilege." *Kiltzman*, 744 F.2d at 961 (noting with distress that a U.S. Attorney's Office "affixed its imprimatur of approval to a rampant trampling" of the attorney-client privilege and work product doctrine). As a result, the "search and seizure of the defendants' personal papers and information unrelated to the [ ] business was beyond the terms of the warrant, supporting the . . . conclusion that the government executed a prohibited general search" of the premises. *Leary*, 846 F.2d at 605.

In light of the foregoing invasion of Defendants' attorney-client privilege, Defendants ask the Court to hold a hearing on how the Government has conducted its taint/privilege review process and procedures, including: (1) how the Government identified which files to treat as potentially privileged; (2) the process by which the Government marked and/or excluded such files from review by the investigating team; (3) the process used for electronic evidence and documents; and (4) to provide the identities of the case agents, analysts, AUSAs, paralegals, or other personnel involved in the taint/privilege review process, as well as any notes made during the taint/privilege review by such persons.[20]

### D.   HI-TECH'S PRODUCTS THAT WERE UNLAWFULLY SEIZED MUST BE RETURNED PURSUANT TO RULE 41(g).

Rule 41(g), Fed. R. Crim. Pro. provides, in pertinent part, that "[a] person aggrieved by an unlawful search and seizure of property or the deprivation of may move for the property's return." The initial search of Hi-Tech's facilities executed on the morning of October 4, 2017, was an "unlawful search" because the search was conducted based on a warrant that on its face was overbroad, failed to describe

---

[20] Defendants reserve the right to further challenge the Government's taint/privilege review process once that process has been revealed. *Cf. Musicus v. Westinghouse Elec. Corp.*, 621 F.2d 742, 744 (11th Cir. 1980) (a motion to disqualify counsel is an appropriate method to bring the issue of "breach of ethical duties to the attention of the court").

with particularity what was to be seized, and included documents that had no nexus to the probable cause proffered in the affidavit submitted in support of the application for the search warrant. The items seized in this search were seized in an "unlawful search," and should be returned to Defendants.[21]

## CONCLUSION

For the reasons stated above, Defendants respectfully pray that this Court: (1) conduct an evidentiary hearing into the legal sufficiency of the initial search warrants; (2) conduct a hearing to determine the legality of the seizure of materials subject to the attorney-client privilege and the individuals who had access to those materials; (3) conduct a hearing to determine which of the seized materials should be returned immediately to Defendants, and (4) order such other and further relief as this Court may deem just and proper.

---

[21] More specifically, as set out above, there were numerous items and products removed by the agents that the search warrant did not grant authority to the agents to seize. Most notably, the agents seized large quantities of at least eight of Hi-Tech's products (Helladrol, Stanabol Depot, Metanabol, Estrogenex, 1-Andro, Arimiplex, Dianabol, and Decabolin) that were neither mentioned nor described in the initial warrant/affidavit or the FDA's own testing revealed were free from any prohibited steroids. These products alone are valued at approximately $2 million. EXHIBIT D at ¶¶ 4, 9-10. Because they were not properly seized under the search warrant – pretermitting the question of the validity of the search warrant in the larger sense  – and because there is no basis to conclude that the products are illegal, forfeitable, or evidence in the case under the charges contained in the indictment, these products should be returned to Hi-Tech immediately so that Hi-Tech may continue to market them as part of its indisputably legal business.

This 22nd day of November, 2017.

Respectfully submitted,

/s/ Bruce H. Morris
_____
Bruce H. Morris
Georgia Bar No. 523575
Finestone Morris & White
3340 Peachtree Road NW
Atlanta, Georgia 30326
404-262-2500
BMorris@FMattorneys.com
  *Counsel for Defendant*
  *Jared Wheat*

/s/ Arthur W. Leach
_____
Arthur W. Leach
Georgia Bar No. 442025
The Law Office of Arthur W. Leach
5780 Windward Parkway, Suite 225
Alpharetta, Georgia 30005
404-786-6443
Art@ArthurWLeach.com
  *Counsel for Defendant*
  *Hi-Tech Pharmaceuticals, Inc.*

/s/ James K. Jenkins
_____
James K. Jenkins
Georgia Bar No. 390650
Maloy Jenkins Parker
1506 Brandt Court
Boulder, Colorado 80303
303-443-9048
jenkins@mjplawyers.com
  *Counsel for Defendant*
  *Jared Wheat*

/s/ Jack Wenik
_____
Jack Wenik
Epstein Becker & Green, P.C.
One Gateway Center, 13th Floor
Newark, New Jersey 07102
973-639-5221
jwenik@ ebglaw.com
Admitted Pro Hac Vice
  *Counsel for Defendant*
  *Hi-Tech Pharmaceuticals, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the foregoing "Defendants Jared Wheat and Hi-Tech Pharmaceuticals, Inc.'s Motion to Suppress Evidence Seized Pursuant to the Initial Search Warrants for Hi Tech's Premises and Memorandum of Law in Support" through this District's ECF system, which will automatically serve all counsel of record.

This 22nd  day of November 2017.


/s/ Arthur W. Leach
Arthur W. Leach
    *Counsel for Defendant*
    *Hi-Tech Pharmaceuticals, Inc.*