1                    UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
2                          ATLANTA DIVISION

3
UNITED STATES OF AMERICA, )
4              PLAINTIFF,    )
                             )
5   -VS-                     ) DOCKET NO. 1:17-CR-00229-AT-CMS
                             ) VOLUME I
6   JARED WHEAT, JOHN BRANDON )
    SCHOPP AND HI-TECH        )
7   PHARMACEUTICALS, INC.,    )
                             )
8              DEFENDANTS.    )
    _____

9
                    TRANSCRIPT OF DAUBERT PROCEEDINGS
10          BEFORE THE HONORABLE CATHERINE M. SALINAS
                  UNITED STATES MAGISTRATE JUDGE
11                 TUESDAY, DECEMBER 15, 2020

12  APPEARANCES:

13  ON BEHALF OF THE GOVERNMENT:

14       KELLY KATHLEEN CONNORS, ESQ.
         D'JUAN B. JONES, ESQ.
15       NATHAN PARKER KITCHENS, ESQ.
         Assistant United States Attorneys
16

17  ON BEHALF OF THE DEFENDANT HI-TECH PHARMACEUTICALS, INC.:

18       ARTHUR W. LEACH, ESQ.

19  ON BEHALF OF THE DEFENDANT JARED WHEAT:

20       BRUCE HOWARD MORRIS, ESQ.
         FINESTONE MORRIS & WHITE
21
         JACK WENIK, ESQ.
22       JEFFREY MONGIELLO, ESQ.
         EPSTEIN BECKER & GREEN, P.C.
23

24            VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
                    OFFICIAL COURT REPORTER
25              UNITED STATES DISTRICT COURT
                      ATLANTA, GEORGIA

1                          I N D E X

2

3    WITNESS                    DIRECT    CROSS    REDIRECT   RECROSS

4    ANISSA CAROLINE MACHAL
     KELLEY                       6    38, 68        91
5
     MERRIE POWELL JACKSON        95  118, 128
6
     GREGORY L. HILLYER          132
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     (HELD VIA ZOOM AT 9 A.M.)

2            THE COURT:  This is case number 117-CR-229.  It's United

3    States versus Hi-Tech, Jared Wheat and others, and we're here to

4    begin two days of Daubert hearings.  Our first -- and then work

5    our way this afternoon to Document No. 321, and then tomorrow

6    morning we're going to jump over to Document No. 319, then back to

7    318 and then back to 321.  So we're going to do, basically, three

8    motions over the course of two days.

9            Let me go ahead and get counsel to state their

10   appearance first from the government.  Mr. Kitchens, would you

11   introduce yourself and your team, please.

12           MR. KITCHENS:  Thank you, Your Honor.

13           AUSA Nathan Kitchens on behalf of the government.  I'm

14   here with my colleagues Kelly Connors and D'Juan Jones from our

15   office.

16           THE COURT:  Good morning.

17           MR. KITCHENS:  Good morning.

18           THE COURT:  Let me hear who is here on behalf of

19   Hi-Tech.

20           MR. LEACH:  Your Honor, it's Art Leach.  Jack Wenik is

21   my co-counsel who is here in the room, and Jessica Leach who is a

22   partner with me in my firm.  And, Your Honor, Mr. Wheat is present

23   in my conference room.  I'm just going to turn the camera so you

24   can see him briefly.  And Mr. Wheat's plan is to be with us

25   throughout the hearings even if they go into Friday.

1              THE COURT:  Okay.  And who is here on behalf of Mr.

2    Wheat.

3              MR. MORRIS:  Bruce Morris, Your Honor, on behalf of Mr.

4    Wheat.

5              THE COURT:  And Mr. Schopp, is he here or counsel?

6              MR. C. LEITZ:  Mr. Schopp is not present with us this

7    morning, Your Honor.  He's aware of the hearing, but he's not

8    present.  This is Carl Leitz, present on his behalf at least for

9    now.  As I mentioned earlier, I'm not planning on attending all of

10   this hearing, but I will be here for parts of it, Your Honor.

11             THE COURT:  Okay.  It's my understanding that we're

12   going to just kind of get in over the course of the next few days

13   seven -- seven witnesses, and really no particular order, and that

14   we're beginning with two government witnesses, Ms. Kelly and

15   Mr. Jackson?

16             MR. KITCHENS:  Ms. Jackson.

17             THE COURT:  Ms. Jackson.  We're going to start with

18   those two witnesses.  Is there anything we need to take up before

19   we go ahead and dive right in?

20             MR. KITCHENS:  Not from the government, Your Honor.

21             MR. MORRIS:  We're ready, Your Honor.

22             MR. WENIK:  We're ready, Judge.

23             THE COURT:  Yes?  I guess maybe if Ms. Connors, Mr.

24   Jones if you would turn your camera off, too, that might help.  I

25   assume Mr. Kitchens will be handling the direct?

1          MR. JONES:  No, Your Honor, I will be handling the

2    direct.

3          THE COURT:  Mr. Kitchens, maybe you can turn off your

4    camera and Ms. Connors.

5          Does that help, Viola?  So the main one you're looking

6    for are Art Leach and Bruce Morris and D'Juan Jones and Ms. Kelly

7    and me.

8          All right.  Mr. Jones, would you go ahead and call your

9    first witness, please.

10          MR. JONES:  Yes, Your Honor.  The government calls

11   Carolyn Kelley.

12          THE COURT:  Hi, Ms. Kelley.  Would you raise your right

13   hand to be sworn?

14          Do you swear or affirm that the testimony you're about

15   to give is the truth, the whole truth and nothing but the truth?

16          THE WITNESS:  I do.

17          THE COURT:  Great.  You can put your hand down.  Would

18   you spell your full name, please, for the record.

19          THE WITNESS:  ANISSA, A-N-I-S-S-A, Caroline,

20   C-A-R-O-L-I-N-E, Machal, M-A-C-H-A-L, Kelley, K-E-L-L-E-Y.

21          THE COURT:  Thank you, Ms. Kelley.  I just want to -- I

22   advise you that the rule of sequestration has been invoked,

23   meaning that you are not to discuss your testimony with anyone

24   other than the lawyers for at least the next couple of days.  If

25   you feel the need to talk about this case or the facts of it, you

1  should consult with Mr. Kitchens and his team first.  But in the

2  interest of playing it safe, just give us your full testimony

3  today and then just don't talk about it for a few days, which

4  might be a pleasant instruction for you, actually.

5          Mr. Jones, you can go ahead and proceed with your direct

6  examination.

7          MR. JONES:  Thank you, Your Honor.

8          MR. LEACH:  One point in, we're not going to fight

9  Ms. Kelley's credentials.  We would like just a brief overview for

10  the record, but there's no need to delve deeply into her history

11  and her qualifications.  So I'll leave it to Mr. Jones to adjust

12  as he sees fit, but there is no need to spend an hour going

13  through her credentials.

14          THE COURT:  All right.  And I would say if you want to

15  put in her CV as an exhibit, that would be a good way to get

16  started and move right on.

17          MR. JONES:  Okay.  I just have a very few questions

18  about her history, no more than a couple.

19                      ******

20              ANISSA CAROLINE MACHAL KELLEY,

21       having been previously sworn, testified as follows:

22                      ******

23  DIRECT EXAMINATION

24  BY MR. JONES:

25  Q.  Ms. Kelley, where are you employed?

**A.**   The United States Food and Drug Administration's Forensics Chemistry Center which we call the FCC.

**Q.**   What is your position?

**A.**   I'm a chemist.

**Q.**   And how long have you been a chemist with FCC?

**A.**   28 years.

**Q.**   And can you describe your educational background?

**A.**   I have a Bachelors of Science degree in chemistry.

**Q.**   Do you have any specialities or areas of focus in your role as an FDA, FCC chemist?

**A.**   Yes, I do GC-MS, which is called gas chromatography-mass spectro detection.  I also do a sister technique to that which is called Headspace GC-MS, and I also do Fouier transform infrared spectroscopy, which we call FTIR.

**Q.**   Did you perform GC-MS analysis in this case?

**A.**   Yes.

**Q.**   Now, in a moment we will take a deeper dive into the step-by-step process for GC-MS analyses, but for now, could you give us the elevator pitch of how GC-MS analysis work?

**A.**   GC-MS is a technique which is a hyphenated technique.  With a gas chromatography core part, you actually separate out the components of the sample, and then when those components go into the mass spec those components are characterized.

**Q.**   And what is a mass spec?

**A.**   It's a detector which detects the masses.

**Q.**   Okay.  Are you familiar with qualitative versus quantitative testing?

**A.**   Yes.

**Q.**   Can you explain those terms for us?

**A.**   Qualitative is a technique where you're looking for an identification or just what the substance possibly could be.  And then for quantitation, once you identify the component, quantitation tells you the amount of the component.

**Q.**   Which type of test is GC-MS?

**A.**   Qualitative.

**Q.**   Do you know if the reliability of GC-MS analysis for the identification of steroids have been reviewed or tested by experts in the field?

**A.**   Yes.  You will find that throughout scientific literature.

**Q.**   Is GC-MS analysis a generally accepted technique to identify steroids within the scientific community?

**A.**   Yes.  Again, you will find that throughout the scientific literature.

**Q.**   And has GC-MS been subject to peer review and publication?

**A.**   Yes.

**Q.**   Were there any procedures that you followed in performing the GC-MS analysis in this case?

**A.**   Yes.  I followed standard operating procedure "T" as in Tom, 015, Version 4.0.

**Q.**   Could you turn to Government Exhibit 1.

**A.**   Yes, sir.

**Q.**   Do you recognize this document?

**A.**   Yes, I do.

**Q.**   What is it?

**A.**   It is our SOP T015, the general screen for drugs and poisons by GC-MS.

**Q.**   Around what is the effective of date of this version of SOP T015?

**A.**   October 22nd of 2014.

**Q.**   Was this version of the SOP in effect at the time of your analysis in this case?

**A.**   Yes.

          MR. JONES:  Your Honor, I offer this document into evidence as Government Exhibit 1.

          MR. LEACH:  No objection, Judge.

          MR. MORRIS:  No objection.

          THE COURT:  All right, it's admitted.

DIRECT EXAMINATION

BY MR. JONES (continued):

**Q.**   Ms. Kelley, directing your attention to page 9 of Exhibit 1, can you read the bolded text near the top of the page starting with Appendix A?

**A.**   Itemize for analysis of samples suspected to contain anabolic-androgenic steroids.

**Q.**   What does the phrase anabolic-androgenic steroids mean?

1  **A.**  It is a way that steroids behave in the body.

2  **Q.**  Does that phrase encompass the steroids at issue in this case?

3  **A.**  I do not recall.

4  **Q.**  Locking back at page 9 of Exhibit 1.  Can you read the first

5  sentence of the paragraph below the bolded appendix heading

6  starting with the purpose?

7  **A.**  The purpose of this appendix is to serve as a general guide

8  for the qualitative analysis of samples for the presence of

9  steroids.

10  **Q.**  What does the sentence mean?

11  **A.**  This is a general guide for possible identifications of

12  steroids in samples.

13        MR. LEACH:  Your Honor, I'm having trouble getting to

14  the right page.  I'm in Exhibit 1, but I'm not seeing page

15  numbers.  Can you help me get to the right spot?

16        MR. MORRIS:  Upper right.

17        MR. LEACH:  I'm sorry.  I see it okay.  And where are

18  you on page 9, please?

19        MR. JONES:  We were discussing the first paragraph, the

20  first sentence.

21        MR. LEACH:  Okay, okay.  I'm with you now.  Thank you.

22  DIRECT EXAMINATION

23  BY MR. JONES (continued):

24  **Q.**  Ms. Kelley, can you read the last sentence of that same

25  paragraph?

**A.**  Those steroids, and there are examples that are given, can

only be detected by LC-MS, which is in standard operating

procedure T041.  So utilizing both GC-MS and LC-MS is recommended

when analyzing the sample suspected to contain steroids.

**Q.**  And what does this sentence mean?

**A.**  That sometimes we use both techniques.  That is specifically

when there are steroids involved, when it comes to analyzing the

sample.

**Q.**  Is it part of FCC standard operating procedures to perform

both LC-MS and GC-MS testing for certain steroids?

**A.**  Yes, sir.

**Q.**  Based on your experience and this SOP, would both types of

analysis be appropriate for steroids at issue in this case?

**A.**  Yes.  It could be utilized opinion on what LC-MS saw in this

case.  If there were other components that Dr. Santos had question

about, it may be LC-MS could not detect, then they would ask for

GC-MS, yes.

**Q.**  And who is Dr. Santos?

**A.**  He is the lead analyst on this case.

**Q.**  And do you know what analysis he performed?

**A.**  LC-MS, liquid chromatography with mass spectral detection.

**Q.**  Can you tell us the main difference between GC-MS and LC-MS?

**A.**  No, because I am not proficient in LC-MS.

**Q.**  What does the "L" in LC-MS stand for?

**A.**  Liquid.

**Q.**   And what does the "G" in GC-MS stand for?

**A.**   Gas.

**Q.**   Directing your attention to the heading sample preparation on page 9 continuing through page 13, generally, what is being discussed in this section?  And I'll give you some time to look over that.

**A.**   Generally what it is discussing is the sample prep -- or I should say, the sample preps, the insurance parameters, as well as data analysis and reporting of steroids.

**Q.**   Can you summarize the step-by-step process you use in conducting the GC-MS analysis in this case?

**A.**   Yes.  In this case I received a composite of five tablets from Dr. Santos.  A composite is where you take five tablets and you ground them into a powder.  Once I received that composite, I took a half of a tablet weight.  So sometimes you have a whole tablet weight.  In this situation, I took half of a tablet weight.  Then you dilute that powder into a solvent, and then once I diluted it, I vortex and sonicate, which simply means I vibrated it into solution.

     Then I did a filtration of the sample.  And the filtrate was the input onto the GC-MS to be analyzed, which we call underivatized, meaning, as is, and then I took 40 microliters of that material and I derivatized that using a TMS derivatizing agent.  What this allows, is there are other volatilized components that maybe you wouldn't see underivatized, you would be

1  able to see derivatized and then that was put onto the GC-MS

2  system.

3  **Q.**  All right.  Are the steps you just described consistent with

4  SOP T015?

5  **A.**  Yes.

6  **Q.**  Are you familiar with the concept of setting a detection limit

7  or a quantitation limit before commencing an analysis?

8  **A.**  I am familiar with that.

9  **Q.**  Can you explain those terms?

10  **A.**  A limit of detection is just that, it limits the amount that

11  can be detected.  And quantitative limitation or an LOQ is the

12  amount of what you can see in the sample quantitatively, meaning,

13  the concentration of the sample.

14  **Q.**  Are you familiar with the concept of noise associated with not

15  setting a limit of detection?

16  **A.**  I am familiar with the concept of noise, but a limit of

17  detection -- okay, I understand what you're asking me.  I'm sorry.

18      The concept of noise would not affect our limit of detection

19  if we're asked to do a limit of detection, because a limit of

20  detection you're still going to see the peak versus the noise.

21  The noise I had to look at as grass, and then you're going to see

22  a peak which could be a bush, a tree or a redwood depending on the

23  abundance of that component.

24  **Q.**  Did you set a detection limit or quantitation limit before you

25  conducted GCM analysis in this case?

**A.**   No.

**Q.**   And why not?

**A.**   Due to the number of samples and matrices that we receive, it is usually on a case-by-case basis if we're asked to do that. Because if we did an LOD or a limit of detection every time a sample came in, we would just not be able to get the cases out the door.

**Q.**   Was noise a concern given that you did not do a detection limit?

**A.**   No, because I saw peaks.

**Q.**   Are detection or quantitation limits required under SOP T015?

**A.**   No.

**Q.**   Now, directing your attention to the heading QC elements on page 2 of Exhibit 1.

**A.**   Yes.

**Q.**   Generally, what does this section discuss?

**A.**   It discusses the QC which we utilize when preparing to use the GC-MS for analysis.

**Q.**   Can you describe some of the quality assurance and control requirements that are applicable to the testing you performed in this case?

**A.**   Yes, with -- monthly we do a -- what's called a column test mix to make sure everything is working well.  And then daily we do a standard tune to make sure the mass spec is working well. Usually you do the QA for the column within four weeks.  In the

1  first set of analysis this was done within six weeks.  However, we

2  have a daily QA which is embedded -- I should not say a daily QA,

3  a time of use QA which is embedded into our sample analysis, which

4  is called a screen check standard or we can also use a reference

5  standard if we have an idea of what is in the sample.

6  **Q.**  And you stated that we do that.  Who is responsible for that?

7  **A.**  I'm sorry, I did that.  It is the responsibility of either the

8  monitor or the person who's getting ready to utilize it, because

9  whoever the analyst is getting ready to utilize it, is proficient

10  in that technique.

11  **Q.**  And are monitors also proficient in the technique?

12  **A.**  Yes.

13  **Q.**  Are you familiar with the concept of calibrating instruments?

14  **A.**  I am familiar with that, yes.

15  **Q.**  Is calibration an aspect of the QA/QC measures for the types

16  of instruments you use in your GC-MS analysis?

17  **A.**  No. I would not say that we do calibrations, no.

18  **Q.**  Now, before you used the instruments in this case, how did you

19  know that the quality assurance and control requirements had been

20  satisfied?

21  **A.**  Based on a log book which we have that gives the information

22  as to when the column test mix had been analyzed, as well as if

23  the standard tune had been used or been done for that day.  And if

24  the standard tune had not been done for that day, that is

25  something that I would have done or if someone had utilized the

1   instrument prior to me, they would have used or that they would

2   have done, I should say.

3   **Q.**   Are the quality assurance and control responsibilities that

4   you just described, consistent with FCC standard operating

5   procedures?

6   **A.**   Yes, sir.

7   **Q.**   And all of those measures were adhered to in this case?

8   **A.**   Yes.

9   **Q.**   Was there ever an issue in this case regarding quality

10   assurance and control?

11   **A.**   No.  Other than, as I said, instead of four weeks, we did the

12   column test mix in six weeks.  But with having the daily -- or,

13   I'm sorry, I keep saying daily, I apologize for that.  With having

14   the time of use screen check standard incorporated, we take care

15   of that just in case something like that happens.  But instead of

16   four weeks, maybe it was six weeks out.

17   **Q.**   Okay.  Now, I would like to switch gears and discuss some of

18   the administrative steps associated with samples and testing.

19       Can you describe some of the administrative steps that take

20   place once a sample has been collected in the field and then sent

21   to FCC for analysis?

22   **A.**   What first happens is a request for analysis comes in, which

23   comes from either an FDA investigator or Office of Criminal

24   Investigations investigator or an OCI special agent, I should say.

25   And those requests can be anywhere from asking to look for active

pharmaceutical ingredients, quantitation, a drug and poison

screen.  And once we receive the sample into the laboratory and

then at the FCC, we decide which techniques and methodologies will

be utilized.

**Q.** And who would at FCC determine that?

**A.** It is usually our management, but it can also be if a

colleague is running a sample or analyzing a sample and they think

that another technique could assist, it would be nothing for them

to approach a supervisor, either their own supervisor or another

supervisor asking for assistance from another analyst.

**Q.** Is the agent who submitted the sample, are they involved in

that scientific process of determining what instrument or what

test to run?

**A.** No.

**Q.** And those administrative steps that you just explained, did

they hold true in this case?

**A.** Yes.

**Q.** Are you familiar with Special Agent Brian Kriplean?

**A.** I know that he was a special agent on this case.

**Q.** Now, I'd like to direct your attention to Government's Exhibit

2 and 3.

**A.** One moment, please.

**Q.** Absolutely.

**A.** Okay.

**Q.** Do you recognize these documents?

1  **A.**   Yes.

2  **Q.**   And what are they?

3  **A.**   They are e-mails from Dr. Tom Brueggemeyer to Dr. Santos and

4  myself.

5  **Q.**   Can you state the positions of those individuals you just

6  mentioned?

7  **A.**   Dr. Brueggemeyer is actually both Dr. Santos' and my

8  supervisor.  And Dr. Santos is a chemist and so am I.

9  **Q.**   What is the sent date on Exhibit 2?

10  **A.**   Monday, November the 28th, 2016.

11  **Q.**   And what is the sent date on Exhibit 3?

12  **A.**   Thursday, December the 8th, 2016.

13         MR. JONES:  Your Honor, I offer Government's Exhibit 2

14  and 3 into evidence.

15         MR. LEACH:  No objection, Your Honor.

16         THE COURT:  All right.  They're admitted.

17  DIRECT EXAMINATION

18  BY MR. JONES (continued):

19  **Q.**   Now, let's first take a look at Exhibit 2.  Can you summarize

20  what's being discussed in this e-mail?  And you can take a moment

21  to look this over.

22  **A.**   Yes.  This is where Dr. Brueggemeyer is stating that we are

23  going to bring GC-MS into the analysis of these products, that he

24  had spoken with SA Kriplean, and also they had discussed a

25  possible grand jury date.

**Q.** Is there a mention of unknown peaks in this e-mail?

**A.** Yes.

**Q.** What -- can you explain what an unknown peak is?

**A.** What that means is that via LC-MS, that Santos saw a peak which he could not identify by LC-MS, and he wanted to know -- he wanted someone in GC-MS to look at that sample to see if those peaks could be identified.

**Q.** Who made the decision to conduct the additional GC-MS testing?

**A.** That would be in a discussion between Dr. Santos and Dr. Brueggemeyer.  And apparently, Dr. Brueggemeyer also spoke with SA Kriplean concerning that.

**Q.** Do you know who had the ultimate authority to make that decision?

**A.** It would have been Dr. Brueggemeyer.

**Q.** Based on your experience, have there been other instances where both LC-MS and GC-MS analysis were done with respect to the same samples?

**A.** Yes.

**Q.** And based on SOP T015 that we discussed earlier, is that consistent with the standard operating procedure?

**A.** Yes.

**Q.** Now, directing your attention to the last sentence in this e-mail that starts with if GC-MS.  What does this sentence mean to you?

**A.** What that means is if I did not find anything via GC-MS that

1  was of interest or any new active pharmaceutical ingredient or

2  API, then we would be finished with the analyses by GC-MS.

3  **Q.**  Now, let's turn to Exhibit 3, and directing your attention to

4  the paragraph labeled one.  Can you take a moment to look over

5  that and then provide a summary for us?

6  **A.**  The paragraph prior to "we agree to"?

7  **Q.**  The paragraph after that one that starts with one.

8  **A.**  Okay.

9      What Dr. Brueggemeyer is -- you asked me to summarize; is that

10  correct?  I'm sorry.

11  **Q.**  Yes, please.

12  **A.**  Okay, okay.  Dr. Brueggemeyer is explaining that there were

13  minor Schedule III steroids that were being found in the sample,

14  and that we would use reference standards to identify those

15  components.  And once those were confirmed, he wanted to make sure

16  that there was no interconversion taking place within the GC-MS

17  instrumentation.  And he said that -- that we could not determine

18  why -- if there were low levels there, which he had said earlier.

19  We can't tell why they were there, were they through -- added

20  intentionally, impurities, or cross-contamination -- and

21  cross-contamination.

22  **Q.**  Okay, I'm going to ask you a few follow-up questions so we can

23  sort of unpack all of this.

24  **A.**  I'm sorry.

25  **Q.**  No, no, you did excellent.

1      What is a reference standard?

2 **A.**  A reference standard is a standard which we would purchase

3 either commercially, and once in a while you may have to make it

4 in-house.  But either way you do that, you have a certificate of

5 analysis saying that that standard is what it says it is.

6 Meaning, if -- say you have a standard of acetaminophen that you

7 purchased from a commercial company, then you would receive a

8 certificate of analysis for that acetaminophen showing that it

9 truly is acetaminophen.

10 **Q.**  And can you also tell us what interconversion taking place in

11 the GC-MS instrumentation means?

12 **A.**  Dr. Brueggemeyer was concerned or wanting to know if there was

13 any way that once the sample was injected into the GC-MS, if the

14 larger steroids could be converted to another steroid.

15 **Q.**  And ultimately, were you able to determine whether this was an

16 issue or not?

17 **A.**  I was able to determine that it was not an issue.  I had

18 analyzed the standards, and based on how the standards behaved

19 that was not an issue.

20 **Q.**  Is it possible for FCC to determine whether the -- actually,

21 let me ask one question before this one.

22      Were Schedule III steroids detected in the samples in this

23 case?

24 **A.**  Yes.

25 **Q.**  Is it possible for FCC to determine whether those Schedule III

1  steroids were added intentionally or were the result of

2  impurities, such as cross-contamination?

3  **A.**  No.  We're simply here to give the results of what the

4  evidence shows scientifically.

5  **Q.**  Do the quality control and assurance responsibilities that we

6  discussed earlier sort of combat the possibility of

7  cross-contamination?

8  **A.**  Yes.

9          MR. LEACH:  Objection.  Objection.  I didn't understand

10 the question.  Did you say combat?

11         MR. JONES:  Yes.

12         MR. LEACH:  Could you rephrase it just so I can hear the

13 question once again, please?

14         MR. JONES:  Sure.

15 DIRECT EXAMINATION

16 BY MR. JONES (continued):

17 **Q.**  Do the quality and assurance responsibilities that we

18 discussed earlier work to prevent cross-contamination?

19         MR. LEACH:  Okay.  Thank you.  Go ahead and answer,

20 Ms. Kelley.

21 **A.**  Cross-contamination within the sample, yes.  There is -- that

22 is correct, we would -- if there had been any cross-contamination

23 with -- in the sample that I had done by GC-MS, is that what

24 you're asking?

25 **Q.**  Correct.

**A.**   I'm sorry.  I would have been able to see that if I had done anything, because we keep our samples isolated from one another. So there wouldn't have been any cross-contamination possible because of how I store my samples.

**Q.**   Okay.  And is it the role of FCC to determine whether a substance was added intentionally or not?

**A.**   No, it is not our role.

**Q.**   Now, I'd like to direct your attention to Exhibit 4.

**A.**   Okay.

**Q.**   Do you recognize this document?

**A.**   Yes, I do.

**Q.**   What is it in?

**A.**   It is a telephone log between SA Kriplean, Dr. Santos and myself.

**Q.**   And what is the telephone log dated?

**A.**   January the 18th, 2017.  I'm sorry, I'm sorry, January the 18th.  I don't know whether I said June.  I apologize.  January the 18th, 2017.

**Q.**   And did you electronically sign this document?

**A.**   Yes, I did.

MR. JONES:  Your Honor, I offer Government's Exhibit 4 into evidence.

MR. LEACH:  No objection.

THE COURT:  All right, it's admitted.

DIRECT EXAMINATION

BY MR. JONES (continued):

**Q.**  Can you summarize what's being discussed in Exhibit 4?

**A.**  Yes.  We were asking if any schedule -- if any of the Schedule III steroids are detected at trace levels, do we need to quantitate those steroids, and --

**Q.**  I'm sorry.  You can go ahead and finish.

**A.**  And SA Kriplean said no.

**Q.**  Now, you previously explained the difference between qualitative and quantitative analysis.  And now could you explain the timing of these analyses if both are conducted?  For example, does one precede the other, are they done at the same time?

**A.**  Identification or qualitative analysis is done or performed most of the time before a quantitative analysis.  So identification is needed before you know want to quantitate.

**Q.**  Based on your experience, are there instances where qualitative testing is conducted but quantitative testing is never conducted?

**A.**  Yes.

**Q.**  And do you know if quantitative analysis was performed at some point in this case?

**A.**  Yes.

**Q.**  Now --

THE COURT:  Wait.  Do you know that or did it happen? The answer was unclear.

THE WITNESS:  I know that quantitative analysis was

1  conducted sometime in this case, here at the Forensics Chemistry

2  Center.

3  DIRECT EXAMINATION

4  BY MR. JONES (continued):

5  **Q.**  Now I'd like to discuss some of the reports in this case, and

6  so I'd like you to turn to Exhibits 5, 6, 7, 8 and 9.

7  **A.**  Okay.

8  **Q.**  Do you recognize these documents?

9  **A.**  Yes, these are case sample summary reports.

10  **Q.**  And for each document, could you state the exhibit number, the

11  date and the FACTS number.

12  **A.**  Exhibit 5 is January the 30th, 2017 date, and the FACTS number

13  is 984260.  Is that all you're needing; is that correct?

14  **Q.**  Yes, that was perfect.

15  **A.**  Okay.  Exhibit 6, the date is January the 30th, 2017, the FDA

16  FACTS number 984276.

17      Exhibit 7 is from July the 17th, 2018, FACTS number 984260.

18      Exhibit 8 is dated July the 17th, 2018, FDA FACTS number

19  984276.

20      And Exhibit 9 is dated July the 17th, 2018, FDA FACTS number

21  1022792.

22          MR. JONES:  Your Honor, I offer Government's Exhibits 5,

23  6, 7 8 and 9 into evidence.

24          MR. LEACH:  No objection, Your Honor.

25          THE COURT:  All right.  They're admitted.

```
1   DIRECT EXAMINATION

2   BY MR. JONES (continued):

3   Q.  Now, let's start with Exhibit 5, and take a minute to kind of

4   get oriented with the layout of the report.

5       What is a FACTS number?

6   A.  A FACTS number is a number which is the FDA gives internally

7   to a sample that comes into the laboratory.

8   Q.  And what makes up the FACTS number for this report?

9   A.  For Exhibit 5 it is FACTS number 984260.

10  Q.  Could you state the item number and product name of the

11  samples that comprise this FACTS number?

12  A.  Item one was Androdiol.  Item two -- I'm sorry, one moment

13  please -- was 1-AD, and item three was 1-Testosterone.

14  Q.  When were these samples received?

15  A.  On October the 19th, 2016.

16  Q.  And so once samples are categorized into separate items and

17  assigned a FACTS number, does that FACTS number stay the same even

18  if further testing is done at some future date?

19  A.  That is correct, yes.

20  Q.  Now, if you could flip over to the second page of the report.

21  The signatures at the bottom of page 2, what do these signatures

22  represent?

23  A.  It represents the portion of the document that you are in

24  charge of or that you performed.  Meaning -- go ahead.

25  Q.  You can finish with your answer.
```

1   **A.**   Meaning -- like for me, Section 668, which would be part of my

2   workpapers, my section is -- I have the number 668, and so I'm

3   signing that I agree with the CSSR based on what is written here,

4   based on what I have in my section.

5            MR. LEACH:  I didn't catch CSSR.  If she could identify

6   that for us?

7            THE WITNESS:  I apologize.  It's the case sample summary

8   report.  The acronym is CSSR.

9    DIRECT EXAMINATION

10  BY MR. JONES (continued):

11  **Q.**   And that's the document that we're looking at now; is that

12  right?

13  **A.**   That is correct.

14  **Q.**   Now, can you explain what types of analyses were performed and

15  reflected in this report?

16  **A.**   Based on the analytical tests performed on samples found in

17  the document, the two techniques were liquid chromatography-mass

18  spectrometry, LC-MS, and gas chromatography-mass spectrometry,

19  GC-MS.

20  **Q.**   And which, if any, analysis did you perform?

21  **A.**   I performed GC-MS.

22  **Q.**   Now, directing your attention to the chart on page 2 two under

23  the heading steroids identified, did the GC-MS analysis that you

24  conducted detect any Schedule III steroids?

25  **A.**   Yes.

1  **Q.**   For which item?

2  **A.**   For item two.

3  **Q.**   And which steroid was detected?

4  **A.**   Androstenedione.

5  **Q.**   Now, looking at the notes below -- below the chart.  The note

6  beside superscript 23, can you explain that note to us?

7  **A.**   Under experimental conditions that were utilized during this

8  time, we can could not differentiate the 4-androsten-3ß-01-17-one

9  or the 1-androsterone or the 4-androstanediol and/or the

10  5-androstanediol based on the experimental conditions used by

11  LC-MS and GC-MS.

12  **Q.**   Can you explain to us in kind of everyday terms?

13  **A.**   Sometimes there are components which are very similar to each

14  other, and based on our normal screening processes, you may not be

15  able to differentiate those components because their

16  characteristics are so similar to one another.

17  **Q.**   And --

18          THE COURT:  And, ma'am, what page are we on Exhibit 5,

19  please?

20          MR. JONES:  We're on page 2.  And we're looking at the

21  chart, and there's the superscript below the chart starting with

22  the 23.

23          THE COURT:  Which are the footnotes?

24          MR. JONES:  Yes.

25          THE COURT:  Okay.  Thank you.

1    DIRECT EXAMINATION

2    BY MR. JONES (continued):

3    **Q.**  Was that -- was that note applicable to any item in this

4    report?

5    **A.**  Yes.

6    **Q.**  And which one with respect to Schedule III steroids?

7    **A.**  Oh, no.

8    **Q.**  So looking at item one, was the footnote applicable there?

9    **A.**  To Schedule III steroids or --

10   **Q.**  Correct.

11   **A.**  No.

12   **Q.**  So in this chart, are we able to determine which substances

13   are Schedule III steroids?

14   **A.**  Yes.  It -- they are the substances that have the superscript

15   of four.

16   **Q.**  And with respect to the -- the footnote that's labeled 23, are

17   there any instances where that three footnote is also applicable

18   to or next to the superscript four indicating -- which indicates

19   that it's a Schedule III steroid?

20   **A.**  Yes.

21   **Q.**  And for which -- for which steroids?

22   **A.**  4-androstanediol and 5-androstanediol.

23   **Q.**  And so is there a -- are any items identified with respect to

24   that section of the report?

25   **A.**  Yes, via LC-MS.

**Q.** And which item was identified?

**A.** Item one.

**Q.** Okay.  Now let's turn to Exhibit 7.

**A.** Okay.

**Q.** Can you describe the relationship between this report and the one we just looked at in Exhibit 5?

**A.** Yes.  This report was specific for additional -- additional report, which included further quantitative and quantitative analysis with a confirmation determination of DA Schedule III steroids -- steroid, excuse me, previously described in the original report.

**Q.** And is this the same FACTS number as Exhibit 5?

**A.** Yes.

**Q.** Now, looking at the bolded note for the top of the page of Exhibit 7, can you read that note aloud?

**A.** A report dated January the 30th, 2001, was sent to SA Brian C. Kriplean.  The current additional report includes further quantitative and qualitative analysis for the confirmation, determination of DEA Schedule III steroids previously described in the original report.

**Q.** And what does this note mean?

**A.** We did additional analyses looking for possible Schedule III steroids, qualitatively and quantitatively.

**Q.** Can you tell us what analysis was conducted on the specific items?

**A.**   Items one, two, and three were further analyzed using GC-MS,
and high performance liquid chromatography with ultraviolet
detection was also utilized, I believe, for items one, two and
three as well.

**Q.**   Now, focusing on item one.  If you could --

**A.**   I'm sorry, let me back up, if I may.  It looks like it was
and/or these items were looked at either by GC-MS and some of them
may have been looked at both by GC-MS and LC-UV, but maybe not all
of them were.

**Q.**   And so perhaps if you direct your attention to the results and
conclusions.

**A.**   Yes.

**Q.**   And so does this section explain what items were analyzed
using GC-MS?

**A.**   Yes.

**Q.**   There is a parenthetical after that GC-MS.

**A.**   Yes, item one.

**Q.**   Okay.  So only item one was analyzed using GC-MS; is that --

**A.**   That is correct.

**Q.**   Okay.

**A.**   Yes.

**Q.**   And then items one, two and three were analyzed using HPLC-UV;
is that correct?

**A.**   That is correct, yes.

**Q.**   Do you know why GC-MS analysis was only conducted on item one?

1  **A.**  Yes, because item one was the only item in which the question

2  came into play as to whether or not it was 4-androstanediol or for

3  5-androstanediol.

4  **Q.**  And that's reflected in Exhibit 5 that we just discussed; is

5  that right?

6  **A.**  That is correct.

7  **Q.**  Now, can you explain to us how GC-MS was able to differentiate

8  between the steroids for item one in this July 2018 report, but

9  not the first round in January of 2017?

10  **A.**  Yes.  It's due to the parameters that were utilized.  I

11  used -- I slowed down my ramp which is -- I allowed the components

12  to stay on the column longer.  So, therefore, I was able to

13  separate out the 4- and 5-androstanediols, whereas before the ramp

14  was faster which is our normal screen to look at active

15  pharmaceutical ingredients, drugs, poisons, that type of thing,

16  look at steroids, but in this case I slowed it down so I was able

17  to separate them out.

18  **Q.**  Is this slowing down that you mentioned consistent with FCC

19  standard operating procedures?

20  **A.**  Yes.

21  **Q.**  And who was in charge or who made the decision to retest and

22  slow down the testing in the way that you did?

23  **A.**  Dr. Brueggemeyer.

24  **Q.**  Now, let's take a look at Exhibit 6.

25  **A.**  Okay.

**Q.**   And what's the FACTS number here?

**A.**   984276.

**Q.**   And what items and samples comprise this FACTS number?

**A.**   Item one is Equibolin, item two is Superdrol, item three is Dianabol, item four is Decabolin, item five is Arimiplex.

**Q.**   And what analysis, if any, did you perform on these items?

**A.**   I performed GC-MS.

**Q.**   And did the GC-MS analysis detect any Schedule III steroids?

**A.**   No, it did not.

**Q.**   Did the differentiation issue that we discussed and as noted in footnote 23, did that exist for any items in this -- on this report?

**A.**   Yes, for item one.

**Q.**   Okay.  Now --

**A.**   And I'm sorry, one moment, please.  Okay, go ahead.  I'm sorry.

Yes, it was for item one, item two and item three.  There were components that could not be differentiated via LC-MS or GC-MS.

**Q.**   And of those, which one was associated with Schedule III steroids?

**A.**   The 4-androstanediol and the 5-androstenediol.

**Q.**   And is that only for item one?

**A.**   Yes.

**Q.**   Okay.  And now let's go on to Exhibit 8.

**A.**   Okay.

**Q.** Can you describe the relationship between this report and the one we just looked at in Exhibit 6?

**A.** Yes.  This report is an additional report for further qualitative and quantitative analysis for the confirmation determination of the DEA Schedule III steroids previously described in the original report.

**Q.** And does this share the same FACTS number as Exhibit 6?

**A.** Yes.

**Q.** And here again, can you describe what testing was conducted on which items?  And it may help you if you looked at the results and conclusions portion.

**A.** GC-MS was utilized to look at item one.

**Q.** And was GC-MS only conducted on item one?

**A.** Because those components were observed or one or the other was observed using LC-MS in that item, in item one.

**Q.** And so is the -- is this second round of GC-MS testing after LC-MS testing already had been conducted, is that consistent with FCC standard operating procedures?

**A.** Yes.

**Q.** And who was in charge of making the decision to conduct a GC-MS testing?

**A.** Dr. Brueggemeyer.

**Q.** And finally, directing your attention to Exhibit 9.  Can you tell us the FACTS number for this report?

**A.** 1022792.

1  **Q.**  So prior to this report, had there been any GC-MS testing on

2  the samples in this FACTS number?

3  **A.**  No, not that I -- not that I'm aware of, no.  I had not done

4  GC-MS analysis, so no.

5  **Q.**  Okay.  Can you describe what analysis was conducted on which

6  items in this report?

7  **A.**  Items one, two, and three.

8  **Q.**  Looking at -- toward the middle of the page under the heading,

9  the second heading analytical tests performed on samples, could

10  you take a moment to look over that first sentence.  Well, it's

11  only one sentence.

12  **A.**  Neither 4-androstanediol nor 5-androstanediol were identified

13  under the experimental condition used, and based on the GC-MS

14  retention time mass spectrometry to reference standards.  In the

15  previous report a component of item four was reported as being

16  4-androstanediol and/or 5-androstanediol.

17        MR. LEACH:  D'Juan, were you referring her to Roman II?

18        MR. JONES:  Yeah, we're working through it now.

19  DIRECT EXAMINATION

20  BY MR. JONES (continued):

21  **Q.**  Ms. Kelley, directing your attention -- I'm sorry if I wasn't

22  clear --

23  **A.**  I'm sorry.

24  **Q.**  -- to Roman II?

25  **A.**  Yes, yes.

**Q.**   That was the section I was referring to.  Apologies if I wasn't clear.

**A.**   I'm sorry, I thought you meant under the table.

Items one, two, three and four were further analyzed using GC-MS and high performance liquid chromatography with ultraviolet detection.

**Q.**   And why was the GC-MS employed -- or why was GC-MS used for items one, two, three and four?

**A.**   To differentiate between the isomers, 4-androstenediol and 5-androstenediol.

**Q.**   Do you know if previous LC-MS testing had been conducted on these items?

**A.**   I do not have that information in front of me.

**Q.**   Looking at that same paragraph, is it fair to say that some sort of testing had been conducted previously and described in the report dated September 14, 2017?

**A.**   Yes.

**Q.**   And so essentially, these items were being tested again using GC-MS; is that right?

**A.**   That is correct.

**Q.**   Was that sort of retesting consistent with FCC standard operating procedures?

**A.**   Yes.

**Q.**   And do you know who would have been in charge for making the decision to retest using GC-MS?

**A.**   Dr. Brueggemeyer.

**Q.**   And could you walk us through the results of the GC-MS analysis?  And I believe it would just be that first --

**A.**   I was going to say just one moment because I need to see what the NQ and the NN, I need to refamiliarize myself.  I'm sorry.

**Q.**   Go ahead.

**A.**   I'm sorry.  4-androstanediol was identified in items one, two, and three --

**Q.**   Can you --

**A.**   -- based on GC-MS.

**Q.**   Can you tell us what the NQ stands for?

**A.**   Not quantified.

**Q.**   And what does that mean?

**A.**   Under the experimental conditions used, quantitative analysis was not feasible due to coelution issues with other components present in the sample.

**Q.**   So would that have been associated with GC-MS testing or another type of testing?

**A.**   That would have been the HPLC-UV testing.

**Q.**   And what does NN stand for?

**A.**   Neither 4-androstanediol nor 5-androstanediol were identified under the experimental conditions used, and based on -- based on the GC-MS retention time and mass spectral metric comparison to reference standards; meaning, that I analyzed that item against both the 4- and 5-androstenediol reference standards.  And neither

1  one of those were identified under the experimental conditions

2  utilized by GC-MS.  And in the previous report based on what NN

3  means in this report, a component of item four was reported as

4  being 4-androstanediol and/or 5-androstanediol.

5           MR. JONES:  If I could just have one second, Your Honor.

6           THE COURT:  Sure.

7           MR. JONES:  I have nothing further for this witness,

8  Your Honor.

9           THE COURT:  All right.  Mr. Leach.

10          MR. WENIK:  Can we take a restroom break for five

11  minutes, if appropriate?

12          THE COURT:  I was going to take a break at 10:30.  Do

13  you want to take a break now, Art?

14          MR. LEACH:  Bruce is going to go first, Judge, but I'm

15  good.

16          THE COURT:  All right.  We'll take a break now.  We'll

17  come back at 10:30.

18          (Whereupon a break was taken.)

19          THE COURT:  I'll leave it to Mr. Morris for

20  cross-examination.

21  CROSS-EXAMINATION

22  BY MR. MORRIS:

23  Q.  Ms. Kelley, I'm Bruce Morris.  I represent Jared Wheat, and

24  forgive me, I did not pass chemistry when I took it.  So some of

25  my questions may be pretty basic.  You may have to help me out.

1  Is that okay?

2  **A.**  That is fine.  I'll do my best as well.

3  **Q.**  Okay.  Let's start with Government's Exhibit 2, please, ma'am.

4  Thomas W. Brueggemeyer, what is his position at FCC?

5  **A.**  Dr. Brueggemeyer is a Ph.D. and he is my supervisor.

6  **Q.**  Okay.  Does he also supervise Dr. Santos?

7  **A.**  Yes, he does.

8  **Q.**  All right.  In Exhibit No. 2, he makes reference to some

9  testing that has already occurred; is that right?

10  **A.**  One moment, please.  Yes, that is correct.

11  **Q.**  Okay.  What is the date of that testing?

12  **A.**  I do not know.

13  **Q.**  And who conducted those tests?

14  **A.**  Dr. Santos did liquid chromatography with mass spectral

15  detection.

16  **Q.**  Okay.  And is there a report from that test?

17  **A.**  Yes.  I believe those are the reports that are listed as

18  984260 -- I'm sorry, FACTS numbers 984260 and 984276.  Are those

19  the ones you're referring to, sir?

20  **Q.**  The reason I'm asking is, those reports are dated

21  significantly after this e-mail.

22       So what tests were performed before November 28, 2016, if you

23  know?

24  **A.**  One moment, please.  I need to look at the exhibits.

25  **Q.**  Sure.

1   **A.**   Based on the case sample summary reports, the CSSRs for FACTS

2   984260, 984276 that I have in front of me, which are Exhibits 5,

3   6, 7 and 8, we received those products on October the 19th, 2016,

4   and with Dr. Brueggemeyer's e-mail, an analysis must have taken

5   place prior to that, between October the 19th and November the

6   28th of 2016.

7   **Q.**   Do you have any report showing the results of the testing that

8   was done that Dr. Brueggemeyer refers to in Government Exhibit 2?

9   **A.**   Yes.  Exhibits 5, 6, 7 and 8 refers to --

10  **Q.**   Do you -- I'm sorry, go ahead.

11  **A.**   Those show the techniques that we utilized.  I'm sorry, go

12  ahead, sir.

13  **Q.**   Even those reports are dated in January of 2017 and September

14  of 2017, you believe those relate back to this e-mail?

15  **A.**   Before we continue, do you mind if we take just one moment,

16  since I have been looking at the reports, to make sure I have the

17  exhibits correct?  May we do that, sir?

18  **Q.**   You certainly may.  And while you're looking, would you see if

19  you have any written report that predates January 30, 2017.

20  **A.**   I do not.  I know I do not have any report that predates that.

21  However -- go ahead.

22  **Q.**   So if testing was done prior to January of 2017, that Dr.

23  Brueggemeyer is referring to, there is no written report of that;

24  correct?

25  **A.**   That is what these case sample summary reports are.  The

1 analyses can take place over a period of time, and so with Dr.

2 Brueggemeyer's e-mail, that would have happened somewhere in

3 between of when the sample was checked out, analysis was performed

4 before -- and then if additional analyses were needed, and then

5 once everything was concluded at that time, then the CSSR would

6 have been written.

7 **Q.** The CSSR was not written until January of 2017; correct?

8 **A.** That is correct for two of the exhibits that I have.

9 **Q.** All right.  Those are the two earliest dated exhibits that you

10 have?

11 **A.** Yes.

12 **Q.** All right.  And you are assuming or do you know that those

13 exhibits that begin January 30, 2017, are indeed the tests that

14 Dr. Brueggemeyer is discussing in Government's Exhibit 2 or do you

15 know if there was an earlier test?

16 **A.** All that I know is that in the e-mail he's speaking of, he's

17 speaking of GC-MS.

18 **Q.** Did you -- is the first GC-MS test that was done January of

19 2017?

20 **A.** It was not performed on that date.  That's just when the case

21 sample summary report was written.

22 **Q.** When was it done?

23 **A.** I do --

24 **Q.** You talked about crushing pills and filtration and the tests

25 that you read GC-MS, what is the date of the test that you ran?

1  **A.**  I do not recall.  That would be in my workpapers which I do

2  not have in front of me.

3  **Q.**  Okay.  So it's your assumption that Dr. Brueggemeyer is

4  referring to the tests that you ran but the report was not done

5  until January?

6  **A.**  That is correct.

7  **Q.**  Okay.  Is that standard procedure to wait so long, months

8  after the testing is completed to prepare a report?

9  **A.**  It's -- that is not unusual, no.

10  **Q.**  Okay.  Let's look at Government's Exhibit 2.

11         THE COURT:  Real quick, ma'am, you said you needed a

12  minute to look at the exhibits.  Do you still need that time?

13         THE WITNESS:  Yes, I would appreciate it.  I don't know

14  if they got mixed up.  So I want to make sure, so if I may have

15  someone confirm for me.

16         MR. MORRIS:  Go right ahead.

17         THE WITNESS:  Exhibit 5 is January the 30th, 2017,

18  984260?

19         MR. MORRIS:  That's Exhibit 5?

20         THE WITNESS:  Yes, is January 30, 2017, 984260.

21         MR. JONES:  That's correct.

22         THE WITNESS:  Okay.  Is Exhibit 6 July the 17th, 2018,

23  984276?

24         MR. JONES:  No.  So Exhibit 6 is January 30, 2017.

25         THE WITNESS:  Okay.  Exhibit 6 is January 30, 2017,

1   984276?

2           MR. JONES:  Correct.

3           THE WITNESS:  Okay.  Is Exhibit 7, July 17, 2018,

4   984260?

5           MR. JONES:  Correct.

6           THE WITNESS:  And is Exhibit 8 July the 17th, 2018,

7   984276?

8           MR. JONES:  Correct.

9           THE WITNESS:  All right.  Thank you.

10           THE COURT:  Sure.  Now that you've clarified that, do

11   you want to change any of your testimony?  I really wasn't

12   following when you thought you might have gotten confused.

13           THE WITNESS:  Based on what Mr. Morris asked, no, I'm

14   fine.

15           THE COURT:  Thank you.

16           THE WITNESS:  I can say that without seeing the

17   exhibits.

18           THE COURT:  Thank you.  Mr. Morris.

19   CROSS-EXAMINATION

20   BY MR. MORRIS (continued):

21   Q.  As best you know, there are no test results in any report that

22   predate January of 2017?

23   A.  All of the test results would predate January 30, 2017 for

24   Exhibits 5 and 6.

25   Q.  All right.  And at the time that Government's Exhibit 2 was

1  written, there were no written reports; correct?

2  **A.**   That is correct.

3  **Q.**   Okay.   And in Government Exhibit 2, Dr. Brueggemeyer is saying

4  that no anabolic steroids had been detected at that point;

5  correct?

6  **A.**   No, he said that there were steroids in the sample,

7  non-scheduled, you are correct, as well as --

8  **Q.**   Non-scheduled?

9  **A.**   Yes.

10  **Q.**   Okay.   And he had spoken with Special Agent Kriplean earlier

11  that day?

12  **A.**   That is correct, yes.

13  **Q.**   And reference is made to a December 13 grand jury date, so you

14  folks obviously knew this was a criminal case and evidence was

15  needed to present to a grand jury on December 13?

16  **A.**   Yes.

17  **Q.**   All right.   Were you aware prior to that time that this was a

18  criminal matter based on the fact that it was Special Agent

19  Kriplean of OCI?

20  **A.**   Yes.

21  **Q.**   And if I understand the e-mail, you tell me if I'm correct,

22  that there are some -- whoops, I dropped all my papers.   Sorry.

23  That's going to slow me down a bit.

24       Correct me if I'm wrong, that Agent Kriplean and Dr.

25  Brueggemeyer agreed to do additional testing, GC-MS?

**A.**   Yes.  Based on this e-mail, yes.

**Q.**   And Dr. Brueggemeyer says that you have informed him that there are some unknown peaks; is that correct?

**A.**   No, that was not my analyses.

**Q.**   Somebody's analysis?

**A.**   That is correct.  Not mine.

**Q.**   What are unknown peaks?

**A.**   Knowledge unknown peaks would be something in this situation the LC-MS could not identify, could not -- using that technique. So Dr. Brueggemeyer decided that he would like to look at the sample using GC-MS.

**Q.**   All right.  And you said there are possibly APIs.  What is an API?

**A.**   Active pharmaceutical ingredient.

**Q.**   At this point --

**A.**   Meaning, like --

**Q.**   Go ahead.

**A.**   You have Tylenol, acetaminophen would be the active pharmaceutical ingredient of Tylenol.

**Q.**   Again, a non-scheduled -- a non-scheduled item?

**A.**   It can either be an over-the-counter or scheduled.

**Q.**   At this point we don't know; right?

**A.**   That is correct.

**Q.**   Now, reference is made here to a tentative ID.  Is that a term of art, tentative ID?

1  **A.** One moment.  Tentative ID, in reading the e-mail, what Dr.

2  Brueggemeyer is speaking of is if -- once an analysis is done by

3  GC-MS, we have this huge database of around 500 -- 300 to 500,000

4  compounds.  So you do a search of the peak, and that gives you an

5  idea of maybe what you're dealing with.  So that would be a

6  tentative identification, but we would follow it up with a true

7  identification by running a reference standard of that component.

8  **Q.** And a true identification, is that a term of art as well?

9  **A.** No, I probably should just say an identification.  A tentative

10 identification would be a library match, and an identification

11 would be using a reference standard.

12 **Q.** Okay.  And Dr. Brueggemeyer reports to you that he is going to

13 get back to Agent Kriplean after you folks have done the GC-MS to

14 see if you find anything of interest; correct?

15 **A.** He said, yes, he will let him know where we stood with that

16 analysis.

17 **Q.** And if nothing was found, that would be it?

18 **A.** That is correct.

19 **Q.** Okay.  The next activity, and you tell me -- there is the

20 December 8, 2016, e-mail.  Is that your Government 3?  I have a

21 different number on mine.  I think that's Government 3.

22 Government 3, that is a December 8, 2016 e-mail from Dr.

23 Brueggemeyer to you and to Dr. Santos?

24 **A.** Yes.

25 **Q.** Okay.  And he reports that he has spoken with Special Agent

1  Kriplean again; yes?

2  **A.**   Yes.

3  **Q.**   And Agent Kriplean has spoken to the prosecutor?

4  **A.**   That is -- yes, that is correct.

5  **Q.**   And now you no longer have this December grand jury deadline

6  so you have more time; yes?

7  **A.**   Yes.

8  **Q.**   Okay.  And at this point in time, again, there is no written

9  report that we are aware of; correct?

10 **A.**   That is correct.

11 **Q.**   Okay.  And Dr. Brueggemeyer says he agrees with Agent Kriplean

12 to identify with standards the three minor Schedule III steroids

13 being found in the samples?

14 **A.**   That is correct, yes.

15 **Q.**   Okay.  And let me go back to the very first line of this.  Dr.

16 Brueggemeyer says he spoke with Kriplean on December 8, 2015.  You

17 figure that's a typo, that that's supposed to be 2016?

18 **A.**   Yes, I do.

19 **Q.**   Okay.  All right.  So there are three minor Schedule III

20 steroids found?

21 **A.**   Yes.

22 **Q.**   And that's a possibility that these could be the result of

23 chemical interconversion he states; is that right?

24 **A.**   Yes, he was -- yes.

25 **Q.**   Okay.  By the way, what is a minor Schedule III steroid?

**A.**   Trace amount.

**Q.**   Trace amounts.  Okay.  And by trace, tell us what you mean?

**A.**   Meaning, that it is smaller than the largest peak within the chromatogram.

**Q.**   Okay.  Go ahead, I'm sorry.

**A.**   Go ahead.  You're fine.

**Q.**   Smaller than other peaks?

**A.**   Yes, in the chromatogram.

**Q.**   At this point do you know what the other peaks are?

**A.**   I would need to see my workpapers.

**Q.**   So the answer is -- right now the answer is you don't know?

**A.**   Yes.  I do not recall.

**Q.**   All right.  He -- he also states that he told Kriplean, and I presume this information came from you and Dr. Santos, that FCC can't tell whether these low-level components were added intentionally or were the result of impurities; correct?

**A.**   That was not discussed with me.

**Q.**   Okay.  But he does say that?

**A.**   Yes.

**Q.**   All right.  Am I correct that you still can't tell after all of your testing whether these were intentionally added or not?

**A.**   Correct.

**Q.**   Okay.  Now these other peaks, is it fair to say that they were not controlled substances?

**A.**   I would need more direction or to look exactly at the CSSR.

1   **Q.**   Be my guest.

2   **A.**   Okay.   Thank you.

3   **Q.**   Of course at this point in time there were no CSSRs?

4   **A.**   That is correct.   It would have been a conversation that he

5   would have had with Dr. Santos and/or me, but based on what I am

6   seeing here in the CSSR, that's Exhibit 5, Dr. Santos says that

7   the Schedule IV were not found to be the most predominant steroids

8   in the sample.   So he found other steroids, the two -- the

9   4-androstenediol and the 5-androstenediol, androstanedione and

10  androstenedione.

11  **Q.**   At this point in time it was undetermined, correct, in

12  December of 2016?

13  **A.**   The minor steroids were not identified.   But I do not

14  know -- I cannot recall, because I don't have my papers in front

15  of me, as to whether or not the most predominant peaks were

16  identified.

17  **Q.**   All right.   And according to Dr. Brueggemeyer, whether the

18  low-level components were added intentionally or not, Agent

19  Kriplean said it didn't matter?

20  **A.**   That is correct.

21  **Q.**   Dr. Brueggemeyer goes on to say that you will attempt to

22  identify the major steroid components of each sample; correct?

23  **A.**   Yes.

24  **Q.**   Some might be scheduled, some might not?

25  **A.**   That is correct.

1   **Q.** And according to Dr. Brueggemeyer, Agent Kriplean said even

2   the unscheduled ones were not permitted in supplements; correct?

3   **A.** The unscheduled designer steroids.

4   **Q.** Are you familiar with DHEA?

5   **A.** I have analyzed DHEA, but that's as far as I can go.

6   **Q.** Is it scheduled -- is it a scheduled item?

7   **A.** I do not know.

8   **Q.** Are you aware that in 2016 it was exempted by Diageo?

9   **A.** Okay.

10  **Q.** Are you aware of that?

11  **A.** I was not aware of that, no.

12  **Q.** Do you know if Agent Kriplean and Dr. Brueggemeyer discussed

13  that?

14  **A.** I do not know.

15  **Q.** It was not discussed with you?

16  **A.** That is correct, it was not discussed with me.

17  **Q.** All right.  There is a reference to interconversion.  Can you

18  tell us what that is?

19  **A.** Meaning converting from one component to another.

20  **Q.** And can that happen during testing?

21  **A.** It can, but we have protocols in place to try to determine if

22  that is going to take place, meaning, I confirmed my samples.  I

23  analyzed them against reference standards, and based on how my

24  standards performed, that would tell me whether or not

25  interconversion was happening.

**Q.**   Can it happen outside of testing?

**A.**   I don't know.

**Q.**   So it's possible that interconversion could occur whether you run a test to determine whether your testing results in a conversion or not?  It could still happen, is that what you're saying?

**A.**   I don't know.

**Q.**   So it's possible?

**A.**   Yes.

**Q.**   Okay.  All right.  What is cross-contamination?

**A.**   Cross-contamination would be if something from one component got onto a second component, let's just say by sitting out somewhere you accidentally spilled something onto another component, then maybe there could be cross-contamination that way.

**Q.**   All right.  Could there be cross-contamination in a manufacturing process?

**A.**   I do not know the manufacturing processes, so I cannot answer that.

**Q.**   All right.  Regardless, Agent Kriplean said it doesn't matter; correct?

**A.**   Yes, that is correct.

**Q.**   All right.  Now, when Dr. Brueggemeyer says you're also going to try to identify the major steroid components even if they're not scheduled, you -- in order to do that, you can do both qualitative and quantitative analysis; correct?

**A.**   Yes, yes.

**Q.**   And you would agree that's the best way to determine what you've got and how much of it there is; correct?

**A.**   Yes, yes.

**Q.**   Do you know if Dr. Brueggemeyer was referring to cross-contamination in the lab or outside the lab before the samples were received?

**A.**   It would have been before the samples were received at the laboratory.

**Q.**   Okay, and so that's possible?

**A.**   Based on Dr. Brueggemeyer, yes.

**Q.**   Okay.  Were you ever involved in a telephone conversation with Agent Kriplean?

**A.**   Yes.

**Q.**   When was that, January 18?

**A.**   One moment.  One moment, please.

**Q.**   I think that's another exhibit.

**A.**   Exhibit 4?

**Q.**   Exhibit 4.

**A.**   That was on January the 18th of 2017.

**Q.**   Did you have any direct communication with Agent Kriplean before January 18, 2017 about this -- about these substances?

**A.**   Not that I recall, no.

**Q.**   Do you know if Dr. Brueggemeyer did or Dr. Santos?

**A.**   Based on the e-mails, Dr. Brueggemeyer had spoken with Dr.

1    Kriplean.  I do not know if Dr. Santos had before we had this

2    conversation.

3    **Q.**  Other than Exhibits 2 and 3, do you know of any other

4    conversations Dr. Brueggemeyer had with Agent Kriplean?

5    **A.**  Not that I was involved in, no.

6    **Q.**  Okay.  Are you aware of any?

7    **A.**  No.

8    **Q.**  Okay.  Let's look at Exhibit 4, your conversation with Agent

9    Kriplean.  Who initiated that call?

10   **A.**  Dr. Santos and I.

11   **Q.**  And you reported to Agent Kriplean that -- or stated to him if

12   any Schedule III steroids are detected at trace levels, do we need

13   to quantitate those steroids; correct?

14   **A.**  Yes.

15   **Q.**  And that would be helpful in telling you how much was there;

16   correct?

17   **A.**  Yes.

18   **Q.**  And he said no, don't do it?

19   **A.**  Correct.  No.

20   **Q.**  Did he say why?

21   **A.**  Yes, you're right.

22   **Q.**  Did he say why?

23   **A.**  Correct.

24   **Q.**  Did he say why?

25   **A.**  No, he did not.

1  **Q.**  What other conversations, was there any other parts to that

2  conversation that either you or Dr. Santos had with Agent Kriplean

3  during this conversation or was that the sum and substance?

4  **A.**  That was the sum and substance.

5  **Q.**  I assume that you believe that quantitation would have helped

6  your analytical process and that's why you asked him?

7  **A.**  No, we asked because we were instructed by management to reach

8  out and ask if quantitation was going to be necessary.

9  **Q.**  By management, you mean Brueggemeyer?

10 **A.**  Yes.

11 **Q.**  Okay.  And, again, the quantitation would tell you how much is

12 there; correct?

13 **A.**  Yes.

14 **Q.**  Because at this point, all you have is trace levels?

15 **A.**  Yes.

16 **Q.**  And how much is a trace level?

17 **A.**  I don't know.  I have no idea.

18 **Q.**  Is trace a term of art?

19 **A.**  It's something -- what we're saying is, it's a very minor

20 component in the sample based on the analysis by LC-MS and GC-MS.

21 **Q.**  Okay.  I think I asked you if you had any communications with

22 Kriplean before the January 18 telephone call.  Did you have any

23 after that date?

24 **A.**  No, I did not.

25 **Q.**  Do you know if Dr. Santos or Dr. Brueggemeyer did?

**A.**   I do know.

**Q.**   Okay.  Let's look for a moment at the January 30 report.  I'll

see which one I've got here.  Hang on with me for a minute.  I

messed up my papers.

   Before we go to that, does FCC have a level below which

something is defined as a trace level or is that a subjective call

on your part as the analyst?

**A.**   We determine level of detection if a -- someone asks for that.

As I said earlier, with the number of samples we get in, that's

just something we don't do unless we are requested of that by

either the person who had submitted the sample or by our

supervisor --

**Q.**   Well --

**A.**   -- or manager.

**Q.**   When you described it as a trace, is that a specific

quantification or just not very much there?

**A.**   Not very much there.

**Q.**   Okay.  All right.  Let's look at the reports of January 30,

2017, which I believe are Government 5 and 6; is that right?

**A.**   Yes.

**Q.**   Okay.  Let's look at Government's Exhibit 5, which I believe

deals with sample 984260; is that right?

**A.**   Yes.  Exhibit 5?  Yes.

**Q.**   And Exhibit 6 would deal with 276?

**A.**   Yes.

1   **Q.**   Okay.   You have those in front of you?

2   **A.**   Yes.

3   **Q.**   Okay.   Now, these -- these were, according to you, the

4   original tests that were done that Dr. Brueggemeyer referred to in

5   his November e-mail?

6   **A.**   Yes.

7   **Q.**   That's your belief?

8   **A.**   Yes.

9   **Q.**   Okay.   And you're using LC-MS testing here -- strike that

10   question.

11       The LC-MS testing was done by Dr. Santos?

12   **A.**   That is correct.

13   **Q.**   And in 276 he identified Schedule III steroids in three

14   products?

15   **A.**   In 276?

16   **Q.**   276.

17   **A.**   Would you ask me the question one more time?

18   **Q.**   Yes.   Is it correct that three products contained Schedule III

19   steroids?   Is that right?   Am I reading that right?

20   **A.**   There were -- there were Schedule III steroids observed by --

21   based on this table by LC-MS in all -- in item one and item two.

22   **Q.**   All right.   They were not the most prominent steroids;

23   correct?   Or I should say predominant, that's the word, isn't it?

24   **A.**   In reading the e-mail based on the LC-MS signals, however,

25   sir, LC-MS is outside of my realm of efficiency, so I'm just going

1 to read what is on the CSSR.  I'm sorry if I said e-mail.  CSSR.

2 **Q.**  Sure, sure.

3 **A.**  Based on the LC-MS signals, these steroids were not found to

4 be the most predominant steroids in the sample items.

5 **Q.**  What were the predominant steroids?

6 **A.**  It does not state.

7 **Q.**  It does not state.  Okay.

8     So the larger peaks are not the Schedule III steroids; is that

9 right?

10 **A.**  Based on the LC-MS signals, that is correct.

11 **Q.**  And the LC-MS is another more sensitive method of testing?

12 **A.**  It depends on the component.  The LC-MS is considered more

13 sensitive, but again, sir, when it comes to LC-MS, that's as far

14 as I'm going to go because that's outside of my realm of

15 expertise.

16 **Q.**  Okay.  Is there a definition of the difference between a trace

17 level and not the most predominant?

18 **A.**  No, other than --

19 **Q.**  Are they interchangeable in this case?

20 **A.**  A trace would be a minor component, and a predominant would be

21 a larger component.

22 **Q.**  Okay.  So the Schedule IIIs that were found were trace?

23 **A.**  Yes.

24 **Q.**  Okay.

25 **A.**  Based on the technique utilized.

**Q.** All right.  Anabolic steroids were not found in numbers four and five; correct?

**A.** Where are you, sir?  We're not found in items.  I only see three items or 260 and 276.

**Q.** That must be 260.  That must be in 260.  I apologize.

**A.** There are only three items in 260.  Oh, okay.  There are -- in four and five that's 276.  Okay.

**Q.** Four and five none found; correct?

**A.** Yes.

**Q.** Is that right?

**A.** Using LC-MS, steroid-like compounds were detected in items four and five but were not identified.  Using GC-MS no drugs, poisons or steroids were identified.

**Q.** It's a steroid-like compound, but you're not identifying it as a Schedule III; is that right?

**A.** Again, outside of my realm of expertise.

**Q.** Okay.  Is that what you believe from reading that?

**A.** They were steroid-like compounds that were detected, but they were not identified.

**Q.** Okay.  In report ending 260, that is the sample 260, three items were tested?

**A.** Yes.

**Q.** And the steroids found -- the Schedule III steroids found again were not the most predominant?

**A.** Again, based on the LC-MS signals.

**Q.** Okay. But you assume Dr. Santos would have reported it correctly and you have no problem relying on what he put there?

**A.** That is correct.

**Q.** Okay. There is -- with regard to either of the January 30, 2017 tests, there is no quantification done of anything found; correct?

**A.** That is correct.

**Q.** And as far as you know, the trace amounts were the least predominant using those interchangeably, they could simply be impurities, couldn't they?

**A.** That I cannot say.

**Q.** It's possible?

**A.** Yes.

**Q.** Because they weren't quantified and you just don't know; correct?

**A.** Correct.

**Q.** And that was told to Agent Kriplean by Mr. Brueggemeyer?

**A.** I'm sorry, ask --

**Q.** That's a poor question. I'll withdraw that question.

**A.** Okay.

**Q.** At this point they could have been quantified to determine whether they were anything other than the result of an impurity or some other kind of contamination; correct?

**A.** Yes.

**Q.** But that wasn't done because Agent Kriplean said don't do it?

**A.**  That is something that is from Dr. Brueggemeyer and SA Kriplean, however, based on the e-mail --

**Q.**  Well, he told you not to quantify it in your telephone conversation, didn't he?

**A.**  Yes, I'm sorry.  I apologize.  Since I don't do quantitative analysis, I apologize for that.  Yes, he said it was not necessary to quantitate.

**Q.**  Okay.  It could have been done but he said not to?

**A.**  Correct.

THE COURT:  Let's move on from that point.  I think we've made it.

**Q.**  All right.  Let's look at the September 14, 2017 test which I believe is on item ending -- sample ending 792, and that would be Exhibit --

**A.**  Exhibit 9?

**Q.**  I'm trying to get there because I have it numbered differently in my exhibits.  Hang on a second with me.  Yes.  Well, actually I have one September 14, 2017.

**A.**  I do not have that.

**Q.**  You don't have that test?

MR. WENIK:  Do you want me to put it on the screen share there for you?

MR. MORRIS:  Would you?  I think it's Defense Exhibit 4, if you could put that on the screen.

MR. WENIK:  Okay.  Give me a moment.

1          Are you seeing Defense 4 on the screen there, Bruce?

2   Did I master the technology?

3          MR. MORRIS:  That's it.  That's it.

4   CROSS-EXAMINATION

5   BY MR. MORRIS (continued):

6   **Q.**  Can you see that?

7   **A.**  I see it.  I can't see it completely, but I do see it dated

8   December the 14th, 2017.

9   **Q.**  If you could go to the second page of that.  I realize it does

10  not bear your signature, but are you familiar with this report?

11  **A.**  I am not.

12          THE COURT:  For the record, this is Defendant's Exhibit

13  4.

14          MR. MORRIS:  Yes.

15  CROSS-EXAMINATION

16  BY MR. MORRIS (continued):

17  **Q.**  You're not familiar with that report?

18  **A.**  No.

19  **Q.**  Okay, then we will skip that.

20      July 17, 2018 --

21          MR. MORRIS:  Jack, would you put up our Exhibit 16,

22  please?  That will help me.  Maybe I can find it on the

23  government's.  Yeah, I think that is Government 8.

24          MR. WENIK:  Government 9, I think.

25          MR. MORRIS:  This is on item -- sample 276.  I believe

1  that's Government 8.

2  CROSS-EXAMINATION

3  BY MR. MORRIS (continued):

4  **Q.**  Do you have that?

5          MR. LEACH:  Jessica can put it up, if you want.

6          MR. MORRIS:  I think it's Government 8.

7  **Q.**  Do you have that one in front of you?

8          MR. WENIK:  Government Exhibit No. 8.

9          (Audio disruption.)

10         THE COURT:  If the witness would look at Defendant's

11 Exhibit 8 and ask your questions.  We are two and a half hours in

12 and we have three witnesses to go.

13 CROSS-EXAMINATION

14 BY MR. MORRIS (continued):

15 **Q.**  Okay, Ms. Kelley, who requested this test?

16 **A.**  The -- Dr. Brueggemeyer requested that I do the GC-MS

17 analyses.

18 **Q.**  Do you know if that request came from Agent Kriplean or not?

19 **A.**  Yes, as per communication with SA Brian Kriplean.

20 **Q.**  Okay.  And do you know when he had that communication with

21 Agent Kriplean?

22 **A.**  I do not.

23 **Q.**  Okay.  This is another test of some of the five items

24 previously tested and reported on January 30, 2017; correct?

25 **A.**  That is correct.

1  **Q.**  And this is to quantify the steroids previously found in

2  example 984276?

3  **A.**  Items one and two were the ones that were analyzed.

4  **Q.**  Just items one and two?

5  **A.**  Yes.

6  **Q.**  And this uses GC-MS and HPLC-UV?

7  **A.**  Yes.

8  **Q.**  Some of the tablets showed the presence of steroids.  That

9  would be item one; correct?

10         MR. LEACH:  Bruce, which exhibit are you on?

11         MR. MORRIS:  I believe I'm on Government 8, Defense

12  Exhibit 16.

13  CROSS-EXAMINATION

14  BY MR. MORRIS (continued):

15  **Q.**  Is that right, Ms. Kelley?

16  **A.**  Yes, item one was further analyzed by GC-MS.

17         THE DEPUTY CLERK:  Mr. Morris, real quick, are you going

18  to admit your exhibit or are you going with the government's

19  already admitted exhibit?

20         MR. MORRIS:  That's a good question.  They're

21  duplicates.  I'll move to admit them.  I just will.

22         THE DEPUTY CLERK:  Okay, so you're going to admit your

23  own exhibit?

24         MR. MORRIS:  Please.

25         THE DEPUTY CLERK:  All right.  When you do that, just

1  let me know.  I'm just trying for clarification to figure that

2  out.

3              MR. MORRIS:  My apologies.

4              THE DEPUTY CLERK:  No worries.

5              MR. MORRIS:  My Exhibit 4 was not admitted because she

6  has not seen it.

7              THE DEPUTY CLERK:  Correct, yes.

8  CROSS-EXAMINATION

9  BY MR. MORRIS (continued):

10  **Q.**  I think my question was, some of the tablets -- steroids were

11  not found.  That's in item number two; correct?

12  **A.**  I will need to go back to the original document, because this

13  was additional testing.

14      Steroids were found in items one, two and three in the

15  original documentation.  They were identified.

16  **Q.**  In your July 17, 2018 report with regard to item two, you did

17  not identify a quantity of any steroid; correct?

18  **A.**  I did not do that analyses.

19  **Q.**  Okay.  Reading the report, is it clear to you that Dr. Santos

20  did not quantify any steroid?

21  **A.**  Dr. Santos did not do the quantitation either.

22  **Q.**  Whoever did it.

23  **A.**  I'm sorry.  Yes, that is correct.

24  **Q.**  Okay.  Thank you.  Very good.

25      Looking at the second July 17, 2018 report that was done on

1  sample ending 792, let's see if we can identify what government

2  exhibit that was.  Is that number 9, I believe?

3  **A.**  Yes.

4  **Q.**  And you were involved in this testing, to a certain extent?

5  **A.**  Yes.

6  **Q.**  And this was done on the four products that were received on

7  August 23, 2017, and originally tested on September 14, 2017?

8  **A.**  One more time?  I'm sorry.

9         THE COURT:  Mr. Morris, this is super repetitive.

10 Cross-examine her.  She already testified as to the reports and

11 what they were.  Cross-examine here, please.

12        MR. MORRIS:  I'd be more than happy to.

13 CROSS-EXAMINATION

14 BY MR. MORRIS (continued):

15 **Q.**  This report reflects that from this testing, some steroids

16 were found and some were not; correct?

17 **A.**  We were looking at items one, two, three and four, and in this

18 testing, I was specifically looking to differentiate between

19 4-androstanediol and 5-androstanediol.

20 **Q.**  Okay.  And am I correct that some steroids were found and some

21 were not?

22 **A.**  In -- no.  In this analysis, I was specifically looking for

23 4-androstenediol and/or 5-androstenediol to see if I could

24 differentiate those two and analyze for those.

25 **Q.**  Well, in number --

**A.** I do not know what was on the September 14, 2017 documentation.

**Q.** Okay.  In item number four, neither four nor five were identified?

**A.** Based on the GC-MS analysis with the experimental conditions utilized, that is correct.

**Q.** All right.  And items, two, three, several of them simply were not just quantified, wasn't feasible?

**A.** Two and three were not quantified.

**Q.** And that was because of coelution, which I think you described as things mixing up; is that a fair statement?

**A.** Coelution is the difference in cross-contamination.  Coelution just simply means two materials could be coming out at the same time and could not be separated out under those experimental conditions used.

**Q.** So you just can't tell; is that right?

**A.** Under those experimental conditions, that's true.

**Q.** Okay.  Looking at the amounts that were found, these are low levels; is that a fair statement?

**A.** I did not do that analysis, so that is something that you will need to speak to that analyst concerning.

**Q.** Fair enough.  Fair enough.  That's okay.

Well, using -- using your earlier example of grass, bushes and redwoods, it's not a redwood or a bush, is it?

**A.** I do not know because that's based on GC-MS analyses.  That's

1  different than LC-UV analyses.

2  **Q.**  Okay, okay.  And, again, from doing these tests, you can't say

3  whether these low-level components were added intentionally or

4  were the result of some kind of impurity; is that right?

5  **A.**  That is correct.

6  **Q.**  Were you ever asked that by Agent Kriplean?  Can you tell one

7  way or the other?

8  **A.**  I was not, no.

9  **Q.**  Do you know if he asked anybody?

10  **A.**  I do not know:

11        THE COURT:  I think Mr. Leach promised me that this

12  hearing was going to be about the methodology.

13        MR. MORRIS:  Well, Judge, I'm asking, I think fairly,

14  whether they tried to determine that and whether they were asked

15  to, which is part of their methodology.

16        THE COURT:  Really?  Okay.

17        MR. MORRIS:  I think.

18        THE COURT:  Go ahead.  But I mean, let's -- let's get to

19  the methodology.  If you think it was a faulty methodology, let's

20  ask questions about that.  We know it's trace amounts.  She's

21  testified what she thinks trace amounts are.  She is not the one

22  who talked to Special Agent Kriplean.  So let's just keep going.

23        MR. MORRIS:  Okay.  Judge, I think that's all I have on

24  that.

25        THE COURT:  Oh, come on.  I know you've got something

1  else.  Don't let me shut you down.

2          MR. MORRIS:  Well, you know --

3          THE COURT:  Do you have something else you want to ask?

4  I'm not trying to shut you down, but I'm also trying to keep, you

5  know, keep this in a reasonable place.  If you think that their

6  methodology was faulty, you know, she's told you what it is.  You

7  can make your arguments about it.  You know, she's told you what

8  she thinks trace amounts are.

9          (Audio disruption.)

10          THE COURT:  Let's pass it over to Mr. Leach.

11          MR. MORRIS:  Go ahead, Mr. Leach.

12  CROSS-EXAMINATION

13  BY MR. LEACH:

14  **Q.**  Ms. Kelley, my name is Art Leach.  I represent Hi-Tech, and

15  I've got some questions for you.

16     My first question for you is, at FCC how often have you

17  testified for steroids in the past?

18  **A.**  I've never testified for steroids.

19  **Q.**  You never tested for steroids?

20  **A.**  Tested.  I'm sorry, I thought you said testified.

21  **Q.**  No, tested.

22          THE COURT:  He did say testify.  I was wondering what

23  does it mean to testify for steroids.  Don't call me as your

24  character witness.  Tested.  Tested.

25  **A.**  Have I ever tested for steroids before?

**Q.**   That's what I meant.

**A.**   Yes.

**Q.**   How much?

**A.**   I do not know.  I do not recall.

**Q.**   In the prior situations where you tested for steroids, were the steroids the predominant compound in what you were testing?

**A.**   I don't recall.  Based on the -- based on my past cases.

**Q.**   Has there ever been a time that you can recall where the steroids that you were testing for were in trace amounts within the compound?

**A.**   Yes, I have seen steroids where that was not -- that you could have a predominant peak which is a steroid, and then you could have more minor components which could be steroids as well.

**Q.**   Okay.  In this case, did you use triple mass spec as part of your testimony?

**A.**   No, I did not use triple mass spec.

**Q.**   Do you know who did use triple mass spec?

**A.**   I don't know anyone at the Forensic Chemistry Center who has done triple mass spec on the sample.  I do not know.

**Q.**   Okay.  How many tests did you perform in this case?

**A.**   Based on the number of sections that I utilized -- that I wrote, my recollection is five.  Meaning, I may --  for 984260 I did an analysis that was summed up in 2017, and then I did a second analysis which was summed up in 2018, and I did that for 276.  And then I think we're -- 792, I did one for 2018.  So that

1  would be five.

2  **Q.**  Okay.  What I am pointing towards is Mr. Morris' examination

3  of the testing that occurred before any of the reports went out.

4  Did you -- did you perform any of that early-on testing?

5  **A.**  I did analysis in -- just one moment, please.

6     I would have done a GC-MS analysis between the dates of

7  October 19, 2016 and January 30, 2017.  There would have been

8  GC-MS analysis concluded.

9  **Q.**  And that would be shown in your FDA workpapers; is that

10  correct?

11  **A.**  Yes.

12        MR. LEACH:  All right, Your Honor, if we could share the

13  screen.

14  **Q.**  I'm going to show you, and if we could go to page 6, this is

15  Dr. Bannister's declaration in the case.

16     Did you get an opportunity to review Dr. Bannister's

17  declaration?

18  **A.**  Are you asking me, sir?  Did I look at --

19  **Q.**  Yes.  Yes, ma'am.

20  **A.**  I do not recall looking at that.

21  **Q.**  Let's go back to the first page just so you can see it, and do

22  you recognize this document?

23  **A.**  No, I cannot say I recognize that document.  I know there was

24  a document that had been submitted, but I do not recognize that

25  document.

**Q.**  And the document that you submitted, you're saying you reviewed that document or you just know that it existed?

**A.**  I know that it exists, and I do not recall if, or not, I reviewed that document.

MR. LEACH:  Okay, if you go to page 6, Jess.

CROSS-EXAMINATION

BY MR. LEACH (continued):

**Q.**  I represent to you that Dr. Bannister, as part of his declaration, went through your workpapers in order to see the early testing, and we have page 6, paragraph 20, of Dr. Bannister's declaration up, which is marked as Exhibit 11, Your Honor, for the record.

In this chart it represents that no controlled substances were found both -- on 11/17, which would have been Dr. Santos; is that correct?

**A.**  In 2017, there was -- based on -- I'm sorry?

MR. JONES:  Your Honor, I'm going to object to this. She's already stated that she hasn't reviewed this exhibit, and at this point Mr. Leach is just testifying about Bannister's review of workpapers.

MR. LEACH:  She's free to look at her workpapers.

THE COURT:  Well, I think if you want to show her FDA 244 to 247, you can ask her what that -- you know, you can ask her about it that way.

MR. LEACH:  Okay.

1          THE COURT:  This is kind of a weird -- it's kind of a

2   weird way to ask her questions.

3          MR. LEACH:  Well, the point that I was trying to make is

4   that since it's LC-MS she didn't do the testing.  It would have

5   been somebody else.  I think it's Santos; is that correct?

6          THE WITNESS:  On July the --

7          THE COURT:  I think -- I think -- hang on one second.  I

8   think you need to ask her that in a more direct way rather than

9   through this affidavit or this declaration that she doesn't

10  recognize.  I think you can just ask her that.

11  CROSS-EXAMINATION

12  BY MR. LEACH (continued):

13  **Q.**  You did not do the LC-MS testing; correct?

14  **A.**  I did not do LC-MS testing.

15  **Q.**  Okay.  And if you look at the third item on the chart on

16  December the 1st, 2016, GC-MS underivatized was performed.  Would

17  that have been you?

18          MR. JONES:  Objection, your Honor.  The chart isn't in

19  evidence.

20          MR. LEACH:  All right, Jack, if you would call up FDA

21  000 --

22          THE COURT:  I mean, you could also just ask her, did you

23  do this test on this date.

24          MR. LEACH:  That's what I'm trying to ask, Judge.

25          THE COURT:  Ask it that way, and then you can pull up

1  the workpapers and show it and help her out instead of showing it

2  through this chart.

3          THE WITNESS:  That would be great.

4  CROSS-EXAMINATION

5  BY MR. LEACH (continued):

6  **Q.**  Did you perform that test?

7  **A.**  I need to see my workpapers because I don't know --

8          MR. LEACH:  Jack, if you would unshare -- Jack, if you

9  would put it up, please.

10          Jack, are you there?

11          MR. WENIK:  I'm working on it.

12          Judge, can we take just five minutes while I try to get

13  work -- get this located, the workpapers, and see if I can figure

14  it out?

15          THE COURT:  I mean, are there other questions you can do

16  and we can come back to this after lunch?  Maybe we can pull this

17  all together after lunch?  I would like to go for 19 more minutes

18  and then take an hour break.

19          MR. LEACH:  I can do that, Judge.

20          THE COURT:  If you can't, we can stop.

21          MR. LEACH:  That's fine.  There's a lot of water front

22  here.

23  CROSS-EXAMINATION

24  BY MR. LEACH (continued):

25  **Q.**  Is it fair to say that you always want the level of detection

1  to be above the noise?

2  **A.**   Yes.

3  **Q.**   So in your -- the example that you gave us, you talked about

4  grass and then bushes and then trees.  Your level of detection

5  should be above the grass; is that correct?

6  **A.**   Yes.

7  **Q.**   And in this circumstance when you're looking through GC-MS, is

8  the grass all other steroids that you're looking at?

9  **A.**   No, the grass is from the electronics, from the GC-MS and the

10  solvent.

11  **Q.**   Okay.  But are there also steroids among the items that are,

12  you know, very low in terms of the amounts that are present?

13  **A.**   It would not be in the grass, no.  It would be above the

14  grass.

15  **Q.**   Okay.  And did you identify each one of the legitimate, that

16  is, legal steroids, non-Schedule III steroids that were in the

17  sample?

18  **A.**   Yes.

19  **Q.**   You identified every single one of the lead ones?

20  **A.**   I identified the ones that we had reference standards for.

21  Because there are sometimes when you cannot get a reference

22  standard for a component.  So the ones that I had reference

23  standards for, are the ones that I identified.

24  **Q.**   All right.  So I saw in the communications with Mr.

25  Brueggemeyer that there was a conversation about retrieving

1  reference standards for -- for all of them.  Did you go through

2  that process, to your knowledge?

3  **A.**  I do not recall if we had them already in-house or if they

4  were purchased.  I do not know, or if they were previously made.

5  **Q.**  I understand that some reference standards can be actually in

6  the library in the equipment; is that accurate?

7  **A.**  Those are -- those are reference standards that someone else

8  has put into a library, but what we consider reference standards

9  are ones that we actually utilize ourself and, actually, analyze

10  them.

11  **Q.**  And were you involved in acquiring the reference standards?

12  **A.**  I can be, but I do not recall if I was involved in this or

13  not.

14  **Q.**  Did you get to review the C of As with regard to your

15  reference standards, that's, basically, the purity of your

16  reference standards?

17  **A.**  Yes.

18  **Q.**  And were they 100 percent pure?

19  **A.**  I do not recall, but depending on if they were around 98 or 99

20  percent pure, that would be something that we would utilize at the

21  FCC when it comes to GC-MS analyses.

22  **Q.**  And what happens when you have a reference standard that is

23  less than 100 percent, do you need to make some sort of adjustment

24  for the difference?

25  **A.**  No.

**Q.** What is the other two percent of that reference standard?

**A.** That could be due to hydration. That may be one of the

reasons it's not 100 percent. There could be some water in it.

**Q.** There would be an impurity in it too; right?

**A.** Yes.

**Q.** Now, in your conversation with Agent Kriplean, did you make

plain to him that what you were seeing in the GC-MS were really --

we've talked about small amounts, trace amounts, did you make that

plain to him?

**A.** What I said was what was on that communication. I asked him

if any are detected at trace levels.

**Q.** But there had to be a reason why you were asking him that, and

was the predicate discussed in the call, that is, we're finding

very small levels? Do you recall that from the conversation?

**A.** I do not recall that because that was back in 2017. The

question that I asked was if any Schedule III steroids are

detected at trace levels, do we need to quantitate those steroids.

THE COURT: Mr. Leach, I'm going to just say, look,

these are arguments you can make this at trial. You can argue all

you want about trace levels and the prosecution and Special Agent

Kriplean and what he did and didn't do and what it shows, you can

do all of that, but don't do it to me on a Daubert hearing. Let's

just -- you told me -- that's why I raised this in the beginning.

I don't want to spend hours on this point. If it has to do with

her -- you said what she did to get to the trace levels. We are

1    not there.  And I think we've done enough trace levels with this

2    particular witness.  We can move on.  You can do a little bit with

3    the next guy, you can do a little bit with the next one, but let's

4    stick to her methodology and what she did and was it reliable.

5    CROSS-EXAMINATION

6    BY MR. LEACH (continued):

7    **Q.**   Now, in your and Dr. Brueggemeyer's notes, there are

8    indications that it could possibly have been not intentional.  Did

9    you consider that possibility?

10   **A.**   When I am doing the science, when I am looking at the

11   evidence, I do not think about whether something was put in

12   intentionally, unintentionally, I don't do that.  I just analyze

13   the evidence that I receive and give the results for that

14   evidence.

15   **Q.**   Okay.  Did you look at the manufacturing process for DHEA?

16   **A.**   No.

17   **Q.**   Are you aware that the manufacturing process for DHEA requires

18   synthesis from Schedule III steroids?

19   **A.**   No.

20   **Q.**   Does the fact that the amounts that you're seeing were trace

21   level indicate to you that it possibly was not intentionally

22   placed in the product?

23   **A.**   Again, sir, I do not think about it in that manner, because

24   I'm just representing the science.  So I don't think about trace,

25   cross-contamination.  I just -- it was there, I saw it by GC-MS.

1   **Q.**   And did you look at the types of compounds that you were

2   dealing with and whether they were chemically similar?

3   **A.**   Yes.

4   **Q.**   In other words, by the simple movement of a double bond, that

5   it could change entirely the substance that you're looking at?

6   **A.**   Yes.

7   **Q.**   Okay.  And did you rule out the possibility that the movement

8   of a double bond could occur during the testing process?

9   **A.**   Yes, that's why I ran -- that's why I analyzed reference

10  standards.

11  **Q.**   In your testimony you mentioned acetaminophen.  Are there

12  known impurities like 4-aminophenol, A-M-I-N-O-P-H-E-N-O-L, in

13  acetaminophen?

14  **A.**   Isn't that acetaminophen?  Isn't that the chemical name?

15  **Q.**   I don't think so.  But let me --

16  **A.**   Acetaminophenol is not the -- I was just using acetaminophen

17  as an example.  So, no, I do not know.

18  **Q.**   Okay.  Okay, are you -- you've tested acetaminophen, I take

19  it?

20  **A.**   Yes.  Yes, I have.

21  **Q.**   When you tested acetaminophen, have you seen other impurities

22  within the acetaminophen?

23  **A.**   I cannot say because it's been so -- it's been a while since

24  I've analyzed acetaminophen.  I just said I was just using that as

25  an example.  So I do not know.  I do not recall.

**Q.**  Would you expect to see small peaks around the big

acetaminophen peak?

**A.**  Not necessarily, no.

**Q.**  Now, in the test results, am I correct that there were

occasions where in earlier testing, Schedule III steroids were

found but then could not be detected in later testing, the NN

testing?

**A.**  One moment, please.

**Q.**  I bring your attention to Exhibit 9, item four.

**A.**  Yes, I do see the NN.  Would you repeat the question, please,

sir?

**Q.**  Well, in the tests that were performed, there were occasions

where Schedule III steroids were initially detected, but then on

retesting they were not found; is that correct?

**A.**  Let me -- one moment, please.  For Exhibit 9, based on my

analysis, it was from the report of 2018, neither the

4-androstenediol nor the 5-androstenediol were identified under

the experimental conditions used by GC-MS.  What was done previous

to that in the report dated September 14, 2017, I do not know.

**Q.**  Well, my --

**A.**  I was specifically asked to look for the 4 and the 5, to see

if I could separate those out.

**Q.**  But you couldn't see either one of them?

**A.**  That is correct.

**Q.**  Okay.

**A.**   For item four.

**Q.**   Item four, yes.

   Does that affect your overall confidence with regard to the earlier determination?

**A.**   No, because in the previous report, it says here component item four was reported as being 4 and/or 5, and I did not do that analysis.  I did not do that GC-MS analysis.

**Q.**   Now, is it -- is it fair to say that the samples that were used for those tests were different?

**A.**   The tests from 2017 and 2018?

**Q.**   Yes, ma'am.

**A.**   What are you asking?  I'm sorry.  What samples were different?

**Q.**   In other words, in the earlier test they took five pills, they crunched them up, they used the solution, they ran the test.  You took five different pills, crunched them up, used the solution, and ran your test; is that correct?

**A.**   I would need to see my workpapers because my recollection is that is the same composite, but I do not recall.

**Q.**   So you would have pulled that composite from some location within the office and run it on exactly the same crushed-up five pills?

**A.**   That is a possibility, yes.

       THE COURT:  I think -- I think what they keep asking is, did you find stuff the first time and when you tested again the second time, you didn't find it?  And I thought you answered no

1  earlier, but now I'm kind of confused.  Can you just kind of

2  explain that in plain English, what -- what happened?

3       THE WITNESS:  Based on the -- based on 102272 of July

4  the 17th of 2018, apparently there was another report that was put

5  out with results on there, and then when I got involved, I

6  could -- I did not identify the 4- or 5-androstenediol in item

7  four, but it looks like that Dr. Santos did see either the 4

8  and/or 5 by LC-MS, is how I read this.

9       THE COURT:  So are you saying it's possible that the

10  earlier test was using a different method and saw one of those,

11  and then when you did it later and did your method, you didn't see

12  them?  Is that what you're saying?

13       THE WITNESS:  That is correct.  Using the technique that

14  I utilized, that is exactly correct.

15       THE COURT:  And is that inconsistent, that you could

16  have one test showing it and another test not showing it?  Does

17  that show a problem with the system?

18       THE WITNESS:  No.  That is not --

19       THE COURT:  Can you just explain that?  I know you

20  probably already explained it, but can you just looking at me

21  explain how that's possible that one variation of a test can show

22  it and another different test could not show it?  Could you just

23  explain that to me?

24       THE WITNESS:  Well, liquid chromatography-mass spec and

25  gas chromatography-mass spec, one uses liquid, one is a gas phase.

So they can be looking at different components maybe seen within

those different techniques.  One can be more sensitive than the

other.  I use a -- I use helium as my -- what flows through my

column.  LC-MS uses a mobile phase.  So it's just differences in

the techniques that can bring out different components within a

sample.  Is that clear?

            THE COURT:  I guess, but does it kind of -- I mean, so

if you've got these two tests, which one do you think is right?

Like, is it in there or is it not in there?  Is one of them

wrong?

            THE WITNESS:  No, that could just be a sensitivity, it

could be the parameters that are used.  They are usually very

complimentary to another, and one may show certain components that

the other may not.

            MR. LEACH:  If I may, Your Honor.

CROSS-EXAMINATION

BY MR. LEACH (continued):

**Q.**  Isn't it in part because the amounts that are detected are so

low that you can't confirm it by the other testing process?

**A.**  That is a possibility.  That is another possibility.

**Q.**  And when you have Schedule III steroids in a product,

shouldn't you be able to confirm it by both LC-MS and GC-MS?

**A.**  Not necessarily.  It depends on the chemistry of those

components.  And, also, as you said, the concentration.

**Q.**  Going to the judge's question, doesn't that impact your

1    confidence in the result if it can only be seen in trace amounts

2    through the LC-MS process?

3    **A.**   No, because you get a -- with both techniques, there -- I

4    believe -- or I should say -- I'm not one to speak for LC-MS.   For

5    GC-MS, you get a retention time as well as a mass spec for that

6    component.   So that's an identification if it matches up with your

7    references standard.

8    **Q.**   Okay.   On the NQs that are marked on the same chart in Exhibit

9    9, isn't that because the amounts are so small that they can't be

10   quantified?

11   **A.**   Based on the NQ on the 1022792, it says on the CSSR, under the

12   experimental conditions used, quantitative analysis was not

13   feasible due to coelution issues with other components present in

14   the sample.

15   **Q.**   Right.   And my question to you is, the coelution issue that

16   we're talking about here, is that it is so -- the sample is so

17   tiny that it can't be measured?

18   **A.**   No, collusion does not mean that.   What it means is, there's

19   component that is --

20   **Q.**   Okay.   So the point is, you can't break it apart --

21            THE COURT:   I'd like her to finish what coelution means.

22   Could you just finish that answer, please.

23            THE WITNESS:   Coelution means two components may be on

24   top of one another, and based on the experimental conditions that

25   are utilized, are not being separated out.

1          THE COURT:  And can you have a coelution problem even if
2    you had, say, a large amount of a substance, could you still have
3    that or is it more likely to show up if it's a small amount?
4          THE WITNESS:  That is a better question for the LC-UV
5    analyst.
6          THE COURT:  Okay, on that note, let's take a lunch
7    break.  Let's just go ahead and take a full hour and enjoy
8    ourselves, get your yoga in, and we'll just come back at 1:00.
9    Okay?
10         (Whereupon a break was taken.)
11         THE COURT:  We'll just go back on the record.  We'll
12   pick up where we left off.
13   CROSS-EXAMINATION
14   BY MR. LEACH (continued):
15   **Q.**  Ms. Kelley, you understand you're still under oath?
16   **A.**  Yes, sir.
17   **Q.**  When did you know you were going to appear at this hearing?
18   **A.**  In the past couple of weeks, I believe.
19   **Q.**  Okay.  And you -- over the course of the lunch break, did you
20   look at your workpapers?
21   **A.**  No, sir, I did not.
22   **Q.**  Would you agree with me that your workpapers are important to
23   your testimony here today?
24   **A.**  Yes.
25   **Q.**  And you say that you knew you were going to testify here for

```
 1  two weeks.  Did you know before that time that --
 2          MR. KITCHENS:  Mr. Leach, I'm sorry, this is Nathan.
 3  Did we lose the judge?  Is Judge Salina still here?
 4          THE DEPUTY CLERK:  I don't see her.
 5          All right, she seems to be back.  You're on mute, Judge.
 6          THE COURT:  I'm back.  The last thing I heard you were
 7  asking the witness when did she know she was to testify and she
 8  said the last couple of weeks.  That's the last thing I heard.
 9  CROSS-EXAMINATION
10  BY MR. LEACH (continued):
11  Q.  My other question was that you understand that your workpapers
12  are important to your testimony?
13  A.  Yes.
14  Q.  Did you make an affirmative decision not to review your
15  workpapers in advance of your testimony?
16  A.  I did review my workpapers, certain parts of them.  I didn't
17  look over all of them completely.  Oh, yes, I did -- I did not
18  look at dates, per se, but I did look at how I analyzed the
19  product.
20  Q.  It appears to me that you have some papers in front of you
21  here today; is that correct?
22  A.  That is correct.
23  Q.  Did you affirmatively decide not to print up your workpapers?
24  A.  I did not receive those from the AUSA.  I am used to receiving
25  the papers that I need for testifying from the attorneys.
```

1  **Q.**  Okay.  A little while ago we were talking about C of As, and

2  on your standards you were talking about 98 percent purity, if I

3  remember correctly.  Am I saying that right?

4  **A.**  I use that as a ballpark figure.  Sometimes we have 98 and 99

5  percent purities.

6  **Q.**  Okay.  I want to go back to Exhibit 9 for a moment.

7  **A.**  Okay.

8         MR. LEACH:  Jess, do you want to put that table up?  Can

9  we share a screen just for a moment, Judge?  Is it up?  Okay.

10  **Q.**  And going down there towards the bottom, you can see that your

11  testing for item number one was -- the range, the amount was 0156.

12  Am I reading that correctly?

13  **A.**  I did not do that analysis.

14  **Q.**  Okay.

15  **A.**  When I say 98, 99, 100 percent, that's based on GC-MS

16  analysis.  That is something that you would have to get to the

17  LC-UV analyst about when it comes to the quantitation.

18  **Q.**  Well, the only point that I wanted to make here is, if you

19  have a finding of .156, just assuming that, does that not mean,

20  and correct me if my math is incorrect, that it's 98.44 percent

21  other things?

22  **A.**  If that's the mathematics, that's a possibility.  I do -- I

23  just said, I do not know.  That is what was in -- that was a

24  quantitation of that component in item one.

25  **Q.**  Okay.  So to the extent you have the NQs that are referenced

1  on item two and item three, those are yours; is that correct?

2  **A.**  No, sir.  The NN is mine.  The NTs are not mine.

3  **Q.**  Okay, so let me ask you about the NN.

4  Did you see that as a defect in your method?

5  **A.**  No, I did not.

6  **Q.**  Okay, you felt like your method was solid?

7  **A.**  Yes, sir.

8  **Q.**  And you simply could not find that particular compound; is

9  that correct?

10 **A.**  Using GC-MS with the experimental conditions utilized, that is

11 correct.

12 **Q.**  Let's go to Exhibit No. 5.

13       MR. LEACH:  And Jess, I would ask that you take it to

14 the screen, the chart on Exhibit 5 to start with.

15 **Q.**  Okay.  Ms. Kelley, looking at the first item in the steroid

16 name, do you recognize those two alternative names as being DHEA?

17 **A.**  No, I do not.

18 **Q.**  Do you have the ability to Google it in order to figure that

19 out?  How would you go about sorting out what that compound is?

20 **A.**  If I needed to know the brand name or the non-chemical name,

21 Google is one way you can do that, but I did not need to do that

22 because I'm representing the scientific evidence and that was the

23 name that I had, and that was the name of the reference standard

24 that I was utilizing.

25 **Q.**  Based upon your footnotes, that first item is not an illegal

1  compound; correct?

2  **A.**   That is correct.

3  **Q.**   Okay.  And if I understand --

4  **A.**   No, I'm sorry.  Just one moment, please.

5       If you're speaking of the 1-androsterone and/or the

6  4-androsten-3ß-ol-17-one, no, those are not scheduled.

7  **Q.**   Correct.  And if I remember your earlier testimony, you were

8  charting out the greatest peaks that you saw that you had

9  standards for?

10 **A.**   Yes.

11 **Q.**   Okay.  So let's come down to the epiandrosterone, the third

12 item, epiandrosterone, do you see that?

13 **A.**   Yes.

14 **Q.**   How about that one, that is also a legal compound, that is to

15 say, not a Schedule III compound; is that correct?

16 **A.**   One moment.  Let me make sure exactly what I had identified.

17      That is a question for Dr. Santos and LC-MS.  But if you're

18 asking me if that's scheduled or not, the answer would be no based

19 on the CSSR.

20          THE COURT:  And Mr. Leach, I'd point out these are

21 arguments for you to make -- you can do this cross-examination at

22 trial and make your points.  We're trying to figure out her

23 methodology and what she did, and I'm really struggling with this.

24 I mean, you're going to have a chance at trial to show that most

25 of what she found isn't illegal and that's not illegal.  That has

1  nothing to do with her methodology.  Mr. Jones is not objecting,

2  but I'm objecting on his behalf for all of us.  Go after her

3  methodology, what she did and was it reasonable.  And you can ask

4  the other guy who did the other test about his, and then you can

5  argue to me why they're incompatible.  You can do all that in your

6  brief.  But get the evidence out of this woman that goes to her

7  methodology.  I'm going to shut you down in about 30 minutes if

8  you don't -- I mean, you've got to keep it on that.  I mean, this

9  is not just a cross-examination.  You're not -- this isn't a civil

10  case taking a deposition of an expert.  This is a Daubert hearing.

11        MR. LEACH:  Judge, you have two exhibits here, Exhibit 5

12  and 6 that list compounds that are completely legal.  I think it

13  is an important point for the court to understand.  Now you have

14  it.  I'm done.  I tender the witness.

15        MR. JONES:  I just have a few questions for redirect,

16  Your Honor, if we could.  Okay.

17        THE COURT:  Mr. Leach, why do I need to know that?  Why

18  do I need to know it?  I'm not the fact-finder; right?  I need to

19  know whether this person gets to testify or not, whether their

20  testimony would be helpful to resolving a fact for the jury.  Why

21  do I need to know that half of what she found shows that your

22  client is not guilty?  Why do I -- why is that something that I

23  have to determine on this Daubert motion?

24        MR. LEACH:  Because it goes to her credibility that she

25  will not identify that first item as DHEA.  This witness came

```
 1  before this court unprepared.  She didn't look at her workpapers,
 2  and the assault is coming towards us.  So all I'm trying to is to
 3  try --
 4          THE COURT:  Okay, so you're going to make an argument
 5  because she doesn't know that those chemical compounds could be
 6  Googled and determined are DHEA, that that makes her methodology
 7  in doing the chemical analysis unreliable or makes her incredible
 8  as a witness?
 9          MR. LEACH:  There is an inference of having Exhibit 5
10  and 6 with those two compounds in there as though they are someway
11  improper.  They are not improper.  They are completely legal and
12  they are the primary compounds in these products, and I just want
13  the court to have that information.  Because you could easily look
14  at that chart and come to a different conclusion.
15          THE COURT:  What?
16          MR. LEACH:  Those two products in Exhibits 5 and 6,
17  those two compounds are completely legal.
18          THE COURT:  I got that.  I got it.  Well, there's a
19  footnote that says these are the ones that are bad, number four,
20  go to number four, they're legal, everything else isn't.
21          MR. LEACH:  You have to do it by exclusion.  It's not
22  that they say these are illegal compounds.  You have to exclude
23  those two because they don't have the proper footnote to an
24  illegal substance.  I just wanted you to be armed with that
25  information, that's all.
```

1          THE COURT:  Okay.  Let's keep going.  Mr. Jones, do you

2  have any follow-up?

3          MR. JONES:  Yes, Your Honor, jus briefly.

4  REDIRECT EXAMINATION

5  BY MR. JONES:

6  **Q.**  Ms. Kelley, in reviewing Exhibit 2, you were asked about

7  whether there was a report that reflected the analysis that was

8  discussed in that e-mail.  And so my question is, is it standard

9  for a chemist to discuss their initial results with their

10  supervisor before they finalize a report?

11  **A.**  Yes.

12  **Q.**  Also during your cross-examination, you were asked whether it

13  was possible for interconversion to occur outside of testing.  I

14  would just like to confirm your knowledge on this point.

15      Do you know if it is possible for interconversion to occur

16  outside of testing?

17  **A.**  I don't know that, no.  I was asked if it was possible.  I

18  don't know.

19  **Q.**  Is it possible for you to determine whether interconversion is

20  occurring during the test that you're conducting?

21  **A.**  Yes.

22  **Q.**  And did you reach a conclusion about that in this case?

23  **A.**  Yes.  Based on the analysis of my reference standard, I did

24  not see any interconversion taking place.

25  **Q.**  You were also asked a series of questions regarding Agent

1    Kriplean and quantification.  Is it best practice to conduct a

2    qualitative analysis before conducting a quantitative analysis?

3    **A.**   Yes, that is our normal practice.

4    **Q.**   And why is that?

5    **A.**   Because you need an identification of the substance before you

6    can quantitate it.

7    **Q.**   Is it often the case that qualitative analysis is conducted

8    and there is no quantitative analysis to follow?

9    **A.**   Yes.

10   **Q.**   You were also asked questions regarding whether the Schedule

11   III steroids that were detected in the samples, could be the

12   result of impurities or other sources.  When you're conducting a

13   GC-MS analysis, are you able to determine whether the presence of

14   the substance is a result of an impurity, cross-contamination,

15   intentional placement or et cetera?

16   **A.**   No.

17   **Q.**   Does the manner in which a substance was added to a sample

18   influence the reliability of your GC-MS analysis?

19   **A.**   No.

20   **Q.**   You were also asked about the purity of the reference samples

21   in this case.  Are there any procedures that you followed that

22   would detect or safeguard against impurities with reference

23   samples?

24   **A.**   You would be able to see those peaks within the analysis that

25   you are doing based on the concentration in which you are looking

1  at those reference standards, yes, you would be able to see that.

2  **Q.**  And was there anything concerning during your analysis here

3  regarding the reference standards?

4  **A.**  No.

5  **Q.**  And just one last point.

6      In discussing Exhibit 9, you received questions from defense

7  counsel as well as the court about how LC-MS could detect a

8  steroid but a subsequent GC-MS test could not.  And on this point,

9  I'd like to direct your attention to Exhibit 1, page 9.

10  **A.**  Yes.

11  **Q.**  Could you read that last sentence of that first paragraph?

12  **A.**  Some steroids can only be detected by LC-MS.  So utilizing

13  both GC-MS and LC-MS is recommended when analyzing samples

14  suspected of containing steroids.  And within that sentence they

15  gave examples in reference, SOP 2041 for the LC-MS analysis.

16  **Q.**  And what does this sentence mean to you?

17  **A.**  That LC-MS and GC-MS can both be utilized in conducting

18  analysis of steroids.

19  **Q.**  Could this help to explain why LC-MS detected a steroid but

20  GC-MS did not?

21  **A.**  Yes.

22          MR. JONES:  I have nothing further, Your Honor.

23          THE COURT:  Any recross?

24          MR. LEACH:  None for me, Judge.

25          MR. MORRIS:  No, Your Honor.

1           THE COURT:  Thank you, Ms. Kelley, for your time.  And I

2  remind you -- I want to remind you to just keep what we talked

3  about here to yourself, don't talk to anybody about it.   If

4  somebody wants to talk to you about it, check with Mr. Jones

5  first.  But for now you're good for the rest of the afternoon.

6  Thank you for your time.  I appreciate it.

7           THE WITNESS:  Your Honor, am I going to be called later

8  on in the week?  I usually don't wear suits to work, that's why

9  I'm asking this question.

10           THE COURT:  I don't expect that you will be recalled.

11           THE WITNESS:  Okay.  All right.

12           THE COURT:  And if you are, you can wear whatever you

13  want because it is being recorded, only audio is recording, and,

14  also, the court reporter, obviously, is only taking down what you

15  say.  And I actually can't see what you're wearing.  So to the

16  extent you dressed up for me, I think it was lost on me.  So there

17  you go.

18           THE WITNESS:  Okay.  Thank you, Your Honor.

19           THE COURT:  Thank you.  Have a good day.

20           THE WITNESS:  You, too.

21           THE COURT:  Mr. Jones, do you want to get your next

22  witness?

23           MR. JONES:  Yes, Your Honor.  Your Honor, we may need a

24  minute just to get her logged in.

25           THE COURT:  Let's take a five-minute break.  Is this

1  going to be the liquid tester?

2          MR. JONES:  No, Your Honor.  This is the quantitative

3  tester, HPLC.

4          MR. LEACH:  Ms. Jackson?

5          MR. JONES:  Yes, Ms. Jackson.

6          THE DEPUTY CLERK:  Good afternoon, Ms. Jackson.  If you

7  would please raise your right hand to be sworn.

8          Do you some swear or affirm that the testimony you shall

9  give in this matter now pending before the court, shall be the

10  truth, the whole truth and nothing but the truth so help you God?

11          THE WITNESS:  I do.

12          THE DEPUTY CLERK:  If you would, please state your full

13  name for the record for us and please spell your full name.

14          THE WITNESS:  Merrie Powell Jackson.  M-E-R-R-I-E

15  P-O-W-E-L-L J-A-C-K-S-O-N.

16          THE DEPUTY CLERK:  Thank you.

17                      ******

18                  MERRIE POWELL JACKSON,

19        having been previously sworn, testified as follows:

20                      ******

21  DIRECT EXAMINATION

22  BY MR. JONES:

23  Q.  Hi, Ms. Jackson.  Where are you employed?

24  A.  I am employed at the United States Food and Drug

25  Administration, Forensic Chemistry Center.

1  **Q.**  What is your position there?

2  **A.**  I am a chemist.

3  **Q.**  How long have you been a chemist with FCC?

4  **A.**  I have worked for the Forensic Chemistry Center for 25 years,

5  and with the FDA for 30.

6  **Q.**  Can you describe your educational background?

7  **A.**  I have a Bachelor of Science in chemistry.

8  **Q.**  Do you have any specialities or areas of focus in your role as

9  an FDA/FCC chemist?

10  **A.**  I -- yes.  I do qualitative and quantitative analyses and

11  mostly gas chromatography, mass spectrometry and high pressure

12  liquid chromatography.  Yes.

13  **Q.**  Is that known as of HPLC-UV?

14  **A.**  Yes.

15  **Q.**  Did you perform HPLC-UV analysis in this case?

16  **A.**  Yes.

17  **Q.**  Now, in a moment we're going to take a deeper dive into the

18  step-by-step processes for an HPLC-UV analysis, but for now, could

19  you give us the elevator pitch of how HPLC-UV analysis works?

20  **A.**  Yes.  HPLC is a column separation science which has been

21  around since the 1940s.  HPLC has been used since the 1970s, and

22  it consists of using a cylindrical column with a solid substance

23  on the inside of it that is used to separate the substance that

24  you're interested in, your analyte or steroid in this case so you

25  can analyze it.

1     The instrument consists of several components, an injector, a

2   pump, and a detector.  And you will take your sample that contains

3   your analyte or steroid and put it into a liquid form and then

4   inject it into the instrument.  And then the instrument will pump

5   it through the column and the detector using liquid mobile phase,

6   which are two solvents mixed together.  And then the analyte that

7   you're looking at, the steroid, will interact with a solid phase

8   of that column and will come off of that column at a specified

9   time, then blow through the detector which will generate a

10  picture, and then flow into a waste container.  It is usually

11  controlled by a software database, and the software database will

12  record that picture.  And the picture is usually a linear line,

13  and then a peak will come out.  And that peak will usually look

14  something like a Gaussian bell-shaped curve.

15     Then we will determine the area of that peak and compare it to

16  the references material of that same analyte or steroid in this

17  case that we are looking at and do a mathematical equation to

18  determine how much is there.

19  **Q.**  When conducting the HPLC-UV analysis in this case, did you

20  follow any standard operating procedures?

21  **A.**  Yes.

22  **Q.**  If you could turn to Government's Exhibit 10.

23  **A.**  Okay.

24  **Q.**  Do you recognize this document?

25  **A.**  I do.

1   **Q.**   And what is it?

2   **A.**   This is -- the Forensic Chemistry Center's SOP T011, Version 4

3   effective date July 1, 2016, HPLC-UV screening and determination

4   of steroids.

5   **Q.**   Was this the version of the some T011 in effect at the time of

6   your analysis in this case?

7   **A.**   Yes.

8            MR. JONES:  Your Honor, I offer Exhibit 10 into

9   evidence.

10           MR. MORRIS:  No objection.

11           THE COURT:  All right, it's admitted.

12   DIRECT EXAMINATION

13   BY MR. JONES (continued):

14   **Q.**   Ms. Jackson, are you familiar with qualitative versus

15   quantitative testing?

16   **A.**   Yes.

17   **Q.**   And can you explain the difference in those?

18   **A.**   Yes.  Qualitative analysis is used to identify a substance in

19   the product, in this case the steroid.  And quantitative analysis

20   is used to determine how much of that steroid is present in the

21   product.  They are different types of tests, and they use

22   different types of equipment to perform the tests.

23   **Q.**   What type of analysis is HPLC-UV?

24   **A.**   It is a quantitative technique analysis.

25   **Q.**   Now, let's look at the SOP Exhibit 10.

1    Could you summarize the purpose of this SOP?  And that's about

2  halfway down the page under the heading purpose.

3  **A.**  This procedure is used for quantitative determination of

4  steroids and their analogs using high performance liquid

5  chromatography with ultraviolet detection.

6  **Q.**  Now, directing your attention to the policy/scope section just

7  below that, could you read us the last sentence of that paragraph

8  which begins with steroid identification?

9  **A.**  Steroid identification is done separately using GC mass spec,

10  LC mass spec, FT-IR, NMR, et cetera, and is not within the scope

11  of this procedure.

12  **Q.**  Now, taking these two provisions together, what do these mean?

13  **A.**  This means that the qualitative identification would have had

14  to be done using a different technique prior to quantitation being

15  done using this particular SOP and this technique of HPLC-UV.

16  **Q.**  Do you know that that happened in this case?

17  **A.**  Yes, it did.

18  **Q.**  Now, directing your attention to the second paragraph under

19  policy/scope that begins with, within FDA and FCC.  Could you read

20  that first sentence?

21  **A.**  Within FCA and FCC there is a 30 year history of anabolic and

22  pharmaceutical steroid analyses using HPLC-UV.

23  **Q.**  And what does that mean?

24  **A.**  That means that the FDA and FCC have been viewing

25  pharmaceutical analysis on steroids using the HPLC-UV

1   instrumentation.

2   **Q.**   Do you know if the reliability of HPLC-UV analysis for the

3   quantification of steroids has been reviewed or tested by experts

4   in the field?

5   **A.**   I'm not sure.

6   **Q.**   Okay.

7   **A.**   I do know that HPLC is a widely-used technique.  It's been

8   used in pharmaceutical manufacturing, drug testing of bodily

9   fluids and in research, and if you do a literature search of

10  databases, you will get about 500,000 journal articles using HPLC.

11  **Q.**   Do you know if there are peer review publications discussing

12  HPLC-UV?

13  **A.**   Yes.

14  **Q.**   And is HPLC-UV a generally accepted technique within the

15  scientific community to quantify steroids?

16  **A.**   Yes.

17  **Q.**   Now, let's look at page 4 of Exhibit 10 under the heading

18  procedures (process details), and this continues through page 8.

19  I'll give you a moment to kind of look through those pages, and

20  when you're done, could you tell us generally, what's being

21  discussed in this section?

22  **A.**   Yes, this talks about the procedure on how to do the analysis

23  of steroids.  It talks about standard preparation, and standards

24  are your reference material of the analyte steroid that you're

25  looking for that are traceable from a reputable source that we use

1  to create a calibration curve to do our comparison of our samples.

2  It goes on to talk about the sample preparation, and that includes

3  what solvent do you need to use to dilute the sample and the

4  reference materials offhand.  You need to use a solvent that will

5  dissolve the material as well as keep it stable.

6      It also talks about the instrument parameters, the temperature

7  flow rate, the wavelengths, the type of column that you need, and

8  then it goes on to give an example of a mathematical equation.

9  **Q.**  Now, can you walk us through the steps that you took in

10  conducting the HPLC-UV analysis in this case?

11  **A.**  Yes.  The first thing I made sure that my instrument had been

12  QA'd.  It had been QA'd in March, and I was doing the analysis in

13  June.  So that met that QA requirement.  Then I determined which

14  reference material I needed.  I weighed it out and diluted it in a

15  solvent, and I made three working standards to create my

16  calibration curve.  I determined the solvent for the samples.  I

17  weighed those out and diluted them up.  Then chose the column and

18  put it on the instrument.  I made my liquid mobile phase, and then

19  I created my -- my sequence through the software and ran

20  everything on the instrument.

21      And then I looked at my data, determined the areas, and did my

22  mathematical equations to figure out how much was in the product.

23  **Q.**  What is a calibration curve?

24  **A.**  A calibration curve is injections of your standards.  So I'm

25  not using just one standard, I'm using several, three in this

1  case, and we use the curve using the -- a linear regression curve

2  using the Internet and the flow to do the mathematical equation

3  with the sample area to figure out how much is in there.  And it

4  gives a comparison to the sample.  We compared the retention time

5  and the UV-spector as well.

6  **Q.**  And did I hear you correctly that you used three standards in

7  this process?

8  **A.**  I -- yes.

9  **Q.**  Now, those steps that you just described, are they consistent

10  with standard operating procedure T011?

11  **A.**  Yes.

12  **Q.**  And did you follow all of these steps in your analysis in this

13  case?

14  **A.**  Yes.

15  **Q.**  Are you familiar with the concept of setting a limit of

16  detection or quantitation limit before commencing an analysis?

17  **A.**  Yes.

18  **Q.**  Can you describe those concepts for us?

19  **A.**  A limit of detection is how low of a concentration of the

20  substance of acceptance that the instrument can perceive detecting

21  the analysis.  A limit of quantitation is how low you can go to

22  determine how much is in there.  A limit of quantitation can be

23  the same as the limit of detection or it can be higher.

24  **Q.**  Are you familiar with the concept of noise associated with not

25  setting a limit of detection?

1  **A.**   Yes.   The noise is how much background your baseline is giving

2  you compared to the performance of the analyte in the analysis,

3  your peak that you're seeing.

4  **Q.**   And what is a peak?

5  **A.**   A peak is -- it's showing you when your analyte, the steroid

6  is coming off the columns and the detector, the software will draw

7  a picture of that peak at a particular retention time, and then

8  you determine the area based on how big that peak is.

9  **Q.**   Did you set a limit of detection in this case?

10  **A.**   I did not.   The method did not require it.

11  **Q.**   Was noise an issue given that you did not set a limit of

12  detection?

13  **A.**   No. The baseline was very small compared to the peak response.

14  **Q.**   Is there any aspect the HPLC-UV analysis that you described

15  that works somewhat similar to setting a limit of detection?

16  **A.**   With my calibration curve, the lowest standard that I used, I

17  cannot report out anything lower than that, and the samples were

18  within my calibration curve.   And I used one PPM concentration and

19  ten PPM concentrations for the different steroids in this case.

20  So those would have been the lowest standards I used in the two

21  different calibration curves for the different steroids.

22  **Q.**   Is setting a limit of detection required under standard

23  operating procedure 2011?

24  **A.**   No.

25  **Q.**   Now, you touched on the quality assurance procedures briefly,

1  but I want to circle back to that.

2      Let's take a look at page 2 of Exhibit 10 under the heading QC

3  Elements.

4      What does this -- what does this section discuss generally?

5  **A.**  These are the QC elements needed to do the analysis.  One of

6  them, as I mentioned previously, was making sure the instrument

7  you use has been QA'd under its SOP.

8      It also talks about running a calibration curve and the

9  correlation coefficient requirement with the calibration curve,

10  the use of the solvent length, the use of replicate analyses of

11  your sample, at a minimum performing it in duplicate, and that

12  your duplicate answers are within 20 percent of each other.  And

13  that if necessary, viewing -- time of use validation, which is a

14  spike or a fortification sample, which is taking the sample and

15  adding the reference material of the analyte or steroid that

16  you're looking for into that sample and going through the same

17  process of diluting the sample and analyzing it.

18      There is a requirement for set spike recovery, that it has to

19  be within 80 to 120 percent.

20  **Q.**  Now, you just mentioned that part of the QA is running the

21  reference standard in the same way as you would the actual sample.

22  Did I hear that correctly?

23  **A.**  Actually, I think I was talking about the fortification

24  recovery, yes.

25  **Q.**  Okay.  And so what's the purpose of that?

**A.** That is a time of use validation to say that your instrument is working and it is detecting the -- the analyte that you're looking at and that -- that's all.

**Q.** Now, can you describe some of the specific QA and QC responsibilities that were applied in your analysis in this case?

**A.** My instrument QA was run and it passed prior to me running the analysis. I ran blanks before and after the standard, before and after the samples and the sequence. My linear correlation coefficient passed for the calibration curve that I used with my standards. I ran the samples in triplicate. So I did duplication of the analysis. And I did a fortification recovery of one of the standards and I know it passed.

**Q.** And how do you know that?

**A.** It fell within the range of 80 to 120 percent that is required by the SOP.

**Q.** Now, you mentioned -- I'm sorry.

**A.** That's required in the SOP.

**Q.** You mentioned that you ran a blank before and after the reference standard. What's the purpose of that?

**A.** The purpose of the blank is to ensure that there is no carryover of your analyte and your standard, your reference material or your sample to make sure everything is clean and there's no interferences in the signal.

**Q.** And are those QA and QC responsibilities that you just described consistent with standard operating procedure 2011?

**A.**   Yes.

**Q.**   Now, I'd like to switch gears.

      THE COURT:  Mr. Jones, did we lose -- there's Mr. Morris.  I thought we might have lost him.

      MR. MORRIS:  You lost me, but I'm back.  Can you hear me now?

      THE COURT:  Do you need to --

      MR. MORRIS:  That's okay.

      THE COURT:  How much did you miss?

      MR. MORRIS:  I'm not sure, but Art will go first and he'll do that part, and I'll do whatever is left.

      THE COURT:  How long were you off?

      MR. MORRIS:  About two minutes.

      MR. JONES:  Mr. Jones, do you think you can try to redo or, Ms. Jackson, we lost one of the defense counsel for the last two minutes, do you think you could give us your last couple of answers again?

      THE WITNESS:  Yes.

DIRECT EXAMINATION

BY MR. JONES (continued):

**Q.**   So if you could just -- I'm sorry.

   If you could discuss the QA and QC responsibilities that applied in this case.

**A.**   Okay.  The first thing is making sure that your instrument has been QA'd following the instrument's SOP, and it had.  It had been

1  done in March, and I ran the analysis in June.

2      You run a standard calibration curve, and you need to have a

3  linear regression correlation coefficient established within the

4  limits in the SOP.  You need to run solvent blanks.  You need to

5  run your samples and duplication, a minimum of two, and in this

6  case I did triplicates.

7      The duplication of your samples need to be within 20 percent

8  of each other, and if needed, you can do additional validation

9  testing, which is a spiked recovery or a fortification recovery,

10 which is taking your sample and adding the reference material to

11 it and taking it through the same dilution and solvent scheme that

12 you did your samples and analyzing it the same way, and it has to

13 fall within 80 to 120 percent.

14     And the reason to run blanks -- well, I ran blanks before and

15 after the standards, before and after the samples, and the reason

16 to run the blanks is to make sure your instrument is clean and to

17 make sure there is no carryover of the steroid analyte in your

18 sample or in your standard and make sure there is no other

19 interferences in the signals.

20 **Q.**  And were all of these measures that you just explained

21 consistent with standard operating procedure T011?

22 **A.**  Yes.

23         THE COURT:  Let's just make sure.  Hang on.  Mr. Morris,

24 are you still there?  Your video is off.

25         MR. MORRIS:  I'm good.

1              THE COURT:  I just want to make sure.

2              MR. MORRIS:  I'm good.  I'll put it on.  I apologize.

3              THE COURT:  I just didn't want to lose you again.

4              MR. MORRIS:  Thank you, thank you.  I'm good.

5    DIRECT EXAMINATION

6    BY MR. JONES (continued):

7    **Q.**  Okay.  Now, I'd like to discuss some of the analyses that you

8    conducted in this case.  Could you turn to Government's Exhibit 7?

9    **A.**  Okay.

10   **Q.**  Do you recognize that document?

11   **A.**  Yes.

12   **Q.**  And what is it?

13   **A.**  It is the case sample report written by Enrico Yanes Santos

14   communicating the analysis report to Brian Kriplean.

15   **Q.**  Did you perform any of the analysis that's reflected in this

16   report?

17   **A.**  Yes.

18   **Q.**  And which analysis is that?

19   **A.**  The HPLC-UV quantitation.

20   **Q.**  And on which items did you conduct that analysis?

21   **A.**  Items one, two and three.

22   **Q.**  Now, looking at the bolded note toward the top of the page,

23   can you read that aloud for us?

24   **A.**  A report dated January 30, 2017, was sent to Special Agent

25   Brian C. Kriplean.  The current additional report includes further

1  qualitative and quantitative analysis for the confirmation

2  determination of DEA Schedule III steroids previously described in

3  the original report.

4  **Q.**  Were you involved in that original January 30, 2017 report as

5  mentioned?

6  **A.**  No.

7  **Q.**  Do you know what types of analysis was reflected in that

8  January 30, 2017 report?

9  **A.**  I believe it was qualitative.

10  **Q.**  Would LC-MS and GC-MS constitute qualitative testing?

11  **A.**  Yes.

12  **Q.**  And so why was it necessary to do that qualitative testing

13  before you conducted this quantitative testing by way of HPLC-UV?

14  **A.**  One of the steroids that was done previously with that

15  particular instrumental parameters, those two isomers, were

16  coeluting.  So additional qualitative work had to be done with

17  some different instrumental parameters to see if those two isomers

18  could be differentiated.  And then once they were differentiated,

19  then quantitative analysis could be done on the appropriate

20  isomer, but if the two are coeluting under the qualitative

21  analysis, first of all, you can't identify which one of them is

22  present.  So that needs to be done first so then you could follow

23  up with the quantitative analysis.

24  **Q.**  Is it at all possible to do a quantitative test before you do

25  a qualitative test?

1   **A.**  You need to know the identity of the analyte first before you

2   quantitate it.  You need to determine that it's there first.

3   **Q.**  And that description that you just gave about the order, is

4   that consistent with FCC standard operating procedures?

5   **A.**  Yes.

6   **Q.**  Now, turning back to that note that you read aloud, do you

7   know who Special Agent Bryan Kriplean is?

8   **A.**  I have never met him, but I know he's an employee of OCI FDA.

9   **Q.**  Do you know what role, if any, he played in this case?

10  **A.**  He is -- he was a customer, and the customer submits their

11  request for laboratory services to our laboratory for us to

12  conduct an analysis.

13  **Q.**  As a customer, was he involved in the scientific processes

14  once he submitted that request?

15  **A.**  No.  The FCC analyst determined the methods and the

16  instruments that we use in order to answer the question that has

17  been submitted in the laboratory request for services.

18  **Q.**  Who informed you that you needed to perform an HPLC-UV

19  analysis in this case?

20  **A.**  My supervisor.

21  **Q.**  And who is that?

22  **A.**  Thomas Brueggemeyer.

23  **Q.**  Who made the ultimate decision to quantify the steroids at

24  issue using HPLC-UV?

25  **A.**  I did using our standard operating procedure T11.

1  **Q.**  Okay.  Now, directing your attention back to the exhibit,

2  exhibit -- I'm sorry, just one second.  Okay.  Directing your

3  attention back to Exhibit 7.  Can you walk us through the results

4  of the HPLC-UV analysis?

5  **A.**  Yes.  Item one contains 0.519 plus or minus 0.072,

6  4-androstanediol milligrams per tablet.

7     Item two contained 0.039 plus or minus 0.012 androstenediol

8  milligrams per tablet.

9     And item three contained 0.0147 plus or minus 0.0012

10 adrostanedione milligrams per tablets.  And that milligram per

11 tablet that I just stated, are the amounts reported as the average

12 plus or minus the uncertainty of triplicate preparation with a

13 coverage probability of 95 percent.

14 **Q.**  Could you explain to us sort of in plain English what the

15 number on the left side of the plus or minus means and what the

16 number on the right side of the plus or minus means?

17 **A.**  The number on the left side is the amount determined from the

18 area, peak area comparison to the mathematical calculation to the

19 calibration curve of the reference standards.

20    The right side of the plus or minus sign is the uncertainty on

21 the amount, and that uncertainty -- uncertainty of using the

22 balances and volumetric plus and the instrumentality uncertainty

23 that is involved in the analysis.  And putting the two pieces of

24 information together means that I can state that item one contains

25 0.44 to 0.58 milligrams per tablet of the 4-androstanediol.

**Q.**  Am I correct in understanding that the number -- that number
to the right of the plus or minus, essentially bakes in a margin
of error?

**A.**  Yes.

**Q.**  And if you could just explain one more time, how do you arrive
at that number?

**A.**  We use a mathematical spreadsheet that has been created and is
part of our uncertainty SOP here, and you put in several pieces of
information.  Part of it is all of the sample duplicates that you
ran that you found, it takes into consideration the reference
material weighed out on a balance, then if you weighed into a
volumetric flask, and then if you did future dilutions with a
pipette and it also has an instrumental component depending on
what instruments you use, HPLC in this case.  And it does many
different mathematical calculations to come up with that
uncertainty number under the coverage probability of 95 percent.

**Q.**  Is the purity of the reference sample considered in coming up
with that number?

**A.**  If the purity would not -- would not have been used in the
uncertainty number, that would have been used in the mathematical
equation to determine the amount of milligrams per tablet -- if it
was used.

**Q.**  But purity is -- is factored into the analysis and thus
factored into the results; is that right?

**A.**  It can be factored into the results.  In this particular case,

1  I would have to look back at my workpapers to say yes or no.

2  **Q.**  Okay.  And can you describe what the NQ finding means?

3  **A.**  Yes.  The NQ under the androstenediol.  NQ means not

4  quantified under the experimental conditions used, quantitative

5  analysis was not feasible due to coelution issues with other

6  components present in the sample.

7  **Q.**  Now, looking at items one and two, if one of these -- so let's

8  start with item two.

9     If one steroid was not quantifiable, how can you be sure of

10  the reliability of the quantifiable finding with respect to the

11  other steroid that was -- that is listed?

12  **A.**  Okay.  In this particular analysis, I had to quantitate these

13  three different steroids, and I came up with method parameters

14  that all three of these steroids came out at different retention

15  times from that column.  And those were with the reference

16  materials of the standards.

17     Then when I was doing the samples, I would compare the peak of

18  the sample to the reference material.  I would be comparing the

19  retention time, and I would be comparing the ultraviolet spectrums

20  as well to determine what was coming out in that sample was

21  matching up with the reference standard and was that particular

22  steroid.  And the coelution that was happening with -- in item two

23  for antrostanedione was happening at a different retention time

24  than the other steroids that was quantitated in that sample.

25  **Q.**  So the fact that for the same item HPLC-UV was able to detect

1  and quantify one steroid, one type of steroid but not another,

2  does that signal any type of reliability issues with the testing

3  itself?

4  **A.**  No.  That was a matrix issue with this sample.

5  **Q.**  And can you explain --

6         THE COURT:  Wait.  Can you explain that answer?  What

7  does that mean, it was a matrix issue with the sample?  What does

8  that mean?

9         THE WITNESS:  Okay.  The fact that the reference

10  standards I ran on the instrument and I got retention times and I

11  got a response from the instrument for those, means that the

12  analysis of the instrument was able to detect those steroids.

13  What I mean by matrix issues is, whatever else was in this product

14  can come out and elude and from that column and for that

15  androstanedione.  I was having coelution of some other component

16  in that product, was coming out at the same time as the standard.

17  And since I was unsuccessful at -- at separating those two things,

18  I could not quantitate them and tell you how much of that steroid

19  was there, because you have to separate all of the different

20  components in that product matrix in order to identify them and

21  quantify them.

22  DIRECT EXAMINATION

23  BY MR. JONES (continued):

24  **Q.**  Can you explain what coelution is for us?

25  **A.**  Coelution means two or more components are coming down that

1  column at the same time and there is a peak that comes out and the

2  picture from the detector, but since there is more than one

3  component there, I cannot tell you definitely anything about any

4  of those components, because they're all coming out at the same

5  time on top of each other.

6  **Q.**  Do you know what causes that?

7  **A.**  That has to do with the chemistry of the components and how

8  they are reacting to the chemistry of the solid substance inside

9  the column as the liquid mobile phase travels it down.

10 **Q.**  So the fact that you -- that your analysis could not quantify

11 these steroids, does that have any impact on the prior analysis

12 that was able to identify the steroids?

13 **A.**  No.  They are two different techniques using different

14 instrumental parameters.

15 **Q.**  And throughout your -- throughout your analysis, did you take

16 into account any alternative reasons why those Schedule III

17 steroids might be present?

18 **A.**  No.

19 **Q.**  And why not?

20        MR. LEACH:  I'm not sure I understood your question,

21 D'Juan.  Alternative reasons?  I think you need to be a little

22 more specific with her.  I don't understand.

23        MR. JONES:  I was just raising what you raised in your

24 brief.

25 DIRECT EXAMINATION

1  BY MR. JONES (continued):

2  **Q.**  So for purposes of your analysis, are you concerned with --

3         MR. JONES:  One second, Your Honor.  I can withdraw that

4  question.

5  **Q.**  Okay.  Let's move on to Exhibit 8.

6  **A.**  Okay.

7  **Q.**  Do you recognize this document?

8  **A.**  Yes.

9  **Q.**  And what is it?

10  **A.**  A case/sample summary report for FACTS sample 984276 written

11  by Enrique Yanes Santos to Special Agent Bryan Kriplean on July

12  17, 2018.

13  **Q.**  And what, if any, analysis did you perform regarding this

14  report?

15  **A.**  HPLC-UV.

16  **Q.**  And can you explain the results of your analysis?

17  **A.**  Yes.  Item one contained 0.382 plus or minus 0.048

18  4-androstanedione milligrams per tablet.

19  **Q.**  All righty.  And looking at Exhibit 9.

20  **A.**  Okay.

21  **Q.**  Do you recognize this document?

22  **A.**  Yes.

23  **Q.**  And what is it?

24  **A.**  Case/sample summary report for FACTS sample 1022792 written by

25  Enrique Yanes Santos to Brian Kriplean on July 17, 2018.

**Q.** And what analysis did you perform regarding this report?

**A.** HPLC-UV quantitation.

**Q.** And can you explain the results?

**A.** Yes.  Item one contained 0.156 plus or minus 0.047 4-androstanediol milligrams per tablet.

Item two contained 0.0294 must or minus 0.0038 androstenedione milligrams per tablets.

**Q.** What does NN mean?

**A.** NN means neither 4-androstenediol or 5-androstanediol were identified under the experimental conditions used and based on GC mass spec retention time and mass spectrometric comparison to reference standards.  And the previous report, a component of item four was reported as being 4-androstenediol and/or 5-androstenediol.

**Q.** So did your HPLC-UV analysis contribute or result in that finding?

**A.** No.  That was all done by GC mass spec.  The GC mass spec determined that neither the 4- or the 5-androstenediol was present based on retention time and mass spectrometric comparison to reference standards of 4-androstenediol and 5-androstenediol.  And since neither of the 4- or 5-androstenediol were detected or identified, there was no quantitative analysis done for that, for that item.

**Q.** So in sort of plain English, can you tell us the difference between the NQ and the NN?

**A.**   The NQ was not quantified by HPLC-UV because of coelution

issues with other components present in the sample.

The NN was neither the 4- or 5-androstenediol were identified

in that item by GC mass spec.

MR. JONES:  If I could just have one second, Your Honor.

THE COURT:  Take your time.

MR. JONES:  No further questions, Your Honor.

THE COURT:  All right.  Mr. Morris, are you up first?

MR. MORRIS:  I think Mr. Leach is going to go first, if

that's all right, Your Honor.

THE COURT:  Sure.

CROSS-EXAMINATION

BY MR. LEACH:

**Q.**   Ms. Jackson, I would like to start where you ended on Exhibit

9, and the fact that you have on item number four an NN, should

that not impact our confidence in the earlier finding,

particularly since they couldn't differentiate between whether it

was 4- or 5-andro?

**A.**   Are you asking me if that pertains to my analysis or someone

else's analysis?

**Q.**   Well, I think I'm asking as to both.  Since you -- since you

made a finding of NN, and if I understand correctly in the note

below, the earlier issue was whether -- that it was detected but

they could not differentiate between either 4- or

5-androstanediol, and my question to you is, should that not

1  impact our confidence in the earlier finding that it was even

2  present?

3  **A.**   Okay.   The NN was not my finding because that was not about my

4  analysis, it was the GP mass spec analysis.   And I think the

5  previous analysis was LC mass spec analysis, and since they are

6  using two different techniques and two different methods, I

7  don't -- that would not say that the previous findings are in

8  question.   Different techniques and different instrumental

9  parameters contribute to whether or not things can be separated

10 out, and different instrumental techniques are more sensitive than

11 others.

12 **Q.**   Now, if I understand your testimony correctly, you are on

13 Exhibit 9 responsible for the NQs; is that correct?

14 **A.**   I am responsible for the NQs, but the NN was not HPLC-UV

15 analysis, that was a GP mass spec analysis.

16 **Q.**   Okay, so let's talk about the NQs just for a moment here.

17      With the prior witness we talked about the noise on a compound

18 being like grass, and then the peaks either being like trees or

19 bushes.   Is the NQs that you have indicated because we are

20 basically getting down into the territory of noise or to use the

21 comparison, grass?

22 **A.**   No.   The NQs are because my trees and bushes have two or three

23 components there together creating that peak, and that was a much

24 higher signal than that grass noise.

25 **Q.**   So basically what you're saying is due to coeluting, the

1  stronger signal was something other that what you were looking for

2  and it was overlapped?

3  **A.**   Correct.

4  **Q.**   Okay.  And as a result you cannot measure what is below the

5  overlap?

6  **A.**   Correct.  They are coming out right on top of each other, and

7  you would have to separate them out in order to do that.

8  **Q.**   Okay.  With regard to item number two on the chart on

9  Government's Exhibit 9, you indicate 0.0294; correct?

10 **A.**   Correct.

11 **Q.**   And would my math be correct that that means there's 99.97

12 percent of items other than the particular Schedule III that

13 you've identified?

14 **A.**   I'm not sure you can draw that conclusion from this

15 information without other information.

16 **Q.**   Well, certainly it would be items other than this

17 1,4-androstenedione; you could agree with that, can't you?

18 **A.**   I can't tell you what else was in there.  All I can tell you

19 about is the androstenedione.

20 **Q.**   And you can tell us that it's at that level that you

21 indicated, 0294; correct?

22 **A.**   Correct.

23 **Q.**   It's just a matter of math; would you agree with me as far as

24 that is concerned?  What else remains?

25          THE COURT:  Importantly, Mr. Leach, I agree with you.

1           MR. LEACH:  Okay.  Move on.

2   CROSS-EXAMINATION

3   BY MR. LEACH (continued):

4   Q.  Was the reason for the NQs, the three NQs that we're looking

5   at on Exhibit 9, the same, or was this a different reason for the

6   NQs when you're dealing with 4-androstenediol or androstenedione?

7   A.  No, there was a coelution issue from the other components in

8   that product.

9   Q.  So same problem?

10  A.  So it would be the same.  It's the same problem with

11  coelution, but the coelution was happening at different retention

12  times, yes.

13  Q.  Did you consider developing another method in order to try to

14  take care of the coelution problem?

15  A.  If you look at my workpapers, there was some attempt made to

16  deal with the coelution problem, but because of the time

17  constraints, we made a decision to stop and report out what we

18  could.

19  Q.  And what was that effort as reflected in your workpapers?

20  A.  I would have to have my workpapers in front of me to answer

21  that question.

22  Q.  And did you not review your workpapers in preparation for your

23  testimony here today?

24  A.  I did, but to specifically give you all of that information, I

25  would need you to hand me that as an exhibit so I could look back

1  at it and give you that answer.

2  **Q.**  You don't have your workpapers in front of you?

3  **A.**  All I have are the exhibits that have been given to me.

4  **Q.**  At what point did you review your workpapers in anticipation

5  of your testimony?

6  **A.**  I've reviewed them the last couple of weeks.

7          THE COURT:  I would just like to say, I think typically

8  we don't want witnesses to just have papers in front of them.

9  That's one of the things that worries me sometimes about Zoom

10  hearings is you'll see officers testifying and you realize they're

11  reading from something and you say, what do you have in front of

12  you and they'll have things and we tell them not to look at them.

13  I just want -- I want you to know, Ms. Jackson, that you didn't do

14  anything wrong by not bringing papers with you, and that if the

15  lawyers have a question for you, they can present you with

16  exhibits.  I just want to put that out there.  I don't like the

17  idea of Zoom witnesses just having papers in front of them that we

18  don't know about.  So for what that's worth.

19          MR. LEACH:  Judge, just so that it's clear, I sent an

20  e-mail to Mr. Kitchens asking that Mr. Santos affirmatively review

21  his workpapers for his testimony tomorrow.

22  CROSS-EXAMINATION

23  BY MR. LEACH (continued):

24  **Q.**  So the bottom line is, you do not recall what other efforts

25  were made, whether you look at the your workpapers, don't look at

1  them, do you recall them?

2  **A.**   I did make some effort to try to address the coelution, but

3  without my workpapers in front of me, I can't give you those

4  details.

5  **Q.**   And was that effort, an effort to create a new method?

6  **A.**   That was changing the parameters of the current method with

7  the particular amounts in the mobile phase trying to see if I

8  could separate out the components.

9  **Q.**   Okay.  And you never did that; correct?

10  **A.**   I did.  Those would be in my workpapers.

11  **Q.**   Oh, no, no.  My question is that you never actually executed

12  the new method?

13  **A.**   I did not find a method that could respectfully separate the

14  coeluting component in the time constraints.

15  **Q.**   So you did try a second method and the same result is what

16  you're saying?

17  **A.**   Correct.

18  **Q.**   Okay.  And was there only would other method or were there

19  multiple other methods that you tried?

20  **A.**   I would have to look at my workpapers to answer that question.

21  **Q.**   Well, can you tell me to the best of your recollection?

22  **A.**   I would prefer to look at my workpapers to answer that

23  question.

24  **Q.**   So the answer is no; is that correct?  In other words, you're

25  not comfortable testifying under oath as to how many methods you

1  tried?

2  **A.**   Not without my workpapers submitted to me as an exhibit.

3  **Q.**   Did you quantify the active ingredients in the products?

4  **A.**   I quantified the steroids listed on the case/sample summary

5  report.

6  **Q.**   Well, are you familiar with DHEA?

7  **A.**   A little.

8  **Q.**   And did you quantify the amount of DHEA in any of these

9  products?

10  **A.**   No.  That is not listed on the case/sample summary report.

11  **Q.**   Okay.  And does that mean you weren't asked to do that?

12  **A.**   That is correct.

13  **Q.**   Did you test for epiandrosterone?

14  **A.**   What I tested is in the case/sample summary report.

15  **Q.**   Since that is not in the report, you did not test for that

16  compound either; correct?

17  **A.**   That is correct.

18  **Q.**   Now, I'm going back to the beginning of your testimony.  If I

19  understood your testimony correctly, you said that you did not set

20  an LOQ before your analysis.  Did I understand that correctly?

21  **A.**   Correct.

22  **Q.**   Is that not part of the scientific method that you're supposed

23  to set an LOQ before you do a test?

24  **A.**   It depends on the standard operating procedures of the method

25  and if the method requires it.

**Q.** I think in conjunction with your testimony about the LLQ, you said something to the effect that the response was very small compared to the peak response.  Did I understand that correctly?

**A.** I don't understand.

**Q.** Okay.  Well, what I took it to mean, and I may be getting this wrong, so please correct me.  But what I took it to mean is that what you were seeing is what I believe is the DHEA or the epiandrosterone, and the amounts -- the things that you were testing compared to those peak responses were very small.  Did I understand that right or do I have that totally wrong?

**A.** In my particular analysis, I did not run standards for those other things that you're talking about.  So I cannot address that question in my analysis.

**Q.** But even in your testing procedure, wouldn't you see the peaks even though you don't have the standards?

**A.** If I don't run a standard in my analysis to compare the retention time and the ultraviolet spectra, I cannot tell you what that peak is.

**Q.** Right, right.  I understand that.  It's just my point is that you can see the peak, you just don't know what that peak is because you don't have a standard?

**A.** I saw other -- I saw other component peaks in my analysis, yes.

**Q.** Okay.  And you did not believe that those other peaks were Schedule III steroids; is that correct?

**A.**   That could not be determined by my analysis.  That would have had to be determined by a quantitative analysis prior to mine.  I have to know what it is I'm quantitating.

**Q.**   I gotcha.  I gotcha.  So you're, basically, standing on the shoulders of the scientists who came before you and they are directing you to particular items within your sample; correct?

**A.**   The qualitative analysis has to identify the drugs or components that are there and then, yes, after that piece of information then the quantitative analysis would happen and the quantitative analyst is told what it is they are quantitating, yes.  We have to be given that information.

**Q.**   Now, I'm looking again at Exhibit 9 and my question to you is: Was it your conclusion that 4-andro and 5-andro were not coeluting here or is it your opinion that they were, in fact, coeluting?

**A.**   I did not do an analysis for the 4- and 5-androstenedione. That is the GC mass spec and the LC mass spec analysis.  I cannot address that question.

**Q.**   Okay, what you're saying is, you didn't compare 4 to 5, but you do have a conclusion, NQ, with regard to 5-andro; correct?

**A.**   No, my NQ has to do with 4-androstenediol, not 5.

**Q.**   Okay.  I see.

THE COURT:  Could you remind me what y'all are looking at, if y'all are looking at a document right now?

MR. LEACH:  Exhibit 9.  If you want, I can put it on the screen, Judge, where you can see it.

1          THE COURT:  That's okay.  I can find it.

2          THE WITNESS:  It is the table in Exhibit 9 that talks

3    about the milligrams per tablet that I found and the item, and

4    there are two annotations.  An NQ is not quantified because of the

5    coelution.  And the NN says that the 4-androstanediol and the

6    5-androstenediol were not present, and that was a

7    different -- that was a qualitative analysis, not the

8    quantitative.

9          MR. LEACH:  She's referring to item four, Judge, in that

10   chart.

11         If I could just have a moment, Judge.

12         THE COURT:  Sure.

13   CROSS-EXAMINATION

14   BY MR. LEACH (continued):

15   **Q.**  Ms. Jackson, I'm looking at my notes and, you know, my

16   exhibits are -- the defense exhibits are marked slightly

17   different.  So I just want to make sure that item nine -- I mean,

18   Exhibit 9 and Exhibit 8, those two government exhibits are the two

19   that you did testing on; is that correct?

20   **A.**  I did testing on Exhibits 7, 8 and 9.

21   **Q.**  Hold on.  Let me go back to seven for a second.  Okay.  I see

22   that.

23         MR. LEACH:  That's all I have, Judge.

24         MR. MORRIS:  Judge, I have very few, if I may.

25         THE COURT:  Okay.

1  CROSS-EXAMINATION

2  BY MR. MORRIS:

3  **Q.**  Ms. Jackson, can you tell me when were you first requested to

4  quantitate these items?

5  **A.**  May 2018.

6  **Q.**  May 2018 was the first request for quantification by you?

7  **A.**  As far as I was requested of anything.

8  **Q.**  And I believe you said the direction came from Dr.

9  Brueggemeyer; correct?

10  **A.**  Correct.

11  **Q.**  Do you know if Dr. Brueggemeyer was asked by Agent Kriplean to

12  have this done?

13  **A.**  No, I do not.

14  **Q.**  Okay.  And if I understand you correctly, because of the

15  coelution, referring to the items on Government's Exhibit 7, you

16  don't know what the other component or components are?

17  **A.**  Correct.

18       MR. MORRIS:  I believe that's all I have, Your Honor.

19       THE COURT:  Any redirect?

20       MR. JONES:  No, Your Honor.

21       THE COURT:  All right.  Anybody else want one more run

22  at Ms. Jackson?  Nope.

23       All right.  Ms. Jackson, you're free to go about your

24  business.  We would ask you not to speak about your testimony with

25  anyone.  If at some point you need to talk about your testimony or

 1  the case, I'd ask you to run it by Mr. Jones and make sure.  We

 2  want to make sure everybody comes in without having talked to each

 3  other.

 4          THE WITNESS:  Correct.  I understand, Your Honor.

 5          THE COURT:  Great.  Well, you're free to go.  Thank you

 6  so much for your time.  We appreciate it.

 7          THE WITNESS:  Thank you.

 8          THE COURT:  All right, let's take a ten-minute break,

 9  everybody.

10          (Whereupon a break was taken.)

11          THE COURT:  Viola, let's go back on the record.  So I

12  think that we were going to shift gears now and move to a

13  defendant witness, which is Mr. Hillyer.  So who from the defense

14  is going to be directing this witness?

15          MR. WENIK:  I will be conducting the questioning, Your

16  Honor.  I suspect Bruce may have a question or two after I'm done,

17  if you see something that I've omitted, but I'll be doing the

18  primary questioning.

19          THE COURT:  All right, you can go ahead and --

20          MR. KITCHENS:  Judge?

21          THE COURT:  Yes.

22          MR. KITCHENS:  Before we get started, can we just

23  provide the same sequestration instruction that was provided to

24  the government witnesses, that the -- Mr. Hillyer should not have

25  any other contact with any other defense witnesses, and the

1  defense attorneys should not have any contact with their witnesses

2  regarding the substance of any questioning that takes place with

3  Mr. Hillyer?

4          MR. LEACH:  Yes.  My thought, Nathan, was that that rule

5  applies to the entire hearing.

6          MR. KITCHENS:  Okay, great.  And we certainly at our

7  end, we're not having contact with our witnesses beyond sending

8  them the exhibits for tomorrow.

9          MR. LEACH:  And with regard to --

10         THE COURT:  So, Mr. Hillyer, I've been kind of doing a

11 shorthand version, but don't talk to anybody about the case.  You

12 can talk to the lawyers, although the lawyers are going to be

13 under their own restraints at what they should be talking to you

14 about.  Typically, they are not supposed to talk to you during the

15 middle of your testimony, coaching and that sort of thing,

16 although I'm sure you have been prepped and that's appropriate.

17 So if you have any questions about who you can talk to, just talk

18 to the lawyers.  But for the most part you're going to testify

19 today and lucky for you, you probably won't have to talk about

20 this case for awhile.

21         THE WITNESS:  Very good.  I fully understand the

22 instruction.  I appreciate the clarification.

23         THE COURT:  Yeah, and so it's really so that witnesses

24 can't sit in court at the same time and listen to each other and,

25 you know, alter their testimony.  That's kind of the big picture,

1  but the idea is just don't talk to anybody about it and you can't

2  go wrong with that one.

3         THE WITNESS:  Very good.

4         THE COURT:  But if you need to, your lawyers, they know

5  what the rules are and they're going to abide by them.  I'll turn

6  it over to the defense to do the direct.

7         MR. WENIK:  Did we lose Bruce or is he sitting out?  Oh,

8  there he is up at the top.  I'm good.

9         Judge, just bear with me a bit.  There is going to be

10  some overlapping with the defense and government exhibits.

11  Candidly, it's just much easier if I use my own set that's

12  organized already, and we can sort out the overlap later on with

13  Mr. Kitchens and I, if we need to.

14         THE COURT:  I don't think we need to.  Just use your

15  exhibits and I think we should be fine.  Just keep the record

16  clean about what we're looking at, and I think we'll be fine.  If

17  there is some discrepancy, y'all can bring it up.  I think just

18  referring to your own and being clear that we're on the

19  defendant's exhibits as opposed to the government's, I think the

20  record will be clear.

21         MR. WENIK:  Thank you, Your Honor.

22         THE COURT:  All right.

23         THE DEPUTY CLERK:  Agent, if you would please raise your

24  right hand to be sworn?  Do you solemnly swear or affirm that the

25  testimony you should give in this matter now pending before the

1   court, shall be the truth, the whole truth and nothing but the

2   truth so help you God?

3            THE WITNESS:  I do.

4            THE DEPUTY CLERK:  Would you please state your full name

5   for the record and spell your full name for us.

6            THE WITNESS:  Gregory, G-R-E-G-O-R-Y, middle initial L

7   as in Lloyd, last name Hillyer, H-I-L-L-Y-E-R.

8            THE DEPUTY CLERK:  Thank you.

9            THE WITNESS:  You're welcome.

10           THE COURT:  Angela, did we swear in Ms. Jackson?

11           THE DEPUTY CLERK:  Yes.

12           THE COURT:  Did we?

13           MR. WENIK:  I thought we did.

14           THE DEPUTY CLERK:  Well, I thought we did.  Yeah.  Yes.

15  I'm pretty sure I did.

16           THE COURT:  I swore the first one.

17           THE DEPUTY CLERK:  I swore in the second one.  That's

18  the first one I did.  So yes.

19           (Discussion off the record.)

20           THE COURT:  Okay, let's go.

21                         ******

22                    GREGORY L. HILLYER,

23        having been previously sworn, testified as follows:

24                         ******

25  DIRECT EXAMINATION

BY MR. WENIK:

**Q.**  Mr. Hillyer, can you tell the court how you're currently employed?

**A.**  I am an attorney, and currently the director of litigation at Hillyer Legal PLLC, same spelling as my last name.

**Q.**  And what type of legal practice are you involved with, what sort of things do you do?

**A.**  Largely intellectual property, focusing, in large part, in the chemical arts, although not necessarily limited to that particular technology.  I also do a fair amount of trademark work, copyright work primarily in the litigation context.

**Q.**  All right.  Can you tell the court about your educational background with specific emphasis, if you will, on your training and knowledge of chemistry, both synthetic and organic and process?

**A.**  Yes.  As a first career, my focus was exclusively in the area of chemistry.  My formal education is that I have a Bachelor of Science degree in chemistry from the State University of New York.

I attended graduate school at the University of Pittsburgh, teaching fellowship to study organic chemistry.  I graduated with a master's degree in organic chemistry.  During my time in graduate school I was employed as a teaching fellow, in which I was assigned to the organic chemistry division, and taught all aspects of chemical synthesis, characterization, interpretation and quantification.

1      After graduating from the University of Pittsburgh, I accepted

2  a position at what was then a joint venture between DuPont and

3  Merck, aptly called DuPont Merck where I was employed as a

4  medicinal chemist, and my responsibilities in that position were

5  to identify synthetic organic targets to plan synthetic route

6  solution to actually carry out the experiments to produce those

7  compounds, including isolating and characterizing them and then

8  submitting them to the pharmacologist to see whether or not they

9  had beneficial properties.  My focus was primarily in the

10  cardiovascular division, although I did work in different

11  therapeutic areas.

12      Following my first occupation at DuPont Merck, I spent a year

13  teaching chemistry at Wingate University in North Carolina, after

14  which I returned to DuPont Merck in the process division where the

15  focus was the same, inasmuch as it was synthetic organic chemistry

16  but process division is much more concerned in scale-up, producing

17  more of what has already been identified as a development

18  candidate date.  And in that job you're concerned more primarily

19  with how you make the compound, what impurities might be present,

20  the activity of those impurities, again, route selection and

21  producing a compound that can be ready for clinical trial.

22  Q.  All right.  Before we get to your legal career, in these

23  positions that you've described for DuPont Merck and later DuPont,

24  I guess, did some of your duties involve using instrumentation

25  techniques to detect various compounds and molecules?

1  **A.**   Yeah, that was done on a daily basis because as a result,

2  whether in met chem or in process, when you make a compound you

3  have to create the synthetic route, you know, on paper, then you

4  actually have to carry it out in a laboratory setting.  You have

5  to monitor the reactions, you have to purify them, you have to

6  characterize them and you have to identify any contaminants and

7  determine the level of purity.

8     So the use of instrumentation was integral to all of those

9  processes, and, again, it's something that I did on a regular

10  basis.

11  **Q.**  So are you familiar with -- we've been hearing terminology

12  today, like, mass spec and gas chromatography and HPLC, are these

13  methodologies that you're familiar with in using and implementing?

14  **A.**   Yes, I first became exposed to those as an undergraduate, and

15  then in graduate school I actually taught those techniques to

16  students and then employed all of them and more in the -- in an

17  industry setting for my tenure at DuPont Merck.

18  **Q.**  All right.  And just briefly before we get into the substance

19  of your testimony, can you tell the court how your legal career,

20  if at all, has involved, you know, review of issues in chemistry

21  and analysis of compounds and that sort of thing.

22  **A.**   Certainly.  After serving as a chemist at DuPont Merck, I was

23  able to move into the legal division at DuPont.  And the reason I

24  was able to do that -- I was actually the first person to ever

25  make that transition in the history of the company.  And the

1  reason was because in the legal division, I was responsible for

2  drafting patent applications for synthetic processes and

3  compositions of matter that covers the drugs and manners and

4  methods of making them.  And in order to perform that job, I would

5  have to liaison with the chemists, understand, again, all of the

6  route selection, identification and the various pieces of

7  characterization that are necessary for a patent application.  I

8  performed largely the same function as a scientific adviser and a

9  patent agent in my first law firm position, you know, slowly

10  moving on and evolving in my career to greater emphasis on

11  litigation, again, in the chemical arts with a strong focus on

12  revolving disputes over chemical technology, whether it be matters

13  involving the FDC, whether it be civil litigation between

14  different pharmaceutical or dietary supplement companies, as well

15  as drafting and overseeing the prosecution of patent applications

16  in the technical area.  So pretty much from the beginning of my

17  career, I've been focused on the chemical arts in some way, size,

18  shape or form.

19  **Q.**  All right.  Did you review some of the FDA reports and other

20  related documents in this matter?

21  **A.**  I did.

22  **Q.**  Let me take you through a few basic questions.  Can you tell

23  the court what is a steroid?  When you say something is a steroid,

24  what is a steroid?

25  **A.**  A steroid is a broad term that applies to organic compounds

1   that have a particular chemical structure, but most well-known is

2   testosterone.  And testosterone has a very characteristic ring

3   structure that involves three six-membered rings and a

4   five-membered ring.  So at its heart it's an organic compound, a

5   fairly high molecular weight.  And then, of course, at various key

6   positions that are subject to sort of classic numbering, steroid

7   numbering or androstene numbering, at various positions you see

8   different functional groups.  So I like to think of chemical

9   entities as having a core, which is sort of the shape of the

10  molecule and then substituents.  So hanging off of this core

11  molecule with different positions, you'll see particular

12  substituents, chemical entities.  Organic chemistry focuses on

13  what we call functional groups.  So you see the same kind of

14  groupings of atoms and bonds over and over again in organic

15  chemistry.  And steroid, sort of as a general term, is a class of

16  compounds that have that characteristic core and then, you know,

17  the same or similar substituents in key positions.

18  **Q.**  Let me follow up with a couple of things you mentioned in that

19  answer.  So you mention molecular weight.

20      So what is that concept?  When you say something is of

21  molecular weight, what are you referring to?

22  **A.**  Just adding up the weights of the atoms to give a total weight

23  of the compound, and as you can probably appreciate, compounds

24  that are administered orally can have a wide variety of molecular

25  weights, but by and large, either because we want to be able to

1  make them efficiently or because we need sufficient activity in

2  the body, it's pretty standard to see molecular weights in the

3  hundreds, you know, 200 to 500 is sort of right in the sweet spot

4  as far as what we see as orally ingestible compounds.  I mean,

5  it's not meant to be overlimiting, but you're probably not going

6  to see a molecular weight of 25 or a thousand in something that

7  can practically be administered to the public.  So it's

8  just -- just a -- some guardrails.

9  **Q.**  All right.  So we're talking about molecular weights and

10  structures.  Are steroids generally, how do you characterize them,

11  small, average, larger molecules?  How would you describe that?

12  **A.**  I would say they're average.  You know, it's very common to

13  see ring structures of the type in steroids in normal drug

14  development, natural products, things that are isolated from

15  nature.  I won't say always, but very frequently they have the

16  same types of six-membered rings.  I mean, there is a reason why

17  we see six-membered rings, and that's because carbons like to take

18  on that confirmation.  Five-membered rings as well, when you start

19  to get to four or three it gets harder because the physical

20  orientation of the atoms is not as -- not as popular.

21      So these are just another way of saying that steroids have the

22  sort of same characteristics of many, many organic molecules.

23  **Q.**  And did you research the various steroids at issue in this

24  case?  Did you conduct some research on them?

25  **A.**  I did.  I looked at the target compounds that were intended to

1  be in the commercial products.

2      I looked at the literature and surrounding documents

3  concerning the areas on the classic steroid skeleton that are

4  modified both in the body as well as outside the body in a

5  laboratory setting, and I narrowed those down to

6  certain -- certain areas of interest on the molecule.

7  **Q.**  All right.  Are you familiar with a compound or a molecule

8  known colloquially, if you will, as DHEA?

9  **A.**  I am.

10 **Q.**  What is DHEA?

11 **A.**  DHEA is -- I would also call it a variant of the type of

12 structures that we're talking about.  As I understand it, it's a

13 non-controlled substance that has a particular set of substituents

14 on the molecule.

15     And also -- so the three areas that we may be talking more

16 about on this molecule, is the presence of a double bond.  It can

17 move around in different types of these molecules, but it's common

18 to see a double bond in various positions.  And as we look at some

19 of the names, the numbers that are assigned frequently have to do

20 with the position of that bond.  And then in two positions you

21 either have -- here we go.

22 **Q.**  So let me interrupt your answer --

23 **A.**  No, please, let's -- let's use this.  It's helpful.

24 **Q.**  -- but I thought it would be helpful to illustrate somewhat

25 what you're talking about.  I put on the screen -- it's one of the

1  exhibits that, I think, is worth me putting on the screen to help

2  us all on.  I'll call it a diagram that I've labeled Defense

3  Exhibit 18.

4      Is this something that you had a role in preparing, this

5  particular diagram that we see?

6  **A.**  Yes, I did.

7  **Q.**  All right.  And I think it may be helpful if you could walk

8  the court through what's displayed here, and, in particular,

9  you're talking about these different structures and double bonds.

10 If you could point out the similarities and differences between --

11 I think you used the word target compounds and the impurities or

12 steroids of interest here?

13 **A.**  Yeah, I'd be happy to.  So the intention here is to juxtapose

14 the intended active ingredients in the commercial products in this

15 case, and those are in the color green on the left-hand side of

16 this particular slide.

17     The impurities that were identified by FDA, which are

18 controlled substances, as I understand it, are on the right-hand

19 of the slide in red.

20     And one of the first things that I'll reiterate with this

21 slide in front is that regardless of whether they're active

22 ingredients or impurities in this slide, you see the same ring

23 structure in every single compound.  That is to say, you see a

24 six-membered ring -- pick any molecule and start on the left-hand

25 side.  You start with a six-membered ring that is fused to another

1  a six-membered ring.

2     Moving sort of north on the slide, that's fused yet to another

3  six-membered ring which is fused to a five-membered ring.

4     So if you see, those have the same -- what I have been calling

5  a core structure.  That's what you call the core of an organic

6  molecule.  And everything else is sort of a thing that -- things

7  that hang off of it.

8     And so the first thing that I mentioned was the presence of

9  this double bond.  And so that's the situation in which in the

10  core you see -- you see two lines instead of one.  That's classic

11  designation of a double --

12  **Q.**  A double bond here which is the two lines on the --

13  **A.**  Yeah, go to the far left to what's labelled as 4-DHEA.  Go

14  inside the ring.  Yeah.  And look for the line inside the ring.

15  No, to the left.  That's it.

16  **Q.**  Okay.

17  **A.**  Right, so that's a double bond.  And if you sort of follow the

18  analogy to that compound and just move to the right, you'll see

19  that that double bond has now moved.  And -- we don't have the

20  numbering on this slide, but steroids have a classic assigned

21  numbering by the international nomenclature that chemists use, and

22  that slide is probably in the stack somewhere.

23     But the way in which you distinguish 4-DHEA from 5-DHEA is

24  that -- the convention is to put the double bond at the lowest

25  number.  So if we had the numbering, you'd see the double bond

1 starts on the four carbon and 4-DHEA and starts on the five carbon

2 on the 5-DHEA.

3 **Q.** So the concept of four molecular weight, what we're seeing

4 here, do these -- what I'll call the target compounds or active

5 ingredients, have the same or similar molecular weight as these

6 impurities that were identified in some of these FDA reports?

7 **A.** Yeah, they're all quite close because of the same skeletal

8 structure, as well as extremely similar substituents, in some

9 cases just differing by one molecular unit.

10 **Q.** Now, one concept that came up in some direct examination

11 earlier this morning, was the concept of the coelution.

12 **A.** All right.

13 **Q.** Can you tell us what coelution means?  What is your

14 understanding of what coelution is?

15 **A.** So I assume coelution came up in the context of high

16 performance liquid chromatography known by its acronym HPLC.  And

17 HPLC is a method by which you can separate a mixture into its

18 individual components.  And if you have the right conditions, then

19 you may be lucky enough to get separation of every component.  And

20 you know that's happening because when you look at the

21 chromatogram that's produced by HPLC, you'll see what we call

22 peaks, like little mountains.

23     If a peak starts on the baseline and creates the peak and then

24 finishes on the baseline without any interruption by other peaks,

25 that's what I would call getting baseline resolution or full

1  separation, because the detector is seeing the compound come off.

2  It's measuring the difference in -- well, it depends what kind of

3  detector you're using, but let's say that it's using UV light.  So

4  it's seeing the compound come off, and then the compound is done

5  and now you're ready for the next compound to come off.  That's

6  great when that happens, but it doesn't always happen that way

7  because sometimes molecules that are very similar with respect to

8  their polarities, which is really what you're measuring, what

9  you're -- it's the characteristic you're exploiting when you do

10 HPLC.  If they're very similar in their polarities, sometimes they

11 come off the column together.  In fact, sometimes they come off

12 the column in such perfect unison, that you only see one peak even

13 though it's two compounds.  It's really one peak on top of another

14 peak.  Depending upon their relative amounts, one might completely

15 dwarf the other.

16     But let's further assume that instead of coming off the column

17 identically, it just comes off very close.  And so instead of a

18 full peak followed by another full peak, what you might see is a

19 shoulder, or maybe you'll see two peaks without coming down to the

20 baseline.  That's just a reflection of the fact that you have two

21 organic compounds that are exiting the column at the same time.

22 The goal when you're separating a mixture, obviously, is to get

23 full separation of every compound.  I mean, that's ideal.

24 **Q.**  And you mentioned that one way, if I understand what you said

25 a couple of minutes ago, that you have this phenomenon, the

1   coelution is when one peak is dwarfed by another and one compound

2   is so much more predominant in the mixture than the other; is that

3   right?

4   **A.**   Right.  So it could -- yeah, it depends what the peaks look

5   like.  One doesn't necessarily have to dwarf the other.  If two

6   organic compounds come off a column at exactly the same time, it

7   may just be that those columns completely -- the peaks completely

8   overlap.  So you might not even know that there's another compound

9   under there.  It's just a limitation of that particular technique.

10      Other times they're close but they're not identical and,

11   therefore, you might see what we call shouldering.  That's another

12   peak coming off, but before it has a chance to finish, another

13   peak starts.  So that's what coelution is.  It literally means

14   eluding off a column at the same time.

15   **Q.**   All right.  Now, what are the -- bear with me a moment.  Let

16   me ask you to look at the -- get rid of this for a bit -- Exhibit

17   1, which is the indictment in this case.

18   **A.**   All right.

19   **Q.**   Pages 14, 15 and 16 list the counts corresponding to the

20   various Schedule III controlled anabolic steroids?

21   **A.**   Yes.

22   **Q.**   And one question I have for you is, if I pronounce it right,

23   boldenone.  Is there a synonym, another name for boldenone?

24   Because we don't see the word boldenone in any of the FDA/FCC

25   chemist reports.  We see them referred to androstenedione and

1  androstenediol, et cetera.  Is that a synonym for another type of

2  steroid?

3  **A.**   It is typically -- so boldione -- I don't know, we don't have

4  the slide up anymore.  But it's got a situation where in that

5  first ring, instead of having one double bond, it has two double

6  bonds.  So that nomenclature will give us "diene," because "ene"

7  stands for double bond, "di" means two.  And I believe that

8  molecule also has two keystones in it at the 3 and 17 position, so

9  that will give rise to the nomenclature "dione."

10  **Q.**   All right.  Before I start showing you some of these lab

11  reports, I want to ask you generally, when we're talking

12  about -- you talked about a commercial product.  When you talk

13  about a commercial product, be it a drug, a dietary supplement,

14  whatever, is there ever such a thing as something that's 100

15  percent pure, without any impurity in it whatsoever?

16  **A.**   It's not physically impossible, but it's extremely infrequent.

17  Even in pharmaceutical-grade compounds that are sold to the public

18  with FDA approval, there are threshold amounts of impurities that

19  are permissible where reporting them is not even necessary, and I

20  believe the reporting threshold is .05 percent of the active.  So

21  if you're -- if your characterization indicates that you have less

22  than that threshold amount, you need not even identify them to

23  FDA.

24          THE COURT:  Could you repeat that and tell me what is

25  your source for that?

1          THE WITNESS:  I believe that that's manifested in FDA

2     guidelines, which in -- which, obviously, is reflected in the

3     Controlled Substances Act.  I can give you the exact citation, but

4     FDA reg -- there's FDA regulation --

5          THE COURT:  I'd be interested if the Controlled

6     Substances Act has that limitation.  I think we'd all be very

7     interested in that.

8          THE WITNESS:  No, that's probably an FDA regulation,

9     Your Honor, that's -- we're sort of providing the agency gloss on

10    what's permissible.  But that's where -- that's where the --

11    that's where those threshold numbers come from.  There is another

12    threshold that I believe is .1 one percent, if you're above that

13    amount, then you actually have to identify the impurities.  And

14    then there's another reporting threshold of .15 percent, whereby

15    the impurities not only have to be identified, but you have to

16    justify their inclusion in the product.

17         THE COURT:  So you're saying if it's less than .05, then

18    what?  You don't have to --

19         THE WITNESS:  That's called the reporting threshold,

20    Your Honor.  And if you have impurities that are less than that

21    threshold amount, you need not report them to the FDA, which,

22    obviously, would mean you didn't have to identify them either.

23         THE COURT:  Okay.  Thank you.

24         THE WITNESS:  You're welcome.

25    DIRECT EXAMINATION

BY MR. WENIK (continued):

**Q.** Let me take a look at what I have marked as Defense Exhibit 2, which is January 30, 2017, case/sample summary report. Let me know when you have that in front of you.

**A.** Sure.

**Q.** Okay. Is this one of the documents that you reviewed in coming to your opinions?

**A.** It is.

**Q.** Okay. So we're looking at this document, and I'm looking at the first page, and that's a number to the right of FACTS, 984260. Is that a sample tracking number that the FDA chemists use in conducting their analyses?

**A.** That's correct. That's my understanding. So if you receive another report with that same FACTS number, it would be dealing with the same substance.

THE COURT: I'm sorry, can you just remind me what exhibit? I'm sorry, I missed that.

MR. WENIK: Defense Exhibit 2.

THE COURT: All right. I've got it. Thank you.

DIRECT EXAMINATION

BY MR. WENIK (continued):

**Q.** So if a report refers to that FACTS number, we're talking then of analysis of the same -- something from the same sample; is that right?

**A.** That is right. And so just using Exhibit 2 as an example, if

1  you'll see items one, two, and three which are called out, if you

2  find another report with the same FACTS number and see items one,

3  two and three, those would be the same items.

4  Q.  Okay.  So whatever then was analyzed under this FACTS number,

5  if I understand what you're saying, in looking at the description

6  of samples received, that would have been materials received on

7  October 19, 2016?

8  A.  As far as I know, yes.

9  Q.  Okay.  So we have here some descriptions of what items one,

10  two and three are.  And if we look at -- I'll just start with the

11  description of androstendiol, if I'm pronouncing that right, on

12  the right?

13  A.  I think it's androstendiol, but --

14  Q.  Androstenediol, okay.  Does that indicate the description of

15  some of the ingredients from the label of the product?

16  A.  Yes.

17  Q.  And does this -- I should have asked a preparatory question.

18  I assume at some point you've looked at the label of the various

19  products?

20  A.  Yes.

21  Q.  Does this list all of the ingredients or just some of the

22  ingredients that are from the label of androstenediol?

23  A.  I don't know that I did a complete accounting, so I'll have to

24  suggest that it includes some, possibly all, but maybe not all of

25  the ingredients.

1  **Q.**  So at least some of the ingredients?

2  **A.**  Certainly.

3  **Q.**  Okay.  Are any of these ingredients that we are seeing here

4  steroid or steroid-like compounds that are listed in the

5  descriptions, this 4-androstenediol 3ßol or any of these items?

6  **A.**  Yeah.  I hate to call them steroid compounds, but I think

7  they're all androstane derivatives.  In other words, androstane is

8  the core structure we were referring to, and it also helps

9  our -- our referral to this document, because as you can see in

10  androstenediol one of the ingredients is 4-androsten 3ßol-17-one,

11  and without belaboring all those chemical vernaculars, the next

12  two products also have these androsten derivatives.

13  **Q.**  And these would have the same core structures of the steroids

14  that we're talking about; is that right?

15  **A.**  They would.

16  **Q.**  And do these descriptions list lot numbers?

17  **A.**  They do.

18  **Q.**  What is a lot number?  Explain to the court what a lot number

19  means?

20  **A.**  When a manufacturing run is performed, let's say you're mixing

21  an active ingredient with various excipients and powders to make

22  the commercial product, that whatever that blend run was, will

23  probably be given a lot number, which would be stamped on the

24  bottle, so that after the fact you want to know which

25  manufacturing run corresponds with which bottle, you can track the

1  lot number.

2  **Q.**  Okay.  And these descriptions list expiration dates?

3  **A.**  They do.

4  **Q.**  And what is the purpose of the expiration date on a dietary

5  supplement product?

6  **A.**  Testing is performed on completed commercial products to

7  ascertain their stability thresholds for things like time, heat,

8  moisture and the like.  As a result of those tests, it will be

9  ascertained at what point the product is no longer

10  chemistry -- has chemical integrity.  And it will be determined

11  that at some point or another the product shouldn't be used, and

12  it's based on those and probably other criteria, but largely it's

13  about the preservation of the contents of the product so that the

14  product that the customer is purchasing and/or ingesting in this

15  case, has the same chemical composition as the day it was made.

16  **Q.**  Let me follow up on that very last phrase.

17      So looking at this document, we see the date it was received

18  at the lab, October 19, 2016, and we see the expiration dates for

19  the products, but can you tell from here when the manufactured

20  date of the various products are or you can't?

21  **A.**  I can't tell based on this document.  I -- I don't believe

22  it's industry standard to include manufacturing dates.  What's

23  more important is once the product is in the consumer's hands, is

24  when it's good until.  It doesn't rule out the possibility that

25  that information is stamped somewhere.  Sometimes on the bottom of

1  the bottle, you know, there might be some additional information.

2  I'm just not aware of it in this case.  As far as I can see, it's

3  not contained in this document.

4  **Q.**  So my point would be or question to you rather is, the report

5  indicates that was received on October 19, 2016, but we don't know

6  how long these items sat on the shelf, so to speak, before someone

7  from the FDA went out there and acquired them and sent them to the

8  lab, do we?  They could have been out there for a year, two years,

9  six months, we just don't know?

10 **A.**  We don't know that, and there's typically a fairly wide

11 variation.  It could be because of a particular outlet that might

12 be less popular than another, it could be that a product base is

13 more appealing than others.  I've seen instances where products

14 have been on shelves for years, even after the manufactures has

15 stopped providing them, and other circumstances it might be

16 something short of that.

17 **Q.**  Have you heard of a concept that's referred to as a shorthand

18 of an LOD or limit of detection?

19 **A.**  Yes.

20 **Q.**  What is a limit of detection?

21 **A.**  Well, any instrument is going to have purposely the ability to

22 see a certain amount of the compound in question.  And the reason

23 you need that is because if you have a level of detection that's

24 too high, you may have a detector that is reacting to every

25 possible impurity or compound included in a -- in a target

1  compound or in the compound of interest.

2      On the other hand, if your detector is set too low, you may be

3  missing things in the baseline that your detector is not picking

4  up.  So for most of these instruments, there's some threshold

5  amount at which the thing should be detected, if they are present.

6  And that's my best explanation I can give you for limit of

7  detection.

8  **Q.**  All right.  And this report that we're looking at, this

9  Defense Exhibit 2, does this set out the limit of detection

10  anywhere in the report?

11  **A.**  Not that I'm aware of.

12  **Q.**  And in your practice when you were involved as a chemist

13  yourself, you're still a chemist, but working as a chemist and

14  working in patent prosecutions and litigation or what have you, is

15  it your practice that what you have seen, that a limited of

16  detection is set before an analysis is conducted, before a sample

17  is run through the instrument?

18  **A.**  It can be.

19      I mean, it gets into a number of other factors, including what

20  your expectations are with respect to the comparative amounts.

21  Because if you're expecting to see a lot of impurities, you may or

22  may not want to have a level of detection that will see all of

23  them or will ignore all of them.  On the other hand, not all

24  compounds have the same -- not all compounds are detected in the

25  same way, because if you're using the UV detector, some things

1  don't absorb the same UV light at the same rate as others.  So it

2  may be that you're not seeing compounds with the same prevalence

3  as others.

4      For standard analysis, things that you've seen before, things

5  where you have a good understanding of your level of expectation,

6  then your level of detection is probably going to be in a static

7  condition, it's going to be set, you're going to know what it is,

8  there's going to be a standard operating procedure or SOP for that

9  instrument, and maybe even for those compounds.

10 **Q.**  So if an entity has been quote, unquote testing for steroids

11 for over 30 years, you would expect that they would have a

12 standard level of detection in their SOPs, wouldn't you?

13 **A.**  I would.

14 **Q.**  Now, you mentioned in passing about a quantity.

15     Can you describe for the court the concept of an LOQ or a

16 limit of quantitation?

17 **A.**  Well, some analytical methods are not designed to determine

18 quantity at all.  So it may -- it may be that you're just looking

19 at identity.  And then in those instances where you are interested

20 if quantities, you may not be in a position where you want to

21 quantify everything in a particular sample.  You may want to look

22 at your primary compound and nothing else.

23     On the other hand, in situations where your -- for example,

24 when I was in the process division, it was very important now that

25 you've identified a target of interest, that you know more about

1  it.  And so quantifying the amount of impurities after you've

2  identified them, was critically important.

3     So it depends on the endeavor.  It depends on what the goal

4  is.  It depends on the compounds and how important it is to have

5  those qualitative measures in any given situation.

6  **Q.**  Now, I'm looking at the first page of this report, I'm still

7  on Defense Exhibit 2, and it has an acronym at the last paragraph,

8  the first page, LC-MS.  Does that refer to analytical or

9  instrumentation method?

10  **A.**  It does.  It's actually a combination of two different

11  methods, and it's a popular one.  LC is just a shorthand for what

12  I called HPLC, liquid chromatography.  That's a technique where

13  you're exploiting different pluralities of compounds in order to

14  achieve separation.

15     MS is shorthand for mass spectroscopy, which is a method to

16  identify the mass to charge ratio of a compound or what you might

17  think of as molecular weight.

18     So one technique is sort of feeding into the next.  First,

19  you're going to separate the compounds using LC.  Then you're

20  going to analyze their molecular weights using MS.

21  **Q.**  And on the second page we see another acronym beneath the

22  table, GC-MS.  What is GC-MS?

23  **A.**  Right.  So similarly, that's the combination of two different

24  techniques.  The first is a separation technique.  Instead of

25  exploiting compounds based on their different pluralities and

1   solvents, you're going to put them into the gas phase.  GC has a

2   lot of similarities to LC because you're counting on different

3   compounds progressing through a column at different rates, but now

4   you're doing it in a gas state.  And then again, coupling it to an

5   MS to determine molecular weight.

6   **Q.**   Now, I'm looking at the table on page 2, and there are steroid

7   names on the left-hand column and there's five different boxes, if

8   you will, one two, three, four, five --

9   **A.**   Yes.

10  **Q.**   -- top to bottom.  And then if we go across, we'll see an

11  alternate name and then identified an item, and then there's three

12  columns, one, two and three.  Do you see where I'm looking at?

13  **A.**   I do.  Correct.

14  **Q.**   All right.  So are the three columns to the far right, items

15  one, two and three, do those correspond, as best you understand

16  this report, to the Hi-Tech products listed on the first page as

17  items one, two, and three, the Androdiol and the 1-AD Anabolic and

18  the 1-Testosterone?

19  **A.**   They do.

20  **Q.**   Okay.  So the first block there under steroid name, the

21  4-androstenediol 3ß, et cetera, et cetera, is that formulation

22  DHEA, that first one?

23  **A.**   The first one is 4-DHEA, which I think we had on the slide of

24  compounds, but that's correct.

25  **Q.**   All right.  And I'm looking down to the third -- and again,

1   I'm probably butchering these names, but epiandrosterone, is that

2   a non-scheduled compound or a legal compound?

3   **A.**  Yeah, that -- correct.  That should correspond to 1-DHEA.

4   **Q.**  Okay.

5   **A.**  Where the difference between the one and the four has to do

6   with the position of that double bond we discussed.

7   **Q.**  All right.  And I'm looking at the -- there's some footnotes

8   beneath the table.  Do you see those?

9   **A.**  Yes.

10  **Q.**  There's one, two, three and four, or two comma three and four.

11  And so on the first item there's a footnote two and it says,

12  cannot be differentiated under the LC-MS and GC-MS experimental

13  conditions used.  And we also see that footnote for the second box

14  there for 4-andro and 5-andro.  Do you see what I'm talking about?

15  **A.**  Yes, I do.

16  **Q.**  What does that mean to you, that something cannot be

17  differentiated under these methods, these instrumental methods

18  using the conditions?  What is your interpretation of that?

19  **A.**  Well, because you have a combination of techniques with

20  respect to LC-MS and GC-MS.  It means that those compounds were

21  not able to be separated by LC or GC and/or they have the same

22  molecular weight.  So for MS you can't -- can't differentiate them

23  by MS if they have the same molecular weight because you're going

24  to have the same number.

25  **Q.**  All right.  And then steroid -- rather footnote four says --

1  indicates that DEA Schedule III steroid, and then it says, based

2  on the LC-MS signals, these steroids were found to be not the most

3  predominant steroids in the sample items.

4      That last phrase, were found to be not the most predominant

5  steroids in the sample items, what is your interpretation of what

6  that means?

7  **A.**  I read that to mean that with respect to the other items in

8  the chart, including the ones that we just discussed, that the

9  controlled substances were present in a lesser prevalence than the

10  other compound.

11  **Q.**  And we don't know from this chart, do we, whether there were

12  still other compounds in items one through three in this same

13  family, if you will, that were legal and not even tested for by

14  the FDA chemist, do we?

15  **A.**  We don't.  We have a chart that is limited to the compounds

16  shown.  It's possible, maybe even likely, that other derivatives

17  were present, but, you know, any analytical technique is -- is

18  subject to some selection criteria by the user.  So if you

19  separate a mixture, you have the ability to decide which ones you

20  care to analyze or continue separating, and if not all of the

21  compounds that are isolated are collected and subject to MS, then

22  obviously, you won't have any MS data.  And, you know, perhaps

23  they don't -- they don't make it into a chart notwithstanding

24  their presence in the -- in the mixture.

25  **Q.**  And continuing on that footnote four, the last sentence talks

1  about based on this information and communication with Special

2  Agent Bryan C. Kriplean on January 18, 2017, no quantification of

3  these steroids were performed.  Do you see that?

4  **A.**   I do.

5  **Q.**   And what takeaway, if any, do you have from the fact that no

6  quantitation of the steroids was performed in this time period of

7  January 2017?

8  **A.**   Well, it's obviously a decision based on the operator, that at

9  this point in time quantification isn't desired.  I do think that

10  that entry level heightened later on, because I believe based on

11  some other reports, the quantification is eventually determined.

12     The issue that I see primarily is that you were mentioning the

13  expiration dates, and based on the -- the testing that was

14  performed, given the potential for compounds to degrade over time

15  and -- and some other things that may happen unintended in a -- in

16  a commercial product over time, it would have been appropriate to

17  have a benchmark as to the relative amounts of these compounds in

18  question, because these amounts can change over time.

19     And so it seems to me that the more rigorous approach, you've

20  gone through the trouble of separating them, you've gone through

21  the trouble of isolating them and subjecting them to mass spec, it

22  would have been appropriate to do the quantification experiment at

23  that time.

24  **Q.**   All right.  I think I will return to that concept later, so

25  hold that thought about degradation in your mind, if you will.

**A.**   All right.

**Q.**   Let's take a look at Exhibit 3 which is another case/sample

summary report.  Let me know when you have that in front of you.

**A.**   Yes, I'm ready.

**Q.**   Okay.  And if we look at the first page of Exhibit 3, there's

a different FACTS number or a different sample tracking number

than what we saw in Exhibit 2; is that right, in the upper right?

**A.**   That's correct, this is 984276.

**Q.**   Okay.  So now we have products that are different than what we

saw in Exhibit 2; is that correct?

**A.**   Yes.

**Q.**   Okay.  And similar to what we saw with Exhibit 2, do the

descriptions of the products on the first page of -- list some of

the ingredients from the labels for the various -- these various

products?

**A.**   They do.

**Q.**   And similarly, do they also list lot numbers of some of these

products?

**A.**   Yes, they do.

**Q.**   And expiration dates?

**A.**   Yes, they do.

**Q.**   All right.  One thing I wanted to ask you about, which was

interesting to me about this particular report, if you look on the

first page, the very last sentence says, items three through five

evidence bag, also contained an additional empty evidence bag.

1    Does the fact that the samples were somehow stored in bags

2 that had an additional bag inside them, create any issues or

3 concern to you as a scientist?

4 **A.**   Well, I think what we can say is that for reasons that are not

5 entirely clear, three through five were subject to some additional

6 treatment that items one to two were not.  Whether that was for

7 purposes of long-term storage, preservation, it is not expressly

8 stated.  But it's possible that that was -- that was the

9 rationale.

10 **Q.**   Okay.  And similar to the report we had in Exhibit 2, does

11 this report list a limit of detection on it anywhere?

12 **A.**   It does not appear to list a limit of detection.

13 **Q.**   And similar to what we saw in Exhibit 2, did the scientists at

14 the FDA/FCC lab perform any quantification of whatever it is that

15 they detected at this time?

16 **A.**   No, they did not.

17 **Q.**   Now, I probably should have asked you this earlier.  I'm

18 looking at results and conclusions on the second page of this

19 report.

20 **A.**   Yes.

21 **Q.**   It talks about a five-tablet composite.  Do you see that?

22 **A.**   I do.  In Section 3?

23 **Q.**   Yeah.  And I think the other report actually mentioned that as

24 well, a five-tablet composite.

25    What does that mean, a five-tablet composite?  What does that

1  signify?

2  **A.**  It's a -- it's a little ambiguous.  It's not clear whether or

3  not in order to have a substantial amount of -- a sufficient

4  amount of material that five tablets were used or whether

5  duplicate tests -- duplicate or triplicate or more tests were

6  performed.

7  **Q.**  All right.  Can that be an issue as to whether the scientists

8  had mashed up all these tablets together to create whatever sample

9  they were going to experiment with?  Did that create any issues

10  with the results that we see?

11  **A.**  Because these were identity issues, the -- the supposition is

12  that each of those five tablets will have similar profiles, but

13  because it's not clear to me what the initiative was behind using

14  five tablets, it's hard for me to say the desired -- the desired

15  reason, but --

16  **Q.**  Well, let me ask it to you this way.

17  **A.**  -- I mean, the preference should have been one tablet

18  analyzed, unless there were issues of amounts.

19  **Q.**  Advancing actually far ahead of your testimony, but my -- I

20  guess my underlying thought in this question is, if we're -- goal

21  is determined -- or whether something is called an impurity or

22  not, is it necessarily going to be the case that an impurity is

23  going to appear in every single tablet depending on how one

24  manufactures the product?

25  **A.**  Well, again, and that's why I say one tablet being tested at a

1   time since the goal is to have parameters on -- on the study.  So

2   you take one tablet, you run the analysis, you see what's in one

3   tablet.

4       When you start combining tablets or making composites, it's

5   unclear to me the rationale.  It should be that there is

6   sufficient ingredients to be able to detect them using this

7   instrumentation without combining amounts.  It's not entirely

8   clear why -- why the combination, but it does prevent you from

9   making a tablet by tablet analysis.

10  **Q.**  Okay.  And I'm looking at page 2 of Defense Exhibit 3.  And we

11  have a grid there.  Similar to what we saw in the other exhibit,

12  there are some steroids, names on the left, an alternative name

13  that identifies with different columns, but here we only see

14  columns for items one, two or three.  Do you see that?

15  **A.**  Yes.

16  **Q.**  And items four and five don't appear.  And why is that?  Why

17  do you -- what is, basically, your reason, for no columns four and

18  five?  I point to your attention there's some -- the next to last

19  paragraph in the report talks about items four and five.

20  **A.**  Well, again it's incomplete because it's -- it, obviously,

21  lists them, I guess the last two, items four and five, as items

22  that were subject to the study.  They don't appear in the results,

23  and as you're pointing or orienting me on the exhibit, it

24  indicates that while steroid-like compounds were detected, they

25  were not identified, which it is not entirely clear how you would

1  know they were steroid-like if you had not identified them, except

2  perhaps to say that they eluded at similar times but weren't

3  subject to full characterization so we don't -- we don't know what

4  they are.

5      So my takeaway from that is that it's entirely unclear as to

6  why they weren't included or, frankly, what the results were.

7  Q.  I take it, and you kind of anticipated my next question, but

8  that phrase steroid-like compound, that's not a term of art, is

9  it?  I mean, I don't know what that means.  I'm asking you what

10 that means.

11 A.  I don't know what it means.  It may be that the vernacular

12 that has been used is -- steroid is sort of indicative of a

13 controlled steroid versus an non-controlled, I mean, that's one

14 interpretation.  And steroid-like means a non-controlled substance

15 that looks like a steroid for the reasons we talked about, it has

16 a similar chemical structure and substituents.

17 Q.  All right.  Let me ask you a couple more things about this

18 particular report.

19     So item three, which is Dianabol, all right, if we look at the

20 grid, we only see the amounts for what you called as 4-DHEA and

21 1-DHEA; is that right?

22 A.  Yes, as well as androstenediol steroid.

23 Q.  So that item Dianabol and items Decabolin and Arimiplex, if we

24 look back to Exhibit 1, and we look at pages 14, 15, 16 of the

25 indictment, none of those products made their way into the

1    indictment, did they?

2    **A.**   No.

3    **Q.**   Okay.  Let me ask you another question about these particular

4    results.  So we see in -- I'll call the 4-andro and the 5-andro,

5    that box there, there is a footnote saying that they cannot be

6    differentiated.  Do you see that?  Footnote three, four, the

7    4-andro and the 5-andro on page 2?

8    **A.**   Yeah, I apologize.  My copy is not at clear as I wish it was.

9    Sorry, can I just ask you to repeat where you're directing my

10   attention to footnotes?

11   **Q.**   Yes, on page 2 of Exhibit 3 --

12   **A.**   Yes.

13   **Q.**   -- you have a footnote note 2 slash 3 which it says cannot be

14   identified under the LC-MS and GC-MS experimental conditions, and

15   that footnote appears -- footnote three appears by the 4-andro and

16   5-andro in that box on the left of the grid?

17   **A.**   Right.

18   **Q.**   Okay.  So the 4-andro and the 5-andro, if we go to the right

19   of the chart, it indicates that that was detected in item one

20   only, the Equibolin.  Do you see that?

21   **A.**   Correct.  Yes, I see it.

22   **Q.**   What implications and do we -- do you draw -- what concern or

23   piece of your ultimate conclusions do you draw from the fact that

24   that while 4-andro and 5-andro was detected in item one, Equibolin

25   but it wasn't detected in item two, the Superdrol or item three

1   the, Dianabol, what -- what would that tell you as to whether this

2   was an intentional adding of these substances or an impurity or

3   some other reason, the fact that we only see it in this report in

4   one of the three products -- or one of the five products,

5   actually?

6   **A.**   The transient nature of the compounds other than the intended

7   ingredient leads to the conclusion that these are -- these

8   compounds are true impurities, that they are being accidentally or

9   unwillingly introduced somewhere in the manufacturing process or

10  in the bottle itself or both.  Again, owing to the extremely close

11  structures of impurities we've discussed, and it just doesn't

12  support the notion of a deliberate adding if, in fact, there is no

13  rhyme or reason to the inclusion of some of these compounds,

14  either because different controlled substances are appearing in

15  different things or different lots or that some products contain

16  certain substances other than the intended, where others do not.

17  And it -- the idea of impurities are -- the whole premise behind

18  having impurities are they are things that they're not desired.

19  You don't want them to be there, but it's a necessary consequence

20  of conducting chemistry, particularly on these molecules that is

21  going to lead to total variations in those key positions to which

22  I was referring earlier.  And at some point or another, I assume

23  we're going to be talking about the amounts.  That is going to be

24  another metric that leads me to believe that this is an absolutely

25  unremarkable and unexpected inclusion of compounds that are

1  introduced somewhere in the synthetic chemistry or otherwise.

2          THE COURT:  Could you just say that answer again just a

3  little bit more short?  So setting aside the amounts, which I'm

4  confident we will get to, it's a big thing in this case, what

5  about -- can you explain to me why this chart makes you think that

6  it's accidental?  And what -- and why -- is that something that

7  you know because you're a scientist or because anybody can see,

8  well, there's different products and some stuff in some and some

9  is not in others so that makes it looks like it's random.  Is that

10  all you're saying or are you saying something based on science?  I

11  know what your lawyer wants you to say, but that's what I'm trying

12  to figure out.

13          THE WITNESS:  No, I think the latter part of your

14  statement, a subjective versus what we might expect in the

15  scientific context.  Impurities -- and so some lots might have

16  impurities, some might not.  Some reaction times go longer than

17  others and as a result there are more of an impurity than another.

18  So I think you used the word randomness, which is probably the

19  word I would have used.

20          The randomness of the -- identifying these compounds in

21  different lots and different products, certainly supports the

22  conclusion that the presence is incidental, that these are the

23  chaotic nature of finding different impurities.  That's why

24  they're called impurities, because it's the accidental inclusion

25  of other impurities, and it's incredibly chemically plausible here

1  because of the nature of the compounds and -- the efforts that

2  you're making on the compound basically take place in three key

3  areas.  And it's exactly in those three key areas that we see the

4  difference in structure.  So it's, again, unremarkable that you

5  might see an OH group where you want there to be a double bond O,

6  because that's the chemical transformation that you carried out on

7  purpose.

8          And so, although I think you asked me to say it shorter,

9  maybe I said it more succinctly, I hope.  But that's the basis of

10  my opinion that this randomness is antithetical to the deliberate

11  inclusion.

12  DIRECT EXAMINATION

13  BY MR. WENIK (continued):

14  **Q.**  Let me continue on this theme with you, Mr. Hillyer.  If you

15  take the report FDA dated December 14th of 2017.

16  **A.**  Yes.

17  **Q.**  All right.  And if we look at the upper right-hand corner of

18  this document, it's a different sample number, is that right,

19  1022792?

20  **A.**  Than what we've seen so far?

21  **Q.**  Yes.

22  **A.**  Yes.

23  **Q.**  And I'm looking at the first paragraph, description samples

24  received, and this looks like August 23, 2017.  So it's a

25  different -- different batch of samples.  Would that be a fair

1  characterization?

2  **A.**   That's right.

3  **Q.**   And similar to what we've talked about before, here we have

4  four items; Equibolin, Superdrol, Androdiol and 1-AD.  And as

5  we've seen with these others, are there some of the ingredients of

6  the labels listed here on the first page for these various

7  products?

8  **A.**   Yes.

9  **Q.**   And we also have some lot numbers and expiration dates?

10  **A.**   We do.

11  **Q.**   All right.  So turning to the second page, we have some

12  results for the items one through four and a similar grid that we

13  have seen in these other two reports?

14  **A.**   Yup.

15  **Q.**   You see where I'm indicating?  All right.  Let's take for the

16  moment item one which is Equibolin, if I'm pronouncing that right.

17  **A.**   All right.

18  **Q.**   And so that's item one here.  And if we look at Equibolin,

19  which is item one on page 2, it looks like they detected 4-DHEA,

20  the first compound, and either 4- or 5-andro.  It says it can't

21  differentiate according to the footnote.  Do you see that?

22  **A.**   Correct.

23  **Q.**   All right.  So to your point, when we look back at Exhibit 3,

24  they also tested, they meaning the FDA, they also tested

25  Equibolin, did they not?

**A.**   Yes.

**Q.**   And in this matter Exhibit 3, and that was something that came in earlier, October 2016, did that have the same lot number for that Equibolin as the Euibolin in Exhibit 4 or are they different lot numbers?

**A.**   I believe they're different lot numbers.

**Q.**   And we have different results, right, in Exhibit 3 for the Equibolin compared to what we see in Exhibit 4.  Exhibit 3 I'm seeing for item one, Equibolin, three different categories of steroids checked off, and the latter one that was done in September 2017, only two; is that right?  Do you see that?

**A.**   Yeah, I think the epiandrosterone was found in Exhibit 3 when they tested Equibolin, but not in Exhibit 4.

**Q.**   All right.  And if we look at Superdrol, which is item two --

**A.**   Yes.

**Q.**   -- in Exhibit 4, we have five different categories of steroids detected there; is that right?  I'm on Exhibit 4, looking at item 2, the Superdrol.

**A.**   Sorry, I was blocking at the word steroid, I confess.

   But there are five substances identified --

**Q.**   Five substances --

**A.**   -- on Exhibit 4, that's correct.

**Q.**   All right.  And if I look back to the Superdrol that was tested in Exhibit 3 some months earlier, is that a different lot number or the same?

**A.**   It should be a different lot number, 770 versus 857.

**Q.**   All right.  And looking at Exhibit 3 for item two which was

the Superdrol tested back then, we only see three compounds

detected rather than five --

**A.**   Correct.

**Q.**   -- is that correct?

**A.**   That's correct.

**Q.**   So rather than belaboring this point by pointing out each

example of this, what is the implication of that to you as a

scientist, the fact that the same product yields different results

depending on what lot number you're testing as to what you're

detecting it, as whether this is something, to use your words,

randomness intentional?  What is -- what is the fact that you're

getting different results for the same product at different lots

say to you?

**A.**   Well, again, because I believe these compounds to be

introduced during the manufacturing process or otherwise, the

impurity amounts or their existence will change from time to time,

as opposed to the deliberate introduction which presumably would

have some inconsistence over time, because the deliberate purpose

is to not just put something in but to put enough in.  And my

supposition is, you would put the same in every time as opposed to

the completely randomized sprinkling of various compounds which

were of no particular purpose that I'm aware of.

     And so again, I don't know that I want to be the first to use

1  the word chaos, but when you run synthetic chemistry reactions and

2  things happen that you don't expect to happen or don't want to

3  happen, it's -- it's often -- leads to inconsistent results.  So

4  when I see inconsistencies across lots for the presence of

5  impurities, their amounts, their existence, that tells me that

6  it's something less than a deliberate inclusion, but rather

7  something that is happening on the chemistry side.

8  **Q.**  And just one more example and then I'll leave this alone.

9      If I'm looking at Exhibit 4, item four was 1-AD, and if I'm

10  looking at page 2, item four they purported -- the FDA chemist

11  purported to detect 4- and/or 5-andro in that product.  Do you see

12  that?

13  **A.**  I apologize.  I had the pages flipped, so I only got to

14  Exhibit 4.  What do you want me to compare it to?

15  **Q.**  I'm looking at item four, which is the 1-AD.

16  **A.**  Yes.

17  **Q.**  Page 2 it looks like they found 4- and/or 5-andro in the

18  1-AD, in that test, in that round of testing?

19  **A.**  Yes.

20  **Q.**  And look back to Exhibit 2 where 1-AD was item two, and I'll

21  look at page 2 of that report, they did not detect 4- or 5-andro,

22  did they, in the 1-AD?

23  **A.**  No.

24  **Q.**  So would that be another example of this randomness that

25  you're talking about contracting -- detecting a Schedule III

1  substance in one lot of the same product but not in another?

2  **A.**  It does, and maybe even with stronger force when there's the

3  controlled substance in one but not the other.  It suggests that

4  for whatever reason the person decided not to include it in a

5  particular lot versus including it in another.

6  **Q.**  All right.  There are more examples, but I'm not going to

7  belabor that point.  I want to turn to the experiments that were

8  done in July of 2018.  So if we could take a look at Exhibit 5 --

9  **A.**  Okay.

10  **Q.**  -- that will be helpful.

11  **A.**  Okay, yes, I'm there.

12  **Q.**  Okay.  So we have Exhibit 5.  All right?  And this has a

13  sample number of 984260, the upper right on the first page.  Do

14  you see that?

15  **A.**  Yes, I do.

16  **Q.**  All right.  And the fact that -- pardon me.  We have the same

17  sample number in Exhibit 2.  What does that mean to you, that

18  those two reports have the same sample identifying number?

19  **A.**  That they're the exact same items, and one reason we know that

20  is because in Exhibit 5, the items are not identified anywhere.

21  So the key to figuring out what the items are comes through the

22  matching up of the FACTS numbers.

23  **Q.**  Okay.  So let me return to a concept you mentioned in your

24  answers maybe 25 minutes ago.  You talked about the concept of

25  degradation.

1        And so we have an example where you're testing something in

2   July of 2018 that was received by the lab almost two years

3   earlier, in October of 2016.  So what, if any, concern does the

4   passage of almost two years before this quantitative testing was

5   even attempted, raise, if any, to you as a scientist, as a

6   chemist?

7   **A.**   Well, as I mentioned before, having the benchmark of

8   quantification during the first testing would be helpful here.

9   Because if you performed another quantification -- well, first of

10  all, it would be closer in time of when it was made so it would be

11  subject to less degradation, that's number one.

12       Number two, if you ran the experiment again later, you could

13  see whether or not you have the same amount of materials or you

14  don't.  You'd have a basis for comparison, and, therefore, you

15  would understand whether or not it's degrading or not.

16       But in the current situation we have a problem created by the

17  fact that we're only doing quantification testing after the

18  package has been opened.  That's number one.

19       Number two, after the passage of time.

20       And number three, without any -- without any earlier reference

21  so that when we find other things, there's no way to tell whether

22  or not those were introduced during the manufacturing or in the

23  bottle after the manufacturing.

24  **Q.**   So when we talk about degradation, can the passage of time and

25  the exposure by opening the bottle to -- I don't know, the air and

1  moisture and what have you, can that cause some of the compounds

2  to break down, like the DHEA to break down and change it to

3  something else?

4  **A.**  It -- it can.  There's moisture in the air, there's oxygen in

5  the air, there's ozone in the air, among other things.  So any

6  time a product is exposed to the atmosphere, and sometimes when

7  it's not exposed because the seals are not 100 percent airtight,

8  and anybody who's opened anything, you know, off their shelf that

9  has been sealed for a year and doesn't have the freshness it used

10  to, understands that things degrade over time, it's just a

11  necessary consequence of living in an environment that isn't a

12  vacuum.  And so in part because we know there is water in the air

13  and in part because we know that these positions are subject to

14  reduction or oxidation from some of these agents, including

15  moisture, that presents a potential that the impurities were

16  introduced in the bottle.

17  **Q.**  And this report, Exhibit 5, this involves a methodology that

18  was supposed to quantify the amount of the -- I'll call them

19  impurities; is that right?

20  **A.**  Correct.

21  **Q.**  And so that the results that were seen in the various boxes

22  under items one, two or three, based on what you're talking about

23  with this concept of degradation, do these represent the

24  quantities that were present in the sample bottles back in October

25  of 2016 when they were first received by the lab?  Is that -- do

1 we have confidence that these are the same quantities?

2 **A.**   There is no way to know that.

3 **Q.**   Okay.   What does NQ mean to you?

4 **A.**   It's a designation used in these reports to indicate

5 that -- that something was not quantified under the experimental

6 conditions in questions.

7 **Q.**   And the fact that the chemists were not able to quantify some

8 of these impurities in this round of testing, does that raise any

9 concerns or issues for you as to the integrity of all that was

10 done here?

11 **A.**   Yeah.   Sorry, I'm just noting that NQ is actually identified

12 at the bottom of Exhibit 5, and it gets back into this coelution

13 issue that you asked me earlier in the day.

14      Whenever you have -- whenever it is your task to separate

15 positively identified quantified chemical constituents, the

16 inability to do any of those three things could be problematic if

17 you're going to base the results -- if you're going to use the

18 results to support a particular conclusion.   And part of the issue

19 with -- with the report is that the amounts we're talking about

20 are quite small.   It makes it very difficult to separate them from

21 the other constituents without overlap, as indicated in this

22 report itself.   It makes it very difficult to have sufficient

23 sample out of the baseline to isolate it and test it.   But in

24 a -- in a scientifically rigorous world, you'd want to be able to

25 separate, identify and quantify at least every compound of

1   interest.  And so if the idea is to talk about the presence or

2   absence of a compound and how much there is, you know, that's a

3   compound of significance.  There may be other compounds in there

4   in miniscule amounts, you know, that just aren't ascertainable.

5   But if the idea is to take the data and draw a conclusion,

6   particularly if they're accusations, then I think it's incumbent

7   upon the analyst to do what's scientifically feasible under the

8   circumstances to separate, qualitate and quantify the compound.

9   Q.   Now, this FACTS number, this sample number, 984260, relates

10  back to Exhibit 3, which has that same sample number.  And if I

11  look at page 2 again of Exhibit 3 --

12  A.   Right.

13  Q.   -- the scientist said -- analyzed five different -- rather,

14  four different compounds, but here they only analyzed three; is

15  that right?

16  A.   You know, I apologize, either you misspoke or I misheard it.

17  I believe Exhibit 5 corresponds to Exhibit 2.  I believe you said

18  three.

19  Q.   I'm sorry, did I say three?  I'm sorry.  I meant two.

20       So in two, they looked at five different compounds, and here

21  they only bother to quantify three of the five; is that right?

22  I'm looking at page 2 of Exhibit 2, which is also --

23  A.   Right.

24  Q.   -- 984260, and we have five different boxes in the grid.

25  A.   Right.  There were five compounds that the analyst deemed

1   significant enough to put into the report, whether controlled or

2   not controlled.

3   **Q.**   But they didn't bother to attempt to quantify the, quote,

4   predominant steroids in the sample, did they?

5   **A.**   That's correct.

6   **Q.**   And --

7   **A.**   And some they tried and weren't able to.

8   **Q.**   You mentioned before that in Exhibit 5, the NQ issue was a

9   result of, quote, coelution, and I know you've already been

10  through that, described what that means, are there techniques to

11  deal with that, that phenomenon?  Are there other techniques that

12  the chemist could have, perhaps, employed to try to address that

13  issue?

14  **A.**   Yes, yes.  A particular technique, whether it be GC-MS or

15  LC-MS has parameters to the study.  One of the things that an

16  analytical chemist does is change those parameters to get

17  different results.  And if, for example, you have a situation

18  where compounds aren't separating, you can, for lack of a better

19  expression, change the conditions in the hopes of getting better

20  separation.  Particularly, if you have coelution issues in HPLC,

21  because the coelution is nothing more than the solvent and the

22  columns' inability to differentiate between the pluralities of two

23  compounds.

24      So some analytical chemists spend their entire career trying

25  to separate mixtures by changing the solvent systems or the

1  columns.  That's -- that's immutable.  So if there are coelution

2  issues, there should be ways to eliminate them by changing the

3  solvent system or changing the gradient of the solvent sometimes

4  or changing the column or changing those and other factors.

5  **Q.**  All right, I'm going to Exhibit 5.  I'm looking at the results

6  and conclusions for items one, two and three that were analyzed.

7  And we talked about using the five-tablet composite before in the

8  context of detection.  What issues does that raise, if any, in

9  your mind, for using that for quantification rather than testing

10  individual tablets and considering this degradation concept that

11  you've also talked about?

12  **A.**  Well, again it's -- it's not clear whether portions from

13  five-tablet composites means that five tablets were combined

14  together in sort of a mortar and pestle style to create a sample.

15  Portions sort of suggest that it is something less than an entire

16  tablet.  And so it may have been an effort to try to sort of

17  homogenize the composition over five tablets by taking a portion

18  of each and combining them.  It's not entirely clear, because as I

19  said before, I find it a bit ambiguous.  But particularly when

20  looking at quantities, and particularly if there's a good chance

21  that the compounds in question are impurities, you would want to

22  know on a tablet-by-tablet basis what was included so that you

23  have some metric by which to guide.  It doesn't even seem to

24  indicate, at least in this report, what a portion is.  So you

25  could be taking more of one tablet from another.  It's

1  just -- it's just -- it may be a shortcoming of the report itself.

2  The language is not particularly specific.  So it's not entirely

3  clear what that parameter means.

4  **Q.**  All right.  Let me ask you to take a look at Exhibit 6, which

5  is another one of these July 17, 2018 reports.

6  **A.**  Yes.

7  **Q.**  And this one is of a different sample than what we looked at

8  before.  It's 1022792 --

9  **A.**  Correct.

10  **Q.**  -- do you see that in the upper right-hand corner?

11      That would relate back to -- let me make sure I don't mess up

12  my exhibits this time.  It relates back to Exhibit 4 that was

13  tested back in January of--

14  **A.**  September 14, yes, Exhibit 4.

15  **Q.**  Okay.  So the one thing I wanted to ask you about on this

16  rather than belabor the points that we've already talked about, is

17  the result of NN in the item four.  What does that mean and what

18  is the implication that you draw from that?

19  **A.**  Well, it seems to indicate that neither the 4- or the

20  5-androstenediol derivative was identified in that particular

21  sample.

22  **Q.**  All right.  So item four, if you look back to the Exhibit 4,

23  that would have been the 1-AD product?

24  **A.**  Correct.

25  **Q.**  If you look back to the report that's reflected in Exhibit 4,

1    where 1-AD was item four, and they did check it as detected, the

2    fact that we got this NN result two years later, does that cast

3    out onto the validity of that earlier test result that we have

4    that we see in Exhibit 4 that was done back in September 2017?

5    **A.**   It does, because there's an inconsistency there.

6    **Q.**   Just bear with me for a moment.

7    **A.**   That's fine.  I'm actually comparing the lot numbers myself.

8    **Q.**   So I just ask you to take a quick look at Exhibit 16.

9    **A.**   All right.

10   **Q.**   And it's another July 17, 2018 report.  And there we have the

11   FACTS number 984276.  So that would relate back to Exhibit 3; is

12   that right, 984276, that one?

13   **A.**   276 -- yeah, is that July 17, 2018?

14   **Q.**   Right, July 17, 2018 for Exhibit 16 and -- pardon me, January

15   30th of 2017 for Exhibit 3.

16   **A.**   Correct.

17   **Q.**   All right.  And so here they tested two products, items one

18   and two, which we know from Exhibit 3 is the Equibolin and

19   Superdrol; correct?

20   **A.**   Yes.

21   **Q.**   So they didn't bother at all to test the other three products

22   that were originally tested in Exhibit 3 back in January 2017; is

23   that right?

24   **A.**   That's correct.

25   **Q.**   And they also didn't bother to quantify all the four compounds

1  they were looking at in Exhibit 3 in 2018, did they, they only

2  looked at two of the compounds?

3  **A.**   That's right.

4  **Q.**   So let me ask you -- we've looked at these different reports,

5  the three -- I'll call them the quantification reports of July

6  2018, and we have various quantities listed in there.  And did you

7  conduct any research as to, for lack of a better word, the dose or

8  effective dose of these steroids compounds?

9  **A.**   I did.

10 **Q.**   And let me turn your attention -- I'm going to try to get it

11 on the screen.  Give me a moment.  If I can find it.  Okay.  I

12 have put up there Exhibit 7.  Is this a chart that you prepared?

13 **A.**   Yes, it is.

14 **Q.**   All right.  What does this reflect?  What work does this

15 reflect?  What did you do in preparing this chart?

16 **A.**   The idea here was to try to juxtapose the maximum amount

17 identified by FDA in its analytical testing against effective

18 doses of the compounds in question in various pieces of

19 literature.

20 **Q.**   All right.  And what did you find generally when you

21 compared -- pardon me -- the amounts found in the FDA chemist

22 testing with what you saw in the literature were effective doses

23 of these compounds?

24 **A.**   Well, the first thing I noticed was that the amount between

25 the compounds in question varied widely.

1     The second thing I found was that in every instance, the

2  amount was several orders of magnitude, sometimes hundreds,

3  sometimes thousands of orders of magnitude smaller than would be

4  considered an effective dose based on the literature that I

5  reviewed.

6  **Q.**   Okay.  And how does this research you did as reflected here in

7  Defendant's Exhibit 7, bear on the conclusions that you're drawing

8  as to whether these compounds, these molecules were added

9  intentionally or were -- made their way into the products or was

10 some other issue, how does this bear on the explanation for the

11 detection either intentional or otherwise adding in these

12 compounds to the products, how does this weigh in on that?

13 **A.**   The first thing to consider is the fact that the amounts are

14 so small so as to be putting aside any activity they have in a

15 moment, just -- just the numbers themselves suggest that these are

16 true impurities, that they are compounds that sort of came along

17 for the ride, if you will, during the chemical synthesis, either

18 because they were impurities in the starting materials -- more

19 likely that they were created during the creating of chemical

20 synthesis.  And as a former chemist, I can tell you there is

21 virtually no reaction that goes 100 percent from starting material

22 to product.  There's probably some, but the vast majority of

23 chemical reactions produce some unwanted products.  That's why

24 it's important to isolate the target compound when you're done.

25 That's why we have a whole industry dedicated to purification of

1   organic compounds, because you simply can't take the result of a

2   chemical reaction and treat it as something you can use going

3   forward.

4       So the amounts themselves, the fact that we're talking about

5   in some cases tenths of milligrams and in some cases numbers of

6   milligrams and the fact that they're randomized across the

7   products, immediately suggests that they are unwanted, unintended

8   impurities.

9       But the intention of this slide was actually meant to show

10  something else, which is that if -- if you look at the comparison

11  between the amounts that are in the commercial product versus what

12  the literature suggests would be necessary to experience a

13  physiological effect, you would need orders of magnitude more

14  compound for it to have any kind of physiological effect in the

15  human body upon consumption.  And so you're -- if you use the

16  scientific premise and extend it to the notion that someone would

17  deliberately put product in, but in this case maybe illegal and

18  controlled, but as far below -- extremely far below the threshold

19  level that would be necessary in order for the consumer to

20  experience any kind of benefit or, in fact, any effect at all,

21  certainly strongly supports the idea that these compounds are

22  impurities, unremarkable that they would be found because there's

23  impurities in virtually every product on the market, including

24  pharmaceuticals.  So much so that there is a protocol for when you

25  have to report them and when you don't, because -- and that

1  supports the overall premise that we know there's going to be

2  impurities, because we don't live in a perfect world.  And so --

3          THE COURT:  Can I just ask you a quick question about

4  that?  I'm still interested in these guidelines.  You had talked

5  about the different thresholds, the .05, the .1 and the .15.

6          THE WITNESS:  Right.

7          THE COURT:  Can you tell me how these -- if you go

8  through and you can give me your opinion that maybe you're saying

9  these fell below one or more of those thresholds?

10         THE WITNESS:  If the comparison is -- turns out, and I

11 did, to be fair, sort a quick calculation on that, it depends

12 on the compound in question, but because as you can see -- I don't

13 know from the slide if you can see one has 519 milligrams, another

14 one has .039 and another one ranges from 0.052 to .356.

15 Certainly, some of them, and it may be the majority, fall below

16 the threshold level where there wouldn't be a necessity to report

17 them.  In order to do that calculation, you have to consider what

18 the actives are on the label, but I did look at that, albeit

19 briefly, and that was the result.

20 DIRECT EXAMINATION

21 BY MR. WENIK (continued):

22 Q.  Give me a moment here.  I want to put something else up on the

23 screen, if I can find it.

24     All right, are you seeing this graphic that we looked at

25 earlier in your testimony?

**A.**   Yes, I am.

**Q.**   All right.  Using this as a reference point, what I would like you to explain to the court as succinctly as you can, how given all your experience that you described in process chemistry and analytical chemistry, how in the manufacturing process you mention using synthesis and incomplete reactions and these sorts of things, how in the manufacturing process might one produce a finished product, assuming for this question only, that these results of the FDA chemist found were accurate, that they really did detect very small amounts of steroids in these samples, assuming for any argument sake for this question that's accurate, how in the manufacturing process might that come about?

**A.**   So I mentioned earlier in my testimony about what I consider to be sort of three active areas in this molecule where chemistry is going to be -- going to be done.  But the first is the far left of the molecule we were looking at, that OH or double bond O.  So pick any structure and go to the farthest left.  That's the position on the compound that is very popular for chemical manipulations.

     And the second is this issue of where the double bond resides or if you have one at all, and it's position and how many there are.

     And the third position is pick any molecule and go as far right as possible and find a functional group, like an alcohol, yeah, or a double bond O.  So that's the 17 position.  That's

1 | another area.

2 | And if you just sort of by simple inspection start comparing

3 | the compounds in the green on the left to the compounds in the

4 | green on the right, you're going to see that those are the three

5 | areas in which they differ.  So they sort of all differ but in the

6 | same manner.  Always been those with respect to those, what I'll

7 | call moieties, or functional groups and positions, and that's not

8 | an accident.  Because you don't buy the compounds that are in the

9 | commercial product from a manufacturer, you buy a starting

10 | material.

11 | And when you start looking at the chemistry as to how you get

12 | into these androstane derivatives, by and large you're going to

13 | buy -- you're going to purchase a compound with that chemical

14 | core, those four ratings that we talked about, then you're going

15 | to start manipulating it.  And if you want, for example, to have

16 | 4-DHEA or 5-DHEA or -- sorry, it's a little cut off on my version,

17 | but the far bottom compound with the two double bonds, yeah,

18 | 1,4-DHEA, your starting material is more likely than not, not

19 | going to satisfy all those permutations.  That means you're going

20 | to have to start performing chemistry to get that double bond

21 | where you want it.  And the minute that you start doing that, you

22 | run the risk of that double bond ending up someplace where you

23 | don't want it, probably as a minor product, because you wouldn't

24 | be running the reaction unless it got you the double bond where

25 | you wanted it.  But you're almost always going to have to count on

1  that double bond by forming a minor product where you don't want

2  it.

3      And it's possible, for example, in those red compounds, that

4  the double bond doesn't form at all and you're left with a ring

5  with no double bond in this.  You can see it's case with one of

6  the controlled substances.

7          THE COURT:  Mr. Hillyer, can you put this back into

8  context?  You've been going for awhile.  It's 4:30 and I kind of

9  lost the train.  I'm going to get a transcript and I'll get to

10 read it and I'm relying on that, but I've also completely lost

11 what you're talking about, to be frank.

12         THE WITNESS:  I appreciate your candor, Your Honor.  Let

13 me just do this.  The far left side of the molecule and the far

14 right side of the molecule in the double bond within the ring are

15 three places where chemistry is going to take place when you try

16 to make the intended uncontrolled substances.  And what's

17 happening here is that because you're manipulating those

18 positions, you're ending up with functionality that you don't want

19 chemically, and you certainly don't want illegally because it's

20 ending up producing the compounds in red as impurities.

21         So not only is it explainable by virtue of the amounts,

22 but it's explainable through a step-by-step chemistry that you

23 have to go through in order to make the intended targets, are

24 producing the unintended targets because each one of those

25 reactions -- and, Your Honor, if you really want to get bored ask

1   me how each of those are made -- but it turns out, it's really not

2   that surprising, because where you have an OH in a non-controlled

3   substance in the far left, some of the compounds on the right in

4   red have a double bond O.  That's a very popular reaction, and if

5   it doesn't go all the way, then you're going to be stuck with a

6   double bond O as an impurity.

7            The same thing as the right-hand molecule.  You want a

8   double bond O in the far right, sometime you get stuck with an OH

9   because you've been doing chemistry there.  And the same thing on

10  the internal ring structure with the double bond.

11           So it's the similarities in the structures, it's the

12  fact that you are undergoing chemical manipulations in three

13  different positions, and it's the fact that you end up with an

14  extremely small amount of the controlled substances that are the

15  compelling factors here.

16  DIRECT EXAMINATION

17  BY MR. WENIK (continued):

18  **Q.**  Okay.  Let me move on to a different topic completely.

19  **A.**  All right.

20  **Q.**  I want to talk to you for a little bit about red yeast rice.

21      First of all, let's start with red yeast rice.  Is red yeast

22  rice a product that you're familiar with?

23  **A.**  Yes, it's a fairly well-known compound that's used in dietary

24  supplements and is understood to have certain qualities that may

25  be beneficial.

1   **Q.**  All right.  What is lovastatin?

2   **A.**  Lovastatin is an organic compound, again, with its own

3   characteristic ring structure.  That is a -- comparatively

4   speaking, a relatively high molecular weight that again has a

5   characteristic core and characteristic substituents at various

6   positions on the ring.

7   **Q.**  All right.  And what is monacolin K?

8   **A.**  Monacolin K has the identical chemical structure as

9   Lovastatin.  As I understand it, the processes to make the two may

10  be different, but, obviously, the fact that you have the exact

11  same chemical structure means that you have to be quite careful

12  when you try to analyze what it is.  Certain instrumentation and

13  techniques will not be able to differentiate between the two.  And

14  I presume at some point we're going to talk about one that may be

15  able to.

16  **Q.**  All right.  So would monacolin K have the same molecular

17  weight as lovastatin?

18  **A.**  Yes.

19  **Q.**  And would monacolin K have the same structure like we're

20  seeing on the graphs that you did?

21  **A.**  Identical structure.

22  **Q.**  Okay.  So we talk -- you mention in passing, predicted some of

23  what I was going to question you about, is the techniques for

24  analyzing monacolin K and lovastatin.

25      Let's talk first about Exhibit 9.  If you can take a look at

1  that, what I've marked as Defense Exhibit 9, which is a FDA case

2  sample summary report dated December 20, 2013.

3  **A.**  Yes, I have it.

4  **Q.**  Is this one of the documents that you used in coming to your

5  opinions?

6  **A.**  Yes, it is.

7  **Q.**  Okay.  And I'm looking at descriptions of samples received for

8  analysis --

9  **A.**  Yes.

10 **Q.**  -- and it says, 828197 was received on August 20, 2013.  Do

11 you see that?

12 **A.**  Yes, I do.  Yes.

13 **Q.**  Okay.  And then it looks like there's an expiration date of

14 August 14, August of 2014.  Do you see that in the description of

15 sample?

16 **A.**  Yes.

17 **Q.**  All right.  So tell the judge in this document what type of

18 analytical method was used.

19 **A.**  So this report is limited to an analysis by -- for purposes of

20 this discussion, we'll just call it traditional mass spectroscopy.

21 **Q.**  And that method that was used here, does that -- does that

22 method have the capacity to distinguish between monacolin K and

23 lovastatin?

24 **A.**  No, it does not.

25 **Q.**  And I'm looking at the second page here that I've attached to

1  Exhibit 9, which is a page from the workpapers that underlie

2  this -- this lab report, if you would take a look at that.

3  **A.**  Yes, page 2?

4  **Q.**  Uh-hum.

5  **A.**  Yes.

6  **Q.**  And the last sentence says, based upon chromatographic and

7  mass spectral data, item one is consistent with the presence of

8  lovastatin.  What is your interpretation of that, that something

9  is consistent with?

10  **A.**  I think it's presumptuous because it suggests that you've

11  definitively identified the compound that was analyzed as

12  lovastatin as opposed to monacolin K.  And there is no way based

13  on this experiment that you could draw that.

14  **Q.**  In 2013, to your knowledge, based on your literature search

15  and what have you, was there a technique known to chemists, known

16  to scientists to distinguish between monacolin K and lovastatin in

17  this time period?

18  **A.**  If there was, to my knowledge it had never been applied in

19  order to make that differentiation.

20  **Q.**  Okay.  I'd like you to take a look at Exhibit 8, Defense

21  Exhibit 8, which is an article -- a peer-reviewed article by

22  Matteo Perini --

23  **A.**  I have it.

24  **Q.**  -- entitled, Stable Isotope Ratio Analysis for Authentication

25  of Red Yeast Rice.

**A.**   Yes.

**Q.**   All right.  Without going into too much detail, can you tell the judge what is the significance of this article?  What is it that Mr. Perini found that was worthy of publishing in a peer-reviewed journal?  What is it that Mr. Perini -- or is he a doctor?  I don't even know -- that Mr. Perini did that made it worthy of a published article?

**A.**   Just as a threshold matter, let me say that figure one gives us the structure of monacolin K, if we care to look at it.

But the answer to your question is that Perini applied isotope mass -- isotope ratio mass spectrometry to differentiate the structures of Monocolon K and lovastatin.

**Q.**   And what exactly does that mean?  How does this method work to make that distinction?

**A.**   It's an extension of mass spec technology that allows the measuring of an isotope of carbon, which is C-13, to be measured.  And the fact that he was exploiting, was the fact that monacolin K and lovastatin have different amounts of isotopic C-13 in the carbon skeleton.

**Q.**   Okay.

**A.**   Simply put, one has more C-13 than the other.

**Q.**   Okay.  So this methodology, this methodology was not applied in Exhibit 9 that we looked at about five minutes ago --

**A.**   No.

**Q.**   -- that was done in December of 2013?

**A.** No, that was traditional mass spec, which simply gives you the mass, and because as we noted, lovastatin and monacolin K have the same mass, there is no way to differentiate those two using that technique.

**Q.** Okay. And to your knowledge, was the application of this isotope ratio analysis, had it been applied to the experimentation with monacolin K versus lovastatin before Perini published it? Was this something that was done before or publicized or widely-used?

**A.** Not that I'm aware of.

**Q.** Take a look, if you will, at what I've marked as Defense Exhibit 10, which is a report of September 4, 2018, from the FDA laboratory.

**A.** Just give me one moment. Yes, I have it.

**Q.** All right. Does this report represent the application of Perini's method of distinguishing monacolin K from lovastatin to a sample in this case?

**A.** It appears to.

**Q.** All right. I'm looking at the description of samples received for analysis, and it says, see original case/sample report dated December 20, 2013, from Laurie A. Lynn. Does that refer us back to what I marked as Exhibit 9?

**A.** Yes, I believe it does.

**Q.** And so if they used the same material for the experiment in September 2018 that was used in Exhibit 9, that material had

1  already expired more than four years earlier, in August 2014; does

2  that look right?

3  **A.**   That's correct.

4  **Q.**   And does that raise any concern, the fact that they

5  experimented on expired material?

6  **A.**   It does, because again the passage of time, particularly past

7  an expiration date which I mentioned earlier, is derived based on

8  stability to test and the like, the compound that you presumed was

9  being analyzed, may, in fact, be -- contain other chemical

10  entities or in some way have been degraded or not have the same

11  identities it did before the expiration date.

12  **Q.**   Okay.  Last area of questioning.  I know we're getting very

13  close to the deadline here.

14      You mentioned that monacolin K as opposed to lovastatin has a

15  higher C-13 content; is that right?

16  **A.**   Correct.

17  **Q.**   Can the way monacolin K is produced or fermented or

18  manufactured or however that is, can that affect the C-13 content

19  based on the research in the literature that you conducted?

20  **A.**   Yes, there's literature to suggest that monacolin K cannot

21  only be produced in higher amounts by tinkering with the

22  conditions, but that the mechanism of creation can be changed.  So

23  the compound when it's formed incorporates a greater amount of

24  C-13.

25  **Q.**   And how would one go about doing that?  How would one increase

1  C-13 without -- without combining monacolin K with actual

2  lovastatin?  How would one increase the C-13 content of that

3  compound?

4  **A.**  Perini itself gives a discussion about the different pathways,

5  photosynthetic pathways to be more specific, that compounds

6  undergo in their formation.  And that leads us into it, a

7  discussion about the difference between a C3 plant and a C4 plant.

8  Simply stated, C4 plants are known to undergo a synthetic pathway

9  that preferentially incorporates C-13 at a higher rate.  That's

10  the rationale that's provided in Perini itself and all of the

11  other literature that I've reviewed.

12     So the short answer is that by adding nutrients, such as

13  sugars, glucose, fructose that is disclosed in several pieces of

14  literature, you have the potential of altering the pathway and

15  making the pathway during Monocolon production more C-4 like than

16  C3.  And it's really about the willingness of a compound as it

17  grows, as it's exposed to light and CO2, to incorporate CO2 from

18  the air.  And if you can get a plant to do that at a greater rate,

19  you will end up with -- shall I say, a C-13 enriched carbon

20  skeleton.

21  **Q.**  So if I understand what you're saying, the suppliers to a

22  dietary supplement company of red yeast rice, depending on who you

23  acquire it from, it may have different C-13 because they may have

24  used different ways to produce that monacolin K in the red yeast

25  rice?

1  **A.**  I believe that's accurate, yes.

2  **Q.**  Okay.

3       MR. WENIK:  Judge, at this point I think I would move

4  into admission for purposes of the hearing, Defense Exhibits 1

5  through 10 and 16, which are the ones that I showed Mr. Hillyer.

6       MR. KITCHENS:  No objection for representation of this

7  hearing.

8       THE COURT:  All right, they're all admitted.  Thank you.

9       MR. WENIK:  And that would be all I have for Mr.

10 Hillyer.  At this point given the hour, Judge, I don't know if you

11 just want to start again in the morning, and I don't know if Mr.

12 Morris may have another couple of questions.  He may not, I'm not

13 sure.

14       THE COURT:  Let's finish up at least from the defense

15 side.  Do you have any questions, Mr. Morris?  It was very

16 thorough.  I can't imagine there are too many -- too many more

17 questions for this witness.

18       MR. WENIK:  I don't intend to be perfect, Your Honor.

19       THE COURT:  It's been a long day with a lot of

20 chemistry.  You're on mute, Mr. Morris.

21       MR. MORRIS:  I'm sorry, I don't have any questions.  If

22 I did, they would be repetitive.  I'm sorry.  I'm just clarifying.

23 I think you got the gist, Judge.

24       THE COURT:  All right.  What about Mr. Leach, are you

25 good?

 1          MR. LEACH:  Judge, I'm co-council to Jack, so I just

 2   assumed I didn't have any right to question.  So...

 3          THE COURT:  Okay.  I agree.  I agree.  I didn't even

 4   mean to ask.  After I yelled at you, I wanted to give you a

 5   chance.

 6          MR. LEACH:  Thank you, Judge.

 7          THE COURT:  Just go after it.  Ask about the double

 8   bonds.  Ask him.

 9          MR. LEACH:  I have a lot to talk to our witness offline

10   about the double bonds and the charts.  I'll reserve that for

11   another time.  Thank you.

12          THE COURT:  All right.  So we'll start in the morning

13   with the cross from the government, and then we'll try to move on.

14   What are y'alls thoughts on these witnesses?  Is this one of the

15   longer ones or what are your thoughts?

16          MR. WENIK:  Well, I'll let Mr. Kitchens speak about his.

17   I assume Mr. Mangrum will be very brief.  Mr. Bannister, Dr.

18   Bannister and Dr. Heuer I think should be probably a little

19   shorter than Mr. Hillyer, not dramatically shorter but somewhat

20   shorter.  I think we're going to try as I work on it a little bit

21   more tonight, maybe try to scale it back so that there is not too

22   much repetition.

23          THE COURT:  Well, isn't part of the motion from the

24   government that it's accumulative?  I mean, are you going --

25          MR. KITCHENS:  We're not addressing that for purposes of

1   this hearing, Your Honor.  So there are certain issues that both

2   sides have raised that we're just relying on the motions that have

3   been filed.

4           So for purposes of the hearing, I think the only inquiry

5   for all of these witnesses is really the reliability and the

6   methodology that they used to conduct their analyses.

7           THE COURT:  And I guess theoretically the credibility of

8   the witness too; right?

9           MR. KITCHENS:  Sure, sure.

10          MR. WENIK:  And I would just add the application of the

11  methodology.  I mean, you can use the correct methodology but

12  applied in a manner that is inappropriate is certainly one of our

13  themes.

14          THE COURT:  Yeah.  And my theme is, you know -- well, I

15  won't tell you what my theme is.

16          All right.  Well, we'll just start plodding through and

17  try to finish, maybe even -- I think I've just set a hearing for

18  tomorrow at 5:30, and I set just set one for today at 6.  So we

19  can maybe go a little bit long tomorrow.  Does anyone want to

20  start earlier in the attempt to power through?  I'm trying to

21  avoid Friday.

22          MR. WENIK:  Well, it's the convenience of the witness.

23  What's your availability tomorrow morning, Greg, can you come

24  back?

25          THE WITNESS:  I'm here at the court's convenience.

1          MR. KITCHENS:  I'll be doing the cross-examination, so

2    I'm happy to, you know, start earlier as well.

3          MR. LEACH:  Judge, I have to be honest.  I don't think

4    there's any way we're going to get to Dr. Heuer tomorrow based on

5    what I've seen.  Now, that's just me.  But I think you're going to

6    end up with one witness hanging out there, whether it be Friday or

7    some other point.  That's just my thought.

8          THE COURT:  All right.  Well, I think we still can try

9    to add in a half hour in the morning and maybe a half hour in the

10   afternoon.

11         THE DEPUTY CLERK:  Judge, I think your call tomorrow is

12   going to go away.  I saw an e-mail.

13         THE COURT:  No, I think that's the one for tonight.

14   That was supposed to be Thursday and now I just made it for 6 p.m.

15   Plaintiff's counsel is going to be out of town, and I was, like,

16   then we'll do it right now.  So I think I do have a 5:30 -- oh,

17   no, you're right.  The 5:30 is Thursday, so we can go late

18   tomorrow.  Let's do 8:30 to 6 tomorrow.

19         Okay, y'all will appreciate it.  Even if we get half a

20   day on Friday, y'all will appreciate it later.

21         MR. WENIK:  If I have power, I'm there.  No problem.

22         THE COURT:  Well, you've got the generator.  You should

23   be fine.

24         MR. WENIK:  I'm hoping the generator works.

25         THE COURT:  And let's all just wave at the camera and

─────UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT─────

1  thank Viola, who like, can we all agree that that's a tough job

2  you've got.  So see you guys tomorrow at 8:30.  All right?

3         Mr. Hillyer, don't talk to anybody about your testimony,

4  and we'll see you tomorrow.  You'll be under oath then.

5         MR. HILLYER:  Understood.  Thank you, Your Honor.

6         THE COURT:  Okay, bye.

7         (Whereupon the hearing concluded at 4:56 p.m.)

1                    C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT

4   NORTHERN DISTRICT OF GEORGIA

5

6       I do hereby certify that the foregoing pages are a true and

7   correct transcript of the proceedings taken down by me in the case

8   aforesaid.

9       This the 29th day of December, 2020.

10

11

12

13

14                    _/s/ Viola S. Zborowski_____
                      VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
15                    OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25