1                    UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
2                          ATLANTA DIVISION

3
UNITED STATES OF AMERICA, )
4            PLAINTIFF,      )
                            )
5   -VS-                     ) DOCKET NO. 1:17-CR-00229-AT-CMS
                            ) VOLUME II
6   JARED WHEAT, JOHN BRANDON )
    SCHOPP AND HI-TECH        )
7   PHARMACEUTICALS, INC.,    )
                            )
8            DEFENDANTS.      )
    _____

9
                   TRANSCRIPT OF DAUBERT PROCEEDINGS
10            BEFORE THE HONORABLE CATHERINE M. SALINAS
                  UNITED STATES MAGISTRATE JUDGE
11                  TUESDAY, DECEMBER 16, 2020

12  APPEARANCES:

13  ON BEHALF OF THE GOVERNMENT:

14       KELLY KATHLEEN CONNORS, ESQ.
         D'JUAN B. JONES, ESQ.
15       NATHAN PARKER KITCHENS, ESQ.
         Assistant United States Attorneys
16

17  ON BEHALF OF THE DEFENDANT HI-TECH PHARMACEUTICALS, INC.:

18       ARTHUR W. LEACH, ESQ.

19  ON BEHALF OF THE DEFENDANT JARED WHEAT:

20       BRUCE HOWARD MORRIS, ESQ.
         FINESTONE MORRIS & WHITE, LLP
21
         JACK WENIK, ESQ.
22       JEFFREY MONGIELLO, ESQ.
         EPSTEIN BECKER & GREEN, P.C.
23

24            VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
                     OFFICIAL COURT REPORTER
25               UNITED STATES DISTRICT COURT
                       ATLANTA, GEORGIA

——UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT——

1                          I N D E X

2

3   WITNESS                    DIRECT    CROSS   REDIRECT   RECROSS

4   GREGORY L. HILLYER                   204       289

5   ENRIQUE YANES SANTOS         303     350       406       412

6   JOHN BRADLEY MANGRUM         417     440       451       454

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (HELD VIA ZOOM AT 8:30 A.M.)

 2             THE COURT:  Can we go ahead and get started?

 3             MR. LEACH:  Yes.

 4             THE COURT:  We're back on with 117-CR-229.  It's United

 5   States versus Hi-Tech Pharmaceuticals, Jared Wheat and others, and

 6   we are in the middle of the examination of Greg Hillyer continuing

 7   from yesterday.

 8             And Mr. Hillyer, you're still under oath and the

 9   admonitions I gave you yesterday speaking to other witnesses,

10   those remain in effect.  Is there anything we need to take up

11   before we can begin with the cross-examination?

12             MR. KITCHENS:  Not from the government, Your Honor.

13             MR. WENIK:  Not from me, Judge.

14             THE COURT:  Go ahead, Mr. Kitchens.

15                          ******

16                    GREGORY L. HILLYER,

17        having been previously sworn, testified as follows:

18                          ******

19   CROSS-EXAMINATION

20   BY MR. KITCHENS:

21   Q.  Thank you.  Good morning.  I didn't get a chance to formally

22   introduce myself yesterday, but I'm Nathan Kitchens.  I'm one of

23   the prosecutors in this matter.

24   A.  Nice to meet you.

25   Q.  I'm going to ask you some questions just briefly about your
```

1  background, but for the most part we're going to focus on kind

2  of -- I think we got a good sense of your opinions yesterday.  I

3  just want to focus really on trying to get to the bases for those

4  opinions and the methodology you used to reach those opinions.

5  Okay?

6  **A.**   Sure.

7  **Q.**   First just to clarify some of your professional experience.

8  You worked in the pharmaceutical industry from 1992 through 1999;

9  correct?

10  **A.**   That's correct.  Probably more like '98, but that's fair.

11  **Q.**   And for at least the first six or seven of those years or, you

12  know, five or six years I guess you were a chemist; is that right?

13  **A.**   Correct.

14  **Q.**   Okay.  And your work as a chemist, is it -- with DuPont that

15  involved pharmaceuticals?

16  **A.**   It did.

17  **Q.**   That was drugs, drug products; correct?

18  **A.**   Correct.

19  **Q.**   Okay.  And then as you noted I think you transitioned to

20  a -- as a patent agent for the last couple of years you were at

21  DuPont?

22  **A.**   That is accurate.

23  **Q.**   And you continued to serve as a patent agent through law

24  school and then, you know, transitioned to your legal career?

25  **A.**   Correct.

1  **Q.**  And then as -- for your legal career aside from fairly early
2  on you served one year as a public defender; right?
3  **A.**  That's correct.
4  **Q.**  And then you worked after that at various IP firms practicing
5  patent and intellectual property litigation; is that right?
6  **A.**  That's correct.  I just might add that some of my engagements
7  involved more general commercial matters, but with that caveat I
8  think your question is accurate.
9  **Q.**  You're -- and just to clarify, you're not testifying or plan
10 to testify in your capacity as an attorney; is that right?
11 **A.**  Not in this matter, no.
12 **Q.**  You're testifying in your capacity as a chemist?
13 **A.**  Correct.
14 **Q.**  Have you ever worked for a dietary supplement company?
15 **A.**  I have performed work for dietary supplement companies, but
16 I've never been formally employed by a dietary supplement company.
17 Actually, well, this is one of the problems with having a career
18 that's longer than I hate to admit.  I actually did work for a
19 supplement company in North Carolina doing quality control.  It
20 was in Monroe.  It was a short stint, so it's not on my resume,
21 but it did exist so I wanted to mention it.
22 **Q.**  Okay.  What was the name of that company?
23 **A.**  I want to say it was Rexall, but this is -- this is some time
24 ago.
25 **Q.**  How long --

1  **A.**  I honestly -- I apologize.  I honestly can't remember.

2  **Q.**  Okay.

3  **A.**  I remember I didn't care for it, but...

4  **Q.**  And you said it was a short period of time.  How long are we

5  talking about that you worked there?

6  **A.**  It was a matter of months.  Six months at the outside and I

7  was -- I was performing quality control.  So the drugs were

8  already -- not drugs but the compounds in question were already

9  made and I was subjecting them to dissolution studies and

10  stability studies and things of that nature.

11  **Q.**  So if the drugs were already made, were you ever involved in

12  developing the dietary supplements?

13  **A.**  Not in that position.  And I'll simply say that I -- if I have

14  over the course of my career, I can't recall it at this moment.

15  **Q.**  You've never developed a dietary supplement from what you

16  recall?

17  **A.**  Correct.

18  **Q.**  Okay.  You've never manufactured a dietary supplement?

19  **A.**  Not that I can recall.

20  **Q.**  Have you ever had experience developing anabolic steroid

21  products?

22  **A.**  It's possible that some of the programs that I was assigned to

23  involved compounds that had steroid-like activities.  Certainly,

24  in my role as a patent agent at DuPont I wrote applications on

25  core molecules with, I won't say unlimited but seemingly unlimited

1   core structures and substituents, so it's extremely possible that

2   some of those compounds fell within the steroid characterization.

3   **Q.**  Just so I -- to clarify, do you have a specific memory of

4   actually developing or manufacturing anabolic steroid products?

5   **A.**  No.

6   **Q.**  Do you have a specific memory of conducting testing on

7   anabolic steroids?

8   **A.**  It's certainly possible in connection with some of the

9   litigations that I've handled that there was third-party testing

10  associated with steroids, but I can't recall a specific instance

11  at this time.

12  **Q.**  All right.  Let's move on from your experience.  You also in

13  preparing for this testimony and for your opinions you reviewed

14  various materials; correct?

15  **A.**  Correct.

16  **Q.**  And I think you went over some of that in testimony.  I just

17  want to make sure we have an understanding of the full scope of

18  what you've reviewed.

19  **A.**  Sure.

20  **Q.**  And you spoke with Hi-Tech representatives about the opinions

21  that you would offer; right?

22          MR. WENIK:  Object to asking for attorney/client

23  privilege conversations.  I'm just troubled by using Hi-Tech

24  representatives.  If he wants to ask what he spoke to Hi-Tech

25  employees about, that's fair game.  But I don't think he should be

1  permitted to delve into my conversations with Mr. Hillyer.

2          MR. KITCHENS:  And to be clear, I'm not trying to delve

3  into specific conversations.  I'm just trying to get across the

4  point that he communicated to Hi-Tech, the party, what his

5  opinions were going to be.

6          THE COURT:  Well, he's their expert.

7          MR. KITCHENS:  Right.

8          THE COURT:  I think that's a fair and obviously -- fair

9  question with an obvious answer.  I think you can answer that

10 question.

11 **A.**  I mean obviously in order to testify here today, at some point

12 or another I had contact with the parties in question in

13 connection with the opinions that I would offer.

14 CROSS-EXAMINATION

15 BY MR. KITCHENS (continued):

16 **Q.**  And let's talk about some of those materials that you

17 mentioned that you reviewed.  You reviewed as you went over

18 yesterday the chemist reports from the FDA?

19 **A.**  Correct.

20 **Q.**  You testified yesterday about, do you recall I think it was

21 shown as an exhibit, a 2017 article, I think we referred to it

22 yesterday as the Perini article?

23 **A.**  Correct.

24 **Q.**  Okay.  You reviewed that.  I think you also referenced

25 reviewing literature on monacolin K?

1  **A.**  Correct.

2  **Q.**  And that was -- just to clarify, is that in addition to this

3  Perini article we were talking about?

4  **A.**  Yes.

5  **Q.**  Okay.  Were those -- for the Perini article, for example, was

6  that a peer-reviewed article?

7  **A.**  It appeared -- it occurred in a -- in a journal.  My

8  expectation is that it was peer reviewed, but I have no way of

9  knowing the protocols for that particular reference, but it seems

10 reasonable.

11 **Q.**  As a scientist, is it important to rely on peer-reviewed

12 materials?

13 **A.**  It depends on the matter, and it depends on the information in

14 question.

15 **Q.**  So you don't always need to rely on peer-reviewed materials?

16 **A.**  Again, and I'm not trying to be cagey, but the question is so

17 broad.  What I might be willing to -- to offer by way of clarity

18 is when relying on literature references, although not necessary,

19 most published literature in the scientific community is peer

20 reviewed.

21 **Q.**  Okay.  And specifically with, you know, chemistry studies when

22 you're looking at reviewing literature, you want to look for

23 peer-reviewed literature?

24 **A.**  I can't -- I can't say that it's always necessary.  I think

25 I'll just repeat what I said before which is that most published

1   literature -- in order to make it into a credible publication,

2   those -- those transcripts, manuscripts, papers, are typically

3   peer reviewed.  So -- so I mean one of the reasons I'm struggling

4   is simply because most published studies are peer reviewed in my

5   experience.  And so when you're reading an article, in my

6   experience, you don't typically spend a lot of energy figuring out

7   how, when and why it was peer reviewed.  You sort of assume it

8   was.

9   **Q.**  Okay.  Now, was there any other materials that you reviewed in

10  preparation for your testimony and your opinions that we haven't

11  covered?

12  **A.**  Just to clarify because I want to talk -- I would just want to

13  mention the specific papers, I believe.

14          THE COURT:  Mr. Hillyer, can you recreate whatever

15  answer that was?

16          MR. HILLYER:  I'm sorry.  Can you give me the question

17  again, please?

18          THE COURT:  Can you go back a little bit further maybe

19  to the question?

20          (The record was read.)

21  **A.**  Yeah.  I presume when you say we haven't covered, you're

22  referring to the exhibits that I was shown.  So I would say that

23  there's a number of materials that led to the opinions, including

24  some background research looking at various articles on the

25  technology employed, some of the techniques, the history, their

1   application.  I did mention the additional specific literature

2   references.  And one of the reasons I was leaning over, I wanted

3   to be able to get you the names for those.  One was a paper by

4   Wen, W-E-N, on the optimization of fermentation conditions for the

5   production of monacolin K.

6       And the other one I had to write down and I'm going to

7   probably mispronounce but I can spell it, and that's Rajasekaran,

8   R-A-J-A-S-E-K-A-R-A-N, which I would characterize as a similar

9   type of study involving the creation of monacolin K under various

10  conditions.  So those are the two specific references.  And then I

11  guess just to be perhaps overly inclusive we can also throw in

12  some of the more raw data that the FDA produced over the course of

13  time that lead to the reports in question.

14  CROSS-EXAMINATION

15  BY MR. KITCHENS (continued):

16  **Q.**  Okay.  Thank you.  And I think you mentioned with the two

17  articles, the Wen article and I'm not even going to hazard a guess

18  at the other pronunciation, I think you mentioned right when the

19  recording cut out that you were aware that those were disclosed

20  by Hi-Tech.

21  **A.**  Correct.

22  **Q.**  And so those were the --

23  **A.**  Written down somewhere, yes.

24  **Q.**  Okay, got it.  With the background materials, can you tell us

25  what those were, what you were consulting?

1   **A.**   Gosh, it's -- it's hard to -- a lot of time has passed.

2   There's many, many structures at issue, many, many different

3   analytical techniques.  So just in the normal course of

4   familiarizing myself with the sort of metes and bounds of the

5   subject matter at issue, you know, I would run searches.  I would

6   look at papers.  I would look at -- consider structures.  I spent

7   a fair amount of time thinking about the synthetic paths en route

8   to the ingredients in the products with an eye toward

9   understanding the introduction of the impurities.  I spent a fair

10   amount of time doing that.  And in order to go step by step in a

11   chemical transformation, you consult a fair amount of literature

12   to make sure that a synthetic transformation that you're putting

13   down on paper has support in the literature because now we're

14   starting to get into what kind of yields you get, what kind of

15   byproducts you can expect because of -- for example, let's say for

16   the sake of argument you want to turn an alcohol into a ketone on

17   one of these molecules.  If you look at the literature and you

18   find that it only goes 50 percent to completion, that gives you a

19   pretty good idea that you're looking at impurities.  And then you

20   want to try to figure out what impurities you may -- is it

21   overoxidation, underoxidation, reaction somewhere else on the

22   molecule.  Then you have to consider for the next step what that

23   impurity is going to do.  And a fair amount of literature,

24   consultation that goes into figuring out the path in order to

25   support the opinions that the unwanted materials that were

1   identified by the FDA are actually true impurities.

2   **Q.**   Okay.   I get it, Mr. Hillyer, but I think -- you know, I

3   understand your answer that you would need to consult literature.

4   What I'm trying to get at is, can you help us identify what that

5   literature was?

6   **A.**   That -- it's written down somewhere and that list can be

7   provided.   I mean there's --

8   **Q.**   Okay.

9   **A.**   Too many to name in this -- in this context.

10  **Q.**   I would just ask, please, if you could provide that list of

11  what you reviewed in forming these opinions.

12  **A.**   I think that's a fair request.   I mean, I won't speak for

13  Jack.

14          MR. WENIK:   We'll work it out.

15  **A.**   Yeah, we'll work it out.   I understand the nature of your

16  request.

17  CROSS-EXAMINATION

18  BY MR. KITCHENS (Continued):

19  **Q.**   All right.   For these materials that you reviewed and that you

20  relied upon, were they materials that you personally located?

21  **A.**   In some instances, yes.

22  **Q.**   What about the other instances?

23  **A.**   There were times when materials were provided to me as opposed

24  to finding them myself.

25  **Q.**   Who provided them to you?

1  **A.**   Dr. Steve Bannister.

2  **Q.**   And what materials did Dr. Bannister provide to you?

3  **A.**   Some of the literature, articles concerning synthetic

4  transformation.

5  **Q.**   And those are articles that you have not identified in any of

6  the disclosure to the government?

7  **A.**   Well, I haven't identified anything to the government so maybe

8  that's something that Jack can speak of.

9  **Q.**   Are you aware of any disclosure to the government about those

10 sources that Dr. Bannister provided to you?

11 **A.**   I'm not aware of that disclosure, no.

12 **Q.**   Any other -- and how many articles are we talking about that

13 Dr. Bannister provided to you?

14 **A.**   Just so we can define the universe.  These would be the same

15 articles for which you just made a request to produce.  These are

16 the same articles.

17 **Q.**   So just so I understand, everything that you will be providing

18 to us, is -- these were the sources of literature that you

19 consulted, they were provided to you by Dr. Bannister?

20 **A.**   No, not all of them.  What I was trying to convey is that when

21 you receive the list of references, those will include the ones

22 that were provided by Dr. Bannister.

23 **Q.**   Understood.  Okay.  Can you identify, however, which ones or

24 the specific topics of the ones that Dr. Bannister provided?

25 **A.**   I'll say that the majority were ones that Dr. Bannister

1  identified in part because he has access to a database where such

2  things are found.

3  **Q.**  What's that database?

4  **A.**  Well, there are a number of them.  There's a classic one

5  called STN that -- and it's -- it's popular and used with a great

6  deal of frequency because you can import structures or products or

7  names and literally get answers back as to how if it's ever been

8  made and if so, how it's been made, literature references,

9  et cetera.  So just not to digress, but if you were sitting in a

10 lab somewhere and you wanted to make a compound to carry out a

11 particular synthetic transformation, this database has the

12 technology available so that you can actually search it and see if

13 somebody else has made it, and you just might follow those

14 experimental conditions to carry it out on your own molecule.  So

15 maybe more than what you wanted to know, but that's one of the

16 reasons that's why we had access to that database.

17 **Q.**  No problem.  This list, by the way, just the materials of

18 reference, is that something that you can pull together fairly

19 quickly?

20 **A.**  Yes.

21 **Q.**  Okay.  Thank you.  Now, the two monacolin K articles, the Wen

22 article and the other one, were those articles that you personally

23 identified?

24 **A.**  I can't -- I can't recall.  It's possible.  I honestly don't

25 remember the source of them.  It could have been provided by

1  counsel.  I could have found them myself.  I just don't recall.  I

2  do a fair amount of research on the monacolin issue.  So it's

3  possible I found them myself.

4  **Q.**  And now you mentioned it could have been provided by counsel.

5  Were there additional documents that were provided by Hi-Tech?

6  **A.**  Sorry, relative to any subject or just...

7  **Q.**  Relative to any subject.

8  **A.**  Well, I mean clearly I received the FDA materials from Hi-Tech

9  or its counsel.

10  **Q.**  Any literature?

11  **A.**  I -- I probably received Perini through Hi-Tech because I

12  think that's specifically named in the FDA material.  By and

13  large, I didn't typically receive literature references

14  from -- from Hi-Tech.

15  **Q.**  Okay.  The only one you specifically mentioned literature

16  reference is the Perini article?

17  **A.**  Correct.

18  **Q.**  Okay.  Any other person aside from Hi-Tech and Dr. Bannister

19  that provided you materials for -- literature materials?

20  **A.**  No, no.  And I just want to say I found a lot of literature

21  through my searches.  So I don't want -- I don't want it to be

22  presumed that those were my only sources of information, but I

23  understand you're trying to ascertain who gave me what, and those

24  are the sources.

25  **Q.**  Understood.  Thanks, Mr. Hillyer.  All right.  Well, let's

1  move to actually your opinions themselves.  I'm going to try not

2  to, you know, basically I may identify the opinions that were

3  listed in the disclosure, but really what I'm going to try to get

4  at is the bases for some of your opinions.  Okay?

5  **A.**  Okay.

6  **Q.**  I'm going to show you what has been marked as Government

7  Exhibit 21.

8  **A.**  I can follow along just -- if you'll excuse me if I'm looking

9  to the side, it's because I have a larger screen where I can look

10  at these materials.  But if you direct me to a particular exhibit

11  number, I'm sorry.  You mentioned it, I already forgot what it is.

12  **Q.**  No problem.  It's marked as Government's Exhibit No. 21.

13          MR. WENIK:  Is that one of the ones from yesterday?

14          MR. KITCHENS:  Correct.  And Angela, I was going to

15  try -- I don't know if it was going to help, I just tried to click

16  on the share screen function and it looks like the function is

17  disabled.

18          THE DEPUTY CLERK:  All right.  Hold on one moment.

19  **A.**  If you want to do it on screen share, that's okay with me.  I

20  know that might deprive others so I don't want to presume -- I've

21  got that, I've got Government Exhibit 21 on my screen.

22          THE DEPUTY CLERK:  You should be good to go also, Mr.

23  Kitchens.

24  CROSS-EXAMINATION

25  BY MR. KITCHENS (Continued):

1  **Q.**  Okay.  Great.  Just for the sake of permutation to see if this

2  works, let me try to bring this up.  Are you able to see this on

3  the screen, Mr. Hillyer?

4  **A.**  Yes, I am.  I'm just going to minimize it so I can see both.

5  **Q.**  Okay.  Well, let me scroll to the beginning of the exhibit

6  first.

7  **A.**  Okay.

8  **Q.**  Do you recognize what this is?

9  **A.**  I didn't prepare this.  I believe my name probably appears in

10  it.  I'm just going to the --

11  **Q.**  If we look at page 6.

12  **A.**  Yeah.  Uh-huh.  All right.  So I see a portion that refers to

13  me and my resume and provides additional information.

14  **Q.**  Okay.  And this is a disclosure that Hi-Tech provided to the

15  government?

16  **A.**  Correct.

17  **Q.**  We'll skip the first paragraph.  And I really just want to

18  focus on the opinions that are being disclosed here to make sure

19  we've covered it and have an understanding of the bases for those

20  opinions.  Look at the second paragraph here.  It says Mr. Hillyer

21  is expected to opine on certain chemical structures, synthesis

22  roots, reaction conditions, scale-up and analysis of compounds

23  relating to the steroid counts in the superseding indictment.

24  **A.**  Yes.

25  **Q.**  Is that an accurate description of your testimony?

1  **A.**  It's -- it's an accurate description of my anticipated

2  testimony, yes.

3  **Q.**  And was that -- did you describe the full scope of opinions

4  covered by the sentence in your testimony yesterday?

5          MR. WENIK:  Are you asking him whether this is something

6  beyond what he testified yesterday that applies to this?  I'm not

7  trying to be cagey.  I'm trying to understanding what you're

8  asking him.

9  CROSS-EXAMINATION

10  BY MR. KITCHENS (Continued):

11  **Q.**  Did you understand the question, Mr. Hillyer?  I mean I'm

12  trying to ask when you testified yesterday was there anything

13  beyond -- or when this sentence describes what you're going to be

14  opining on, is there anything that you would anticipate opining on

15  at trial that you did not discuss yesterday?

16  **A.**  Yeah, there probably will be.  I mean it will be of the same,

17  you know, subject matter, if you will, the compounds in question,

18  routes to their preparation which we really didn't discuss that

19  much.  And so because yesterday's direct examination was, you

20  know, had a -- had a limited scope and purpose for this hearing.

21  **Q.**  I'm sorry.  So when you say for example synthesis routes, are

22  you suggesting that you have additional opinions that you did not

23  discuss yesterday?

24  **A.**  Right.  In fact, I even mentioned -- I might have even made an

25  offhand joke to the court that I've actually gone through and

1  considered the specifics and synthetic preparation that would be

2  necessary for the active ingredients in order to demonstrate that

3  the impurities would be made along the way.  And we really didn't

4  get into that in detail yesterday, but I want to be fair about

5  what -- what I've looked at and what I could offer depending upon

6  what -- what counsel wants me to talk about.  But -- and again I'm

7  not trying to be difficult, but the paragraph in question does

8  continue on to discuss some other things, so I don't know that

9  that one sentence while broad and reasonable and can be relied on

10  is the sum total of what will be my opinion.

11  **Q.**  Sure, and we will get to the, you know, rest of the paragraph

12  in a little bit as well, Mr. Hillyer.

13  **A.**  Okay.

14  **Q.**  I want to understand, you specifically said you looked at the

15  synthesis -- I want to understand what opinion you have and would

16  plan to present at trial that we didn't hear about yesterday about

17  the synthesis routes.

18  **A.**  Sure.  That's fair.  The point at which everybody's eyes

19  glazed over was when I started talking about specific areas of

20  these molecules.  And I think -- I won't repeat it, mercifully I

21  won't repeat it, but there are three key areas and every molecule

22  in question relative to the steroid count where chemistry is

23  deliberately being -- being performed.  Those same areas are where

24  the differences exist between active ingredients and what I'm

25  calling the impurities, the control substance.  And so if one can

1   imagine that if you go back to and consider how the active

2   ingredients were made, you would want to look to see whether or

3   not you can explain how these impurities were introduced.  And

4   I've gone to a fairly granular level in this respect because what

5   I used to do for a living was come up with synthetic routes and

6   identify impurities.  Part of that is knowing what's going to

7   happen in reactions other than what you intended.  So the

8   references that we referred to earlier, those are references that

9   are relative to those synthetic routes.  Step-by-step analysis.

10  I'm going to start here and I'm going to do this reaction, and as

11  a result I'm going to get the product I want and I'm going to get

12  the product I don't want.  And proceeding through on a

13  step-by-step basis justifying each step with a literature

14  reference in order to explain, yes, that's a logical thing to be

15  performing, and showing how the production of impurities will

16  eventually give way to the exact impurities that FDA identified.

17      So we didn't really have a chance to get into all of that.  I

18  don't think it's a departure of what we discussed, but I want to

19  be clear there's another layer of analysis that I looked at to

20  give a plausible description for the existence of the compounds

21  that FDA found.

22  Q.  Thanks, Mr. Hillyer.  And yes, on our end, too, we want to

23  make sure that the judge has a full understanding of the opinions

24  that you'll be offering to make sure that there is a reliable

25  basis for those opinions as well.  As I understand it for what,

1   you know, you're outlining in terms of being able to follow the

2   synthetic route from step by step, you're suggesting that you

3   would be basing that on a literature -- an examination for each

4   one of those steps; is that correct?

5   **A.**   To be completely honest, I base the synthetic transformation

6   on my profound experience in synthetic organic chemistry and then

7   went and found literature references to support them.  And it

8   turns out I was right.

9   **Q.**   And based on the literature references that's how you're

10  forming this opinion?

11  **A.**   Right.  And just to be clear, many of the synthetic

12  transformations are garden variety transformations to synthetic

13  organic chemistry.  When you're talking about oxidizing alcohol to

14  a ketone, that's -- that's something you learn about in organic

15  chemistry in college if you're a chemistry major.  And then once

16  you've carried it out hundreds of times, you don't really need a

17  literature reference anymore than you would need one to know

18  that -- how to ask a direct question.

19  **Q.**   Sure.  And, yeah, I was not a chemistry major, so I certainly

20  would need to know reference materials.  The literature you're

21  describing that you relied upon to corroborate your experience,

22  that's all literature that you're stating you're going to be

23  providing; correct?

24  **A.**   Subject to counsel's objection.

25  **Q.**   I hear none.

1          MR. WENIK:  We'll work it all out.  We'll get you a

2    list.

3          MR. KITCHENS:  Okay.

4    CROSS-EXAMINATION

5    BY MR. KITCHENS (Continued):

6    **Q.**  So aside from that, I just want to make sure, at least for

7    this -- are there any lines of testimony that you would anticipate

8    offering at trial if you were a witness that we haven't covered?

9    **A.**  I think that sentence is a -- is a fair representation.  I

10   mean, it's broad, but I think that it was intended to convey what

11   I expected to offer.

12   **Q.**  Okay.  So we've covered it, at least the topics?

13   **A.**  I've got to be honest, I don't know what that question means.

14   **Q.**  Okay.  Have you -- are there any topics along the synthetic

15   routes, reaction condition, scale-up, whatever?

16   **A.**  I think as long as we are clear that that's relative to the

17   steroid counts, yes, I think that's fair.

18   **Q.**  Let's look at the next sentence of the paragraph.  He will

19   testify about the numerous synthetic approaches and difficulties

20   which explain the presence of the specific impurities identified

21   by the FDA.

22   **A.**  Correct.

23   **Q.**  Okay.  Now, did you -- can you just remind us, and I don't

24   want you to have to repeat your opinions, but what -- what

25   opinions did you mention yesterday that you think fall into this

1  category?

2  **A.**  Well, I think they range from my interpretation of the FDA

3  reports, the significance of the findings, whether it be in a

4  particular study of a particular compound, a comparison of the

5  reports to each other, whether it be repetitions of studies or

6  elaborations on studies to go from qualitative to quantitative.

7  **Q.**  Okay.

8  **A.**  Certain aspects of the instrumentation and the limitations and

9  what they're designed to do, certain analytical techniques are

10  good for certain things but they have limitations.  And so I would

11  expect my opinions to also include explanations of what can be

12  expected by virtue of certain analytical technique and just one

13  example we talked about the coelution.  That's an example of

14  something that isn't about synthetic routes, but it's relevant to

15  the instrumentation and studies that were conducted by the FDA.

16  **Q.**  Okay.

17  **A.**  As we mentioned, the nature, existence, behavior, quantities

18  of the impurities and how they got there, but I think -- that's

19  the best I can do as far as a general explanation.

20  **Q.**  Thanks, Mr. Hillyer.  And so I understand it, I think, those

21  were difficulties you identified yesterday, what you would term

22  difficulties as it is phrased in this disclosure?

23  **A.**  Well, I think difficulties are -- are one aspect of it, but I

24  think there's something more broad and which is what -- what are

25  these instrumentation techniques, what are they designed to do,

1  what aspects of a -- I mean, broadly speaking, a different

2  technique exploits a different quality of a molecule, whether it's

3  HPLC using polarity, GC using volatility, mass spec using

4  fragmentation.  So I would have to fold in maybe the more basic

5  explanation of how these techniques work, what they're designed to

6  do, what -- the limitations and difficulties, as you put it.

7  **Q.**  And I guess what I'm getting at, just to -- let me know if

8  this is shortening it too much, but is this sentence referring to

9  essentially your -- your opinions regarding the FCC testing?

10 **A.**  When you say this sentence, you mean the second sentence?

11 **Q.**  Correct.

12 **A.**  I think that's fair.

13 **Q.**  And so when you're talking about numerous synthetic approaches

14 and difficulties, that's referring to the FCC testing?

15 **A.**  No.  It's broader than that.  The difficulties that I'm

16 referring to is the ability to carry out synthetic transformations

17 without producing impurities.  That all happened long before FDA

18 started doing its testing.  So in order to understand the

19 preference of these organic compounds that were identified by FDA,

20 I endeavored to take several steps before that to figure out what

21 happened in the manufacturing to explain their existence.  So

22 there are sort of two pieces which is the findings, what FDA did,

23 an explanation of the techniques, their limitations and the

24 findings and an analysis of an alternative theory as to how those

25 impurities -- why those impurities were present in the product

1  other than the deliberate addition.

2  **Q.**  And so really this numerous synthetic approaches and

3  difficulties, you're saying it happened before it even got to FCC.

4  You're talking about these were things that in your judgement, in

5  your theory, is that this happened at what, the point of

6  manufacture?

7  **A.**  Correct, or in the bottle or both.

8  **Q.**  Or in the bottle?

9  **A.**  Right.

10 **Q.**  Okay.  When you say or in the bottle, we'll talk about it a

11 little bit, is that referring to the degradation theory that you

12 described yesterday?

13 **A.**  Yes.

14 **Q.**  Thank you.  Now, let's go to the last sentence of this

15 paragraph because I think some of these concepts we may not have

16 discussed yesterday.  And so we'll go through kind of each of

17 these and these are explanations that -- that you're disclosing

18 for those impurities found by the FDA, as you call it; correct?

19 **A.**  Correct.

20 **Q.**  Okay.  So some of these, I don't believe you testified about

21 yesterday.  If these are not opinions that you're planning on

22 addressing in testimony, let us know and we'll move on.

23 **A.**  Okay.

24 **Q.**  All right.  So the first one you identify here is the use of

25 one-pot chemistry?

**A.**   Right.

**Q.**   Does that accurately describe your opinion that the use of one-pot chemistry accounted for the presence of the Schedule III steroids in this case?

**A.**   Yeah, we didn't use that vernacular one pot, but let's say, for example, that you have a synthetic transformation that involves two steps.  You have two options.  You can run step one, isolate the product and sort of clean it up, if you will.  You can purify it, you can identify it, you can calculate your yield and make sure you made what you intended to make.  And then you can run step two.  So that's option number one.

The second option is what we're calling is one-pot chemistry. After I run my first synthetic transformation, I'm not going to bother cleaning it up.  I'm just going to convince myself that the transformation is taking place in the same pot, if you will, the same reaction vessel.  I'm going to run step two, and then I'm going to clean it up at the end.  That is what one-pot chemistry is.  It's a -- it's a technique -- forget about the term.  But it's a technique that is widely employed in commercial manufacture because unlike being at a bench where you're working at maybe a milligram or gram level, you're talking about kilogram productions now.  And the time, effort, expense it takes to purify an intermediate, right, the one that's made after step one, is enormous.  And so if you can carry your reactions through in one pot, the more you can do in one pot, the better from a savings

1   standpoint for all those factors I just mentioned.

2      So that's a common technique and as you can probably imagine

3   or infer from my explanation so far, a one-pot method is dirtier

4   than cleaning it up at each step, and hence you get more

5   impurities that you have to live with, deal with, maybe identify

6   and might be present in your -- in the product that you finally

7   decide to isolate.

8   **Q.**  And so it's your opinion that Hi-Tech's use of one-pot

9   chemistry in the manufacture of these products would explain the

10  presence of the Schedule III steroids; is that accurate?

11  **A.**  I think it's one explanation.  And again --

12  **Q.**  One explanation?

13  **A.**  Yeah.  There's no -- no rule on what constitutes one pot.

14  Sometimes you might run four reactions in one pot, sometimes you

15  might run one.  But it's certainly a factor on scale-up to get to

16  a commercial manufacture level that you have to consider when --

17  **Q.**  Now, what was the basis for forming this opinion about one-pot

18  chemistry?

19  **A.**  Practical experience as a process chemist in running and

20  monitoring, designing such experiments.

21  **Q.**  Okay.  Your review serial (audio disruption) -- about the use

22  one-pot chemistry in this case?

23  **A.**  I don't believe so.  In fact, I relied on my fairly vast

24  experience in understanding the concept.

25  **Q.**  Did you -- did you gain facts about -- or excuse me.  Let me

1  rephrase.

2       What do you know specifically, what information do you have

3  about how Hi-Tech manufactured these products?

4  **A.**  I was -- was provided, at some point, I think it's been years

5  now, materials from a manufacturer concerning the synthetic

6  routes.

7  **Q.**  It's a little -- can you give us more explanation about that?

8  I'm not sure that I understand.  It was a little ambiguous.

9  **A.**  Yeah, it's only ambiguous because I'm trying to remember.  So

10  I'll try to do better in my answer.

11      I had access to some information about the preparation of

12  these compounds by the manufacturer, which included specific

13  starting materials, synthetic transformation, things of that

14  nature.

15  **Q.**  And how did you have access to that?

16  **A.**  I think those were provided by Hi-Tech.

17  **Q.**  When was that provided?

18  **A.**  I'm going to estimate somewhere -- 2018.

19  **Q.**  Did you rely specifically on those materials in providing this

20  opinion?

21  **A.**  I considered them.

22  **Q.**  Okay.  And would that be included in the materials that you

23  will be listing and providing to Hi-Tech?

24  **A.**  That's a decision to be made by counsel, but they're not

25  necessary for my opinions from my standpoint.

**Q.**  All right.  Even though you considered them, the actual synthetic process that Hi-Tech used was not necessary for your opinions on this -- the use of one-pot chemistry; is that correct?

**A.**  That's correct.

**Q.**  Okay.  It doesn't matter what Hi-Tech actually used as its starting material, that wasn't necessary for your analysis and your ability to form this opinion?

**A.**  I believe I had already come to those conclusions prior to the receipt of those materials.

**Q.**  Okay.  And the actual synthetic manufacturing process that Hi-Tech used, that was not a basis for this opinion?

**A.**  My efforts were directed to find multiple ways to carry out these synthetic transformations in an effort to try to account for any possible synthetic approaches, and so because the materials that I reviewed were not complete, it was necessary for me to consider all potential systems.

**Q.**  Mr. Hillyer, is it correct that your review of the actual materials about Hi-Tech's manufacturing process for these products was not a basis for your opinion on the use of one-pot chemistry?

**A.**  Yes, those materials did not indicate whether or not certain steps were performed in one step or sequential.  It just didn't get into that issue which is why I didn't -- didn't rely on them in that regard.

**Q.**  So it didn't -- so based on the materials that you reviewed, it did not state one way or another as to whether Hi-Tech used

1   one-pot chemistry?

2   **A.**   Correct.

3   **Q.**   So you did not --

4   **A.**   Well, it just wasn't relevant to that issue.  Let me finish.

5   It didn't speak to that issue, so that's why I'm answering the

6   question the way I'm answering.

7   **Q.**   And understood.  So it -- it was not a basis for this opinion?

8   **A.**   When you say "it," I assume you're referring to the materials

9   from the manufacturer and I think I've answered that question that

10  they were not part of my -- I did not rely on those materials for

11  purposes of determining whether certain steps were carried out in

12  one pot or otherwise.

13          THE COURT:  Can we take a five-minute break, please.

14          (Whereupon a break was taken.)

15          THE COURT:  All right.  We can go ahead and get started.

16  BY MR. KITCHENS:

17  **Q.**   All right.  Mr. Hillyer, we were just talking about the use of

18  one-pot chemistry and I'll move on in a second.  Just you noted

19  that your experience was the basis for this opinion?

20  **A.**   Yes.

21  **Q.**   Okay.  Have you ever manufactured DHEA?

22  **A.**   No.

23  **Q.**   Have you ever manufactured the active ingredients in the

24  Hi-Tech products at issue?

25  **A.**   No.

1   **Q.** If you look at this last sentence to the next after one-pot

2   chemistry, just to move on, you describe undesired or incomplete

3   reactions?

4   **A.** Right.

5   **Q.** Does that accurately state your opinion that undesired or

6   incomplete reactions explain these impurities, what you call

7   impurities identified in this case?

8   **A.** Yes, that is my opinion.

9   **Q.** And what was the basis for that opinion?

10  **A.** Well, again, years of experience in the design, carrying out

11  of synthetic transformation, using analytical techniques to

12  ascertain the progress of a reaction, the inclusion of unreactive

13  starting material, the production of unwanted impurities followed

14  by the purification and characterization of the final product

15  which would include the presence of impurities in the final

16  product as well.

17  **Q.** Okay. Was there any literature you relied upon in forming

18  that opinion?

19  **A.** The references that we discussed earlier that justified the

20  particular chemical steps which would include information relating

21  to the yield which is the percentage of correct transformation

22  that you get. So coupled with my background, experience and

23  education it would include those references of materials relied

24  on.

25  **Q.** Okay. So the basis of your experience, basis on your time as

1    a chemist, these reference articles you mentioned the literature

2    about -- and your education; is that right?

3    **A.**   Correct.

4    **Q.**   Any other -- I just want to make sure there's nothing else

5    that served as a basis of this opinion.

6    **A.**   Not that I can think of at this moment.

7    **Q.**   When you mention undesired or incomplete reactions, I just

8    want to make sure I understand what that is.

9    **A.**   Yeah.

10   **Q.**   Are these things that you testified about yesterday?

11   **A.**   Yes.  Probably not to the level of specificity that I could

12   have, but generally speaking, the idea that chemical reactions by

13   their nature, particularly in connection with molecules of this

14   complexity, maybe I can think of one or two reactions that are so

15   clean that no impurities are produced, those are usually done with

16   a gas.  Every other chemical transformation is -- is a compromise

17   as to when you're ready to stop that reaction.  And the compromise

18   is how much starting material has been consumed, how much

19   transformation have I gotten to the -- what I'll call the major

20   product, the one you want, versus production of the minor product.

21   And at some point or another even the intended product which you

22   successfully made, you keep it in the reaction mixture long enough

23   it's not going to stay intact, it's going to start overreacting as

24   well.  So there -- that's why we have reaction times.  That's

25   relevant to the compromise I'm talking about.  When it's time to

1  stop the reaction, work it up and purify it.

2  **Q.**  And so these -- just to, you know, try to get at the core of

3  your opinion, the specific Schedule III steroids found here were a

4  result of undesired or incomplete reactions during Hi-Tech's

5  manufacturing process; is that correct?

6  **A.**  That's my opinion.  That's correct.

7  **Q.**  That's your opinion?  Okay.

8  Let's go to the next one.  Inadequate purification of

9  intermediates and/or final targets.

10  Does that also accurately state your opinion that inadequate

11  purification of intermediates and/or final targets accounted for

12  the Schedule III steroids in this case?

13  **A.**  Yes, that's just an extension of the same issue I just spoke

14  about.  Obviously, if you are satisfied with a certain degree of

15  purity for your final product, you may have no interest, need or

16  desire or time, effort or resources to take a product that's 99

17  percent pure to 99.5 percent pure.  So that's one issue which is

18  the level of purity that is sufficient.  And the other -- the

19  other issue is the issue of whether you decide to clean them and

20  how good the yield is the same issues I was eluding to before.

21  **Q.**  So again it's your opinion that inadequate purification of

22  intermediates or final targets in Hi-Tech's manufacturing

23  accounted for the specific Schedule III steroids that were found

24  here?

25  **A.**  I would say they contributed to it, among the other factors I

1   discussed, yes.

2   **Q.**   And what was the basis for that opinion?

3   **A.**   The same materials that I mentioned before, the references in

4   question, coupled with my education, background and extensive

5   experience in the chemical synthetic arts.

6   **Q.**   Same materials, your experience as a chemist and your

7   educational background?

8   **A.**   Correct.

9   **Q.**   Your review of Hi-Tech's actual manufacturing process was not

10  a basis for this opinion?

11  **A.**   I'm -- I'm sorry, could I ask you to repeat that?  Because I

12  was actually -- I wanted to add to my prior answer, maybe this was

13  inferred, but also I'm including materials that the FDA generated.

14  I mean obviously those were considered as part of my opinions

15  because if a material is present at a, you know, odd amount that

16  is going to add to the body of evidence that these are impurities

17  and not intended targets.  So I apologize, I did not catch your

18  next question.

19  **Q.**   No problem.  Thanks for amending your answer.  So I just, you

20  know, to start there, is there anything else that we haven't

21  discussed that was a basis for this opinion?

22  **A.**   Not that I can think of at this time.

23  **Q.**   So Hi-Tech's actual manufacturing process, the materials you

24  reviewed regarding Hi-Tech's manufacturing process was not a basis

25  for this opinion?

**A.**  As I mentioned before, I considered them.  I guess it depends where you start drawing the line about what it means to rely on versus something -- every material either corroborated it independently with the materials that I discussed or I had already come up with synthetic routes in question that I believed were accurate prior to receiving those materials.  So I would probably say that they were cumulative.  But --

**Q.**  So just so I understand, did you rely on your review of those materials about Hi-Tech's actual manufacturing process in forming this opinion?

**A.**  I'm just going to stick with my prior answer because it's a question just using the term rely.  So I can't explain it any better than I have.

**Q.**  Mr. Hillyer, I'm going to ask you to try.  Sorry.  But I think that's a yes-or-no answer.  Did you rely on your review about the materials of Hi-Tech's manufacturing experience --

MR. WENIK:  This has been answered at least four times in different permutations and at some point I believe we should be moving on.

THE COURT:  Okay.  Well, then is the answer no?  I mean --

THE WITNESS:  In -- in -- Your Honor, the difficulty in -- in the question is that we're talking about materials about multiple --

THE COURT:  I think he's saying that you made your

1  decision and you didn't really consider how they actually

2  manufactured these particular supplements.

3          THE WITNESS:  No, Your Honor, I'm not saying that.

4          THE COURT:  You just said in general if somebody

5  manufactures things, this chemical reaction could happen and I

6  think that's -- but he's not -- but I think that's the point

7  Nathan is trying to make.  And it sounds like earlier you said no,

8  I thought.  I thought you answered the --

9          THE WITNESS:  No, Your Honor.  With due respect, I want

10  to clarify.

11          THE COURT:  Please.

12          THE WITNESS:  I think you're asking me a different

13  question and I wouldn't want to answer no to that question,

14  because I considered the materials provided because I think it

15  stands to reason that if you're going to get insights as to how

16  something was actually made, then that -- that should be

17  considered and what was made and so I think that that's -- umm, in

18  an effort to try to -- talking about those materials and the way

19  in which they may have factored into my analysis even if they were

20  corroborative, I will say that I did rely on them in part.

21          MR. WENIK:  Judge, let me interpose another objection

22  which may clarify, I think, the disconnect between Mr. Hillyer,

23  Mr. Kitchens' questions and my -- my problem with this line of

24  questioning, is that Mr. Kitchens' questions assumes a fact not in

25  evidence, mainly, that Hi-Tech manufactured the raw materials

1    involved here as opposed to them importing them from somewhere

2    else.  So I think the confusion I suspect is that Mr. Hillyer may

3    have seen things like blend sheets and what have you.  But the

4    actual manufacturing of the -- of the DHEA that is the heartland

5    of his opinion, you know, that's not something that Mr. Kitchens'

6    questions are exploring, and I think that's the problem, is that

7    when he says the actual Hi-Tech manufacturing process, you know,

8    that's assuming a lot and not a defined term in his questioning.

9            MR. KITCHENS:  I appreciate that from Mr. Wenik.  We're

10   obviously talking about materials that were provided to the

11   expert, apparently considered by him that have not been disclosed

12   to the government despite the various deadlines imposed by the

13   court, and we'll obviously address that later.  So, you know, that

14   information that Mr. Wenik provided is new to me, since we have

15   not received that material that Mr. Hillyer has reviewed,

16   apparently.

17           THE COURT:  Wait.  Is this an issue that I'm aware of?

18   What's -- what's the issue?

19           MR. KITCHENS:  It came up this morning, this is my first

20   time discovering there this was material apparently provided to

21   Mr. Hillyer that was not disclosed or provided to the government.

22   I think it's appropriate, Your Honor, we'll address it at a later

23   time.  I don't think we need to address it while Mr. Hillyer is

24   testifying.

25           THE COURT:  Okay.

1  CROSS-EXAMINATION

2  BY MR. KITCHENS (Continued):

3  **Q.**  But on this issue, if that is a source of confusion,

4  Mr. Hillyer, you know, I want to rephrase.

5      Your review of materials provided by Hi-Tech regarding the

6  actual manufacture of these products, is that material that you

7  relied upon in forming these opinions that undesired or incomplete

8  reactions accounted for the specific impurities identified by the

9  FDA?

10 **A.**  Again, the materials in question, though provided by Hi-Tech,

11 were not Hi-Tech materials.  So that's number one.  So I don't

12 know if you want to talk about them separately.  So just for

13 purposes of this question, I am assuming you're talking about

14 materials that were given to me that were relevant to the

15 manufacturing.  And I guess there's two levels of manufacturing.

16 So sorry to belabor the point, but it may help if you ask a

17 different question.  But my understanding of what Hi-Tech does is

18 it orders materials and it may do some blending on site.  That's

19 not the manufacturing I'm talking about.  The manufacturing I'm

20 talking about is the actual preparation of the active ingredients

21 in the commercial product.  My understanding is that Hi-Tech

22 doesn't do that, that that's done elsewhere, probably overseas.

23 **Q.**  And did you review materials about the actual production of

24 those materials that were used in these products?

25 **A.**  I would -- these are the materials I've been testifying about.

1          THE COURT:  Okay.  I think there's -- I'm getting

2    confused about the word materials because I think -- I was

3    thinking materials were like papers but then there's also

4    materials that are nutritional supplement parts.  So let's just --

5          THE WITNESS:  These are -- sorry, Your Honor.  I don't

6    mean to interrupt, but these are paper materials.

7          THE COURT:  It seemed like that last question had

8    materials in it twice using it in two different ways, but maybe

9    I'm just which -- maybe I'm missing it.

10          MR. KITCHENS:  I probably -- I probably confused it.

11          THE WITNESS:  These are documents.  These are documents.

12    CROSS-EXAMINATION

13    BY MR. KITCHENS:

14    **Q.**  These are documents describing the manufacture of the

15    ingredients that were used in the product at issue in the

16    indictment.  Is that accurate?

17    **A.**  It's accurate, except that I'll add the caveat that they were

18    incomplete.

19    **Q.**  They were incomplete materials.  Okay.  And you received these

20    from Hi-Tech?

21    **A.**  Correct.

22    **Q.**  And were those materials that you were provided and by this, I

23    mean the documents you were provided by Hi-Tech regarding the

24    actual ingredients for the products at issue in the indictment,

25    did you rely on those documents in forming your opinion that

1  undesired or incomplete reactions explain the presence of the

2  Schedule III steroids identified in this case?

3  **A.**  As I said before, I considered them.  I probably investigated

4  certain synthetic transformations that were disclosed in them, but

5  as I said, they were incomplete.  I probably used them more as a

6  corroborative sense so in that sense I relied on those materials,

7  but as I said, the consideration was not as thorough as it might

8  have been had those documents been more complete.

9  **Q.**  And Mr. Hillyer, is it the same answer for the opinion you

10  want to offer regarding the inadequate purification or

11  intermediates and/or final targets accounting for the specific

12  steroids found in this case?

13  **A.**  As far as the reliance of those materials?

14  **Q.**  Yes.

15  **A.**  Yes, it's the same answer.

16  **Q.**  You say the materials were incomplete.  Can you explain that?

17  **A.**  Anyone who has ever dealt with a foreign manufacturer knows

18  that they tend to give technical information about their processes

19  away very reluctantly, whether they considered them to be trade

20  secret or what have you.  And it -- it may be that, umm -- it may

21  be that they had thorough materials that were -- that were never

22  disclosed to Hi-Tech.  I can't -- I can't speak to that.  All I

23  can say is that the materials that I received were schematics, to

24  some degree, but they were -- they were incomplete.  Either

25  because they didn't come anywhere near -- well, they didn't

1  address every compound at issue in this case from start to finish.

2  This is what we start with and this is our target and didn't

3  describe things like conditions or reagents in -- in great detail.

4  They were rough -- rough schematics.  But I didn't consider them

5  because if this is the way in which the manufacturer was

6  indicating they made the product, then I wanted to consider that.

7  Q.  Even though they were incomplete and you could not form an

8  opinion just on those materials that were provided?

9  A.  Well, no.  They -- because, you know, in my view, in order to

10 explain the presence of impurities in a final product, you need to

11 walk through the whole process and try to understand specifically

12 how were these made.  At this position when you have a double bond

13 O where you wanted a single bond OH, where -- where did that

14 -- where did that double bond O come from.  Is it an

15 under-reaction, an overreaction, was it formed later by an

16 existing impurity?  And so again, trying to thread the needle of

17 your question, I considered them because I assumed that they were

18 going to be relevant, but they only offered so much information

19 that was useful.

20 Q.  Let's move on to your last topic or explanation that's

21 identified in this disclosure.  You state that the subjective

22 interpretation of test results was one of the contributing factors

23 for the identification of the specific Schedule III steroids in

24 this case.

25           MR. WENIK:  I want to object to the form of the

1  question.  I'm not objecting to Mr. Kitchens' right to explore

2  this, but it's a little misleading as he's phrasing these to say

3  he states or Mr. Hillyer.  This is clearly a synopsis that was

4  crafted by lawyers summarizing in a very general way his opinions

5  which I think more thoroughly is the government's issue for

6  another day.  I just think it's inappropriate to suggest that

7  these are all direct quotations from Mr. Hillyer, he said this, he

8  said that.  So I just want to put that on the record, Judge.

9         MR. KITCHENS:  Let's address that first.

10  CROSS-EXAMINATION

11  BY MR. KITCHENS (Continued):

12  **Q.**  Mr. Hillyer, is it accurate to say that it is your opinion

13  that the subjective interpretation of test results was a factor in

14  the identification of the Schedule III steroids in this case?

15  **A.**  First of all, I think this is information that we covered

16  yesterday in connection with Mr. Wenik's questioning.  I think

17  it's broader than just that.  I think it's the conclusions -- it's

18  the idea that the data supports the inclusion that I believe to be

19  part of the subjective interpretation.

20  **Q.**  I'm not sure I understood that, Mr. Hillyer.  Can you explain?

21  **A.**  Sure.  Let me try again.

22  **Q.**  Thank you.

23  **A.**  It's my understanding that it's the government's position that

24  the controlled substances were deliberately added.  And my -- so

25  that's -- that's part of the subjective interpretation and my

1   position is that these were introduced during the manufacturing

2   process or through degradation, they're there accidently, that

3   the -- that the amounts, the transient nature of their existence

4   over time but not over time, but over -- across samples, across

5   lot numbers are all contrary to that -- that conclusion.  So it

6   may be that in an instance they've misidentified something, but it

7   also may -- may be an instance where they've correctly identified

8   something but drawn the wrong conclusion.

9   **Q.**   Okay.  So if I understand it right and based on your review of

10  the FDA reports, is it your conclusion that the FDA made an

11  assessment as to whether Hi-Tech was deliberately adding the

12  Schedule III steroids to these products?

13  **A.**   I think there are assumptions made in the reports themselves,

14  you know, including instances where they call something lovastatin

15  without establishing what it was.  Instances where they find a

16  product in one lot and test -- test another and don't find that.

17  So that's issues in connection with the reports themselves which

18  were done specifically by FDA.  But we're all here today about the

19  final conclusion as I understand it.  That conclusion may not have

20  been derived -- you know, that may not have been expressly stated

21  by FDA because that may not be their decision.  Their role may

22  have been to test them and report what they identify.  It may have

23  been the government that decided that the ultimate conclusion is

24  that these were deliberately added, but in my view, those are

25  two -- two things are inexplicably intertwined regardless of who

1  came to that decision because it's the data that supposedly

2  supports the conclusion.  And since the data is also -- also

3  scientific in nature, it's an extension of my opinions that the

4  conclusion is wrong.

5  **Q.**  So just to try to put a -- put a fine point on it, is it your

6  opinion based on your review of the FDA materials, that the FDA

7  was concluding that Hi-Tech was deliberately adding these

8  substances to the products?

9  **A.**  I can't -- I can't answer the question as to what the FDA

10 was -- was thinking or concluded.

11 **Q.**  And you did not see that conclusion in the FCC -- the FDA test

12 results that you saw?

13         THE COURT:  I mean, Mr. Kitchens, I mean, can't we

14 assume that because they got indicted for it?

15         MR. KITCHENS:  Your Honor, to clarify.

16 CROSS-EXAMINATION

17 BY MR. KITCHENS (Continued):

18 **Q.**  Mr. Hillyer, when you're talking about the subjective

19 interpretation of test results, are you talking about it from the

20 U.S. Attorney's Office or from subjective interpretation by the

21 FDA chemist that conducted the test?

22 **A.**  Generally, I think I've explained this.  And I think -- I

23 think they're one and the same.  One has to do with the -- sort of

24 the analytical methods interpretation of results.  The FDA

25 certainly interpreted the results, they're in their finding.  That

1  eventually gave way in a cooperative experience with the

2  government that came up with conclusions based on the data.  So I

3  don't want to be problematic, but I also don't want to be overly

4  limiting.  I've tried to explain that the subjective

5  interpretation is both the way the FDA looked at the data itself,

6  as well as the conclusions that were drawn from the data

7  regardless of who drew them.

8  Q.  Okay.  And I guess that's what -- again, I'm just trying to

9  understand your opinion here.  When you're talking about

10 subjective interpretation and I just want to limit it to the FCC

11 chemist.  What are you suggesting was subjective about their

12 interpretation?

13        MR. WENIK:  Well, I'm going to object to the form of the

14 question.  If you want to ask him, you know, what his view of the

15 FDA chemist's views are, that's a difficult question to answer.

16 If you want to ask him what his impression is, what the whole

17 government prosecution is here, we've already covered that.  But

18 you're asking the same question three or four times, just because

19 you're not getting an answer you like.  I don't think it's right

20 to ask it again.

21        MR. KITCHENS:  I think I'm just trying to get at there

22 is a disclosure here being made and it may be that it was an

23 inaccurate disclosure by Hi-Tech or an imprecise one.  I want to

24 try to get an understanding if you understand what it means when

25 they're describing an opinion you will offer is -- that a

1  subjective interpretation of test results resulted in, you know, a

2  finding about the presence of the Schedule III steroids.  I want

3  to understand what that opinion is, the basis for that opinion.

4          THE COURT:  Let's -- let's just figure out what -- you

5  know, I mean, what's subjective here?  I mean, I don't think those

6  chemists yesterday -- I mean, maybe I missed something.  But it

7  didn't seem like there was a lot of subjectivity going on with

8  those two women; right?  I mean, is that your point, Mr. Kitchens?

9  It's not like they were going, hmmm.  I mean, it seemed pretty

10 locked down and tight what they were doing.  I think the

11 subjective part is whether, you know, Hi-Tech and Mr. Wheat, you

12 know, intentionally violated the law; right?  That's, I assume,

13 what the point of this disclosure is, and that you can look at

14 test results and make different conclusions.  And, obviously, Mr.

15 Hillyer looks at the test results and says, oh, it's random and

16 unintentional and, you know, Mr. Kitchens looks at them and says

17 it's there, we're going to charge them.  I mean -- so I have a

18 feeling that's what the defense are saying in their disclosure,

19 but I guess you're taking issue with that.  Mr. Kitchens is trying

20 to say that's not an appropriate place for him to have an opinion

21 or what -- what -- you're challenging his opinions.  I mean, I

22 guess you're just looking for the basis, but you filed a motion

23 challenging it.  So what's your -- what's your beef with that

24 opinion, I guess?  Is it too broad?

25          MR. KITCHENS:  To be clear it's not a beef.  I'm

1  actually -- and maybe the court fully understands what Mr. Hillyer
2  is, you know, or the description of what Mr. Hillyer's expected
3  testimony would be when this disclosure says, you know, that he
4  will testify, if you look at the sentence before that, that
5  various things that will explain the presence of the specific
6  impurities identified by the FDA, these explanations include --
7  the last one is the subjective interpretation of test results.
8  I'm trying to understand if -- if, you know, he agrees or what his
9  opinion is if -- if this is an, you know, accurate disclosure
10 about how or if he could just explain what exactly was the
11 subjective interpretation that would explain the presence of the
12 specific impurities identified by FDA.
13         MR. WENIK:  Here's the problem I'm having with all this,
14 Judge, with all due respect to Mr. Kitchens.  If we were in a
15 civil case and this document on the screen was the expert's own
16 words, his or her expert report, then it would be fair game to ask
17 in a deposition, you know, what did you mean by that sentence and
18 how does that affect your opinion.
19         THE COURT:  All right, Jack, let's ask you.  Okay.  Then
20 you wrote it, you tell us then.  What did you mean by it?  I
21 mean -- I think, you know, he's entitled to know what the opinions
22 are and what the basis is and it does sound like there's -- what's
23 subjective is in this one sentence, you know, that talks
24 about -- I don't know.  I mean, is it what I was just saying,
25 like, you know, somebody could look at this, one person sees it

1  this way, you say tomato, I say tomato?

2          MR. WENIK:  I think that's a big part of it.  But again,

3  you know, there are communications that he testified about, we

4  looked at between Agent Kriplean and these chemists.  There's the

5  whole chronology of what happened here.  I mean, I don't want to

6  testify before the court, but my point is to flyspeck word by word

7  every word of an attorney's synopsis of the opinions, you know --

8  if I put the government's synopsis on the screen, you would see

9  not even a full paragraph, you would see one sentence.  And I'm

10 just saying it's not really germane to the purpose we're here for.

11 If he wants to ask what the basis of his opinions are, that's

12 fine.

13          THE COURT:  Well, what's the objection?

14          MR. WENIK:  What does subjective mean that an attorney

15 put into a document, but obviously he has a different

16 interpretation of the test results than the government and his

17 agents, and the government is not just the FCC chemist.  It's the

18 special agent, it's the personnel that put all this together.

19          THE COURT:  Different -- different people can view the

20 evidence differently; right?  That's his -- and is that

21 appropriate for expert testimony; right?  Is that closing argument

22 kind of testimony; right?  Like, Mr. Hillyer can get up there and

23 explain that he thinks these things are random, that typically

24 when you're going to insert something into a product, it would be

25 more uniform.  I think, you know, that sort of thing, but I don't

 1  know that he can, you know -- different people have different -- I

 2  don't know.  I -- I probably butted in.  I'm just trying to move

 3  us along and trying to figure out what the problem is and whether

 4  it's worth dealing with.  Mr. Kitchens, you tell me where are we

 5  and what are we trying to get?  I'm happy to squeeze Jack and make

 6  him, you know -- I'll keep squeezing on him if that will help.

 7          MR. KITCHENS:  No, I -- I appreciate it, Your Honor.

 8  And I'm sorry.  I want to move things along as well.  I'm not

 9  trying to give Mr. Wenik a hard time about what may be imprecise

10  phrasing about the disclosure.  I just want to make sure I -- and

11  I think the court gets it.  I want to make sure Mr. Hillyer if he

12  were to testify at trial is not presenting opinions that were not

13  disclosed to the government or not clear to the government and

14  have not been covered.  And I want to make sure before he would

15  have an opportunity to testify to a jury that there is a reliable

16  basis for those opinions.  So I'm really just trying to get at it

17  and it may be that Mr. Hillyer when he views that doesn't have,

18  you know, really the same understanding as Mr. Wenik when he wrote

19  this -- this disclosure about what it means about subjective

20  interpretation of test results.  But I would just like, you know,

21  an understanding of what Mr. Hillyer would plan to testify about

22  in this category at trial and the basis for that opinion.  And I

23  feel like we haven't gotten there yet, if it's a simple -- and I

24  can, you know, follow up.

25  CROSS-EXAMINATION

BY MR. KITCHENS (Continued):

**Q.** But I think, you know, Mr. Hillyer, the court suggested an interpretation that, you know, a possible, you know, opinion that you may be offering is that different people can interpret data differently. Is that an opinion that you are planning on offering if you are a witness at trial?

**A.** Yes. First, let me say I think this sentence is accurate. Second, I think as I tried to explain and maybe not very artfully or persuasively or convincingly, that I think there's two parts to that sentence. One part it seems like the part we're discussing now, which is I'm looking at the data and I'm going to draw certain conclusions from it.

And maybe it would be helpful if I just gave a 12-second example. If I was working as a process chemist and I went to my boss and I said here's the final product, it's 99 percent pure, and he says -- he or she says, well, that means we have one percent impurity, why did you put those in there? I'd say, well, I didn't put them in there. Here's what they are, here's the steps that introduced them, we identified them here and they are in the final product.

So to me to talk about the test results of finding these things and ignore the conclusion that a tiny impurity is deliberately put in seems to me to be extremely shortsighted and overly restrictive of what my opinion is, because it's -- it's a logical or, how shall I say, an illogical extension of the

1  findings to reach the conclusion that the government found.  So

2  that's one piece.

3      The second piece is that within the reports themselves, for

4  example, when a report says these particular compounds were not

5  coeluted and the inference is that they couldn't be separated, I

6  may disagree with that.  I mean we talked about these things

7  yesterday.  So the piece about the reports about inconsistency and

8  the interpretation of results I believe we covered yesterday.  So

9  those would represent my opinions.  That is what I was trying to

10 do was close that box for you.  As far as the reports, I believe

11 we covered that during the direct testimony.

12 **Q.**  Okay.  And that's helpful.

13 **A.**  I agree with the court that the term subjective is really

14 about the conclusions that are drawn from the presence of

15 impurities.  But to me, and again the Court will be the final

16 arbitrator whether I can offer it or not.  But it stands to reason

17 that if you're going to explain the presence of impurities, then

18 you're necessarily testifying that those are impurities.  I guess

19 somebody else can worry about state of mind and what was

20 deliberate and what wasn't.  Maybe there is a way to draw that

21 line, but that -- I'm trying to answer your question.  I hope I

22 tried -- I hope I shed some light.

23 **Q.**  No, that -- that was helpful.  And that helped me, Mr.

24 Hillyer, so I appreciate it, and just to try, you know, to make

25 sure I got it, your opinion you offered yesterday that these were

1  not deliberately added, that's part of this subjective

2  interpretation, that's part one?

3  **A.**  Correct.  Correct.

4  **Q.**  And part two is you may disagree with a chemist with some of

5  the conclusions that they draw, for example, as to whether -- for

6  example, that coelution discussion whether those substances

7  should -- could be coeluted?

8  **A.**  Correct, or a decision not to quantify certain products on an

9  initial test but to do it later.

10  **Q.**  Okay.  And those are the two parts?

11  **A.**  Correct.

12  **Q.**  Okay.  What -- what is the basis for your opinions on those

13  parts?

14  **A.**  Which part do you want to talk about?  Let's not do them

15  together.

16  **Q.**  All right.  Let's do the first part first.

17  **A.**  Well, let's say the first part is the testing itself.  Again,

18  my basis for that is my educational background, my years in

19  developing solid methodologies for experimentation, the practical

20  experience of physically carrying out experiments in a laboratory

21  atmosphere as well as directing -- carrying out and directing

22  analytical chemists and using the methods employed for rigorous

23  scientific study, which would include all of my practical work

24  experience.

25  **Q.**  Okay.  And so that was your conclusion about the dispute you

1  might have with the FCC chemists, about how they do that.

2  **A.**   Correct.

3  **Q.**   Let's talk about your conclusion that these substances were

4  not deliberately added.  What -- what is the basis for that

5  opinion?

6  **A.**   Yeah, I think it's the same answer.  My formal education, my

7  considerable experience in running synthetic organic chemical

8  reactions with a strong emphasis on process chemistry, which is

9  all -- all about commercial scale reactions and the ways in which

10 impurities are formed, dealt with, characterized, and accepted at

11 certain levels.

12 **Q.**   Now, moving on.  I think one thing, you know, we mentioned it

13 briefly, but it certainly came up yesterday on direct.  You

14 testified about the degradation of products being a cause of

15 impurities?

16 **A.**   Correct.

17 **Q.**   Right?  Now, can you describe what was the basis for that

18 opinion?

19 **A.**   Formal education and experience and oddly enough including the

20 experience that came to light that you asked me about working in

21 the dietary supplement field and I do think that company was

22 Rexall, might have been Rexall Sundown at the time.  But quality

23 control is directed in part to making sure that the presence of

24 active ingredients when they're first produced is in a tight band

25 of percentage so you know how much is being administered, but it's

1    also about conducting stability studies.  So my experience in

2    conducting those studies is relevant because part of what you do

3    when you do quality control is, you subject dietary supplements to

4    various conditions, including temperature, time, moisture, and you

5    run analysis on them to figure out whether or not the compound is

6    still intact and how long it's good for in the bottle and whether

7    it was subject to degradation under certain conditions.

8    **Q.**  And so those stability studies, those were things that you did

9    conduct in your short time at Rexall?

10   **A.**  Correct.  And we would also do similar experiments in the

11   process division because when you work in process, you're at the

12   very end of what is the discovery process.  After you're done with

13   it, it's ready for biological testing so you're looking at

14   different forms and believe it or not, drug forms actually change

15   form over time.  Sometimes just by looking at them there's a

16   concept called polymorphism where things will take on different

17   crystallin structures, and sometimes it's even difficult to

18   reproduce the exact same crystallin structure and sometimes you

19   realize you may never find that first one again.  So the point is

20   there is an enormous amount of focus on the final product, its

21   purity, its structural form, its stability, things of that nature.

22   **Q.**  And depending on what you're testing, you know, different

23   compounds react differently to -- you mentioned moisture, for

24   example, lights --

25   **A.**  Correct.

**Q.**   -- time?

**A.**   Correct.

**Q.**   They degrade in different ways; right?

**A.**   Different compounds can degrade in different ways.  The same compound can degrade in different ways -- that's -- that's why you need the testing.

**Q.**   Right.

**A.**   Figure out what happened.

**Q.**   Now, did you conduct any testing about degradation of DHEA in this case?

**A.**   No.

**Q.**   Did you review any reference materials regarding the degradation of DHEA?

**A.**   I don't believe so.

**Q.**   Did you review any reference materials stating that any compound could degrade and create the Schedule III steroids that were found in this case?

          MR. WENIK:  Can I hear that again?  I'm sorry.

CROSS-EXAMINATION

BY MR. KITCHENS (Continued):

**Q.**   Did you review any literature stating that the degradation of a compound could result in the exact Schedule III steroids found in this case?

**A.**   Degradation is a function of nature and so that I took as a -- as an ironclad premise.  I did not review specific materials

1   that demonstrated the degradation from the active ingredients to

2   the -- to the scheduled compounds that were identified by FDA, but

3   I did -- I did base my opinion that the similarity in the

4   structure and their subjecting to oxidation or moisture, addition

5   of water or cross bonds, things of that nature based on my

6   education, background and experience was plausible.

7   **Q.**   And aside from your education, background and experience, is

8   there any other basis for the opinions you would offer regarding

9   degradation that we haven't discussed?

10  **A.**   The absence of FDA testing that would demonstrate that these

11  things were stable over time.

12  **Q.**   Okay.  Anything else?

13  **A.**   No.  Not that I can think of at this time.

14  **Q.**   Let's talk about a couple more opinions you offered yesterday

15  about, you know, these impurities, as you call them, in the

16  prohormone products that, you know, I'm not sure if it entirely

17  came up in the disclosure.  Do you recall your testimony yesterday

18  regarding a chart that the defendant showed -- showing an active

19  dose and for a particular -- and the quantities of that active

20  dose?

21  **A.**   Yes, I believe it was Defense Exhibit 7.

22  **Q.**   That's right.  Do you have that in front of you?

23  **A.**   That's the only reason I knew what number it was because it's

24  sitting right in front of me.

25  **Q.**   Good, you're ahead of the game.  Let me try to pull that up

1  myself.  And if I can find it, I'll put it up on the screen.

2  Okay.  Mr. Hillyer, this is the chart that you testified about

3  yesterday?

4  **A.**  Yes.

5  **Q.**  And did you -- did you prepare this chart?

6  **A.**  Yes.

7  **Q.**  Okay.  When did you prepare this chart?

8  **A.**  It was some time ago.  It was probably 2000 -- it wasn't this

9  year.  So, you know, 2018, 2019 time frame.

10  **Q.**  And you prepared this chart with the same rigor as all of your

11  other opinions?

12  **A.**  That assumes that every endeavor is done with the same degree

13  of rigor.  So I prepared it.  It suited the purpose for which I

14  made it and I moved on to the next.

15  **Q.**  And on that point, the purpose for which you made it, just

16  so -- I want to try to clarify a couple of things.  There's a logo

17  at the bottom left; right?

18  **A.**  Yes.

19  **Q.**  For Hi-Tech Pharmaceuticals?

20  **A.**  Yes.

21  **Q.**  Is that something you included on the chart?

22  **A.**  I think -- I think it was part of just a boilerplate, what am

23  I trying to say, PowerPoint.  Probably part of a PowerPoint that

24  was included just because I wanted to remember what client it was

25  for.

1   **Q.**   I see.

2   **A.**   I'm sorry.  It wasn't significant -- it wasn't given to me by

3   Hi-Tech.  It has no legal significance.  It's absolutely a

4   boilerplate relevant to the Hi-Tech matters is how I would

5   interpret that.

6   **Q.**   All right.  And I noticed you said it was part of the

7   PowerPoint.  It looks like there's a 16 at the bottom?

8   **A.**   Right.

9   **Q.**   It appears this is page 16 of a larger document?

10  **A.**   Correct.

11  **Q.**   And this is a document, the larger document is something that

12  you used as part of preparing your testimony?

13  **A.**   I'd say it was something I used in connection with my

14  opinions.  It turned out to be relevant to the -- to the

15  testimony, too.  But...

16  **Q.**   This is an issue we can take up later, Your Honor, but we have

17  not been provided this document.  This is another document that we

18  would certainly, in light of the testimony, need to have produced

19  from Hi-Tech.  But we can address that at a later point.

20      All right, Mr. Hillyer going back to this document itself, the

21  chart --

22  **A.**   Yes.

23  **Q.**   -- I just want to understand the second column where it says

24  active dose reported in literature.

25  **A.**   Right.

1  **Q.** That was -- again was this a heading that you used and

2  prepared?

3  **A.** Yes.

4  **Q.** Okay.  What do you mean by that?

5  **A.** The -- the -- the effort was to try to find in the literature

6  papers or I guess in one case a patent that talked about the

7  active doses of the particular substances listed in the left-hand

8  column.  And so in each of those references, and I think the

9  second page lists the references, there is a report on the dose

10  for those particular substances that will lead

11  to -- pharmaceutically effective dose is the term I would probably

12  use.

13  **Q.** Pharmaceutically effective dose?

14  **A.** That's a catch phrase that's used in -- in technical parlance

15  to talk about the axiomatic premise that you need to have enough

16  of the active for it to do something.  If you don't, I mean --

17  it's one of the reasons why FDA will permit certain impurities,

18  because if they're there at such a low level, even if they have

19  activity you're not going to experience it; right?  That's why all

20  drugs have a certain active threshold, otherwise you're going to

21  need to find a more active substance.  It's not going to do

22  anything in the body.  So that's -- that's the premise behind this

23  chart.

24  **Q.** Okay.  Thank you.  And just so I understand that premise,

25  these numbers that you're reporting in the second column, is this

1  the lowest thresholds of a pharmaceutically effective dose that

2  you found in the literature?

3  **A.**  No, I don't think -- I wouldn't phrase it that way.

4  **Q.**  What -- what are these numbers reflecting?

5  **A.**  These numbers are reflecting the doses provided in the

6  literature that's cited as being appropriate levels of the

7  compounds to be administered.  It -- it -- it's not impossible

8  that these are the lowest threshold, but they're probably

9  considered, as I mentioned sort of pharmaceutically effective

10  doses to bring about whatever therapeutic effect you're trying to

11  address.

12  **Q.**  And so it could be a possibility, just so I understand it,

13  that lower doses than what are reported in column 2, could cause a

14  pharmaceutically effective response?

15  **A.**  Well, let me just direct your attention to -- to row 3 where

16  it gives a range.  I would interpret that 25 milligrams to be the

17  lowest effective dose because it's giving you a range and if I'm

18  under 25 milligrams, I wouldn't have any confidence that I would

19  get a pharmaceutically -- a pharmaceutical effect or physiological

20  effect.

21  **Q.**  I'm sorry, Mr. Hillyer.  Just one second.  Before we move on,

22  but just on that row 3, I want to understand it.

23  **A.**  Sure.

24  **Q.**  You're drawing the opinion that 25 milligrams, based on your

25  review of the reference provided, is the lowest pharmaceutically

1  effective dose?

2  **A.**  My interpretation -- according to that reference my

3  interpretation would be that there is a range for a reason, and if

4  I'm outside the range, I'm probably -- well, on the lower side,

5  I'm probably below an effective pharmaceutical dose, yes, that

6  would be my interpretation.

7  **Q.**  Okay.  How about for the other two steroids?

8  **A.**  Those -- those references were not patents but they were

9  literature references in my sense.  I don't have those literature

10  references in front of me, but my recollection is that they are

11  studies involving the actual administration -- let me

12  double-check.  Well, okay.  The second row looks like it's -- it's

13  the -- it's -- it's information about Boldione, and in connection

14  with the information, it provides an effective dose.  So it

15  doesn't give a range.  It doesn't mean that just because you have

16  399 milligrams, it wouldn't work.  So if that's one of your

17  points, I'll concede that point.

18      And then the -- the top row is what I was trying to address a

19  second ago, which is that's probably an actual study that was

20  conducted and that's the amount that they used.  And so the

21  supposition is that they picked an amount that would have the

22  effect in question.  Again, it doesn't necessarily mean that if

23  you drop the milligrams by one milligram that it wouldn't be

24  effective but that's the does that they chose to use and that's

25  the dose that I relied on.

**Q.** Okay.  And that's helpful and just to put a fine point on it, it sounds like you're saying for rows 1 and 2, those numbers are not necessarily the lowest dose in order to have an effective response; is that right?

**A.** All I can say is that that's the dose that was reported.

**Q.** That's the dose that was reported in the literature, you can't make a conclusion about whether that's the lowest effective dose?

**A.** I think that's correct.

**Q.** And for row 3 based on your read of the patent, you believe that 25 is the lowest effective dose?

**A.** I think they gave that parameter for a reason, and I believe the reason is that it's based on the information that the inventor had, that is the lowest effective dose.  And again, I mean, 24.9? I can't sit here and say that's not going to be effective.  But I would be remiss if I didn't point out that the conclusion is that we are many orders of magnitude, in some cases thousands, in some cases 10,000 orders of magnitude below these levels.  So I'm not going to argue with your premise which I think is reasonable which is some diminution of these amounts might be possible.

**Q.** Okay.

**A.** But I wouldn't agree with you if you were to say if you had a hundred times less would be active or 385 times less.  So that's -- that's my caveat.

**Q.** Thanks, Mr. Hillyer.

Now, before, I think you referenced this already, but just so

1 it's clear, with each of those numbers reported in column 2, there

2 is a number in brackets, one, two and three?

3 **A.**   Right.

4 **Q.**   If we look at the second page and I don't think we saw this

5 yesterday in the exhibit that corresponds with the specific

6 references?

7 **A.**   Yes.

8 **Q.**   And I guess referenced in column 2 of your chart?

9 **A.**   Yes.

10 **Q.**   Okay.  And are these -- you reviewed each of these references?

11 **A.**   Yes.

12 **Q.**   Okay.  Are these references that you located yourself?

13 **A.**   I -- I don't recall.

14 **Q.**   You don't recall if you -- okay, if you found these yourself

15 or if you received them from another person?

16 **A.**   Correct.

17 **Q.**   Aside from these three articles or -- excuse me -- reference

18 materials that are created here, is there any other basis for the

19 information you provided in column 2 of your chart?

20 **A.**   Other than the -- the mere numbers themselves and a great deal

21 of experience in pharmaceutical chemistry about what constitutes

22 an effective dose, when you -- when you do drug discovery at the

23 very initial stage and you're looking for activity, any compound

24 that you would want to develop as an actual active compound has to

25 have some threshold level of activity.  And it would be

1  extraordinarily rare to find a compound that's so active that you
2  only need to administer, you know, micrograms of it.  Believe me,
3  it would be a pharmaceutical celebration if you could, because the
4  cost benefit of having to administer that tiny dose would be
5  fantastic.  But it's just not -- just not in the realm of
6  practicality.  So I have to say that it's more than just those
7  references.  It's the numbers themselves in isolation and also in
8  combination with the presence of the active.  I mean you can learn
9  a lot from the amount of active that's being delivered since these
10 are derivative compounds.  And they probably have comparable
11 activities.  So in my view, it's -- it's all of those things.
12 **Q.**  And just again to try to put a fine point on it you're
13 suggesting your experience in addition to these three articles
14 which was the basis for the numbers in column 2?
15 **A.**  I'm sorry, go ahead.
16 **Q.**  Any other reference materials than what is identified here?
17 **A.**  No, I don't believe so.
18 **Q.**  Okay.  Thank you.
19     You also recall your testimony yesterday, you spoke about
20 different threshold limits created by the FDA for impurities?
21 **A.**  I did.
22 **Q.**  Okay.  I think you mentioned the numbers, and correct me if
23 I'm wrong, 0.05, 0.1 triggering something and 0.15 triggering
24 another requirement under the FDA; is that right?
25 **A.**  Yes, I think we can appropriately refer to those as threshold

1  levels.

2  **Q.**  Okay.

3  **A.**  If that works for you?

4  **Q.**  It does and I appreciate it.  Those threshold levels, those

5  were -- you found those based on FDA guidance; is that correct?

6  **A.**  Yeah.  I actually think that they're part of a larger body

7  that -- that covers the international community.  There's a

8  difficult to remember acronym, ICH which stands for the

9  International Council for Harmonization of Impurities in

10  Pharmaceuticals.  I actually think there's -- it's a broader

11  effort, but obviously one we're concerned with the U.S. law arm of

12  it, but yes, that is a -- I think a well -- a well-recognized and

13  understood guidance that manifests in FDA materials, probably

14  including very user-friendly materials for either the public at

15  large or pharmaceutical dietary supplement chemists, et cetera, so

16  that they can understand with examples and what the threshold

17  amounts are and actually what they mean, how to interpret them and

18  apply them.

19  **Q.**  Just so I get it, the threshold levels that's created by this

20  ICH and you said that's for impurities in pharmaceuticals; is that

21  correct?

22  **A.**  That's how I understand it, yes.

23  **Q.**  As well as FDA guidance about these threshold levels?

24  **A.**  I mean, the guidance is -- flows from the ICH, either

25  legislation or requirements, yeah.

1 **Q.**  Okay.

2           THE COURT:  Mr. Kitchens, can we -- can I interrupt you?

3 Let's take a little break, about five minutes.

4           MR. KITCHENS:  Sure.

5           THE COURT:  Do you have any idea how much longer you're

6 going to go?  We have four more witnesses to do today.

7           MR. KITCHENS:  I know.  I'm hoping not too much more.

8 This is my last topic on the prohormones.  I'm going to discuss

9 the lovastatin.  I think his opinions will be much briefer on

10 that.

11           THE COURT:  Okay, thank you.  Let's be back at -- let's

12 do till 10:45.

13           (Whereupon a break was taken.)

14           THE COURT:  I think everybody is back that we need.

15 Mr. Kitchens, if you can pick back up.

16           MR. KITCHENS:  Thank you, Your Honor.

17 CROSS-EXAMINATION

18 BY MR. KITCHENS (continued):

19 **Q.**  Mr. Hillyer, where we left off we were discussing the -- and

20 I'm sorry.  I want to adopt the exact same term you did, was it

21 threshold limits?

22 **A.**  Yeah, I think we were talking about thresholds.

23 **Q.**  Okay.  Thresholds.  I'll just use thresholds so we're on the

24 same page.

25       You mentioned that a source for those thresholds is the ICH

1  which has a list of thresholds for impurities in pharmaceuticals?

2  **A.**   Right.   The -- the ICH is for technical requirements for

3  pharmaceuticals.   And I think the designator Q3A, for whatever

4  reason, probably the provision has to do with impurities in

5  pharmaceuticals.

6  **Q.**   Okay.   On that note, can -- do you have Government Exhibit No.

7  24?

8  **A.**   I can, sure.

9  **Q.**   Great, and I'll bring it up on the screen as well.

10  **A.**   Actually, mine stops at 23, but you're referring to the

11  document that I referred to.

12  **Q.**   Okay.   And -- so this document is on the screen.   Do you see

13  it, Mr. Hillyer?

14  **A.**   Yeah, I can see it.

15  **Q.**   Okay, great.   You mentioned Q3A, is this -- is this the

16  guidance you were referring to?

17  **A.**   That's it.

18  **Q.**   And just -- I apologize, it will just take a minute and I'll

19  flip to the appendix.   Here we go.   And let me try to magnify this

20  a little bit.

21  **A.**   Right.

22  **Q.**   All right.   Are those those thresholds you were talking and

23  testifying about?

24  **A.**   They are reporting, identification and qualification.

25  **Q.**   All right.   And that's -- is this document and this guidance,

1  as well as the ICH guidance, the basis for that opinion you were

2  offering yesterday about various thresholds?

3  **A.**  Yes.

4  **Q.**  All right.  If we go again to the first page of Exhibit 24,

5  what is this -- what is this guidance for?  What -- what is Q3A?

6  **A.**  I think Q3A is just the designator for impurities in drug

7  substances.  I don't have any other greater understanding of Q3A.

8  It probably comes out of a provision of this international

9  harmonization agreement.

10 **Q.**  All right.  So just to bring you back.  ICH is, it's

11 addressing impurities in pharmaceuticals?

12 **A.**  I think the -- I think ICH is broader than that.  I think it

13 has to do broadly with technical requirements for pharmaceuticals

14 for human use.

15 **Q.**  Okay.

16 **A.**  And obviously impurities in drug substances is part of that.

17 **Q.**  I see.  And this document we're looking at is also talking

18 about as it's titled drug substances; right?

19 **A.**  Yes, yes.  Um-hum.

20 **Q.**  Is it your opinion that these same thresholds and guidance

21 applies to dietary supplements?

22 **A.**  No.  I'm guessing the dietary supplements get even more leeway

23 than -- than these requirements.

24 **Q.**  Are you aware of FDA guidance or ICH guidance on dietary

25 supplement thresholds?

**A.**   No, but the intention here was to try to apply a stricter

requirement and show that even under -- even more stringent

regulations there's certain impurities that don't even need to be

reported.  That was the intention not to try to apply these

strictly to this case as a legal matter, but to point out that

even the FDA recognizes that impurities are going to exist even in

pharmaceutical grade drugs which is the most tightly controlled

substances on the face of the earth.

**Q.**   And you stated that you agree there would be looser thresholds

for dietary supplements?

**A.**   Well, I don't know that there are any reporting requirements

at all.  So I would say, yeah, that's looser.

**Q.**   You don't know if there is any reporting requirements for

dietary supplements?

**A.**   Not that I'm aware of.

**Q.**   Excuse me, Mr. Hillyer, I'm not sure we heard your answer.

**A.**   My phone was going off.  I want to shut it off.

**Q.**   Thank you.

**A.**   No, these -- my opinion is that these requirements that we are

looking at, Q3A, are not applicable to the dietary supplement

industry and for better or worse the dietary supplement industry

is largely self-regulating.

**Q.**   These thresholds you were talking about, is it your opinion

that they do not apply to the dietary supplements at issue in the

indictment?

1    **A.**   Yes.

2           MR. WENIK:  I'm sorry, that's Exhibit 24, whether this

3    applies, is that what you're saying?

4           MR. KITCHENS:  I asked -- I believe Mr. Hillyer answered

5    yes.  I think he understood it.

6    **A.**   Yeah.  My -- again that is my understanding.  And again it was

7    my intention to draw an analogy to -- to further support my

8    opinion that impurities are not only common, but they're

9    acceptable at certain levels.  Not to try to apply this, you know,

10   piece of guidance or legislation to dietary supplements.  That

11   wasn't the point at all.

12   CROSS-EXAMINATION

13   BY MR. KITCHENS (Continued):

14   **Q.**   All right.  Let's go back to and try to flip back to what we

15   viewed earlier, Exhibit 21.

16   **A.**   Okay.

17   **Q.**   I just want to cover -- move on from the prohormones and your

18   conclusions on that and the last paragraph here seems to be

19   discussing your anticipated opinions regarding lovastatin; is that

20   accurate?

21   **A.**   Yes.

22   **Q.**   Okay.  It notes that -- if we look at the second sentence of

23   this last paragraph on the page of Exhibit 21, and I believe this

24   is page 6, it says he is expected to offer alternative

25   explanations to the FDA's conclusions that lovastatin was

1  artificially added to the commercial product.  Does that

2  accurately state your opinion?

3  **A.**  Yes.

4  **Q.**  All right.

5  **A.**  The topic of my opinion, yes.

6  **Q.**  All right.  Fair.  Just so I understand it, I think you

7  mentioned -- well, I just want to get it.  It says alternative

8  explanations.  Can you explain what those alternative explanations

9  are?

10 **A.**  Well, one I -- I specifically addressed yesterday which was

11 the production of monacolin K that is high in C13 isotope, higher

12 than the reference standard used against which the sample was

13 compared.

14 **Q.**  And I -- can -- can you explain again -- I just want to

15 understand what you're suggesting is the alternative explanation

16 of the FDA's conclusion here?

17 **A.**  Sure.  Sure.  As I mentioned, I'll keep it excruciatingly

18 brief.

19 **Q.**  We won't hold it against you.

20 **A.**  The Perini reference on which the government relies in part

21 has a short discussion about the distinction between C3 and C4

22 plants.  And -- and simply stated, C4 plants preferentially

23 incorporate C13 at a higher level than C3 plants.  And so the

24 assumption is that the photosynthetic pathway that's used to

25 create lovastatin proceeds by a C4 mechanism thereby incorporating

1  C13, whereby monacolin proceeds through a C3 photosynthetic

2  pathway; and therefore, it does not incorporate C13 to as high of

3  an extent as lovastatin does.  And so the alternative theory that

4  I'm prepared to provide is that there are conditions under which

5  monacolin can be fermented, made by fermentation, more

6  specifically so that it incorporates a greater amount of C13.  And

7  so when the FDA tests the sample and finds high C13, it is

8  concluding that it's lovastatin.  And I'm suggesting that it still

9  may be monacolin K, just higher in C13 content than expected.

10  **Q.**  Thank you.  That was very concise, Mr. Hillyer.

11  **A.**  I tried.  I did it all for you, Mr. Kitchens.

12  **Q.**  All of us appreciate it.  Thank you.

13  **A.**  You're welcome.

14  **Q.**  So that -- just, you know, I want to make sure I'm not missing

15  anything, is that what your theory is for what the alternative

16  explanation is for the presence of what the FDA concluded was

17  lovastatin?

18  **A.**  Yes.

19  **Q.**  Any other alternative explanation?

20  **A.**  No, not that I can think of at this time.

21  **Q.**  All right.  And the basis for this opinion, I think you

22  already mentioned it, but it's based on I think your review of the

23  Perini article?

24  **A.**  Coupled with the other two references I mentioned, the Wen and

25  the one we couldn't pronounce.

1  **Q.**  The one we can't pronounce, okay.

2  **A.**  Correct.

3  **Q.**  Just to be clear.  Any other reference materials that you used

4  to form your opinions in this matter?

5  **A.**  I've read other literature, none that I can cite to you as to

6  sort of the intent and purpose, probably just background material

7  on fermentation techniques and things of that nature.  There is a

8  fair amount of literature out there on the creation of -- well,

9  the fermentation of red yeast rice by inoculation, but the

10  preparation is still kind of black box.  So I tried to read as

11  much as I could.  But with respect to the opinions I'm offering I

12  think we've already covered the references that are significant.

13  **Q.**  All right.  Any other basis for this opinion other than what

14  we've covered with that literature that you reference?

15  **A.**  No, not that I'm offering at this time.

16  **Q.**  All right.  Now, regarding that literature, those two

17  articles, the Wen article and the other one that you mentioned,

18  did you -- I'm just trying to recall, and I apologize, but did you

19  locate those two articles?

20  **A.**  I believe so.

21  **Q.**  And did you review any materials about Hi-Tech's -- or excuse

22  me, did you review any materials about the actual synthesis or

23  manufacturing of the monacolin K found in the products at issue in

24  the indictment?

25  **A.**  Not that I can recall.

1 **Q.** Earlier I think you also testified yesterday about degradation

2 of monacolin K could also, you know, account for the isotope

3 results that were seen by the FDA.

4          MR. WENIK:  Object to the mischaracterization of his

5 testimony.  I don't recall hearing degradation.

6          MR. KITCHENS:  Okay, I'll leave it more open.

7 CROSS-EXAMINATION

8 BY MR. KITCHENS (Continued):

9 **Q.** Mr. Hillyer, do you have any opinion or would you plan on

10 offering any opinion about degradation being a cause of the IRMS

11 results reported by the FDA?

12 **A.** I think what I certified to is that the passage of time can

13 always lead to the degradation of a target compound, and,

14 therefore, any analysis of its integrity is subject to question.

15 **Q.** And that's based on your experience and training as a chemist?

16 **A.** Correct.

17 **Q.** Any specific literature that you reviewed regarding the

18 degradation of monacolin K or lovastatin?

19 **A.** No, but I -- I would just add that the technique in question

20 using isotopic mass, ratio mass spec is literally measuring the

21 amount of C13 in certain constituents.  And so the impact of the

22 degradation of a monacolin-like or a lovastatin-type compound, if

23 you're -- if you're losing carbon skeletal structure then your C13

24 results are going to be off.  And so that to me would be the

25 connection between the degradation and the -- and the questionable

1  result, you know, reading a C13 number as being fully attributable

2  assumes that you have a fully intact monacolin or lovastatin and

3  if there's degradation, then that would not be the case.

4  Q.  Just to talk a little bit more about your experience, just so

5  I understand that, if that was part of your basis of your opinion

6  here.  Have you conducted IRMS analysis?

7  A.  I've worked with isotopes.  I've worked with C13.  I worked

8  with instrumentation employing C13.  I've even conducted

9  fermentation experiments with C13 labelling.  I don't think I've

10  ever ran an isotopic ratio mass spec.

11  Q.  Okay.  Have you ever been involved in developing lovastatin

12  drugs?

13  A.  Not that I can recall.

14  Q.  Do you have prior experience developing red yeast products?

15  A.  Not that I can recall.

16  Q.  I think the final exhibit I have, this is the next one we

17  marked, Exhibit 22, and I'll just represent this is the other

18  disclosure -- another disclosure we received regarding topics of

19  your testimony.

20  A.  I'll use your screenshot for now in the interest of time so if

21  that works.

22  Q.  It does.  I will point right to the relevant part and this is

23  on page 4 of what's been marked as Exhibit 22.

24  A.  Yes.

25          MR. WENIK:  Judge, I have to interpose an objection

```
1   before Mr. Kitchens goes down this line of inquiry.  So in a -- I
2   think it was a conference call we had with you, Your Honor, some
3   weeks back, you had expressed your intention to rule in the
4   government's favor on the discovery motion related to Avomeen.  We
5   have an issue -- as far as I know, I haven't checked PACER.  I
6   don't think you reached any sort of recommendation or any sort of
7   formal opinion, but that was your inclination that you expressed
8   to us that you were going to rule in that fashion or make an R&R
9   in that fashion.  Obviously I'm not going to reargue the merits of
10  that at this point.  That's your prerogative based on the
11  arguments to do so.  But my objection to this is if that is
12  ultimately going to be your opinion, that your R&R which may
13  ultimately be --
14          THE COURT:  Well, I was going to do an order -- I was
15  going to do an order and I asked you guys if y'all were going to
16  object to it, file an appeal of my order, which guys said you
17  would.  If you would like me to rule on it, I can rule on it right
18  now.  But assuming that you guys are going to file an objection to
19  it, I have to write something more than that.  So I'm
20  still planning -- I'm still planning to deny it on an order, but I
21  haven't done it yet.
22          MR. WENIK:  All right.  So that being our understanding,
23  it would be the defense's reaction to that to withdraw any
24  opinions whatsoever related to Avomeen, and any information
25  related to Avomeen, and any underlying information provided about
```

1  that, and I was very careful yesterday in my direct of Mr. Hillyer

2  not to elicit any opinion or testimony based on anything he may

3  have seen to or from Avomeen.

4         THE COURT:  Well, I would suggest that we just do that

5  right now, but as long as you guys are going to fight about it, I

6  think we just keep going.

7         MR. WENIK:  But my point is --

8         THE COURT:  Yeah, my point is that you're -- you know,

9  your expert is out there.  I haven't issued my order yet, and I

10  haven't because of the reasons we discussed.  If I was a district

11  judge, you would already have your ruling, but I'm going to have

12  to do -- I'm going to do an order.  It's not going to be an R&R.

13  It's going to be an order which you guys can appeal.  So that's --

14  if y'all want to take a minute and powwow about it, but I haven't

15  done it yet and my bad.

16         MR. WENIK:  I think we need to, Judge, because the

17  answer may be where we're withdrawing any and all of the Avomeen

18  opinions which would mean that this entire line of questioning is

19  irrelevant and inappropriate and unnecessary and the only --

20         THE COURT:  Well, you know, I wouldn't -- you know, I

21  haven't done it.  You know, it's on me.  But I'm going to do it.

22  And if y'all are going to appeal it, you might win it.  So, you

23  know, I don't know what to tell you.  If y'all want to take a

24  minute and just resolve the issue right now, we can do that.  That

25  would be great for me, just not related to the case at all, but

1  just personally that would be something that I didn't have to do.

2  So if y'all want to think about that and if that would shorten

3  some of this, I think that would be good, too.

4          MR. WENIK:  I think we need to discuss amongst defense

5  counsel, a few minutes amongst ourselves then this issue because

6  again our position would be to withdraw Avomeen in its entirety,

7  rather than our motion papers we try to salvage part of what

8  Avomeen did, not just for counts relating to steroids but for

9  everything.  So I need to consult with my colleagues for a moment

10 or two then.

11         THE COURT:  Well, then let's take a 15-minute break.

12 Let's come back at 11:20.

13         MR. WENIK:  Thank you, Judge.

14         (Whereupon a break was taken.)

15         MR. WENIK:  Judge, I forgot when you said to reconvene.

16         THE COURT:  Okay.  Are all the players here?  Yes, they

17 are.  We can go back on the record.

18         MR. WENIK:  Judge, thank you for affording us some time

19 to confer.  So we -- we've conferred amongst the defense and we

20 are not going to appeal your order, oral or memorialized in

21 written form.  I don't think you need to write a whole analysis

22 and that means with regard to Government Exhibit 22 which was a

23 supplemental expert disclosure that we made back in -- wow, it's

24 already October 2019 -- that we are withdrawing all of that,

25 proposed opinions for both Dr. Bannister and Mr. Hillyer.  We're

1   not going to offer any evidence of the CAIS testing.  We're not

2   going to offer into evidence any evidence of any Avomeen testing.

3   We're not going to offer into evidence any experts for Avomeen or

4   having anything to do with Avomeen.

5          So in light of withdrawing all of that, that would mean

6   in my mind we don't have an obligation to provide any discovery of

7   it because we're withdrawing all those experts and all of those

8   expert opinions and there is no need to question these experts

9   about it because we're not going to offer any of that as evidence.

10          MR. KITCHENS:  I'll say from the government side we --

11   we appreciate that -- that clarification and I think that will

12   certainly streamline the questioning, not only for these experts

13   but also, you know, obviously the evidence at trial.  What we want

14   to try to get at regardless is whether Mr. Hillyer ever reviewed

15   results of that Avomeen testing, and if so whether that would

16   affect his opinions that he provided elsewhere.  If so, it seems,

17   you know, that that certainly is fair game to ask as part of the

18   court's determination of the reliability of his opinions if he in

19   fact reviewed test results and whether that in fact affected any

20   of his opinions that he wants to draw about the FCC's testing.

21          So there is a limited number of questions that I think

22   we can ask Mr. Hillyer and certainly need to in order to assess

23   the reliability of other opinions he's offering about the FCC

24   testing unless Hi-Tech is planning on withdrawing those opinions

25   as well.

 1          MR. WENIK:  No, we're not withdrawing Mr. Hillyer's

 2   opinions in general or Dr. Bannister's or anyone else's.  The fact

 3   of the matter is, he's not basing any of his opinions at all on

 4   Avomeen's work.  I expressed and limited my direct examination to

 5   avoid any mention of it.  And the whole point of this exercise is

 6   Daubert -- of the opinions he's offering and the basis he's

 7   offering those opinions.  And if everything we're offering has

 8   nothing whatsoever to do with Avomeen, this is not a fair germane.

 9   The defense is entitled -- we argued in our motion papers to

10   consult with experts when they want to explore various defenses

11   and that is why we argued that we had a right to not share these

12   materials.

13          Having heard Your Honor's ruling and agreed not to

14   appeal it, we're simply withdrawing -- this is not -- these are

15   not fact witnesses.  We don't have to get into stuff that they may

16   or may not have seen.  I don't think actually Dr. Bannister

17   reviewed the -- ultimately reviewed the Avomeen stuff.  I don't

18   recall off the top of my head if Mr. Hillyer did or did not review

19   all of the Avomeen materials, but it's just simply not germane.

20   It's just a fishing expedition then to gather what now is in the

21   context of consulting work that's privileged that the defense did

22   in exploring its various defenses.

23          Now, I can understand, and I obviously briefed

24   differently, Your Honor's position that if you're going to offer

25   into evidence, you know, a piece of it, then the government is

 1  entitled to see all of it.  But we're not offering any of it into

 2  evidence, and none of our experts are relying on any of the

 3  opinions, I don't see --

 4           THE COURT:  I think he wants to just explore and make

 5  sure that's true with the witness.  So let's let Nate -- I think

 6  Mr. Kitchens will do this carefully and slowly, and I don't think

 7  Mr. Hillyer -- he didn't just fall off the turnip truck.  Let's

 8  just move carefully through this and see where we land.  Okay?

 9  Mr. Wenik, you can jump in at any moment, but let's -- let's see

10  where we go.  I'm going to let Mr. Kitchens ask a couple of

11  questions just to kind of verify some of what you said.  Okay?

12           MR. KITCHENS:  Thank you, Your Honor.  And I'll bring

13  up, just to help guide us a little bit on this, the Exhibit 22

14  again.

15  CROSS-EXAMINATION

16  BY MR. KITCHENS (continued):

17  **Q.**  In that first sentence it notes you'll provide additional

18  testimony regarding the results of CAIS' testing of Choledrene and

19  its constituents.  Next sentence, he will further likely testify

20  regarding the results of Avomeen and CAIS' analysis of the

21  products and impurities identified in Counts 11 and 13 through 18

22  of the superseding indictment.  We'll stop there.

23      Mr. Hillyer, my question is:  Did you receive and review test

24  results from Avomeen in this matter?

25  **A.**  Yes.

1  **Q.**  And those test results, did they involve the Choledrene

2  product?

3  **A.**  Yes.

4  **Q.**  Did they involve the prohormone products in the indictment?

5  **A.**  Yes.

6        MR. WENIK:  Object to the former question, but go ahead.

7  **A.**  Yes.

8  CROSS-EXAMINATION

9  BY MR. KITCHENS (Continued):

10  **Q.**  Specifically, how many reports did you review?

11  **A.**  I believe it was one report for each of those issues you

12  mentioned.

13  **Q.**  And I think just to clarify the record, too, this also

14  mentions CAIS' testing.  Did you also review testing by CAIS?

15  **A.**  I have to confess, that -- I don't remember that acronym.  Can

16  you assist me as to -- does that stand for something?

17  **Q.**  I believe it does.  My recollection and I may be wrong on this

18  is that that involved a University of Georgia laboratory.  I'm

19  sure Mr. Wenik can correct me if I'm wrong.

20  **A.**  I don't know that acronym to be representative of University

21  of Georgia so...

22  **Q.**  Let me -- let me try to go about this a different way.  Did

23  you review test results involving Choledrene from someone other

24  than the FCC and the FDA and other than Avomeen?

25  **A.**  Yes.

1  Q.  Do you recall who -- who prepared or provided those test

2  results?

3         MR. WENIK:  Judge, again, I, you know, I think this

4  should have been one question, did you rely on any of these --

5  this information for the opinions you expressed yesterday or the

6  opinions that were outlined in what was Government Exhibit 21.  I

7  just don't think he's entitled to a chapter and verse what was

8  done, when, how, why.  It's just not germane.

9         THE COURT:  I don't disagree, Mr. Kitchens.  I mean I'll

10 give you a little bit more room, but I think -- I think

11 Mr. Hillyer can understand that you frame up your question nice

12 and tight and let him answer.  But of course, Mr. Hillyer, you've

13 got to answer it honestly and if it requires an explanation, then

14 go ahead and give it and we'll deal with that.  But Mr. Kitchens,

15 I think you need to, you know, frame it up pretty tight.  They've

16 made a big concession here which, you know, I'm not saying that

17 should change your questioning, but they have attempted -- I mean

18 in doing so they've narrowed it so Mr. Hillyer's opinions are

19 going to be narrowed.  I think that's what we're discussing.  So

20 with respect to what he's not going to be testifying about, you

21 can ask him.

22        MR. KITCHENS:  I appreciate it, Your Honor.

23        THE COURT:  With respect -- with respect to what he is

24 going to be testifying about, I think you can ask him those

25 questions.

1          MR. KITCHENS:  I appreciate it, Your Honor.  I'll try

2    to -- I was just trying to get a sense of the framework of what

3    all he has reviewed.  But I'll move forward.

4          THE COURT:  You know, but -- but with respect to

5    opinions that he's not going to give anymore, I don't know that

6    you're really entitled to go too far into that.  I mean we want to

7    be careful, but I also think Mr. Hillyer should be able to

8    separate what he read that he's not allowed to consider and see if

9    that changes his mind.  I mean I think that would be a good

10   question knowing now that you can't rely on anything that you read

11   from --

12         MR. WENIK:  Avomeen.

13         THE COURT:  Avomeen, you know, did any of your -- I'll

14   just ask you that, Mr. Hillyer, we're not going to consider

15   anything for Avomeen.  Does that change any of your opinions that

16   you've given over the last day and a half?

17         THE WITNESS:  No, it doesn't, Your Honor.

18         THE COURT:  And I know, Mr. Kitchens, that's not what

19   you wanted, but that's enough -- that's enough for me.

20         MR. KITCHENS:  That's helpful.  I'll do just a couple

21   follow-ups just to make sure I understand exactly what Mr. Hillyer

22   considered.

23   CROSS-EXAMINATION

24   BY MR. KITCHENS (Continued):

25   Q.  Mr. Hillyer, you've already described both yesterday and

1  today, this morning, that you intend to offer opinions about what

2  you perceive to be flaws in the FDA's testing; is that fair?

3  **A.**   Testing and conclusions, but yes, that's fair.   That's fair.

4  **Q.**   Okay.   So flaws in the testing itself, the methodology that

5  the FDA used; correct?

6  **A.**   Correct.

7  **Q.**   And in addition to what we already discussed this morning, the

8  subjective determinations that the FDA drew that you also will be

9  opining about which you view as flaws in those conclusions?

10  **A.**   Incorrect conclusions, that's correct.

11  **Q.**   In drawing those opinions, did you consider the results that

12  you reviewed from Avomeen?

13  **A.**   No.

14  **Q.**   So the results from Avomeen did not affect your opinion

15  regarding how the FDA conducted its testing or the conclusions

16  that the FDA reached?

17          MR. WENIK:   I'm going to object, Judge.   This is all

18  privileged.   He said, no, that he did not consider those materials

19  in coming to his opinions.   We're done.

20          THE COURT:   I think this -- I think this is Mr.

21  Kitchens' swan song question.

22          MR. KITCHENS:   Yes.   I'm trying -- and I think this is

23  directly relevant to the reliability of Mr. Hillyer's opinions

24  whether or not he considered the results from Avomeen in drawing

25  those conclusions in the opinions that he wants to offer regarding

1   the FDA's testing.

2           MR. WENIK:  And he said no.  We're done.

3           THE COURT:  Well, let's -- let's just go ahead, give him

4   a little bit of latitude.  Come on.  Mr. Hillyer.

5   **A.**  No, I -- I did not consider those materials from Avomeen in

6   connection with my opinions.  They didn't affect them, contradict

7   them or modify my opinions in any way.

8           THE COURT:  Because I do think that's a different

9   question than what I asked which is if you take out all of that

10  Avomeen testimony, are your opinions the same.  So I think that's

11  a different question than what Mr. Kitchens said.  So you're

12  saying that you didn't -- when you reached your opinions about the

13  testing and the conclusions, the Avomeen stuff was not part of how

14  you got there in the first place.  Is that right, Mr. Hillyer?

15          THE WITNESS:  That's correct, Your Honor, and if it's

16  helpful, I didn't have any of the Avomeen materials when I formed

17  my opinion.

18          THE COURT:  That's very, very helpful, I think.

19          MR. KITCHENS:  It is.  And just one follow-up, I think.

20  CROSS-EXAMINATION

21  BY MR. KITCHENS (Continued):

22  **Q.**  After you received the Avomeen results, did it cause you to

23  change any of the opinions that you drew?

24  **A.**  No.

25          MR. KITCHENS:  I think at this point, Your Honor, that's

1   all the questions I have.

2          THE COURT:  Okay.  Well, just before we leave that, I

3   just want to ask you, Mr. Kitchens, with respect to the pending

4   motion, I think it's number 357, United States motion to compel

5   discovery related to testimony in evidence from Avomeen analytical

6   services, is that motion moot now?

7          MR. KITCHENS:  If you can let us consider that over

8   lunch, I don't want to take any more of the Court's time, but we

9   can certainly after the lunch break get back to you and, you know,

10  I think we'll tell you, you know, our views of it.

11         THE COURT:  That's fine.  Okay, do you have any more

12  questions for the witness?

13         MR. KITCHENS:  No further questions, Your Honor.

14         THE COURT:  All right.  Mr. Wenik, any redirect?

15         MR. WENIK:  Yes.

16         Do you mind, Nathan, just taking the screen share off so

17  I can start with a clean slate here.

18         MR. KITCHENS:  Of course, I'm sorry.

19  REDIRECT EXAMINATION

20  BY MR. WENIK:

21  **Q.**  All right, Mr. Hillyer, hopefully, we'll get you out of here

22  before lunch.

23     Do you recall you were asked a series of questions by

24  Mr. Kitchens about whether you had experience in dietary

25  supplement industries, about manufacturing dietary supplements and

1  what have you?  Do you recall those series of questions?

2  **A.**  Yes, I do.

3  **Q.**  All right.  A couple of follow-ups to that if you will.  In

4  the course of your work I think you mentioned in your testimony

5  that you've done patent prosecutions, patent litigations, these

6  sort of things.  Have you been involved with dietary supplement

7  manufacturing processes in the context of patents and litigating

8  them and prosecuting them and obtaining them, that sort of thing?

9  **A.**  Yes, that is part of my practice.  I'm routinely -- I mean

10  obviously I represent dietary supplement companies in connection

11  with litigation.  Some of my practice is directed to things like

12  advertising, labelling, purity issues that the likes of which are

13  at issue in this case.  I was involved in a rather large FDC

14  matter involving a whole host of dietary supplements in the weight

15  loss category, and sort of deal with dietary supplements on a

16  regular basis.

17      And I also want to add that dietary supplement is a regulatory

18  category.  There's nothing to distinguish the chemical structures

19  in the dietary supplement area from the pharmaceutical area or,

20  frankly, any other natural product area.  They all have the same

21  characteristic compositions.  These are carbon-based molecules,

22  the likes of which I've been dealing with my entire career in many

23  facets.  So there is really no distinction.  If anything, the

24  pharmaceutical industry in its focus on the creation, testing,

25  characterization are much more rigorous than the dietary

1  supplement industry.  And I don't mean that as a condescension.  I

2  just mean you're working with some of the best synthetic chemists

3  in the world.  You're expected to do everything with a high degree

4  of proficiency and excellence, and so that more than prepares you

5  to deal with any chemistry involved in the dietary supplement

6  industry as well.

7  **Q.**  So let me ask as a follow-up.  So is there any significant

8  difference between how one would apply, I think you used the term

9  interchangeably of synthetic and process chemistry, how would you

10  apply those disciplines to either the manufacture of drugs or

11  dietary supplement?

12  **A.**  None whatsoever.

13  **Q.**  All right.  And from what you've just described in your prior

14  answer, having represented dietary supplement companies and been

15  involved in litigation and patent applications, what have you,

16  have you come to some understandings of manufacturing processes

17  dietary supplement companies employ?

18  **A.**  Yeah, again there is a great deal of carryover if not an

19  identity between the creation of chemical compounds, whether it be

20  in the drug context or the dietary supplement context.  And in my

21  role as a litigating attorney in the dietary supplement industry,

22  I'm very frequently called upon to review manufacturing records,

23  design experiments.  I've even informed chemists how to conduct

24  certain experiments, even in my lawyer -- role as a lawyer because

25  I've had two careers and that puts me in the unique position of

1   being able to understand science.  So my background, experience

2   and training has been applied to the dietary supplement industry

3   in a number of ways, all of which have been harmonious.

4   **Q.**  And has it been your experience that you're describing, that

5   dietary supplement companies and manufacturing finished goods will

6   import or acquire from its supplier the active raw ingredients for

7   those products?

8   **A.**  I think that's common.  I think it's probably not true in

9   every situation, but I think there's commonly two levels of

10  manufacturing in the dietary supplement industry.  A lot of

11  companies will do what I might refer to as blending onsite.  Some

12  won't even do that.  So some -- let's start at one end of the

13  pendulum is you order a product.  You a dietary supplement

14  provider will purchase a product from a manufacturer completely

15  intact, I mean, label on it, in the bottle, everything is put

16  together.  Okay.

17      The other end of the pendulum, you make everything in-house

18  which I think is fairly uncommon.  And then there's -- sort of the

19  middle of the pendulum is we may do some blending onsite, the

20  labeling, but we'll get the actives from a manufacturer.  And it's

21  also equally common in that instance for the dietary supplement

22  company to run some in-house tests, have certificates of analyses,

23  that kind of thing to gauge the level of purities of the

24  ingredients and then they'll blend them together, package them and

25  send them out.  And I think that's the case with Hi-Tech, the

1  latter case.

2  Q.  All right.  And to follow up with your answer, is it your

3  understanding that the DHEA that made its way into the Hi-Tech's

4  finished products were imported or acquired from some supplier by

5  Hi-Tech?

6  A.  Correct.

7  Q.  Okay.  I want to go through some of the questions that

8  Mr. Kitchens asked you about your bases for opinions.

9       So he asked you in one series of questions about the bases for

10  your opinions that your view was there were probably some -- I'm

11  just looking at my notes -- quote, incomplete reactions and their

12  undesired chemical reactions in this case?  Do you recall those

13  series of questions?

14  A.  Yeah, though I probably stated it more strongly than probably.

15  I would say definitely.

16  Q.  Okay, definitely.  What I wanted to flesh out, the analyses

17  that you went through in considerable detail yesterday of the

18  results of the FDA chemists' testing and the various reports we

19  went over, does that information also form a basis for your

20  opinions that there definitely was incomplete reactions and

21  undesired results?

22  A.  Right, and that was the reason I wanted to correct one of my

23  responses to make sure that I included that the FDA testing itself

24  or the materials I relied on supported my conclusions because not

25  only do I think that it supports it, I think it confirms it.

1  **Q.**  You were asked about -- a series of questions by Mr. Kitchens

2  interpreting a letter I wrote, I think I wrote.  Let me

3  double-check that I signed it.  I wrote it, yeah.  I'm on Exhibit

4  21, which was a synopses of different experts and you were one of

5  them.  Do you recall seeing that document?

6  **A.**  Yup, and I have it in front of me now.

7  **Q.**  Okay.  One of the things he asked you about, Mr. Kitchens

8  asked you about, a series of questions, was looking in quite

9  detail at the last phrase of paragraph 2 under your block, if you

10  will, that phrase subjective interpretation of test results.

11  **A.**  Right.

12  **Q.**  All right.  So as part of your analyses in this case -- I

13  thought that was my doorbell for a minute -- was -- were you

14  looking at, in addition to the work of the FCC chemists -- well,

15  actually, let me back up and give you a prefatory question.

16      As part of the materials you reviewed, did you review some of

17  the e-mail communications that went back and forth between Special

18  Agent Kriplean and the FCC chemists?

19  **A.**  Briefly.

20  **Q.**  Okay.  And I think you testified you looked at the indictment

21  in this matter that was returned on September of 2017; is that

22  right?

23  **A.**  I did.

24  **Q.**  And I take it did you look at the counts that set forth the

25  various Schedule III compounds that were listed in that

1  indictment?

2  **A.**   Yes, I think that was Defense Exhibit 1, if memory serves.

3  **Q.**   And so did all those things also inform part of your opinion

4  about whether there was a subjective interpretation of test

5  results in this matter?

6  **A.**   Yes, of course.

7  **Q.**   All right.  And would you agree with me -- well, actually, let

8  me just -- you have a file date up there in the right-hand corner

9  of September 28, 2017.  Do you see that?

10  **A.**   Yes.

11  **Q.**   All right.  And the very reports that we discussed yesterday,

12  Exhibits 5 and 6 and 16, these were the reports that dealt with

13  quantitation?

14  **A.**   Right.

15  **Q.**   All right?  Did those reports come after the indictment?

16  **A.**   I believe they did.

17  **Q.**   Okay.  Was that something that you considered in coming to

18  your opinions as to whether there might have been some subjective

19  interpretations in this matter of the test results, that fact that

20  the quantitation didn't come until after the charges were filed?

21  **A.**   Well, sure, because the mere identity still allows for the

22  possibility that they're there -- that the impurities are in fact

23  there by accident; that they're -- the amount was not considered.

24  The option that they were accidentally produced during the

25  manufacturing process or just considered to be in such small

1   amounts that they were of no moment, wasn't part of the picture.

2   And, of course, we only find out afterwards and apparently the

3   government's opinion hasn't changed on the topic, but I think it's

4   manifest that simply identifying something that's present, well,

5   that -- that could lead to an accusation in connection with any

6   impurity, no matter how small so long as you could detect that it

7   exists.  And it's just not consistent of what we know of what are

8   necessary requirements for oral consumption of products.  So I

9   think the lack of quantification is -- is significant.

10  **Q.**  Okay.  Mr. Kitchens also asked you for your -- to elucidate

11  the bases for your opinion that there might have been degradation

12  of the sample items there.  Do you recall being asked a series of

13  questions in that regard?

14  **A.**  Yes, I do.

15  **Q.**  My question to you would be, did the passage of time between

16  when the samples are received by the FDA, FCC lab and the dates

17  when they were actually tested or quantitated, was that part of

18  the bases for your opinion in regards as to degradation in this

19  matter?

20  **A.**  Yes, I think I testified, or maybe I meant to and didn't

21  articulate it, but we -- we know not only there was passage of

22  time, but we know that the lots in question have been subject to

23  the air.  They're open.  They're no longer sealed.  I believe

24  that's the case in each one.  And so without that benchmark of

25  knowing the level of what I'm calling impurities in the initial

1  testing and being able to show that the quantities remain the same

2  over time or that, well, we tested it later, but there's been no

3  degradation, coupled with the understanding that -- there's

4  virtually nothing that stays intact over time, myself included,

5  coupled with the fact that the container has been subject to the

6  open air, and we don't know anything about the storage conditions.

7  I mean, I'm presuming it was at atmospheric temperature pressure,

8  you know, but we don't know where that bottle was or what it was

9  subject to, raises concern about the legitimacy even about the

10  subsequent quantification results because those impurities could

11  have been formed over the passage of time.

12  Q.  All right.  We talked yesterday about -- I think we discussed

13  in some of the reports how in some of this testing it appeared

14  that the -- that the chemists used --

15        THE WITNESS:  I'm sorry, Jack.  When you turn away, I

16  stop hearing you.

17        MR. WENIK:  Sorry about that.

18        THE WITNESS:  I wanted you to know I wasn't getting your

19  whole question.

20        MR. WENIK:  Sorry about that.

21  REDIRECT EXAMINATION

22  BY MR. WENIK (Continued):

23  Q.  So do you recall we had some or you had some testimony, you,

24  not me -- I was going to say we -- you had some testimony

25  yesterday talking about some of these reports, and if you take a

1   look at the Defense Exhibit 2 as one example, and we talked about

2   some of these reports where the chemists used a, quote,

3   five-tablet composite --

4   **A.** Right.

5   **Q.** -- in their -- in their work?

6   **A.** Yes.

7   **Q.** Is that a factor, also, or a basis for your opinion about

8   possible degradation that rather than test per capsule, we had

9   what at least appears to be from the reports, testing of some sort

10   of amalgamation of the product?

11   **A.** Right. So that's one of the reasons, again, I wanted to make

12   sure that the FDA reports were part of the materials relied on to

13   support the opinions. Again, it's not -- it's not clear to me

14   what the purpose of taking composites was, it would do nothing

15   than cloud the results by combining portions, appear to be

16   portions from different tablets and combining them. And so it

17   just calls the results into further -- further question.

18   **Q.** Okay. Mr. Kitchens also asked you a series of questions about

19   your, quote, bases for concluding that the presence of the

20   Schedule III compounds in the commercial products was not -- he

21   used the word deliberate rather than intentional, that is it was

22   not deliberate. And my question to you would be in redirect,

23   these various, for lack of a better word, issues or anomalies that

24   you talked about yesterday in the FDA test reports --

25   **A.** Right.

1  **Q.**  -- how does that factor into that opinion, if at all?  Is that

2  part of your bases?

3  **A.**  Well, it is.  And any time you -- you see an aspect of testing

4  where results are not reproducible, compounds can't be

5  distinguished from one another, efforts aren't made to achieve

6  resolution between two compounds so you can characterize them.

7  When efforts are not made to quantify them and repeat results,

8  lead to the disappearance or appearance of other quantities,

9  those -- or other compounds, those are all indicative of a, you

10  know, of a sort of chaotic climate that not only supports the fact

11  that impurities are present, because -- because they're transient

12  and because they vary from lot to lot, but also that we don't have

13  a wonderful handle on precisely what's present in the first place

14  or how it got there.

15  **Q.**  Okay.  And my final question on redirect to you, Mr. Hillyer,

16  Mr. Kitchens was talking about eliciting your opinions about,

17  quote, flaws in the methodology.  And my question to you is, when

18  you looked at what was done here by the FDA chemists and how they

19  did it, were you also looking at how they applied the

20  methodologies that they used?  In other words, not so much whether

21  HPLC or GC-MS was or was not a bad methodology but how they

22  applied it in this case, is that something you looked at in

23  interpreting these reports?

24  **A.**  Right.  So the instrument I mentioned that the techniques, the

25  instrumentation are pretty standard fare.  Most of them have

1    standard operating procedures and can be -- these tests can be

2    carried out by a competent analytical organic chemist.  But

3    as -- as many things, these tests are user-sensitive; right?  So

4    if you decide that you want to run one experiment but not another,

5    if you choose to accept results without endeavoring further, if

6    you choose to run some experiments now and some experiments later,

7    the instrumentation might be fine, the method might be fine, but

8    the human interaction as -- as part of the experiment is subject

9    to greater question and that's the case here and I think we talked

10   about those instances, yesterday.

11           MR. WENIK:  Thank you, sir.  I have nothing further for

12   you.  I pass the witness.  I don't know if Bruce wants to ask any

13   questions or if there is any recross.

14           THE COURT:  Mr. Kitchens?

15           MR. KITCHENS:  Hearing nothing from Bruce, but there is

16   nothing else from the government either.

17           THE COURT:  All right.  Can this witness be excused

18   then?  I think so.

19           MR. KITCHENS:  I think so, Your Honor.

20           MR. WENIK:  I think so, Judge, yes.

21           THE COURT:  All right, Mr. Hillyer, thank you for your

22   time.  Just like I said, don't talk to anyone about your

23   testimony, at least until we get through with this hearing.  You

24   can always consult with the lawyers.  They'll know what to advise

25   you on, but you are free to have the rest of your day to yourself.

1    So thank you.

2            THE WITNESS:  Understood.  Thank you, Your Honor.  I

3    appreciate it.

4            THE COURT:  All right.  For the rest of us let's take

5    our lunch break now.  How about we go more like a 45-minute lunch

6    break.  We can go now until -- come back at maybe 12:40 and start

7    with whoever our first witness was going to be for today.

8            MR. WENIK:  Judge, can I just raise a point about the

9    scheduling?  I think realistically what we have to cover and I

10   think both sides are making an effort here to get through quickly,

11   I just can't imagine we're going to get through four more people

12   between now and 6 o'clock.  And my only concern candidly is, if we

13   could end maybe at 5 so I could get food before we're blizzarded

14   in up here in New Jersey from the grocery.  I think we will have

15   to come back for one more day.  In any event I don't see how we're

16   going to finish all of these other witnesses before today.  I'm

17   just throwing it out there.  Judge, if you want to plow ahead as

18   much as we can, I'll make do.

19           THE COURT:  I mean, I would like to plow ahead

20   regardless of whether we're going to Friday.  So let's do -- let's

21   come back at 12:40 and we can stop at 5:30 today.  How about that?

22           MR. MORRIS:  May I ask who is next?

23           MR. KITCHENS:  I wanted, you know, to raise a similar

24   scheduling issue on that part.  We had anticipated that

25   Mr. Mangrum would be the next witness I believe, but our witness

1   after that, Dr. Santos, I think is only available today.  I wanted

2   to try to get a sense of, you know -- I would expect the directs

3   for both of those witnesses on our side, you know, would take

4   roughly about an hour, I would imagine for each, and, hopefully,

5   for at least one of them less than that.  I just wanted to get a

6   sense from the defense if they have any concerns about being able

7   to complete even Dr. Santos' testimony today since he is only

8   available today.

9           MR. WENIK:  I think you may want to start with Santos

10  then.  I defer to Art who is going to question him for us.

11          MR. LEACH:  Well, it just seems to me, Nathan, that

12  would be the safe bet is to go ahead and put Santos up and then,

13  you got -- if you've got more availability on Mangrum -- my

14  feeling is to answer the question that you raised is that yes, we

15  can do it and maybe we have to go past 5:30, but, Jack, to the

16  extent that you feel you've got to go to the grocery store, go.

17  You know, I think we can work all these things out, but I think

18  the safe bet is to put Santos up when we come back.

19          MR. KITCHENS:  Okay.  I appreciate that.  We'll try to

20  reach Dr. Santos and see if he would be available as the next

21  witness.

22          THE COURT:  Okay.  We'll see you guys back at 12:40.

23          MR. WENIK:  Thank you, Judge.

24          (Whereupon a lunch break was taken.)

25          THE DEPUTY CLERK:  Dr. Santos, if you would please raise

1  your right hand to be sworn.  Do you solemnly swear or affirm that

2  the testimony you shall give in this matter now pending before the

3  court, shall be the truth, the whole truth and nothing but the

4  truth so help you God?  You're on mute.

5          THE WITNESS:  Yes.

6          THE DEPUTY CLERK:  Thank you.  If you would please state

7  your full name for the record and spell your full name for us.

8          THE WITNESS:  Enrique Yanes Santos.

9          THE DEPUTY CLERK:  Thank you.

10          THE COURT:  All right, Mr. Jones.

11                        ******

12                  ENRIQUE YANES SANTOS,

13          having been sworn, testified as follows:

14                        ******

15  DIRECT EXAMINATION

16  BY MR. JONES:

17  **Q.**  Dr. Santos, where are you employed?

18  **A.**  The FDA, Food and Drug Administration, Forensic Chemistry

19  Center.

20  **Q.**  What is your position?

21  **A.**  I'm an analyst or a chemist.

22  **Q.**  And how long have you been a chemist with the FCC?

23  **A.**  Eight years.

24          MR. LEACH:  D'Juan, let me just say that you could do

25  the same sort of summary overview, I am not going to challenge his

1  credentials.

2          MR. JONES:  Yeah, that's what I'm doing now.

3  DIRECT EXAMINATION

4  BY MR. JONES (continued):

5  **Q.**  Can you describe your educational background for the court?

6  **A.**  I have a bachelor's in secondary education with a minor in

7  physics and chemistry.  I have a master degree and Ph.D. in

8  analytical chemistry.  I have three years of postdoctoral training

9  with the USDA.

10  **Q.**  Is there a method of analysis that you primarily focus on as

11  an FCC chemist?

12  **A.**  At the FCC, primarily the two I use is LC-MS which stands for

13  liquid chromatography - mass spectrometry.

14  **Q.**  Did you perform LC-MS analyses in this case?

15  **A.**  Yes.

16  **Q.**  Now, in a moment we're going to take a deeper dive into the

17  step-by-step process for LC-MS.  But for now, could you kind of

18  just give us a short summary of how LC-MS works?

19  **A.**  In short, it's -- we use the LC-MS for the separation in this

20  case.  In the particular case of the steroids we use LC-MS, that

21  is the separation part, so we separate -- we separate the

22  components of a sample and then those components of the sample

23  they are introduced into the mass spectrometer which is the

24  detector that we use in this particular analysis.

25  **Q.**  Is LC-MS a qualitative or quantitative analysis?

**A.**  For the type of analysis that I do and I did for the sample,
is purely qualitative analysis.

**Q.**  Do you know if the reliability of LC-MS analysis for the
identification of steroids has been reviewed and tested by experts
in the field?

**A.**  Yes.  So in our particular case here at FCC, we use a
validated protocol.  It's a validated methodology, and we
regularly use for -- for the analysis of steroids.  The protocol
is called T041 here at FCC.

**Q.**  So we're going to touch on that in a bit.  But for now I just
want to get a general idea of LC-MS and its relation to the
testing for steroids.  So is the LC-MS analysis a generally
accepted technique to identify steroids within the scientific
community?

**A.**  Yes.

**Q.**  Has LC-MS been subject to peer review and publication?

**A.**  Yes, every day.

**Q.**  Have you personally authored publications about LC-MS?

**A.**  Yes.

**Q.**  Now, were there -- you just mentioned this, but are there any
procedures that you followed in performing the LC-MS analysis in
this case?

**A.**  Yes.

**Q.**  And what is that procedure?

**A.**  It is called T041 here at FCC.

1  **Q.**  Now, could you turn to Exhibit 11.  Do you have the exhibits?

2  **A.**  Yes.

3  **Q.**  And let me know when you get to it.

4  **A.**  Yes, I'm --

5  **Q.**  Okay.

6  **A.**  I have it.

7  **Q.**  Do you recognize this document?

8  **A.**  Yes.

9  **Q.**  What is it?

10 **A.**  It is, like, as I stated before, it is the standard operating

11 procedure or technical procedure that we use for the analysis of

12 steroids.  The document is T041.  It is -- the title is LC-MS,

13 Screen For Steroids.  In other words it's LC-MS analysis for

14 steroids.

15 **Q.**  Do you -- and sometimes the court reporter might ask you a

16 follow-up question if she didn't hear you because she's the one

17 kind of writing down everything.  Looking back at the exhibit, can

18 you tell me what that effective date is there at the top right?

19 **A.**  It's 3/19/2015.

20 **Q.**  Was this the version of the standard operating procedure in

21 effect at the time you did the analysis in this case?

22 **A.**  Yes, correct.

23      MR. JONES:  Your Honor, I offer Government Exhibit 11

24 into evidence.

25      THE COURT:  Art, you're on mute.

```
 1            MR. LEACH:  Sorry.  No objection.

 2            MR. MORRIS:  No objection.

 3            THE COURT:  Submitted.

 4   DIRECT EXAMINATION

 5   BY MR. JONES:

 6   Q.  And Dr. Santos, if I could direct your attention to the

 7   section labeled purpose on the first page?

 8   A.  Okay.

 9   Q.  Can you read that sentence for us?

10   A.  This procedure provides a general guide for the analysis of

11   samples for the presence of steroids by LC-MS.

12   Q.  And I know this might be an obvious question, but what does

13   that sentence mean to you?

14   A.  The protocol in that case, the protocol is used for the

15   analysis of steroids using LC-MS.

16   Q.  For identification of steroids?

17   A.  Yes, correct.

18   Q.  Now, directing your attention to page 2, starting at the

19   heading procedures, process details, through page 5, if you could

20   take a moment to review pages 2 through 5, and once you're done

21   could you just give us a high-level summary of what that section

22   is discussing?

23   A.  The -- they're talking about the procedures, process details.

24   Q.  Yes, sir.

25   A.  So in this particular section it provides all the details that
```

we follow for the preparation of the sample for the preparation of

the planned solution.  We -- that is the -- kind of the general

guidelines to help you approach in that case the different

matrixes of -- different matrixes of a sample, how to prepare the

standard.  And again it provides all the general parameters that

we regularly use here at FCC for the analysis of steroids, in

particular using a type of mass spectrometer that is called ion

traps.

**Q.**  Now, could you now turn to page 3?

**A.**  Page?

**Q.**  Yes, I'm sorry, page 3.  Now, toward the top of the page there

are three bulleted items and I want to direct your attention to

that second bullet that starts with, if sample consists of either

tablets or capsules.  Do you see that one?

**A.**  So could you repeat again, page 3?

**Q.**  We're on page 3 at the very top.

**A.**  Yup.

**Q.**  Do you see there is a list of three items there, those bullet

points?

**A.**  Yes.

**Q.**  That second bullet point, do you see that one?

**A.**  If the sample consists of either tablets or capsules, yes,

correct.

**Q.**  Could you keep reading that for me?

**A.**  If the sample consists of either tablets or capsule, prepare

1  composite if appropriate with the equivalent one-tenth of a tablet

2  capsule content weight into a 20 ml scintillation vial.

3  Q.   Now, can you tell us what a composite is?

4  A.   A composite is -- in that case just to explain, a composite in

5  that case is a representative sample in that case.  It's a small

6  sample that represents in that case a bottle of tablets.  In that

7  case if I have, like, a bottle, I will select, like, five or ten

8  tablets and make a composite of that.  So that composite is going

9  to be a representative of that -- tablets coming from that

10 particular bottle.

11 Q.   And so why is it necessary to create a composite when tablets

12 or capsules are involved?

13 A.   Well, that is the protocol that we have in place.  So instead

14 of analyzing individual tablets like this, it of course will take

15 more resources.  So we typically use a composite that is going to

16 be a representative of a large sample.  So we typically, you know,

17 select five or ten tablets depending in that case of the sample

18 that we're going to analyze.

19 Q.   Do you know if there is a reason why you would not just use

20 one tablet instead of using five or ten?

21 A.   Because in that case it would be -- it wouldn't be a

22 representative sampling protocol for the analysis.

23 Q.   Now, kind of directing your attention to the analysis that you

24 performed in this case, can you give us a summary of the

25 step-by-step process you followed in conducting the analysis for

1  this case?

2  **A.**   So typically the whole -- the whole -- the whole process, of

3  course, the sample is received at FCC.  I get the sample from the

4  custodian.  So I take custody of the sample.  I do a further

5  documentation of the sample, and then I review the -- review

6  the -- the actual request for the analysis.  So, and then

7  typically in that case if I have a question, I go to the -- to

8  management or to my direct supervisor to -- to define what is the

9  type of analysis that I have to do.  So in that case for this type

10  of sample, they were tablets, I used the protocol, you know.  We

11  made a composite, and then we followed the extraction protocol for

12  extraction of the analysis of interest using a mixture of -- of

13  organic solvent and water.  That is the general terms.  So I don't

14  know if I have to explain the whole process of identification or

15  just the --

16  **Q.**   If you could, yes.  Just a high-level summary for us.

17  **A.**   So after the sample, after the preparation of the composite,

18  we -- from that composite we remove, as is stated in the protocol,

19  a specific amount of sample, and then an extraction solvent is

20  added to the sample.  And that extraction solution is the one that

21  is injected into the LC-MS for identification.  For the

22  identification, there is crucial information that is obtained.

23  That is what we call retention time and mass spectra data and that

24  is what we use for the identification.  All this happens in the

25  LC-MS.  So if we -- we have the extraction solution or the

1   solution that we extract from -- from the sample, a small amount
2   of sample is injected into the -- in that case into -- into the
3   LC-MS, particularly the front end.  So the sample is injected into
4   a moving stream of liquid that is passing through a column, and
5   the column consists of a tube packed with packing material or
6   solid material.  So the separation of the sample or the components
7   of the sample there are going to be separated depending on the
8   extent and degree of interaction of the sample components with the
9   solid particles of the packing material in the tube.
10      For example, hypothetically we have a sample of steroid A and
11  steroid B, hypothetically assume that steroid A has a strong
12  interaction with the packing material and we assume that the
13  steroid B has a weak interaction with the packing material, what
14  is going to happen in the tube is that when both steroids move
15  along through the column, the steroid A which has the strong
16  interaction with the packing material, that is going to be -- is
17  going to move at a slower pace through the column.  In other
18  words, it's going to -- it's going to spend more time in the
19  column.  It's going to be retained longer in the column.  The
20  opposite is going to occur with the steroid B.  In that case we
21  hypothetically assume that has a weak interaction with the packing
22  material.  In this case what will happen with the steroid B is
23  that, of course, it has a weaker interaction with the packing
24  material, it's going to move faster through the column.  And other
25  times it's going to spend less time in the column and in other

1  words in our case we call it, less retaining column.  Eventually

2  both components of the sample, steroid A and steroid B, they're

3  going to exit the column and going to reach the detector.  And in

4  this particular case the detector that we use is mass spectrometry

5  or mass spectrometer.

6      So when we reach the detector, a response is generated, and

7  that response is what we call the retention time.  So steroid A

8  and steroid B is going -- they're going to have a unique retention

9  time.  But just to give you an idea, if, for example, we know that

10  the steroid A spends more time in the column, it's going to have a

11  retention time of five minutes, for example, and steroid B is

12  going to have a retention time of two minutes.  So that

13  information later on is crucial for the identification.  That is

14  one part that -- you know, that we get from the instrumentation.

15  In the mass spectrometer the steroids, or in that case the

16  components of the sample, they are detected in -- in -- in the

17  form of charged ions.  These charged ions data is utilized to

18  determine the mass of the components of the sample, in this

19  particular case steroid A and steroid B.

20      The other thing that takes place in the mass spectrometer is

21  that these charged ions are presenting steroid A and steroid B,

22  they are broken apart and they are fragmented into smaller pieces.

23  This generates a specific fermentation pattern, or fermentation

24  profile or a fingerprint of the steroid A and steroid B.  The

25  combination of the mass data and this fermentation pattern is what

1  we call mass spectrum data.  So with the retention time that is

2  unique in the mass spectrum data, the combination of that, we take

3  that information and we compare that -- that retention time and

4  mass spectra data with the data that is listed in the SOP, in

5  2041.  And with that through that comparison we can

6  determine -- we can establish a tentative identity of the steroid

7  A and steroid B.

8      Hypothetically, we assume that our first -- through that

9  comparison we determine that the tentative identity of steroid A

10 is testosterone, for example.  So with that information in hand,

11 we analyze testosterone, certified representative standard using

12 the same instruments and the same experimental conditions.  After

13 we gather all the results, if the retention time and the mass

14 spectra data with steroid A matches the retention time and the

15 mass spectra data of the testosterone, we conclude that, you know,

16 based on the retention time and mass spectra data compared to a

17 reference standard, testosterone was identified in sample X.  And

18 that is the whole process that takes place in the identification

19 of steroids.

20 **Q.**  Thank you for that.  So are those the steps that you followed

21 in this case?

22 **A.**  Yes.

23 **Q.**  And are those steps consistent with standard operating

24 procedure 2041?

25 **A.**  Yes.

1  **Q.**  Now, are you familiar with the concept of setting a detection

2  limit or quantitation limit before starting an analysis?

3  **A.**  Yes, but I do purely qualitative analysis.  So I don't, you

4  know -- there are other analysts here at FCC are the ones that

5  deal because those parameters are basically directly used by

6  people that do quantitation work.

7  **Q.**  So you were not required under the standard operating

8  procedures to set a detection limit or a quantitation limit; is

9  that correct?

10  **A.**  That's correct, yes.

11  **Q.**  Now, directing your attention back to Exhibit 11.  And we're

12  going to go to page 2 under the heading QC elements.  Could you

13  summarize what's being discussed in that section?

14       MR. WENIK:  What page are you on again on Exhibit 11?

15  I'm sorry.

16       MR. JONES:  On page 2.

17       MR. WENIK:  Two?  Thank you.

18  **A.**  So -- so -- so prior to using any -- at FCC we have

19  instrumentation in different labs.  So if -- if I'm going to do

20  any type of analysis and then I go and select a specific

21  instrument, I have -- I have to make sure that the instrument has

22  gone through all -- before I start the -- I initiate any type of

23  analysis, I have to ensure that the instrument has been gone

24  through the QA and quality control assurance.  So -- or quality

25  control parameters.  So I need to make sure that the -- the

1  instrument has been properly maintained, has been calibrated, has

2  been -- a sensitivity test has been performed.  So there's

3  a -- there's a logbook of each of the instruments.  I would go to

4  that logbook entry and read to make sure that everything has

5  been -- has been -- all the required testing has been done on that

6  instrument.  For example, like every week somebody -- the person

7  that is the monitor of that instrument has to reboot the computer,

8  check the levels of the helium.  Every three months the same

9  person, the monitor has to -- to make sure that the instrument has

10  been maintained, has done a sensitivity test, has done diagnostic,

11  has done calibration.  And every -- every six months, like, like

12  in our beacons that we use, regularly use, that person has to do

13  an oil change for the mass spectrometer so that -- in general that

14  is what -- I have to ensure that all that has been done prior to

15  the usage of that particular instrument.  And that is with respect

16  to the instrument.

17     For the analysis, the paragraph states that prior to any

18  analysis of a sample, I have to inject what we call a solvent

19  blank.  It's a blank solution that does not contain any -- any

20  components of the sample.  It's a blank solution.  You do not

21  detect anything in that solution.

22  DIRECT EXAMINATION

23  BY MR. JONES:

24  Q.  So all of those quality assurance and quality control matters

25  that you just described, were all of those taken care of before

1  you started your analysis in this case?

2  **A.**   Yes.

3  **Q.**   And how do you know that?

4  **A.**   Because I, like I say, looked through the logbook and I go

5  through all those -- the logbook entries and then it will state

6  kind of the time period when the instrument can be used.  So it

7  will say, you know, it's used -- it's going to be good from time X

8  to time X.  It's just going to give you a time window.

9  **Q.**   Okay.  Now, I want to turn to some of the actual analyses that

10 you performed in this case.  And so I'd like you to turn to

11 Exhibit 12.

12 **A.**   Yes.

13 **Q.**   So we're going to discuss the findings in just a moment, but

14 for now, can you just tell me if you recognize this document?

15 **A.**   Yes.

16 **Q.**   And what is it?

17 **A.**   It is the -- what we call the analytical section.  It is the

18 section that contains all the results obtained through the

19 analysis using LC-MS.

20 **Q.**   And is this titled, FCC Section Result Sheet?  Is that the

21 title at the top?

22 **A.**   The title is LC-MS Qualitative Analysis.

23 **Q.**   I'm sorry, the heading at the very top, the bold where it

24 starts with FCC.

25 **A.**   Sorry.  So FCC Section Results.

1 **Q.** Now, how is this different than a case sample summary report?

2 **A.** This is just the results performed by one technique, LC-MS.

3 So the similar report it contains -- it is the compilation of the

4 results obtained from different techniques performed by different

5 analysts.  Like in that case -- in my case I only performed LC-MS

6 analysis.  Somebody else would have done GC-MS analysis and

7 somebody else did HP-LC analysis.  So that is the distinction

8 between the two, the compilation of all of the results.

9 **Q.** And there's a sample number at the top right of this page.

10 Can you read that for me?

11 **A.** 984260.

12 **Q.** Is that the same thing as a FACTS number?

13 **A.** Yes.

14         MR. JONES:  And Your Honor, I offer Government's Exhibit

15 12 into evidence.

16         MR. LEACH:  Just one second, Judge.  Let me look at this

17 document just for a second.  D'Juan, maybe you covered this but

18 what's the date of this document?  Oh, I see in the electronic

19 signature.  Okay.  Hold on.

20         MR. JONES:  There are several dates.

21 DIRECT EXAMINATION

22 BY MR. JONES:

23 **Q.** Dr. Santos, what is the date listed in the lower right-hand

24 corner of this document?

25 **A.** This is 11/30/2016.

**Q.** And so what does that date represent?

**A.** That date actually could change.  That is the time the -- like in this particular case, it is the time when I submitted my report for review process.

**Q.** Thank you.  And we're just going to wait one second.  Okay?

**A.** Sure.

             MR. LEACH:  No objection.

             MR. MORRIS:  No objection.  But I would like to ask when the test was performed?  I realized he submitted his report on 11/30/2016.

             THE COURT:  You'll have that chance to ask him on cross-examination.

             MR. MORRIS:  Thank you.  I'll be glad to.

             THE COURT:  All right.  That's admitted.

DIRECT EXAMINATION

BY MR. JONES:

**Q.** Dr. Santos, so looking at this document, I want to discuss some of the results listed there in the middle of the page in the bold.  Could you just walk us through the results of this -- of this testing?

**A.** So both parts is where actually we summarize the -- we would call it the kind of the final conclusion.  So -- it has stated -- I explained how we do the -- we do the identification of the -- of the components present in the sample.  The sentence that I used at the end of that explanation, based on the

1  chromatographic retention time and mass spectral comparison to

2  reference standards, the following was identified in the analyzed

3  portions of -- and then lists the sample -- the sample items that

4  were analyzed in the steroids that were identified in that

5  particular case.

6      It also includes at the bottom two notes.  One which states by

7  using LC-MS under the experimental conditions that we used, there

8  are two steroids that cannot be differentiated.

9  Q.  Can I just interrupt you there so we can discuss both of those

10 notes in turn.  So looking at that first note, what does that mean

11 cannot be differentiated?

12 A.  This -- in this particular case, the steroids, they're what we

13 call isomers.  They're molecules of chemical substances that they

14 have the same molecular formula but with a different

15 chemical -- physical properties.  Under the experimental

16 conditions that we use, we cannot distinguish -- in that case if

17 there are two isomers, we cannot distinguish in that case the

18 4-androsten-3B-ol-17-one versus the 1-androsterone.  So

19 even -- even that is -- is in the operation -- in the standard

20 operating procedure.  So for this particular type of molecules in

21 which I cannot be -- I'm not able to distinguish them, a different

22 or -- a different technique needs to be utilized.

23 Q.  Do you have --

24 A.  That could be the easiest way.  Because, yeah, I could spend

25 more resources, but in that case I will have to utilize a

1  different separation column in order to distinguish one of the

2  items in that case to distinguish the two isomers.

3  **Q.**  And when you say different technique do you mean something

4  other than LC-MS?

5  **A.**  Yes, correct, gas chromatography-mass spectrometry.

6  **Q.**  That's known as GC-MS; right?

7  **A.**  Yes, correct.

8  **Q.**  Okay.  Now, let's look at that second bullet point under

9  notes, discussing additional peaks.  What does that bullet point

10  mean?

11  **A.**  So of course, the sample is a mixture of different components.

12  So the -- the protocol that we use is a targeted analysis.  So we

13  are specifically -- we are specifically -- the instrument is going

14  to -- is specifically dictate -- well, not dictate, but

15  specifically will help us to determine the identity of the

16  steroids that are listed in the SOP.  Other components that are

17  not listed in that SOP, it will be detected but we are

18  not -- we're not going to be able to identify.  That is

19  the -- that is one of the things that may happen.  So in that

20  particular case, so when I submitted my report, there were several

21  components that I couldn't determine the identity right away.  So

22  they were -- the same way with the intention that we will need to

23  use a different technique to help us determine the identity.  One

24  of the -- at that time when I did the analysis, one of the

25  drawbacks of LC-MS at that particular period of time is that we

1  didn't have access to mass spectrum libraries.  And then you have

2  to go to the Internet and spend a lot of hours trying to figure

3  out.  While GC-MS at that time has an extensive mass spectrum

4  library, so that was -- the idea was that it was -- it was going

5  to be easier to use GC-MS for the identification of those

6  components that I detected, but I was not able to determine the

7  identity.

8  **Q.**  Now, do you -- I know we discussed the date in the lower

9  right-hand corner, but do you have any idea of when you may have

10  performed the actual underlying tests associated with this report?

11  **A.**  In the second -- in the second page, they give you the date in

12  the upper left corner.  It will give you the date when the sample

13  preparation starts and then throughout the sheet if -- if I, you

14  know -- that particular day I prepared the sample and I -- I

15  started the analysis using the LC-MS --

16  **Q.**  Can you read that date for us?

17  **A.**  The second page is a sample preparation and then they give you

18  the dates.  And then the --

19  **Q.**  I'm sorry, can you just read the date into the record for us?

20  **A.**  11/16/2016.

21  **Q.**  Yes, thank you.  And so after you did the test and this report

22  was generated, you then discussed this report with -- anyone at

23  the office?  You mentioned that you submitted it to a supervisor.

24  Did I hear that correctly?

25  **A.**  The report itself is -- is submitted -- well, typically I go

 1  and discuss it with the -- in that case my immediate supervisor.

 2  Q.  And who is that?

 3  A.  Dr. Thomas Brueggemeyer.

 4  Q.  Okay.  And you can continue.  Sorry to interrupt you.

 5  A.  And then of course I present the data, and that is when I

 6  generate -- I process the data, generate the report and I have to

 7  submit the report to a reviewer that has the same expertise in

 8  LC-MS for the review and presentation, of course.

 9  Q.  Now, could you turn to Exhibit 5 for one moment?

10          MR. MORRIS:  Is that in this same batch?

11          MR. JONES:  Yes.  It was the same batch that was sent

12  over yesterday.

13          MR. MORRIS:  Actually we received something today.  Do

14  you know if it's in today's?

15  DIRECT EXAMINATION

16  BY MR. JONES (continued):

17  Q.  So in Exhibit 5, do you recognize this document?

18  A.  Yes.

19  Q.  And what is it?

20  A.  It is the case sample in my report for sample 984260.

21  Q.  And is that the same FACTS number from Exhibit 12 that we just

22  discussed?

23  A.  Yes.

24  Q.  Now, I want to direct your attention to the item listing where

25  it lists items one, two, and three.

1  **A.**   Yes.

2  **Q.**   Can you tell me what information is being provided in the

3  description of those items?

4  **A.**   So item one refers to the product Androdiol.   Item two refers

5  to the 1-AD product.   Item three refers to the 1-Testosterone

6  product.

7  **Q.**   And so that's also a listing -- for example, if we're looking

8  at item one it says for Andro -- and then it says 17-1 and some

9  other term.   What are those?

10 **A.**   That is what is -- the information that you -- that is

11 provided in the label of the product.

12 **Q.**   Now, that information that's provided on the label, do you use

13 that at all as part of your analysis?

14 **A.**   Yes and no.

15 **Q.**   Can you explain?

16 **A.**   When I started at FCC, I will go to -- to the label of a

17 product and I will -- if that was -- just to give you an example,

18 no -- probably not related to this particular product.

19 **Q.**   And so I want -- I want us to focus just on what was done in

20 this case.

21 **A.**   In this case --

22 **Q.**   Yeah.

23 **A.**   --  so the -- the request is the detection for steroids.   So

24 sometime what happens is, you know, we go to the label but in

25 certain -- well, in some occasions, whatever is declared on the

1 label is not what we detect, we identify through the sample

2 analysis.  So where I learn through the experience was that yes,

3 if -- if they're requesting for steroids, it's easy for me just

4 to, you know, apply directly the -- the -- the standard operating

5 procedure for the analysis of this steroid.  So -- and then, of

6 course, I will detect whatever steroid is present in the sample is

7 going to be detected by the LC-MS instrument.  So -- because what

8 happens typically is, you know, you go to the label and then you

9 start preparing certified reference standards that match that

10 label, but in some occasions you don't find any of the steroids

11 that they are declaring on the label.

12 **Q.**  So did that happen here?

13 **A.**  Yeah, in some of the products, yes, I wouldn't detect or I

14 couldn't identify whatever is declared in the label, what is --

15 **Q.**  Okay.  So I just want to make sure that I'm understanding.  So

16 in some instances you'll go to the label and you'll see what

17 ingredients are listed on the label; is that right?

18 **A.**  Yes.

19 **Q.**  And then what do you do with that information from the label?

20 **A.**  Usually I put it in a spreadsheet and tentatively I have

21 readied the certified -- I have, you know, the number of the

22 standards that I may utilize for the analysis.  But sometimes, you

23 know, I don't utilize all the standards that are listed in the

24 label, but, of course, I put it in a spreadsheet and I have it

25 just -- just in case, of course.

1  **Q.**  So in this case when you did your analysis, were there -- did

2  these items show up -- were these items detected by LC-MS?

3  **A.**  Well, to tell you the truth, I have to go one by one and, you

4  know, through all these samples.

5  **Q.**  Okay.

6  **A.**  Because I cannot recall.  The other -- the other thing that

7  may happen is, you know, a label may have listed the name of the

8  steroid in a different way.  And that is, of course -- sometimes

9  it's not as easy, it's not as straightforward to try to determine

10  because there's so many different ways to name a steroid.  So

11  that, you know -- so you don't want to spend that much time trying

12  to figure out did they mean that steroid A is actually

13  1-androsterone.

14  **Q.**  So let's say you did -- so let's say you factored into your

15  analysis some of the ingredients that were listed.  If that's a

16  disconnect between what's on the label and ultimately what your

17  analysis finds, does that mean that you need to retest?  Like,

18  what happens then?

19  **A.**  In some occasions what will happen is -- sometime it's not as

20  straightforward.  It's like -- so the protocol is, like if we, you

21  know -- if the request of analysis is identification of the

22  steroids, so -- so we're not -- in this particular case there were

23  like different samples.  So we could through the analysis, we

24  could determine the presence of any type of the steroids in the

25  samples.  So -- but in some occasions if we analyze something and

1  it's declared on the label, the protocol states that we have to

2  certify the fact that that particular steroid is in the sample, if

3  we -- if we cannot detect them or if we cannot identify.

4     But in this particular case we were -- through the analysis we

5  detect several steroids that were not detected in the -- that were

6  not listed in the label.  So in this particular case because we

7  are detecting other steroids other than whatever is listed in

8  the -- in the label, we don't have to certify the sample because

9  we are -- we are detecting some other steroids.  So we are proving

10 that the standard protocol and the instrument that we are using is

11 actually working properly.

12 **Q.**  Okay.  Let's turn to a different exhibit.  We're going to take

13 a look at Exhibit No. 2 now.  Do you recognize this exhibit?

14 **A.**  Yes.

15 **Q.**  And what is it?

16 **A.**  It is a communication -- it's an e-mail.

17 **Q.**  And I'll give you -- I'm sorry.  I'll give you a moment to

18 read -- to read over it, if you need it.

19 **A.**  Yes.

20 **Q.**  Can you summarize what's being discussed here?

21 **A.**  My supervisor, Dr. Thomas Brueggemeyer, is providing an update

22 to Special Agent Brian Kriplean as to the status of the -- of the

23 results that I'm finding through the analysis of LC-MS.

24 **Q.**  And was that the results that we just discussed, Exhibit 12?

25 **A.**  In general terms, yes, that we were finding certain steroids,

1 and it states that some of the steroids are not schedule, but also

2 at the same time we were finding other -- we were detecting other

3 components that we were not able to determine the identity.  So

4 that's what we call unknowns.  And the -- we could determine the

5 identity by most likely utilizing a different technique in that

6 particular case.  It's indicating we could use GC-MS gas

7 chromatography-mass spectometry.

8 **Q.**  And so the decision to use another technique, the decision to

9 use GC-MS, whose -- whose decision was that?

10 **A.**  So in that case I will go with my supervisor, discuss it and

11 then we made that conclusion.

12 **Q.**  Now, you mention Agent Kriplean.  Did he make the decision at

13 all?  Was he part of that decision process at all?

14 **A.**  No, we are the one providing that -- that possibility that we

15 call for -- analyze the sample by using a different technique or

16 continue using our resources through LC-MS for the identification

17 of the component that I was not able to determine the identity at

18 one point.

19 **Q.**  Also in the body of the e-mail there's a mention of a December

20 13th date for grand jury.  Do you see that?

21 **A.**  Yes.

22 **Q.**  And it seems like there's, you know, a concern about timing

23 here.  Can you -- can you give us additional color about why there

24 was concern about timing?

25 **A.**  Well, when we received the sample that -- we received two

1  samples, like we call it a standard priority that, you know, it

2  will give us -- it will take like a period of 60 days to generate

3  the -- in that case the -- to provide the consumer report to the

4  investigators.  But in some cases we have samples that they are

5  expedited.  So because in that -- most of the time because there's

6  a grand jury date that has been stated and we -- we have to

7  analyze -- we put those -- that sample analysis in the priority

8  list.

9  **Q.**  And in your experience, do you often speak with your

10  supervisor after you run -- run an analysis?

11  **A.**  Mostly in the occasions when I have some difficulty.  The

12  other samples that are straightforward there is no -- there is no

13  need to discuss with him.  I will give him an update daily of

14  what, you know, is the status of certain analysis, but typically I

15  don't -- you know, if the analysis is straightforward, yeah,

16  there's not much discuss --

17  **Q.**  You're saying -- you're saying this analysis wasn't

18  straightforward?

19  **A.**  Correct.

20  **Q.**  And is that -- I'm sorry, why was that?

21  **A.**  As I stated, we have several components that we were not able

22  to determine the identity, and on top of that there was like

23  presence of isomers so we have to -- in that case if the agent

24  really needed the -- the identity of that particular -- of a

25  particular steroid we will have to use other resources to

1  determine the identity of those components.

2  **Q.**  Now, there's a -- with respect to the GC-MS testing, is it

3  part of standard operating procedures to run both LC-MS and GC-MS

4  on certain samples?

5  **A.**  Not really.

6  **Q.**  Now, if I could --

7  **A.**  Each technique we have a criteria for the full identification

8  of components.  So in most of the cases we don't have to.

9  **Q.**  So let me direct your attention to Exhibit 1.

10        MR. MORRIS:  Which one is that one?

11        MR. JONES:  It's the SOP for --

12        MR. MORRIS:  Okay.  Thank you.  Okay.  Yeah.  Thank you.

13  **A.**  Yeah, Exhibit 1?

14  DIRECT EXAMINATION

15  BY MR. JONES (continued):

16  **Q.**  Yes, can you flip to page 9 for me?

17  **A.**  Page what?

18  **Q.**  Nine.

19  **A.**  Yes.

20  **Q.**  That first paragraph, can I direct your attention to the last

21  sentence of that first paragraph?

22        MR. LEACH:  Page 9 of Exhibit 1?

23        MR. JONES:  Yes.  Correct.

24        MR. LEACH:  It's only a one-page exhibit as far as I can

25  see.

1          MR. JONES:  We're discussing the exhibit from yesterday

2     that was sent over.

3          MR. LEACH:  Okay, okay.  Hold on.  Let me get to where

4     you are for a second.  I thought it was a one-page exhibit.  My

5     mistake.  Okay.  I'm with you now.  Go ahead.

6     DIRECT EXAMINATION

7     BY MR. JONES (continued):

8     **Q.**  The last sentence of that last paragraph that starts with some

9     steroids.  Do you see that?

10         MR. LEACH:  Okay.

11    **A.**  Page 9, appendix 8.

12    **Q.**  Yes.  And the last sentence of that first paragraph that

13    starts with some steroids.

14    **A.**  Some steroids, yes.

15    **Q.**  Can you read that sentence and then let us know what means to

16    you?

17    **A.**  Some steroids can only be detected by LC-MS.  So utilizing

18    both GC-MS and LC-MS is recommended when analyzing a sample

19    suspected contains steroids.

20    **Q.**  Is that what happened in this case?

21    **A.**  So in this particular case, yes.  So utilizing both LC-MS and

22    GC-MS, it is recommended.

23    **Q.**  Okay.

24    **A.**  Because --

25    **Q.**  I'm sorry.  Go ahead.

1  **A.**  Mainly it was recommended because in -- under the experimental

2  conditions that I used for the analysis, as I stated before, I was

3  not able to distinguish two isomers, two sets of isomers.  So in

4  that case we needed the expertise of somebody with GC-MS to try to

5  differentiate which of the two isomers were present in the sample.

6  **Q.**  Now, let's go to Exhibit 3.

7  **A.**  Yes.

8  **Q.**  And I'll give you a moment to -- to look over this e-mail, but

9  I want you to focus on the paragraph listed as number 1.

10  **A.**  Okay.

11  **Q.**  Do you see the mention -- let's see.

12     The next to last sentence in paragraph 1 that starts with I

13  told him, do you see that?

14  **A.**  Yes.

15  **Q.**  And so my question is, does LC-MS analysis, does that show

16  whether -- whether a substance was placed intentionally into a

17  sample or not?

18  **A.**  No.

19  **Q.**  As an analyst, does it matter to you whether it was placed

20  there intentionally or not?

21  **A.**  No.

22  **Q.**  Does that affect the outcome or the reliability of your

23  testing at all?

24  **A.**  No.

25  **Q.**  And there's also a mention of cross-contamination in that

1    sentence.  Now, the quality control and quality assurance

2    responsibilities that we discussed earlier, do they work to

3    prevent cross-contamination?

4    **A.**   Yes.

5    **Q.**   How?

6    **A.**   So one of the -- to ensure that the first -- that we are not

7    getting a false positive like I said at the beginning, one of the

8    quality controls in place is that prior to running the sample, we

9    have to run a blind solution that doesn't contain any component of

10   the sample and that's going to assure us or assure that the

11   quality of the data that we're going to generate is true and

12   acceptable.

13   **Q.**   Now, let's take a look at Exhibit No. 4.

14   **A.**   Yes.

15   **Q.**   And do you recognize this document?

16   **A.**   Yes.

17   **Q.**   Can you summarize for us what's being discussed here?

18   **A.**   So this is a communication between myself -- between Analyst

19   Caroline Kelley and I, a communication with Special Agent Brian

20   Kriplean, and the -- the sole purpose of the phone call was to

21   obtain a clarification, that we were asking him if quantification

22   was needed in the case that we detect and identify steroids that

23   were classified by the special screen.  And the purpose of

24   that -- the end result of that clarification was to basically to

25   define a date for closing the case.

1  **Q.**  I'm sorry.  Could you say that last part again?

2  **A.**  The whole clarification, the purpose of this clarification was

3  to kind of define the date for closing the case.

4  **Q.**  I see.

5  **A.**  Because what will happen is if -- if quantification was

6  needed, we will have to use a different technique for the

7  quantification for the sample products.  So that -- that, of

8  course, will extend the gate of closing the case.

9  **Q.**  I see, I see.

10  So at this point qualitative testing had already been

11  conducted; is that right?

12  **A.**  Yes.

13  **Q.**  And so is it generally the case that qualitative testing will

14  come first and then quantitative testing comes after that?

15  **A.**  In general terms, yes.  We -- a high percentage of the type of

16  analysis that we do at FCC, high percentage I will say, are

17  qualitative analysis.

18  **Q.**  Are there cases where no quantitative testing is done and it's

19  only qualitative?

20  **A.**  Yes, correct.

21  **Q.**  Is it consistent with the standard operating procedures to run

22  qualitative testing first?

23  **A.**  Yes, because remember quantitation -- qualitative analysis is

24  try to determine what is present in a sample.  You know, before

25  analysis we don't have any idea what could be present in a sample.

1   So an agent cannot request could you determine the amount of

2   testosterone in example X because we don't -- we don't have -- in

3   the beginning we don't have any idea what can be present in the

4   sample, so we have to do a qualitative analysis.

5   **Q.**  Now, let's go back to Exhibit 5 and we're going to discuss

6   some of the results a bit more.  Now, looking at the table on page

7   2, can you give us a summary of the results?

8   **A.**  So this is -- excuse me.  This is Exhibit 5 you say?

9   **Q.**  Yes.

10           MR. MORRIS:  Five, is that what we're on?

11           MR. JONES:  Yes, five.

12   **A.**  Yes.

13   DIRECT EXAMINATION

14   BY MR. JONES (continued):

15   **Q.**  So can you tell us what types of analyses were done with

16   respect to this report?

17   **A.**  For the summary of results listed in table one, two techniques

18   were utilized, LC-MS and GC-MS.

19   **Q.**  And looking at the results chart, can you summarize those

20   results for us?

21   **A.**  There's three columns.  Yeah, three -- there's a table listing

22   all the different steroids that we -- we identified in product one

23   in item one, item two and item three.

24   **Q.**  And is there a way to tell which steroids are Schedule III

25   steroids?

1  **A.**  We have a notation at the bottom of the table that it states

2  in notation number four indicates -- indicates the DEA Schedule

3  III steroid.  There is a notation for it.

4  **Q.**  Now, can you explain why you were able to detect some of

5  these -- some of these steroids on the retesting but they weren't

6  detected the first go-round in the November, testing that was

7  Exhibit 12?

8  **A.**  Could you repeat the question?

9  **Q.**  Sure, sure.  So in this chart it says the steroid names and it

10 tells you that that -- let's say for example, item two, found two

11 types of Androstenediol steroids that were Schedule III according

12 to the footnote four.  Do you see that?  But previously when we

13 were discussing Exhibit 12 which was your November report, those

14 weren't detected.  So can you explain why or what happened there?

15 **A.**  So what happened, that was my 98.260, 98.275, 76, my initial

16 analysis was -- the extraction protocol was slightly different.

17 So that is one of the -- one of the things.

18 **Q.**  I'm sorry, so what does that mean?

19 **A.**  So when I did the first analysis I use basically -- on another

20 attempt I use less diluted sample.

21 **Q.**  Okay.

22 **A.**  So -- and then, of course, the -- when I was the -- when I did

23 the analysis, there was low levels of certain components in

24 the -- in the -- through the analysis.

25 **Q.**  And we're talking about that first analysis; right?

1   **A.**   Yes, the first analysis.

2   **Q.**   Okay.

3   **A.**   Then at that time what I couldn't distinguish or I couldn't

4   determine the identity because, of course, there were low levels

5   and remember we made annotation that what I call many components

6   were detected but were not identified.  So what will happen in

7   those cases is I -- to try to get further information, what we do

8   is kind of tweak the extraction protocol or we could do several

9   things.  We could -- instead of analyzing a less diluted sample,

10  we analyze a less or a more concentrated sample.  So in that case

11  to increase the signal of -- in the mass spectrometer.  That is

12  one of the things.  It could be -- several things can be done.

13  You could use more sample to be extracted or you could inject --

14  in my practical case I typically use one microliter injection for

15  the analysis, 10 microliters could have been used, but in this

16  particular case what happened was I used less diluted sample for

17  the analysis.  And then of course, I start seeing higher things

18  and I was able to determine the identity for these steroids listed

19  in this table.

20  **Q.**   So I want to make sure that I'm understanding this correctly

21  and if I say something wrong, please let me know.  But you're

22  saying in the first sample -- I'm sorry, in the first testing that

23  you -- you knew that the substance was there, but you couldn't

24  tell what it was.  And so in order to tell what it was, you

25  retested it and that's the results that we see here.

1  **A.**  Yeah, depending on the results also on that table, yes.

2  **Q.**  Okay.  And were these items that you detected on this second

3  go-round, were they listed on the label?

4  **A.**  Some of them they were not declared on the label.

5  **Q.**  Did that have any impact on your ability to detect and

6  identify them?

7  **A.**  Not -- not at all.

8  **Q.**  Okay.  Now, let's go back to Exhibit 5 for a second.  Now,

9  that fourth footnote under the table and it mentions that these

10  steroids were found to be not the most predominant steroids in the

11  sample items.  Can you explain to us what that means?

12  **A.**  That means -- in other words, they're -- the steroids that are

13  present are at low levels.

14  **Q.**  But at this point they had not been quantified; is that right?

15  **A.**  Yes, you're correct.  So the terminology that we use there

16  that other components, they're the -- they're more -- more

17  predominant than the Schedule III steroid.

18  **Q.**  Now, let's go on to Exhibit 6.

19  **A.**  Yes.

20  **Q.**  Was there -- what type of testing was done here?

21  **A.**  LC-MS analysis and GC-MS analysis for the identification of

22  steroids.

23  **Q.**  And looking at -- so below the chart it says items four and

24  five in bold.  Do you see that?

25  **A.**  Item four and five, yes, correct.

1 **Q.** That sentence below that, those two sentences, can you read

2 those and tell us what they mean?

3 **A.** Using LC-MS, the steroid-like compounds were detected in the

4 analysis portions of items four and five, but they were not

5 identified. Using GC-MS, no drugs or poison or steroids were

6 identified.

7 **Q.** And so why were these -- the first line --

8          MR. LEACH: Where was he when he's reading that? We're

9 still in Exhibit 5? That's what I thought.

10          MR. JONES: We are in Exhibit 6.

11          MR. LEACH: Thank you.

12          MR. JONES: Sure.

13 DIRECT EXAMINATION

14 BY MR. JONES (Continued):

15 **Q.** That first line regarding LC-MS and not identifying

16 steroid-like compounds, could you explain that to us?

17 **A.** So when we do LC-MS for the analysis of steroids, remember

18 steroids we have -- there's a core structure and then all the

19 different steroids is just a modification of that, of that current

20 structure. So based on the fermentation pattern that we were

21 seeing for those particular -- for the particular components in

22 items four and five, that is the conclusion that we made that most

23 likely there is steroids, but we of course -- because of the SOP

24 that we use we were not -- most likely those steroids that are

25 present in the sample they are not listed in those 157 steroids

1  that are in the standard operating procedure.

2  **Q.**   So you chose not to retest those items; is that right?

3  **A.**   For these particular items, they were -- I'm trying to

4  remember.  For these particular items I detected mainly one

5  component.  That was one -- one component was the most predominant

6  in each of the -- in each of these sample items.  So, yeah, we

7  didn't do further testing with LC-MS, but the sample was

8  transferred to a different analyst to do GC-MS.  Remember that at

9  the beginning I stated that GC-MS has extensive mass spectral

10  libraries.  So we were hoping that through the GC-MS we were going

11  to be able to detect, to identify whatever was present in items

12  four and five.  Because pickup ability of -- of GC-MS user.

13  **Q.**   But eventually you stopped testing and just let that go; is

14  that right?

15  **A.**   Yes.  Correct.  Because sometimes of course, we have limited

16  resources.  We cannot, you know -- for -- for some of the samples

17  sometimes what we do is -- we made -- we made a decision and we

18  conclude that these items they could be used for research

19  purposes, and I think that both of those two items they were put

20  aside for -- for -- to be tested in the future to try to determine

21  what is actually present in those sample items.

22  **Q.**   Was Agent Kriplean at all involved in the decision not to

23  continue to retest and identify those steroids?

24  **A.**   Not -- we just provided that information and yeah, there was

25  no involvement at all.  It's just a decision made in that case by

1    my supervisor and myself.

2          THE COURT:  Mr. Jones, what is Dr. Santos's opinion that

3    you're offering in this case?

4          MR. JONES:  He was the individual who rendered the

5    test -- the LC-MS testing which detected the Schedule III steroid

6    for the product.

7          THE COURT:  So what is his opinion going to be, there

8    was this -- Schedule III steroids in this product?  Is that his

9    opinion?

10          MR. JONES:  Yes, Your Honor, in sum and substance.

11          THE COURT:  All right.  I can just see -- I can see Mr.

12    Leach, you know, wanting to cross-examine and I just want to

13    remind everybody that this is a Daubert hearing about the opinion.

14    Okay?  And there's going to be a lot of questions about what else

15    could have been done, what you should have done, why you didn't do

16    it that I don't know is appropriate.  I'm just thinking and

17    I'm -- I'm thinking ahead, but I just want to keep this limited to

18    what -- he's going to say I tested this product and I found a tiny

19    little bit of this illegal substance in it; is that right?

20    That's -- and his opinion is it was there, I did the process, I

21    found it, and this is what it is; right?

22          MR. JONES:  Well, he didn't quantify so he's going to

23    testify that the steroid was there, period, and not regarding the

24    amount.

25          THE COURT:  All right.  So whether he could have tested

1    other things is what we're talking about now; right?

2            MR. JONES:  Yes, Your Honor, and that's mostly related

3    to the line of questioning from defense counsel regarding the

4    motivations of Agent Kriplean and his involvement in the

5    scientific process.

6            THE COURT:  Right, which I -- I mean, Mr. Jones, what's

7    your position on the purpose of this hearing?  I mean you haven't

8    made any objections, but I mean I can see the next four hours of

9    my life going into -- anyway, I --

10           MR. JONES:  Your Honor, I agree.

11           THE COURT:  I'm anticipating something.  I think you

12   should limit your questioning to his methodology for the opinions

13   that he's going to offer in the case.

14           MR. JONES:  I completely agree with you, Your Honor, and

15   I hope that the cross-examination is also limited as well.

16           THE COURT:  Well, we can talk about it.

17           MR. MORRIS:  I would hope the Court would allow me to go

18   into the subject matter that he's already covered.

19           THE COURT:  We might have to have a conversation about

20   it, honestly, people.

21           MR. MORRIS:  I'll be quick.

22           THE COURT:  I mean, I mean -- maybe we should have it

23   now.  Like, what is the purpose of this particular hearing?  This

24   is not just a general getting to take the deposition of an expert

25   in a civil case.  I mean, as far as I understand it we are focused

 1  on the methodology that this witness -- and Dr. Santos, this has

 2  nothing to do with you -- the methodology that this witness used

 3  to arrive at his opinion.  And I -- I can see what you would do at

 4  trial with this witness.  There's a lot of things you can do at

 5  trial with him, but I don't want to go there.  You know, Judge

 6  Totenberg asked me to do this piece of it.  I'll do this piece of

 7  it.  The rest of it is not before me.  So I mean, I'll hear from

 8  Bruce and Art on this, but I feel like we're beyond what his -- I

 9  mean, I think D'Juan's just trying to get his stuff out at the

10  beginning before you all cross-examine him about it, but I

11  don't -- I don't want to cut off, but I got the gist of it.

12  To the extent -- I mean, I know we're going to talk about this

13  when we put the agent on the stand, right, and I know that -- and

14  this is -- or maybe.  Maybe he doesn't have anything to do with

15  this.  It sounds like possibly he doesn't.  I feel like that's a

16  better place for this conversation about what you did, what you

17  didn't do, what you told the judge, why you did it that way, were

18  you willfully blind?  I mean, I can see all of that.  I think

19  that's appropriate and we will do it at our hearing.

20          MR. MORRIS:  Judge, two points if I may.  One is, I

21  think it's fair to ask him what he did, what he didn't do and why

22  he did what he did and why he didn't do what he didn't do and who

23  told him to or told him not to or when they told him to.  That all

24  goes to what he did.  In addition to that, I believe quickly, it

25  will assist you ultimately in a Franks hearing to cover a little

1  bit of the communications with Mr. Kriplean.  Otherwise, we're

2  going to have call this witness back to get that at the Franks

3  hearing and I think in the interest of time I can do it very

4  quickly today.

5           MR. LEACH:  Judge, my point is this:  And I think that

6  what's going on here is slightly different than what you have

7  concluded.  I think what D'Juan, what the government is doing here

8  is trying to clean up some stuff from yesterday.  That's really

9  what's going on here.  And, Judge, I haven't objected on leading,

10  but I think that's part of the problem of what's going on here is

11  that rather than the witness providing answers, D'Juan is leading

12  him to get him to a particular spot, and, you know, when you're

13  dealing with experts, it's a more lax standard, we're in front of

14  you as opposed to a jury, I get all of that.  But that's where my

15  patience is coming to an end.  The witness needs to testify, not

16  D'Juan.

17           MR. JONES:  If I could have one moment, Your Honor.  But

18  to my recollection as both sides have been leading the entire

19  time.  In fact, I can recall defense counsel testifying

20  extensively about an exhibit that actually wasn't an exhibit.  But

21  that aside, me questioning Dr. Santos primarily is an effort to

22  move things along given the time constraints.  If he would prefer

23  me to ask all open-ended questions, I'm happy to do so.

24           THE COURT:  No, honestly I think you're going a great

25  job.  I think Dr. Santos is giving great answers.  I mean, I think

1  it's clear.  I just -- I'm seeing, you know, stuff coming and I

2  just wanted to raise it.  Let's all just pin all of this and

3  just -- just keep going.  I just don't know how much further you

4  need to go about things he didn't do or why he didn't do them.  I

5  guess if you want to get it out now but they're going to ask him

6  again and again.  He's going to get asked three times all those

7  questions that are very important to the defense, and important to

8  the theory.  So I just -- and I mean, to Mr. Morris's point, you

9  know, if we're going to have to talk about it at the Franks

10  hearing, we can say just ask him.  Did you have any conversations

11  with Special Agent Kriplean, did you get any e-mails from him?

12  Et cetera.  Let's just -- if you want to get it out there, let's

13  get it out there.

14         MR. MORRIS:  I can do it quickly, Judge, I promise.

15         THE COURT:  Yeah, I know, I know, I don't mean to be

16  pushing everybody.  I'm just -- I just wanted to say that, that's

17  all.  And pardon me if I stand.  I'm stretching a little bit.

18  It's been a long -- a lot of sitting.  Don't mind me if I do some

19  yoga moves.

20         MR. JONES:  Okay.  Your Honor, I'll keep moving on and

21  go directly to what his last report that we haven't had the

22  opportunity to discuss with any of the other witnesses regarding

23  LC-MS.

24  DIRECT EXAMINATION

25  BY MR. JONES (Continued):

1  Q.  Dr. Santos, if you could turn to Exhibit 13 for me.

2          MR. MORRIS:  Excuse me, D'Juan, is that in today's or

3  was that in yesterday's, 13?

4          MR. JONES:  Yeah, it was from yesterday.

5          MR. MORRIS:  Thank you.

6          MR. JONES:  You're welcome.

7          THE COURT:  And to Mr. Leach's point, if you're just

8  walking him through the answers that we pretty much probably know

9  the answer to, I don't mind a little bit of leading, but if it

10 gets too much, Mr. Leach, just jump on in there.  But I think we

11 know the places really you shouldn't be leading him and the places

12 where it's maybe okay.  So maybe just keep that in the back of

13 your mind.

14         MR. JONES:  Absolutely.

15         MR. WENIK:  Did you just say 13?  Is that the exhibit

16 we're on now, Government 13?

17         MR. LEACH:  I'm pretty sure it's in today's package as

18 opposed to yesterday's package.

19         MR. MORRIS:  Oh, today's.

20         MR. JONES:  Yeah, it's the case summary report.

21         MR. MORRIS:  Is it today's?

22         MR. JONES:  Yeah, it was sent today.

23         MR. MORRIS:  Okay, thank you.

24 DIRECT EXAMINATION

25 BY MR. JONES (Continued):

1   **Q.** Dr. Santos, looking at Exhibit 13, are you familiar with this

2   document?

3   **A.** Yes.

4   **Q.** And what is it?

5   **A.** It's the case sample summary report for sample 1022792.

6   **Q.** And what is the date on this document?

7   **A.** September 14, 2017.

8   **Q.** What type of testing was conducted here?

9   **A.** Quantitative analysis.

10  **Q.** Was that LC-MS or GC-MS?

11  **A.** Only LC-MS.

12  **Q.** Is there a reason why GC-MS wasn't also conducted here?

13  **A.** GC-MS was not conducted because the -- the results that we

14  were -- because there were basically --

15          MR. LEACH:  This is yesterday, because this one really

16  hurts them.  But all of this is the first battery and they have

17  your --

18          MR. MORRIS:  Art, you're not on mute.  You're not on

19  mute.

20          THE COURT:  Was that an objection, Mr. Leach?

21          MR. LEACH:  No, I'm sorry, Judge.  I'm talking to my

22  client who is sitting right next to me.

23          THE COURT:  That's okay.

24          MR. MORRIS:  Can I have the date of this?  I apologize.

25          THE WITNESS:  September 14, 2017.

1          MR. MORRIS:  Thank you.

2   DIRECT EXAMINATION

3   BY MR. JONES (Continued):

4   Q.  Dr. Santos, directing your attention to the second page of

5   this document looking at the signature -- the signature section,

6   whose signatures are those?

7   A.  My -- my signature, I'm the author of section 1 and section

8   735, and then underneath is the signature of my supervisor,

9   Dr. Thomas Brueggemeyer.

10  Q.  So is it -- so what chemist other that yourself performed

11  analysis for this report?

12  A.  For this particular report there's no other chemist.

13  Q.  So you were the only chemist to perform the analysis in this

14  report; is that right?

15  A.  Yes, correct.

16  Q.  Okay.  Now, looking at the first page the item numbers, had

17  these items -- I'm sorry, actually, when were these items

18  received?

19  A.  They say they were received August 23, 2017.

20  Q.  So were these items received at a different time than the

21  items tested in the previous reports?

22  A.  Yes, correct.  Almost a year later, I think.

23  Q.  And do these have different lot numbers as well?

24  A.  I cannot recall that.  I have to recheck everything.

25  Q.  Okay.

1  **A.**  But the products they were similar than the other two sets of

2  samples.

3  **Q.**  Okay.  Do you know why these products, although received at a

4  different time, why they were tested again?  And I can -- if that

5  question is not clear, I can rephrase that for you.

6  **A.**  Yes, please.

7  **Q.**  So previously these items or these products, although it was a

8  different sample, had already been tested; is that right?

9  **A.**  Yes, correct.

10 **Q.**  And now they're being tested again for a different steroid

11 sample; is that right?

12 **A.**  A different set of samples, yes.

13 **Q.**  And so why are they being retested again?

14        MR. LEACH:  D'Juan, it is clear that he does not

15 understand your question.

16        MR. JONES:  I'll let the witness let me know if he

17 understands it or not.  Thank you, though.

18        MR. LEACH:  Okay.  Your peril.

19 **A.**  So the samples were received and my role is to analyze any

20 samples that we receive, you know, that we receive at FCC.  So I'm

21 the lead analyst.  I reanalyze it.  You see only LC-MS.  So in

22 this particular set of samples, we use only LC-MS because

23 different results -- there were similar results that we saw in the

24 other -- in the prior set of samples that we received -- I -- I

25 get earlier.  So we didn't -- we didn't -- based on the results,

1  we didn't see any gain of using a different technique in that case

2  like gas chromatography.  Because the result was going to be the

3  same.

4          MR. LEACH:  Objection, your Honor.  Completely

5  nonresponsive to Mr. Jones' question.

6          THE COURT:  That's sustained.  I think he asked you why

7  were they tested again.  Wasn't that the question?

8          MR. LEACH:  That was the question, and that's why I

9  raised with Mr. Jones that I didn't think the witness understood.

10          THE COURT:  Mr. Jones, ask your question again, please.

11          MR. JONES:  Sure.

12  DIRECT EXAMINATION

13  BY MR. JONES (Continued):

14  **Q.**  So Dr. Santos, these products are essentially testing new

15  samples of products that were already tested; isn't that right?

16  **A.**  Yes.

17  **Q.**  Do you know why these new samples of the same products were

18  tested again?

19  **A.**  So in certain cases, the need for additional samples is

20  dictated by the sample itself.  In the -- in the first set of

21  samples, we identified Schedule III steroids.  So if the -- if the

22  sample contains some components there of relevance and in this

23  case if they are DA controlled or the components may be of high

24  danger to a consumer, I think it's an obligation in that case is

25  for the agent or for myself as the analyst to reanalyze that type

1   of product.

2   **Q.**   Okay.   Thank you.

3            MR. JONES:   I have no further questions.

4            MR. LEACH:   Okay.   If I may, Judge, do you want to

5   proceed?

6            THE COURT:   Do you want to take a little break or are we

7   good to go?

8            MR. WENIK:   I could use five minutes.

9            THE COURT:   Let's take a quick break.

10            (Whereupon a break was taken.)

11   CROSS-EXAMINATION

12   BY MR. LEACH:

13   **Q.**   Dr. Santos, my name is Art Leach.   I represent the defendant

14   Hi-Tech in this case.   The first thing I want to ask you is what

15   materials did you review in preparation for your testimony here

16   today?

17   **A.**   The exhibits.

18   **Q.**   Just exhibits?   Did you review your work papers?

19   **A.**   Yes, the -- the different reports, yes.

20   **Q.**   Yeah, I'm not talking about the reports.   I'm talking about

21   your work papers behind the reports.

22   **A.**   I'm not sure which type of papers I used.

23            THE COURT:   Sir, he's asking you what you looked at to

24   prepare.   Tell him every single thing you looked at to prepare.

25   **A.**   The SOPs, tried to figure out how to use simple language to

1    explain the protocol, the separation and detection of the

2    different components of the sample.

3    CROSS-EXAMINATION

4    BY MR. LEACH (Continued):

5    Q.   What else?

6    A.   Some of the communications and all the paperwork that is

7    related to the sample case.

8    Q.   So one of the exhibits that were put -- was put on by

9    Mr. Jones was a document reflecting some testing that you did I

10   think on November 30th.  That came from your work papers; is that

11   correct?

12   A.   Yes.

13   Q.   Okay.  So did you look at other documents like that document

14   in preparation for your testimony?

15   A.   Yes.

16   Q.   Okay.  So I would imagine that you have either an electronic

17   file or a paper file where all those items are located; is that

18   correct?

19   A.   Yes, correct.

20   Q.   And you went through that file?

21   A.   Yes.

22   Q.   Okay.  Now, based on other testimony and I believe your

23   testimony today, you supervised Ms. Kelley and Ms. Jackson who

24   testified yesterday; is that correct?

25   A.   Sorry, there is a supervisor and we are under his chain of

1   command.  We are three different analysts at the same level.  And

2   we have one supervisor.

3   **Q.**  I got you.

4   **A.**  They are my co-workers.

5   **Q.**  Earlier on in your testimony you talked about composites.  Do

6   you remember that testimony?

7   **A.**  Yes.

8   **Q.**  And you indicated in the SOP that you can create a composite

9   if appropriate.  Do you remember that testimony?

10  **A.**  Yes.

11  **Q.**  Why was a composite appropriate in this case?

12  **A.**  That is the protocol that we have in place, you know, we

13  prepare a composite of five to ten tablets.

14  **Q.**  Okay.  But when you read the protocol you said if appropriate.

15  And my question to you is why was it appropriate in this case?

16  **A.**  In terms of -- of timing, of course, we -- the other way we

17  could have done it is do individual analysis of the tablets and

18  that is a fantasy.

19  **Q.**  Okay.  Isn't it true that you are looking for a very small

20  amount of a compound that your likelihood of finding it increases

21  when you use five tablets to make a composite?

22  **A.**  Yes and no, because the opposite could happen.  What if one

23  tablet only contains one component and you made a composite and

24  then it's just -- basically, what's going to happen, you will

25  dilute that component that isn't present in just one of the

1  tablets.

2  **Q.**  Explain to me how you completed the composite.  And by that

3  I'm asking did you take all five pills, put them in a pestle,

4  break them up or did you take a portion of the pills?  Explain

5  that to me.

6  **A.**  So what happens is you take the five tablets, you use a mortar

7  and pestle to grind them and that is your -- your composite.  And

8  then from that composite, the protocol that we have in place is

9  to -- for the qualitative analysis we take two portions from that

10  composite.  So that way the protocol state that both -- there is

11  going to be an agreement, there has to be an agreement between --

12  for the results of those two different parts.

13  **Q.**  Okay.  So going back to my last question, by taking those five

14  pills and crushing them all together, aren't you increasing the

15  possibility of finding something that is very small in the product

16  that you are testing by having a cross-section of five pills?

17  **A.**  If -- if the component is the same amount as the initial

18  tablets, the concentration is going to be the same.  It's not

19  going to change.  If you have five milligrams in each of the

20  tablets, at the end you're going to have five milligrams in that

21  case, and in terms of concentration is going to be five milligrams

22  per tablet, no matter what, no matter how you prepared it.

23  **Q.**  How about if you've got one tenth of one milligram, you could

24  end up by crushing the five tablets, you could get that one

25  portion in one pill; isn't that correct?

**A.**  So what happens is, that composite we -- the whole purpose of

the composite is to make a homogeneous -- a homogeneous sample, to

homogenize that sample.  So when we homogenize there is a

likelihood in that case that by grabbing two portions, they're

going to be coming from this homogeneous composite.  We are not

just taking one particle for that, you know --

**Q.**  You testified about standards on direct.

**A.**  Yes.

**Q.**  Where did you get your standards?

**A.**  We get a standard for several different pharmaceut --

-- chemical companies.

**Q.**  Do you remember where you got them in this case?

**A.**  Sometime we get it from Cerulean, from Sigma.  I don't

recollect exactly from where they're coming from.

**Q.**  What was the purity of your reference standards?

**A.**  I cannot recall that.

**Q.**  Were they 100 percent?

**A.**  I cannot recall that.

**Q.**  They're never 100 percent; isn't that correct?

**A.**  Correct.

**Q.**  The best you get is 98 percent; isn't that correct?

**A.**  Yes.

**Q.**  Now, in the samples that you ran, you actually did find DHEA

and epiandrosterone; isn't that correct?

**A.**  If I go back to -- I don't know what -- if you're referring to

1  a particular exhibit.

2  **Q.**  You just can't remember that, those two --

3  **A.**  Yeah, so --

4  **Q.**  The answer is yes?

5  **A.**  Yes.

6  **Q.**  And when we talk about the major components, those were the

7  major components in these pills; isn't that correct?

8  **A.**  Yes.

9  **Q.**  Okay.  Now, there was a piece of your testimony with Mr. Jones

10  that I did not understand.  You stated that they, being the

11  steroids, are specifically determined in the SOP.  Did I

12  understand that right?

13  **A.**  Would you rephrase the question?

14  **Q.**  Well, it's -- that is the way that I wrote the note and I

15  thought that perhaps what you were going to was by saying SOP, you

16  were referring to your internal library of steroids.  In other

17  words, the way to determine was by reference to your library.  Am

18  I misunderstanding that?

19  **A.**  So the SOP states or lists the mass spectral data of 157

20  steroids.  So the type of analysis that we do is target analysis.

21  The protocol using the LC-MS -- use -- apparently is coming from

22  that -- from the SOP in that case there's going to be 157

23  steroids.  So because it's a targeted -- whatever -- if any sample

24  that contains any of those 157, they are going to be easily

25  detected or identified through the LC-MS protocol, yes.

1   **Q.**   Okay.  So what you're saying is, you have a listing in your

2   computers for references of every Schedule III drug in the law?

3   **A.**   The Schedule III they are included in that list of 157, yes,

4   correct.

5   **Q.**   And now, I want to ask you -- a different category.

6        Did you run triple mass spec on any of these products?

7   **A.**   No, not at all.

8   **Q.**   Okay.

9   **A.**   Three --

10  **Q.**   Go ahead.

11  **A.**   Because triple mass -- triple mass spec -- triple mass

12  spectrometry is utilized for quantitation purposes.  I

13  don't -- the mass spectrometry that we utilize here at the FCC, a

14  high percentage of them are for qualitative analysis.

15  **Q.**   Going back just for a minute to the composite, did you make

16  the decision to do the composite or was that decision made by Mr.

17  Brueggemeyer and you?

18  **A.**   Typically it's done by, you know -- it depends on the -- in

19  that case if you're referring to tablets, it will depend on the

20  number of tablets that we receive.  So we could say if it's

21  limited -- for example, if we have just two tablets we will in

22  that case utilize just one of the tablets for the analysis.  If I

23  have a 100, I will select either five or ten.  In some cases when

24  I have a large number of samples, I will go and talk with my

25  supervisor, yes.

**Q.** Okay. Well, I don't want to go to what's done every day. I want to go to what happened here. So in this case did you talk to Tom Brueggemeyer about doing a composite?

**A.** Yes, so typically an average is five tablets, yes.

**Q.** And did Brueggemeyer make the decision that it be a composite or did you make the decision or was it a joint decision?

**A.** I usually, I have a -- I have the expertise. I usually take the lead and say or I provide an update to him saying I'm going to do five tablets composite, would that be okay?

**Q.** So it's like a checkoff?

**A.** Yes.

**Q.** He's your supervisor, you tell him what the plan is and if he's got a problem he tells you?

**A.** Yes.

**Q.** Okay. Now, you were talking about esters in your direct examination. And the question that I have for you, is the fact that what you were looking at was DHEA acetate, did that create a problem for you in terms of identifying the DHEA?

**A.** I don't recall that.

**Q.** Okay. Do you recall having any problem identifying DHEA?

**A.** If it's present, yes, I wouldn't have any problem. I don't recall identifying that.

**Q.** And 4-androsten is DHEA; isn't that correct?

**A.** I don't know what is the -- in that case which other names are used for referring to 1-androsterone. I don't have that

1   information in front of me.

2   **Q.**  Let me ask you this.  You testified at some length about

3   what's on the label.  With regard to the predominant, that is the

4   major steroid compounds in the pills, did the bottle tell you that

5   it was DHEA, whether it's 1-DHEA, 4-DHEA, 19-Nor-DHEA, did the

6   bottle tell you that it was DHEA?

7   **A.**  It is declared on the label and sometime when I concentrate on

8   the labels, it will be a misspelling so sometimes I cannot have

9   any idea what is, you know -- which steroids they're referring to.

10  **Q.**  All right.  Between the label and your testing could you

11  figure it out?

12  **A.**  Yes.

13  **Q.**  I mean, at the end of the day whether it was misspelled or

14  they used another word, you knew it was DHEA or epiandrosterone;

15  correct?

16  **A.**  So I will have to go and compare the names that are listed in

17  the table to the label of the product.  Because I don't have that,

18  I cannot access that information right away.

19  **Q.**  Okay.

20  **A.**  There is no way for me to tell you which is DHEA if it's

21  1-androsterone.

22  **Q.**  So when you were testifying for Mr. Jones, and you said that

23  you were looking at the labels and trying to identify what was on

24  the label to what you actually discovered on the product, you

25  hadn't looked at the labels prior to testifying for Mr. Jones?

```
1   A.   I usually, I typically I generate a spread list or a

2   spreadsheet of all of the stuff that may be present in the sample.

3   Q.   Did you do that in this case?

4   A.   Yes.

5   Q.   And those are the summary charts that we see in your reports;

6   is that correct?

7   A.   No, they're not in those reports.

8   Q.   They're in your work papers?

9   A.   Yes.

10  Q.   How many tests did you perform in this case?

11  A.   For the -- for the first two sets of samples, I performed two

12  different -- I generated two different result sheets.

13  Q.   And you did tests in the early phase of this case and then you

14  did tests in 2018; is that not correct?

15  A.   2017.

16  Q.   Was your second round of tests?

17  A.   That was another analysis for a third set of samples.

18  Q.   Okay.  We'll go through those.  Now, Mr. Jones took you

19  through some tests that you performed early on.  And my question

20  to you is, isn't it true that you ran some tests on or about

21  November 16, 2016, on LC-MS that were negative?

22  A.   What do you mean negative?  I identified certain steroids in

23  that preliminary analysis that I did.

24  Q.   Okay.  Now, are you aware that Tom Brueggemeyer filed a

25  declaration in this case?
```

1  **A.**   No.

2  **Q.**   Okay.  I'm going to show you on the screen what is marked as

3  our Exhibit 20.  It's Document 330-1 filed in this case, paragraph

4  5, second page.  Can you blow that up a little bit, yes, sir.  Mr.

5  Brueggemeyer says, on or about November 16, 2016, FCC Chemist

6  Enrique Santos analyzed composite samples from each of Hi-Tech's

7  eight bottles in FACTS #60 and 276 for the presence of active

8  pharmaceutical ingredients including liquid chromatography-mass

9  spectrometry, but did not identify the presence of anabolic

10  steroids in all of the Hi-Tech products at that time.

11      Do you agree or disagree with the sworn declaration of Mr.

12  Brueggemeyer?

13  **A.**   I would disagree.

14  **Q.**   Okay.  If you look back at the testing that you did, that

15  testing was on November 30 when you identified steroids.  And you

16  can look at the exhibits if you want to satisfy yourself.  Isn't

17  that correct?

18  **A.**   Would you repeat the question, please?

19  **Q.**   The testing where you found the steroids was after this

20  testing that Mr. Brueggemeyer is talking about, it was on the

21  30th.  And if you need to look at your documents, you can go into

22  your documents and satisfy yourself.  Do you see what I'm saying?

23          MR. JONES:  I'm going to object to this because counsel

24  is mischaracterizing his earlier testimony as well as the exhibit.

25          MR. LEACH:  Well, the witness can straighten that out,

1  Judge.

2          THE COURT:  In what way is he mischaracterizing the

3  exhibit?

4          MR. JONES:  As Dr. Santos already stated that -- the

5  test was performed on November 16, according to Exhibit 12.  And

6  he testified to that effect as well and I think defense counsel is

7  confusing that.

8          MR. LEACH:  He said it was positive and it was negative.

9  And if you look at your work papers, you're going to see that.

10          MR. JONES:  Negative for what?

11          MR. LEACH:  That is what Brueggemeyer is saying here, it

12  was negative.  He did not identify any anabolic steroids.  It was

13  negative.

14          MR. JONES:  But he said steroids were detected

15  nonetheless.

16          MR. LEACH:  Let me ask the witness another question if I

17  can.

18  **A.**  Excuse me.  There may be a mistake.  I studied the analysis

19  November 16, 2016.  The analysis started that date.  So by that

20  time I had -- we hadn't generated any results at all.  I

21  established the analysis that date.

22  CROSS-EXAMINATION

23  BY MR. LEACH (Continued):

24  **Q.**  Right.  And it was negative as of that date; is that not

25  correct?

1              MR. JONES:  Your Honor, I'm going to object again.  If

2   defense counsel has a question about a specific test, he's more

3   than welcome to show him his work papers as opposed to this

4   declaration.

5              MR. LEACH:  No, I can show him a grapefruit if it

6   refreshes his recollection.  This is a sworn declaration from his

7   own supervisor identifying the steps that occurred in this case,

8   and he's saying that it was negative.

9   CROSS-EXAMINATION

10  BY MR. LEACH (Continued):

11  **Q.**  Now, my question is, is that or is that not true, Mr. Santos?

12  **A.**  My statement is I disagree.  That was my answer before.

13             THE COURT:  Okay.  Mr. Santos, can you -- you're saying

14  you disagree with this paragraph 5 that's up on the screen, you

15  disagree with that?

16             THE WITNESS:  Yeah.  My Honor, I studied the analysis

17  November 16 of 2016.  So there is no way that that statement will

18  have come out from my result because at that time I hadn't even

19  generated a result because I just started the analysis.

20             THE COURT:  Okay.  So when was the first -- do a

21  timeline for me if you would, Dr. Santos.  You started on November

22  16, and when did you get results with respect to those two FACTS

23  numbers that are in the paragraph?

24             THE WITNESS:  Just give me a second.

25             THE COURT:  Okay.

1            THE WITNESS:  So as is stated in the summary report, we

2  received the sample on October 19, 2016.  So I did the sample

3  preparation on November 16, 2016.  I of course through the

4  analysis during the process of this analysis I could go and

5  discuss some of the results with my supervisor, but at that time I

6  couldn't even discuss the result because I didn't have result.  I

7  just started the analysis.  The results -- the report was

8  generated on November 30.

9            THE COURT:  I'm sorry.  November 20, is that what you

10  said?  November 20?

11            THE WITNESS:  30th.

12            THE COURT:  The 30th.

13            THE WITNESS:  Yes.

14            THE COURT:  That's when you did the report or that's

15  when you got the results?

16            THE WITNESS:  That is when I generated the result but

17  during that process when I presented the data I could go and

18  discuss with Dr. Thomas Brueggemeyer, my supervisor.

19            MR. LEACH:  Let me take it one by one if I may, Judge.

20            THE COURT:  Please.

21  CROSS-EXAMINATION

22  BY MR. LEACH (Continued):

23  Q.  So on Androdiol, which is 984260 is the FACTS number, item

24  number one.  On 11 -- November 17, 2016, you ran an LC-MS and

25  found no controlled substances; is that true?

1  **A.**   Yes.   That's true.

2  **Q.**   With regard to 1-AD which is 984260 item two, on November 17,

3  2016, you ran an LC-MS and came up with no controlled substances;

4  isn't that true?

5  **A.**   At that time, yes, correct.

6  **Q.**   With regard to 1-Testosterone which is FACTS number 984260,

7  item three, on November the 17th, 2016, you ran an LC-MS and found

8  no controlled substances; isn't that true?

9  **A.**   Yes.

10  **Q.**   With regard to Decabolin which is 98426 -- 276, item number

11  one, on November 17, 2016, you ran an LC-MS and found no

12  controlled substances; isn't that true?

13  **A.**   At that time, yes, correct.

14  **Q.**   With regard to Superdrol which is FACTS number 984276, item

15  two on November 16 and 17, you ran an LC-MS and found no

16  controlled substances; isn't that true?

17  **A.**   True.

18  **Q.**   Now, my question to you --

19          THE COURT:   Mr. Leach, can I just suggest that -- that

20  was beautifully done.   And whether or not -- you know, I think we

21  can move on.   I'll let you do a little bit more.   That was very

22  clean and I think you got your point across.

23          MR. LEACH:   One more point if I could.

24  CROSS-EXAMINATION

25  BY MR. LEACH (Continued):

1  **Q.**  There was no report generated of those negative results; isn't

2  that correct?

3  **A.**  Yes.

4  **Q.**  Why?

5  **A.**  As I stated at the beginning, I had to reanalyze the sample

6  and modify my section protocol to increase the levels of -- in

7  that case to have a better response with the mass spectrometer,

8  and that is when I started detecting the Schedule III steroids.

9  **Q.**  Now, when we got back to Mr. Brueggemeyer's statement in his

10  declaration, paragraph number 5 that is still on the screen, that

11  paragraph is correct; isn't that so?

12  **A.**  Based on what we went through, yes, correct.

13  **Q.**  Okay.  Thank you.

14          THE COURT:  And Dr. Santos, I have a question.  Did

15  anyone -- you probably already testified to this, but did -- did

16  anyone direct you to redo it?  I know you said there's reasons why

17  you'd redo it.  Did anyone tell you to redo it or did you do it on

18  your own based on your own experiences or did someone say let's do

19  it again?

20          THE WITNESS:  In some cases I do it based on my

21  experience, but in this case, yeah, I discussed it with my

22  supervisor.

23          THE COURT:  So your supervisor -- when you told your

24  supervisor it's all negative, he said do it again?

25          THE WITNESS:  No, no.  What happened is, I -- we

1  initial -- the initial analysis, we were -- we were able to

2  determine the identity of certain steroids, but as I stated in my

3  result report there was still some -- so then that is the decision

4  that made that I would --

5          THE COURT:  Repeat the last couple of sentences that you

6  said.  Our court reporter missed it.

7          THE WITNESS:  So when the first section -- the first

8  report we had identified certain steroids, but I have two notes

9  and one of the notes is that I couldn't determine the identity of

10  those components.  And that is when I approached my supervisor and

11  then even before that through -- utilize a different technique for

12  the -- try to determine the identity of those components that I

13  couldn't identify.

14          THE COURT:  And did you ever speak with Special Agent

15  Kriplean yourself?

16          THE WITNESS:  No, not at all.

17          THE COURT:  Did you ever e-mail with him?

18          THE WITNESS:  No.  Typically I don't do it.  I prefer

19  not to.

20          THE COURT:  Did you discuss -- when you talked to your

21  supervisor, did y'all talk at all about the criminal case or what

22  the agent wanted or what law enforcement wanted you to do?

23          THE WITNESS:  At that time, no.

24          THE COURT:  But later you did?

25          THE WITNESS:  Later on after the communication with

1  my -- of the -- my supervisor with the investigator.

2          THE COURT:  I'll leave it to you, Mr. Leach.

3          MR. LEACH:  Okay.

4  CROSS-EXAMINATION

5  BY MR. LEACH (Continued):

6  Q.  We're going to call up our Exhibit 15 just to go to a point,

7  Mr. Santos, that you just discussed.  This is a telephone log of a

8  call that you were actually on with Special Agent Kriplean; isn't

9  that true?

10  A.  Yes.

11  Q.  Okay.  You just testified to the judge that you did not talk

12  to the agent.

13  A.  Typically I don't do it, that's correct.

14  Q.  We're not asking typically.  Did you talk to the agent in this

15  case?

16  A.  In this particular case we called with my co-worker Carolyn

17  Kelley.  The sole purpose of this was to -- as I stated at the

18  beginning, was to determine if -- if the quantitation was needed

19  but with the purpose of setting up a timeline for closing the

20  case.

21  Q.  Tell me what happened in this conversation.  What was said?

22  A.  We basically call him and ask him to clarify if quantification

23  was needed for the Schedule III steroids that we -- in that case

24  we were detecting and we were trying to identify.

25  Q.  Wasn't it because you were only finding trace amounts of those

1  Schedule IIIs?

2  **A.**  Yes.  No.  Because that -- that -- like I say -- my sole

3  purpose was to close the case.  You notice at -- on the bottom it

4  says this analyst and Analyst Caroline Kelley told Special Agent

5  Kriplean this will be wrapped up by next week.  So we were more

6  interested in closing the case.

7  **Q.**  In this conversation you talked to Agent Kriplean specifically

8  about the fact that there were trace amounts of Schedule III

9  steroids; isn't that correct?

10 **A.**  Yeah, that were present at low levels, yes.  Trace levels.

11 **Q.**  And if they were quantified or quantitated, it would reflect

12 very low amounts, isn't that correct, you told him that?

13 **A.**  We didn't discuss anything else.  That was it.  And he said,

14 yeah, let's -- there's no need for quantification at that time.

15       THE COURT:  Mr. Leach, just to put this in context for

16 me, this is nine months before the search warrant?

17       MR. LEACH:  Yes, and there's later quantitation -- I'm

18 going to go through every bit of that on a timeline for you,

19 Judge, so you'll be able to see that.

20       THE COURT:  And when was the search warrant, October?

21       MR. LEACH:  September.

22       A VOICE:  No, October.  September was the other case.

23       MR. LEACH:  Yeah, I'm sorry.

24       THE COURT:  October 3, maybe.

25       MR. LEACH:  October 2017, Judge.

1          THE COURT:  Okay.  Thank you.

2   CROSS-EXAMINATION

3   BY MR. LEACH (Continued):

4   **Q.**  Now, we're going to move away from Exhibit 15 and I'm going to

5   put Exhibit 12 up.

6          MR. MORRIS:  Is this Defendant's 12?

7          MR. LEACH:  Yes, sir.

8   CROSS-EXAMINATION

9   BY MR. LEACH (Continued):

10  **Q.**  All right.  Mr. Santos, do you recognize this as being the

11  e-mail that you also went through with Mr. Jones?

12  **A.**  Yes.

13  **Q.**  Okay.  Now, the time of this is important relative to what we

14  just discussed.  So let me remind you that your initial testing

15  took place on November 16 and 17.  Do you recall that?

16  **A.**  Yes.

17  **Q.**  That is of 2016.  So on Monday, November 28th you received

18  this e-mail from your supervisor, Tom Brueggemeyer; is that

19  correct?

20  **A.**  Yes.

21  **Q.**  And am I correct that you were not on this call?

22  **A.**  That's correct, no, I'm not on the call.

23  **Q.**  Okay.  So he told you that he just spoke with Special Agent

24  Brian Kriplean and explained that you were finding steroids in the

25  sample, parenthesis, non-scheduled.  Do you see that?

**A.**   Yes.

**Q.**   And that is consistent with the testing that we just talked about on November 16 and 17 and the results from that testing that there were no Schedule III steroids that you found at that time; correct?

**A.**   Yes.

**Q.**   Okay.  As well as some unknown peaks.  I said that it was possible that these unknowns were steroids, parenthesis, scheduled and not; correct?

**A.**   Yes.

**Q.**   So as of November 28, 2016, you did not know whether there were any Schedule IIIs in any of your samples; isn't that correct?

**A.**   Yes, correct.

**Q.**   Okay.  And he says or possibly APIs.  What does he mean by APIs?

**A.**   Other chemical substances, but in this particular case it means other pharmaceutical ingredients.

**Q.**   Okay.  He asked about the grand jury and there was some pressure with regard to the grand jury.  What was going on there?

**A.**   I assume they have set up a date for a grand jury, and they needed the results.  The case was expedited, so the results they needed right away.

**Q.**   So you were working against a deadline, is that right, a deadline of December 13?

**A.**   Initially, yes.

1  **Q.**  But that deadline was extended; correct?

2  **A.**  Yes.

3  **Q.**  And he says so we agreed to look at the samples with another

4  technique, GC-MS; correct?

5  **A.**  Yes.

6  **Q.**  And that is not your department, that's Ms. Kelley; correct?

7  **A.**  Yes, correct.

8  **Q.**  To see if we could identify any other components.  I said that

9  after our first time through the samples with GC-MS, we would let

10  him know where we stood.  So none of that had happened by the time

11  this e-mail went out; correct?

12  **A.**  That's correct.

13  **Q.**  He knows that if there were tentative IDs, we may need to

14  order standards before the true identification.  Now, standards of

15  Schedule IIIs or standards of legal compounds within the pills?

16  **A.**  That could be any standard, any schedule or not schedule.  We

17  don't know.  We didn't have the identity at that time.

18  **Q.**  Okay.  And then he says if GC-MS does not find anything new or

19  of interest, then we would probably be done; isn't that correct?

20  **A.**  Yes.

21  **Q.**  Okay.  So clearly by November the 28th, 2016, there's been no

22  identification of any steroids at that point; isn't that right?

23  **A.**  Identification -- remember, there's identification

24  of -- they're referring to non-scheduled steroids.

25  **Q.**  Right.  All right.  So you had found non-scheduled items

1  within it, you knew that, but you did not know whether there were

2  any scheduled items as of November --

3  **A.**  Yeah, yeah, correct.  So that's true.

4  **Q.**  Okay.  Now what we're going to do we're going to look at

5  reports two, three, four -- Exhibits 2, 3 and 4 which are your

6  reports.  We'll start with 2.  I'm going to put them on the screen

7  so you can see them.

8     Okay, in this report you are explaining to Agent Kriplean what

9  you had found to the point of January 13, 2017; isn't that

10  correct?  January 30.  Did I say a different date?  I'm sorry.

11  January 30, 2017.

12  **A.**  Yes.

13  **Q.**  Okay.  Go to the second page.  Now, in this report the first

14  item is 4-Androstenediol and the third item is epiandrosterone; is

15  that correct?

16  **A.**  Which exhibit is this?

17  **Q.**  This is our Exhibit No. 2.  You have got your --

18          MR. MORRIS:  Government 5.  It's Government 5 as well.

19          MR. LEACH:  I have a cross reference here that I can

20  tell him.

21          MR. MORRIS:  I believe it is Government 5.

22          MR. LEACH:  It is.

23  **A.**  So yeah, the item one, item two, and item three I have

24  information on the exhibit.

25  CROSS-EXAMINATION

BY MR. LEACH (Continued):

**Q.** Item one is DHEA; correct?

**A.** I cannot tell you because I don't have that information.  I don't know what is the abbreviation for that particular steroid that is in item one.

**Q.** Well, in all of these tests do you find anything other than DHEA as the predominant component?

**A.** What is DHEA, are you referring -- what is that?

**Q.** Whether it's 1-DHEA, 4-DHEA or 19-nor-DHEA, they're all DHEAs; isn't that correct?

**A.** I don't have that information in front of me, sir.  I cannot answer that question.

**Q.** So your testimony is that you don't recognize that? 4-Androstene-3ß-ol-17-one is DHEA, is that your testimony?

**A.** Yeah, I don't recall.  I don't know if that is a synonym name for that particular steroid.

**Q.** Didn't you earlier in your testimony identify that as DHEA for me?  I think you did.

**A.** Like I say, you know, I will have to go back to papers and see if that name the same name that refers to the name that you are using.

**Q.** Okay.  So let's look at the epiandrosterone where I have the cursor right now, hopefully you can see it.  How about that one, is that a legitimate legal compound?

**A.** Yes, that is the name of the steroid, yes.

374

1  **Q.**  And the first one, is that a legal compound or perhaps we can

2  say is that not a scheduled compound?

3  **A.**  Not a scheduled, yeah, according to the notation that I have

4  here.

5  **Q.**  Okay.  Let's go to Exhibit 3 and go to the chart there.  Stop

6  right there for one second.  As you can see this is 276, do you

7  see the FACTS number?

8  **A.**  Yes.

9  **Q.**  The first one was 60.  So let's go to the chart on this one.

10  With regard to these compounds, you once again have the same

11  androsten-3ß-ol-17-one and you have epiandrosterone in your chart;

12  correct?

13  **A.**  Yes.

14  **Q.**  Both of them legal, that is non-scheduled compounds; correct?

15  **A.**  That's correct.

16  **Q.**  All right.  Let's go to Exhibit No. 4.  As you can see

17  starting here this is 792.  Do you see the FACTS number 792?

18  **A.**  Yes.

19  **Q.**  Let's go to the chart.  Once again, you have listed the

20  4-androstene-3ß-ol-17-one and the epiandrosterone and both of

21  those are legal compounds; is that not correct?

22  **A.**  Yes.

23  **Q.**  Okay.  Now, the last one that we were looking at was the new

24  products that you tested; isn't that correct?

25  **A.**  That is the last set of samples that I analyzed, yes, that's

1    correct.

2    **Q.**   Okay.  As to all those reports that we just saw which is

3    Defendant's Exhibits 2, 3 and 4, there was no quantitation, you

4    did not quantify the amount of Schedule III steroids that were

5    located in those products; isn't that correct?

6    **A.**   Yes, that's correct.

7    **Q.**   Now, let's take a look at Exhibit 13, Defendant's Exhibit 13.

8    Do you recognize this as the same e-mail that Mr. Jones walked you

9    through earlier?

10   **A.**   Yes.

11   **Q.**   The date of this e-mail is December the 8th, 2016.  Do you see

12   that?

13   **A.**   Yes.

14   **Q.**   So now in terms of the timeline that the judge was talking

15   about, you had performed additional testing and Ms. Kelley has

16   performed additional testing on these products; isn't that

17   correct?

18   **A.**   Yes.

19   **Q.**   Okay.  Now, were you a participant in this conversation

20   between Tom Brueggemeyer and Agent Kriplean?

21   **A.**   No.

22   **Q.**   You just received this e-mail and Mr. Brueggemeyer asked you

23   to upload it to the file?

24   **A.**   Yes, correct.

25   **Q.**   What does that mean to upload it to the file?

1  **A.**  We have what we call our business computer, an internal

2  computer.  So any communication between the agent and FCC

3  personnel has to be - a document has to be created and placed in

4  the folder related to a particular case.

5  **Q.**  Okay.  So --

6  **A.**  E-mail as well.  Placed that into OpenLab, our internal

7  network.

8  **Q.**  Okay.  There is discussion in the first paragraph of this that

9  you -- once again you're talking about the grand jury situation;

10  is that correct?

11  **A.**  Yes.

12  **Q.**  And he is saying that in the second sentence there, no, third

13  sentence, he has spoken to the prosecutor and they are free to

14  submit the case to the grand jury when our work has been

15  completed; is that correct?

16  **A.**  Yes.

17  **Q.**  So it's clear that there is going to be additional testing

18  performed at this point, is that not true?

19  **A.**  Yes.

20  **Q.**  He then says they want us to take whatever time is needed to

21  obtain the necessary component identifications.  What does that

22  mean?

23  **A.**  So we will have -- in that case, we -- I will have to

24  reanalyze the sample, and if I determine the identity -- the

25  identity of the component of the sample, that means I will -- if

1  we don't have the standard -- the standards in-house, I will have
2  to place an order to have those standards approved.
3  **Q.**  He then says we agreed to, number one, identify with standards
4  the three minor Schedule III steroids we are finding in the
5  samples.  Why would you have to identify what standards if you've
6  already identified the Schedule IIIs?
7  **A.**  No, at that point -- at that point we hadn't fully identified.
8  So we -- the identification is done by analyzing the standard at
9  the same time then the -- then the samples.  So both have to be
10  analyzed at the same -- basically the same day.
11  **Q.**  Isn't it true that the reason what is stated, what you
12  understood three minor Schedule III steroids was intended to mean
13  to you the trace amount steroids; is that correct?
14  **A.**  Yeah, in other words, yeah, that they're low levels, yes.
15  **Q.**  And the major steroidal components were the DHEA and the
16  epiandrosterone; isn't that correct?
17  **A.**  Yeah, the non- -- the non-schedule ones, of course, are the
18  most predominant, yes.
19  **Q.**  Okay.  He says I told him that in addition to confirming
20  these, we would be sure that their presence is not the result of
21  any type of chemical interconversion.  What does that mean?
22  **A.**  Typically with the LC-MS we don't have that issue.  But with
23  the GC-MS, we could -- a chemical process will take place and then
24  it can convert to something else so that is what it means.
25  **Q.**  How do you go about, how do you make sure that there

1  is -- that it is not the result of chemical interconversion?  How

2  do you make that sure?

3  **A.**  It is only for particular compounds.  So you make sure that

4  you take all the measures in that particular case when you are

5  analyzing particular steroids.

6  **Q.**  Okay.  I'm not sure I understand that answer.  How does -- I

7  mean, is there some sort of way that you can confirm that there is

8  no interconversion?

9  **A.**  The -- remember we analyze the sample with both techniques.

10  We don't do -- there's no -- the conversion when we use LC-MS.  So

11  if in that case somebody else is doing by GC-MS, it's confirming

12  what I'm identifying or detecting by LC-MS.  That is one way to

13  compare it.

14  **Q.**  Mr. Brueggemeyer tells you I told him that we can't say

15  whether these low level components were added intentionally.  What

16  did you understand that to mean?

17  **A.**  So, yeah, he's just -- my understanding that he's trying to

18  explain to the agent that -- that there's no way to determine

19  if -- in any way to determine that, yeah, the components -- minor

20  Schedule III steroids there were, you know, notation --

21  **Q.**  That they could be in the product inadvertently, isn't that is

22  what he's trying to say?  Mr. Santos?

23        MR. MORRIS:  Did we lose him?

24        MR. LEACH:  No, he's here.

25  **A.**  No, I try to -- you're asking me -- could you repeat the

1  question?

2          MR. LEACH:  Can the court reporter read that question

3  back, please.

4          (The record was read.)

5  **A.**  Yes.

6  CROSS-EXAMINATION

7  BY MR. LEACH (Continued):

8  **Q.**  Yes?  The answer is yes to that question; isn't that true?

9  **A.**  Yeah, that's no way to determine.

10 **Q.**  He also says or were the result of impurities.  I mean that's

11 pretty plain.  There could be impurities in the raw materials that

12 caused this problem, isn't that true?

13 **A.**  Yes, correct.  That is -- it could be impurities in the raw

14 material that is used for the manufacturing of the product.

15 **Q.**  Did you talk to Mr. Brueggemeyer about that possibility?  Is

16 that how he knew to talk to Agent Kriplean about it?

17 **A.**  No, we didn't discuss that.

18 **Q.**  Okay.  Was Ms. Kelley reporting directly to Mr. Brueggemeyer

19 outside of your presence or would meetings on this case take place

20 with both you, Ms. Kelley and also Ms. Jackson along with Mr.

21 Brueggemeyer?

22 **A.**  I don't recall.  Most of the cases if I'm the lead analyst

23 -- in this particular case I was the lead analyst, I wasn't

24 speaking directly to him.

25 **Q.**  And as lead analyst does that mean that Ms. Kelley would

1  provide you information on GC-MS?

2  **A.**  At the end of his -- at the end she will generate the result

3  report and then my -- my role is just to -- to do the compilation

4  of the results.  Yes, and sometimes yeah, we will discuss any

5  results that or some of the -- or some of their findings.

6  **Q.**  Because her findings could potentially lead to you doing

7  additional LC-MS work; is that correct?

8  **A.**  Yes, we could.

9  **Q.**  Okay.  He talks about result of impurities such as

10  cross-contamination.  What did you understand cross-contamination

11  to mean in this context?

12  **A.**  In that context, cross-contamination during the manufacturing

13  process of the product.

14  **Q.**  Now, the e-mail says he said, which is Agent Kriplean said it

15  didn't matter.  What did you understand that to mean?

16  **A.**  My understanding is that it didn't matter -- no matter from

17  where the steroids are coming from, those Schedule III steroids

18  shouldn't be in the product.  That is my understanding.

19  **Q.**  Okay.

20          MR. LEACH:  Hold on one second, Judge.

21  CROSS-EXAMINATION

22  BY MR. LEACH (Continued):

23  **Q.**  Mr. Santos, have you ever tested any food or water or any

24  other product that had steroids in it, Schedule III steroids?

25  **A.**  Related to steroids, no.  Other products containing

1 benzodiazepines, yes.

2 **Q.**  So what you just identified as a carcinogen; isn't that

3 correct?

4 **A.**  No, in some other like -- can I use a different -- it's a

5 totally different product.

6 **Q.**  Okay.  What is that?

7 **A.**  It's supposed to -- a Xanax tablet, it's only supposed to

8 contain only alprazolam, but of course now there's a lot of

9 counterfeit Xanax tablets that doesn't contain alprazolam at all.

10 It contains more designer benzodiazepines, and I have to go back

11 and reanalyze something because I couldn't determine the identity

12 right away.  So I have to go to the internet to do some research,

13 and then finally identify a new designer benzodiazepine.  So yeah,

14 it -- it's common that sometimes in the first analysis that we do

15 we cannot determine the identity of whatever we are detecting.  So

16 we have to pursue.  But sometimes remember we don't have all of

17 the resources to pursue all of the samples, to pursue or to do

18 additional samples.

19 **Q.**  Is it fair to say that when you looked at these particular

20 supplements, this was quite a bit of steroidal-type compounds that

21 were at very low levels?

22 **A.**  Yes, I will say that, yeah.  That would be correct.

23 **Q.**  Just to give the Court an idea of what we're talking about,

24 would you say in the neighborhood of a dozen, two dozen, three

25 dozen different chromatograph peaks that could have been other

1  steroidal compounds?

2  **A.**   Yes.

3  **Q.**   How much?  Three dozen?

4  **A.**   No less than that.  Less -- there's -- in some of the -- in

5  some of the pills there were probably, I don't know, eight

6  different components that --

7  **Q.**   And you did not --

8  **A.**   Part of them -- I couldn't determine the identity because like

9  I say at the beginning we don't have access to -- at that time we

10  didn't have mass spectral libraries.  We didn't have access to.

11  **Q.**   Right.  But in this e-mail, Mr. Brueggemeyer is telling you

12  that you can identify the items that were in these products, was

13  he not?  In other words, you can go by the standards in order to

14  identify them, but you did not do that?

15  **A.**   For some of them, yes.

16  **Q.**   Well, which ones did you select to get the standards for?

17  **A.**   In this particular case, probably most of the standards that

18  are or some of the components that we were detecting, I

19  utilized -- I used the standard that we have already in-house.

20  **Q.**   And as you told us those are all Schedule IIIs?

21  **A.**   Yeah, they are schedule -- and non-schedule.

22  **Q.**   You do have a library of some non-schedule steroidal

23  compounds?

24  **A.**   Yeah, they are in the same library, in the same SOP, they are

25  listed in that 157 steroids or mass spectral library listed in the

1    SOP 2041.

2    **Q.**   So when we look at those charts that you had prepared and what

3    I am calling DHEA, that was in your library?

4    **A.**   Most likely, yes.

5    **Q.**   Epiandrosterone was in your library?

6    **A.**   Yes.

7    **Q.**   All right.  Let's go to paragraph number 2.  He says if

8    standards are available, either in-house or readily available

9    commercially, we will identify the major steroid compounds in each

10   sentence.  Do you see that?

11   **A.**   Yes.

12   **Q.**   And when he's talking about the main steroid compounds, he's

13   referring to the items that are most prominent in these compounds;

14   isn't that correct?

15   **A.**   Yes.

16   **Q.**   So from my point of view, the item number one on your chart

17   which I'm calling DHEA, that item number one and the

18   epiandrosterone are the most prominent in these pills; isn't that

19   correct?

20   **A.**   Yes.

21   **Q.**   Okay.  You said these unscheduled designer steroids in quotes

22   are not permitted in supplements.  What did you understand that to

23   mean?  He's saying that Kriplean said that these unscheduled

24   designer steroids are not permitted in supplements.  What did you

25   understand that to mean?

1  **A.** My understanding of the standard steroids that are like new in

2  the black market, that -- handmade and then they may be present in

3  product.

4  **Q.** Did it turn out that anything that was in any Schedule III

5  that you identified was what you would classify as a designer

6  steroid?

7  **A.** Could you repeat the question?

8  **Q.** Was anything that you identified, any one of the Schedule

9  IIIs, were any of them designer steroids?

10 **A.** I cannot -- I cannot answer that.  I don't -- I don't know if

11 in that case the 4- or 5-androstenediol is a designer steroid.

12 **Q.** Okay.  Did you understand this sentence to indicate that what

13 I'm referring to as the DHEA and the epiandrosterone is a designer

14 steroid?

15        THE COURT:  That question is confusing, Mr. Leach.  Ask

16 another.

17 **A.** I don't know.  I don't know if the steroids that you're

18 referring is non-scheduled.

19        MR. LEACH:  The reason why I ask that, Judge, is because

20 it says unscheduled.  So --

21        THE COURT:  Right.  I just think that wasn't the right

22 question.

23        MR. LEACH:  Okay.

24        THE COURT:  I mean, I read that, for what it's worth, as

25 saying the unscheduled designer steroid is referring to not the

1  scheduled ones.  So that's what I think it refers to, but you can

2  ask him what he thinks it refers to.

3  **A.**  Yeah, my understanding that that -- the unscheduled are the

4  non-scheduled.

5  CROSS-EXAMINATION

6  BY MR. LEACH (Continued):

7  **Q.**  So the point I'm trying to make, I'm referring to DHEA just

8  generically and epiandrosterone.  Is that what is being referred

9  to there?

10  **A.**  No idea if it's referring to that.  I don't know if it's

11  natural steroids, naturally occurring, that is -- that is beyond

12  my expertise.

13          MR. LEACH:  Judge, I need just one second to talk to

14  Mr. Wheat, if I could.

15          THE COURT:  Go ahead.

16          MR. LEACH:  Okay.  I'm back, Judge.

17  CROSS-EXAMINATION

18  BY MR. LEACH (Continued):

19  **Q.**  All right, so I think what we have to do we have to read these

20  two sentences together.  If standards are available, we will

21  identify the major steroid components for each sample even if

22  they're not scheduled.

23          THE COURT:  Mr. Leach, I don't know that we have to do

24  it with this witness.  I read the two sentences pretty clearly.

25  He's talking about the ones that are the major steroid components

1  which you already got him to explain what those were, which are

2  the two that you're talking about.

3          MR. LEACH:  Right.

4          THE COURT:  Even if they're in the schedule so that

5  makes it clear that they're not talking about scheduled ones, if

6  they're not major, and that he said that these unscheduled

7  designer steroids are not permitted in supplements.  So I think I

8  understand what that sentence says regardless of whether Dr.

9  Santos agrees with how -- which is how I think you want me to

10 understand.

11         MR. LEACH:  Yes, Judge.

12         THE COURT:  Okay.  Let's just go.  I would just stop

13 there.

14 CROSS-EXAMINATION

15 BY MR. LEACH (Continued):

16 Q.  All right.  As far as the minor -- I'm on paragraph number 3.

17 As far as minor steroid peaks which are not scheduled, we will see

18 if standards are in-house or readily available.  You did that, did

19 you not, Mr. Santos?

20 A.  Yes.

21 Q.  The answer is yes?

22 A.  Yes.

23 Q.  You identified the ones that you could identify?

24 A.  Yes.

25 Q.  Correct?  Even if these standards are available, these

1  analyses may not be necessary if other components of

2  interest (see 1 and 2 above) have already been identified in a

3  given item.  So basically -- oh, well.  You tell me what he meant

4  by that statement, how you understood it.

5  **A.**  My understanding is that basically the primary -- primary

6  focus will be to identify the major components -- well, to

7  identify the minor Schedule III steroids at a different point.

8  The second point is to identify the -- the steroids that -- the

9  known scheduled steroids.  They're the most prominent,

10  that they're high levels in the sample.  The minor ones, I

11  couldn't identify.  Even they were -- they were not critical at

12  this point.

13  **Q.**  So looking at this once again, it's December the 8th, 2016;

14  correct?

15  **A.**  Yes.

16  **Q.**  The reports that we looked at earlier, 2, 3 and 4 and if you

17  need me to go back to them, I will, but the two reports are

18  January 13, 2017 and then the last one which was the new product

19  that came in was September 17, 2017; correct?

20  **A.**  Yes.

21  **Q.**  So is it fair to say based on the reports taken in conjunction

22  with this e-mail, that you did precisely what Mr. Brueggemeyer

23  told Agent Kriplean you would do?

24  **A.**  Yes.

25  **Q.**  Okay.  Now, that included identifying the major components in

1  all those products; isn't that correct?

2  **A.**  Yes.

3  **Q.**  And it's on the chart, we've already seen it; correct?

4  **A.**  Yes.

5  **Q.**  Okay.

6          THE COURT:  Mr. Leach, can you give me the time on that?

7  When did they identify the major components?

8          MR. LEACH:  It is on January the 3rd for FACTS number

9  984260.

10          THE COURT:  And that was 2017?

11          MR. LEACH:  Yes, ma'am.  So this is the 16 that we're

12  looking at in the e-mail, December.  They do the testing following

13  that, and they write these reports effective January 30th, and

14  it's for 260, as I indicated, and 276, and then they get new

15  bottles of material in and they run new tests on September 14,

16  2017, which is my Exhibit No. 4.  Okay.

17          THE COURT:  Thank you.

18          MR. LEACH:  All prior to indictment, Judge.

19          THE COURT:  Well, prior -- I'm interested -- oh, I

20  for -- I'm interested in prior to affidavit.

21          MR. LEACH:  Yes.  I'm getting there, Judge.

22          THE COURT:  I mean, I'm not supposed to be -- I'm

23  supposed to be doing a Daubert hearing, but that's where my -- to

24  be honest that's what I'm most interested in, is the timeline of

25  what they knew, you know, but I still don't know that any of this

1   has much to do with Daubert type things.  And I might ask

2   everybody to reconsider their motions after we go through all of

3   this.  Maybe after the defendants have three days of, you know, of

4   questioning the experts we might, you know, everybody might have a

5   different view of their motions, but I don't know.  What we do,

6   you know, in the next hearing is the big one.

7           MR. LEACH:  Well, my hope is you'll see where I'm going

8   here in just a little bit, Judge.

9   CROSS-EXAMINATION

10  BY MR. LEACH (Continued):

11  **Q.**  So there are three additional reports that are issued on July

12  17, 2018; isn't that correct, Mr. Santos?

13  **A.**  Which dates?

14  **Q.**  July 17, 2018, and I'm going to ask to just put Exhibit 5 up.

15  **A.**  Yes, there are three reports.

16  **Q.**  All right.  So we're looking at our Exhibit No. 5 here.  Do

17  you see that?

18  **A.**  Yes.

19  **Q.**  And when we go to your charts down here at the bottom,

20  this -- this set of reports was to quantitate the amount of

21  Schedule III steroids in the products; correct?

22  **A.**  Yes.

23  **Q.**  Where is the DHEA and the epiandrosterone?

24  **A.**  If you go to the -- in section 2 it is explained what is being

25  reported here.

1  **Q.**  Right.  But my question to you is why did you not quantify

2  DHEA and epiandrosterone as part of this report?

3  **A.**  First of all, I don't do quantification.  Remember I do

4  qualitative analysis.  The person that did the quantitation is

5  Marie Jackson.  Because I'm here in this particular case because

6  I'm the lead analyst, I'm the one in charge of doing the

7  compilation or summarizing the results from other analysts.  And

8  as is -- as is stated in section 2, analytical test performed on

9  samples, the particular goal in this -- for this analysis was to

10 use GC-MS to differentiate between the isomers 4-androstenediol

11 and 5-androstenediol and use HPLC for quantification of those

12 steroids.  The focus here was basically to quantify the steroids

13 that they were schedule steroids.

14 **Q.**  Isn't it true that the reason why you did not quantify DHEA is

15 because you would have had to report that DHEA is 99.5 percent of

16 the steroid components in this product?

17       MR. JONES:  Your Honor, I'm going to object to this.

18 Dr. Santos has already made -- one second, Dr. Santos -- he's

19 already made clear that he did LC-MS.  He was not involved in

20 quantification.  He said that probably about 15 times at this

21 point.  And anything dealing with quantification has no bearing on

22 the basis of his opinion or the reliability of his opinion.  He's

23 not offering anything related to quantification.

24       THE COURT:  I know.  We've gotten way off track here.

25 We've gotten into the whole land of la-la land.  But once -- you

1  know, once they told me they're going -- they might have to call

2  these people to deal with the Franks hearing, I'm more interested.

3  And frankly, this is much more interesting to me.  It's very

4  interesting.  And if he can answer it -- I mean, he's a chemist,

5  and if he can answer the question, which would be nice for Mr.

6  Leach to have that -- I mean, I think the point is that everybody

7  knew that these supplements were 95 percent legal or maybe 99

8  percent legal with a tiny little bit illegal, and that they knew

9  it and the forensic scientist knew it and that Special Agent

10  Kriplean knew it.  I think that's what they're going to say.  So

11  I'm interested if this witness knew it as well or even if he

12  doesn't know it exactly that way, if it's like obviously, I mean

13  if it's an answer like that.  He's looking at it.  He has to know

14  whether these are the minor ones or the major ones.  You know,

15  maybe he doesn't quantify it, but he has to know the difference

16  between a major versus minor.  So he can answer it.  I'll let him

17  answer it at this point.  I mean, it's a little -- I think it's a

18  little late, Mr. Jones, to jump in and saying we're limiting it.

19  We've been doing this now for awhile.  It doesn't really have much

20  to do with what he did.  I don't know.  I'll let him answer it.

21  CROSS-EXAMINATION

22  BY MR. LEACH (Continued):

23  Q.  Do you remember the question, Mr. Santos?

24  A.  Would you repeat the question?

25  Q.  Isn't it true that the reason why you didn't test, quantitate,

1 quantify DHEA or epiandrosterone is because that test would have

2 shown that the DHEA was 99.5 percent of the steroid compounds in

3 this product; isn't that true?

**A.** It could be.

**Q.** And the reason why you don't know is because you didn't test

it; isn't that correct?

**A.** Correct.

**Q.** And if we go to item number two, the numbers are even greater,

it's 99.9; isn't that correct?

**A.** There is no way to hypothetically say the other steroid is

more prominent.  Through my analysis, they were about 98 percent.

I cannot make that statement.

**Q.** But for the same reason because you did not test it; isn't

that correct?

**A.** Yeah.  We didn't test it.  Yes, that's correct.

**Q.** And then when we look at that in three it's exactly the same

thing but lower yet, 99.989; isn't that correct?

**A.** This is just one component of a base sample.  This is

not -- is not representing, you know, the total amount of steroids

in a particular sample.

**Q.** But the only -- the only reason why you can't tell us with

clarity once again is because you did not test it?

**A.** Yeah, we did not quantify for the prominent steroid, that's

correct.

**Q.** Okay.  Let's go to Exhibit 6.

1          THE COURT:  Let me ask a quick question, Dr. Santos.

2     You didn't quantify for -- is it the word primary, is that the

3     right word?

4          MR. LEACH:  Major is what they use.

5          THE COURT:  For the major steroid.  And are you sure it

6     was just one that the major -- that there was one major or could

7     it have been a lot of other ones?  I know I'm not --

8          MR. LEACH:  It would have been two.

9          THE COURT:  -- paying as close attention as I should

10    have.  Was it pretty clear that there was one major steroid

11    that -- that was not scheduled?  Does that make sense?

12         THE WITNESS:  Yeah, there were some steroids present in

13    the sample that they are non-scheduled.

14         THE COURT:  And could you tell just, you know, generally

15    speaking -- I know you're not the quantifier scientist, but could

16    you tell just as a scientist working on the project that the vast

17    majority of this sample was not a Schedule III substance?  Was

18    that pretty obvious just for a scientist working on the project?

19         THE WITNESS:  That's correct.

20         THE COURT:  Was it so much that you knew that it was

21    more than 99 percent?

22         THE WITNESS:  With the -- you have to do a lot of

23    detection to determine the purity, so that is not -- that -- the

24    person that does the quantitation will help to elucidate what is

25    the purity in that case of a particular steroid in a particular

1  sample.

2          THE COURT:  But I guess -- so just generally speaking

3  those as a scientist working on the project, you knew that the

4  majority of this substance was not a Schedule III substance.

5          THE WITNESS:  Yes, correct.

6          THE COURT:  And that's within your scientific

7  understanding and within the course of your duties on the project

8  was to have that kind of an understanding, right?

9          THE WITNESS:  Yes.

10          THE COURT:  Thank you.

11  CROSS-EXAMINATION

12  BY MR. LEACH (Continued):

13  Q.  Just to the judge's point, Mr. Santos, you signed this report

14  as the primary author; correct?

15  A.  Yeah, I'm the lead analyst, correct.

16  Q.  You also signed below as one of the concurring officers along

17  with Ms. Kelley, along with Ms. Jackson and along with

18  Mr. Brueggemeyer; isn't that correct?

19  A.  Yes, as a lead analyst.  Remember, I do the further

20  documentation, and section one refers to that -- section one

21  refers to collect all the documentation, and for that reason my

22  signature is there, yes.

23  Q.  Okay.  And just, if you could take it down to the next page.

24  The same thing with this report, right, you are the lead analyst?

25  A.  Yes.

1  **Q.**  Also signed concurring?

2  **A.**  Yes.

3  **Q.**  Now, go back to the chart.  You can see this is July 17.  This

4  is FACTS number 792.  Do you see that?

5  **A.**  Yes.

6  **Q.**  And once again, there is no quantification, you do not

7  quantitate DHEA or epiandrosterone; isn't that correct?

8  **A.**  Yes, correct.

9  **Q.**  Okay.  And I would ask you the same questions on the math but

10  basically if you do the math, you can see it's -- it's like 99.8

11  percent the primary steroid is a legal compound; isn't that

12  correct?

13  **A.**  We -- again, you cannot just do a summary of, you know, the

14  amount of the steroid plus the amount, because the other thing

15  that you don't -- you don't -- we don't -- we may not know is how

16  much excipients is present in the sample.

17  **Q.**  Okay, but I'm only asking you about steroidal compounds.  I'm

18  not asking you about fillers, excipients or anything else.  As far

19  as you know because you didn't test, it's 99.8 percent legal

20  steroid?

21  **A.**  Again, I cannot agree with that 99 percent because we

22  didn't -- like you say, we didn't do the testing.  So there's no

23  way for me to validate that 90 percent.

24         THE COURT:  But Dr. Santos, you do know that less than

25  one percent was illegal, that you know, right?

1           MR. JONES:  I'm a bit confused as to where these

2   percentages are coming from.

3           THE WITNESS:  Yes, so there is -- in this case this

4   number just represents the amount of steroid per tablet.

5           MR. LEACH:  I think the number that the judge is

6   referring to is on the first report which is Exhibit 5, and you

7   see 519 which would mean that it's less than one percent, it's

8   actually half of a percent.  That's the point that the judge is

9   making.

10          THE WITNESS:  This is --

11          MR. JONES:  Marie Jackson testified -- one second,

12  Dr. Santos.  Marie Jackson testified yesterday that the table

13  shows milligrams per tablet, not concentrations and not

14  percentages.  So again I'm not sure where your percentages are

15  coming from.

16          MR. LEACH:  It's coming from simple math.

17          MR. JONES:  But Ms. Jackson already testified that your

18  math is not correct because it's premised on an incorrect

19  interpretation of the chart.

20          MR. LEACH:  You agree that that is half a milligram,

21  right, that you're looking at?  Half a milligram, that is what it

22  is.  So the other 99 and one-half milligrams whether you do it in

23  milligrams or you do it by weight is going to be legitimate

24  substances, period.  That's what we're saying.

25          THE COURT:  Mr. Jones, tell me what you think she said.

 1          MR. JONES:  So Marie Jackson yesterday said that the

 2   table shows milligrams per tablet, not a concentration rate per

 3   tablet, and that's what Mr. Leach is getting at it seems.

 4          THE COURT:  And how many milligrams was in a tablet?

 5          MR. JONES:  I don't know the math.  I'm not a chemist.

 6   I don't claim to be.  I frankly don't know.  But Marie Jackson

 7   made clear that when Mr. Leach was asking her that question, that

 8   his information, his calculus was incorrect.  And now he's asking

 9   Dr. Santos who does not do quantification and who is less familiar

10   as compared to Ms. Jackson.

11          MR. LEACH:  Judge, I will admit what I am doing is

12   percentage comparison.  Okay.

13          MR. JONES:  And it's incorrect.

14          MR. LEACH:  You may think it's incorrect.

15          MR. JONES:  Ms. Jackson says it's incorrect and she's

16   the one that performed the analysis which is why the question

17   should have been asked of her on yesterday instead of Dr. Santos.

18          MR. LEACH:  You can make that objection, but it's

19   already done.  And here's -- here's the real point.  Regardless of

20   how you quantify --

21          THE COURT:  Wait, wait, hang on, hang on, Mr. Leach.  I

22   don't remember that, Mr. Jones, so I was thinking that that was a

23   percent.  So I guess if you have a tablet, if you have a

24   one-milligram tablet and .5 milligrams is the steroid then it

25   would be 50 percent; is that right?

1          THE WITNESS:  You're going to do -- typically the --

2    let's say -- a tablet, an average could be, like, 3 to 500

3    milligrams.

4          THE COURT:  Okay.  That doesn't really -- okay.

5          THE WITNESS:  And remember there's some other components

6    in the sample.  You cannot just state that 99 percent belongs to

7    the -- is coming from another steroid.  You have to quantify all

8    the different components.  It's not just a percentage.

9          MR. JONES:  At this point it's all speculation,

10   honestly.

11         THE COURT:  Did anybody testify how many milligrams are

12   in a tablet?

13         MR. JONES:  I'm not sure if Ms. Jackson did or not.

14         MR. LEACH:  Let me do this, Judge, so we have an

15   example.  Just go back to Exhibit -- Defendant's Exhibit No. 2.

16         THE COURT:  And I'll say, I'm with you, Mr. Leach, on

17   the minor versus the major like we had that with the point one,

18   two and three from the e-mail.  I'm not sure that this chart jibes

19   exactly with that.

20         MR. LEACH:  So okay, Judge, here's what we're showing

21   you is Defendant's Exhibit No. 2 and it's showing you that the

22   DHEA is 75 milligrams in the two top products and then 50

23   milligrams on the bottom -- or no, 210 milligrams -- just move

24   that back.  It's over to the left.  See those, Judge?

25         THE COURT:  Okay.  We just need to be precise with our

1  math when we get to that point.  Let's move on with this witness.

2  I believe he's giving you a lot beyond his techniques.  So...

3           MR. JONES:  Your Honor, that's just how it's labeled,

4  I'll point out.  We don't know if that's accurate either.

5           MR. LEACH:  Your own reports?

6           THE COURT:  These are your reports, Mr. Jones.

7           MR. JONES:  If taken from the label of the product.

8           THE COURT:  We'll keep moving.  We can all try to absorb

9  it over the next month or so.  I'm also just looking for what the

10 chemist thought just in general about the pills, and what

11 they -- how they talked to the special agent about it and what he

12 said back to them.  I am listening for that at the same time.

13 Because shortly after all this, the special agent went to the

14 judge and made representations and that's what I've got to think

15 about in the coming months, so I'm listening for that.

16          To the extent the math that I said was wrong or that Mr.

17 Leach said was wrong, we can sort all that out later.  But

18 let's -- I do --you know, I turned down Mr. Jones earlier, but

19 let's stay -- stay away from the quantification with this witness.

20 CROSS-EXAMINATION

21 BY MR. LEACH (Continued):

22 **Q.**  Now, these reports were generated in July of 2018.  Do you see

23 that, Mr. Santos?

24 **A.**  Yes.

25 **Q.**  And are you aware of the fact that this case was in court as

1  of that time, July 17, 2018?

2  **A.**   Yes.

3  **Q.**   Were there any conversations that you knew of with Agent

4  Kriplean or anyone else relating to what was going on in court in

5  this case?

6  **A.**   No, not that I know.

7  **Q.**   What caused you to set forward the series of tests

8  quantitating these substances?

9  **A.**   I don't know if we received -- the first time that I received

10 communication that we will pursue quantification was I think April

11 2000 -- April 2018.

12 **Q.**   What was that communication?

13 **A.**   I think that was an e-mail, a communication between my

14 supervisor and Dr. Kriplean (sic) -- and Special Agent Kriplean.

15 **Q.**   And what was said in that e-mail?

16 **A.**   Basically just proceed with quantitation of the different sets

17 of samples.

18         MR. LEACH:  Do we have that e-mail?

19         THE WITNESS:  No, I --

20         MR. LEACH:  I'm asking the lawyer, Mr. Santos.  Hold on

21 one second.  D'Juan, do you know if we have this e-mail?

22         MR. JONES:  I assumed it was -- I'm sorry, one second.

23 What was the date of the e-mail you said, April 2018?

24         THE WITNESS:  April 23, 2018.  My recollection is at

25 that time they were requesting personal examples to be sent to two

1  different labs to corroborate or to do further testing, like NMS

2  Labs.

3           MR. LEACH:  We're checking on our side too, D'Juan.  I

4  don't think I do have that e-mail.  If I could just have a moment,

5  Judge.

6           THE COURT:  Yeah, a moment.  I mean it wasn't to him.

7  So, you know, if he can remember anything about it he can testify

8  but otherwise we can try to get you the e-mail, but it wasn't to

9  him.  So I think we ought to keep moving.

10          MR. LEACH:  Yeah, I don't think any of these are to him.

11  But let me ask you, Mr. Santos, can you just read us that e-mail?

12          THE COURT:  Are you asking him to look in his e-mail

13  right now?

14          THE WITNESS:  I don't have access.

15          MR. LEACH:  I thought he had it in front of him.  He was

16  so precise I thought he had it in front of him.

17          THE COURT:  Yeah, how do you know the date?

18          THE WITNESS:  Because I read it in the package of all of

19  the material that I had to go through, all of the communications.

20          MR. LEACH:  Okay.  I'll move on, Judge.  We're going to

21  look through our stuff and see if we can find it.

22  CROSS-EXAMINATION

23  BY MR. LEACH (Continued):

24  **Q.**  So what you're saying is in April of 2018, you got an e-mail

25  from Agent Kriplean asking you to go ahead and do the

1  quantification?

2  **A.**   It was a communication, yeah, between the agent with my

3  supervisor, yeah.

4  **Q.**   Okay.   Now, in terms of not quantifying the major steroids,

5  did you make that decision or did Mr. Brueggemeyer make that

6  decision or did the two of you do it together?

7  **A.**   Typically the decision is made on the relevance of the

8  component present in the sample.

9  **Q.**   Relevance from a criminal violation standpoint, is that what

10  you're saying?

11  **A.**   Yeah, so in that case if -- if at that time we know that it's

12  a case of three, yeah, most likely the investigators they're going

13  to request quantification of those particular components.   Just to

14  give you an example, if I find fentanyl in a tablet, that is

15  critical information that is needed.   So in the same way like in

16  this case because there were DEA Schedule III steroids that was

17  most -- they were critical information that -- and for that reason

18  it was pursued, the quantification of those.   So in that case if

19  we find vitamin C in a product, I don't think that is much

20  relevant to quantify vitamin C in the product.   So the same way if

21  we find that, yeah, the, yeah, the steroid that is non-scheduled,

22  you know it's legal, so there is no -- that is not going to

23  provide critical information to the agents or the investigator.

24  **Q.**   Let's get back to Exhibit No. 6 and let's get through this

25  part of it.   Can you tell me looking at item number one in your

1 chart here, the conversion of 0.156 to milligrams?

2 **A.**  That was -- as I stated before, that was a quantitation

3 analysis performed by Marie Jackson.

4 **Q.**  But you know how to convert 156 to milligrams, do you not?

5 That doesn't have to have anything to do with Ms. Jackson?

6 THE COURT:  All right.  Mr. Leach, I'm going to object

7 on Mr. Jones's behalf and sustain the objection and tell you to

8 move on.  You got your own people.  You got your own math you can

9 do.  You got your own people that you can put up.

10 MR. LEACH:  Okay.

11 THE COURT:  Don't make this guy do it.  Let's keep

12 going.  Come on.

13 CROSS-EXAMINATION

14 BY MR. LEACH (Continued):

15 **Q.**  Let's go to Exhibit 16, yes, sir.  Okay.  This is the last of

16 the reports.  This is the last of the quantitation reports; isn't

17 that correct, Mr. Santos?

18 **A.**  Yeah, one of the -- a third set of samples, yes.

19 **Q.**  So this is FACTS number 276.  Do you see that?

20 **A.**  Yeah, 984276.

21 **Q.**  Right, and it's July 17, 2018, the same as the others?

22 **A.**  Yes.

23 **Q.**  And coming down to the bottom, same result, you did not

24 quantitate DHEA or the epi, either correct?

25 **A.**  Yeah, remember the -- the primary focus of this quantitation

1    was only to quantify the Schedule III steroids, yes.

2    **Q.**   Now, does the FCC lab abide by ISO standards?

3    **A.**   Yes.

4    **Q.**   And tell the Court what ISO standards are?

5    **A.**   We use all the, you know, traceability standards, all

6    certified standards.

7    **Q.**   Okay.  I want to show you the ISO standards, if I could,

8    please, Exhibit 19.  Okay.  General requirements for competence in

9    testing -- of testing and calibration of laboratories; correct?

10   **A.**   Yes.

11   **Q.**   And what the ISO does it sets out basic rules or principles

12   that each lab including government labs should follow; isn't that

13   correct?

14   **A.**   Yes.

15   **Q.**   Okay.  Let's go to page 8 of that document.  Okay.  Did you

16   see -- go to the bottom and blow it up a little bit, yes.

17   Impartiality, do you see that there?  That is terms and

18   definitions.  Do you see impartiality?

19   **A.**   Yes.

20   **Q.**   Objective means that conflicts of interest do not exist or are

21   resolved so they do not adversely influence subsequent activities

22   of the laboratory.  You would agree with that; correct?

23   **A.**   Yes.

24   **Q.**   Note two, other terms useful in conveying the element of

25   impartiality include freedom from conflict of interest, freedom of

1  bias, lack of prejudice, neutrality, fairness, open-mindedness,

2  even-handedness, detachment and balance.  My question to you is,

3  when you decided not to test the major components, the major

4  steroidal components, do you believe that that reflected fairness

5  as far as the FCC lab is concerned?

6  **A.**  Again, the -- the -- the primary focus of -- of the

7  quantitation was not to quantify the predominant non-scheduled

8  steroids.

9  **Q.**  Do you believe that that was even-handedness by not testing

10  the major component?

11  **A.**  Again that was not the primary focus of the analysis.

12  **Q.**  Right, you're serving your client; isn't that correct?

13  **A.**  We are analyzing whatever is requested by the investigator.

14  **Q.**  Right.

15        THE COURT:  Mr. Leach, you can make -- you can make

16  those arguments, I mean, but he wasn't the guy calling the shots.

17  He's doing what he's told to do.  I think you can -- you can

18  certainly make your arguments and I know you will.  I don't think

19  you have to do that with this witness either.  Let's just move on.

20        MR. LEACH:  Can I just go to page 8 just so you can see

21  it, Judge?  Because --

22        THE COURT:  Do I have to see it today at 4:04 p.m.?  I

23  mean, can't you show it to me?

24        MR. LEACH:  All right.  All right.  Let me just see --

25        THE COURT:  I mean, I get your point.  I've heard your

1  point for years now.  I know the point.  And these -- and these

2  witnesses have driven it home to me.  And we'll have, you know --

3  we'll talk more about it at our next hearing.  So I don't think

4  you have to beat me over the head with it.

5            MR. LEACH:  Okay.

6            THE COURT:  And, you know, I like to -- I'm concerned

7  with fairness and impartiality myself.  So I don't know that you

8  need to do anything for me at this point in this hearing on this

9  day.

10            MR. LEACH:  Can I just have a moment, Judge, so I can

11  regroup?

12            THE COURT:  Yes.

13            MR. LEACH:  Okay.  We're done, Judge.

14            MR. MORRIS:  I have a few questions.

15            THE COURT:  Mr. Morris, go ahead.

16            MR. MORRIS:  Thank you.

17  CROSS-EXAMINATION

18  BY MR. MORRIS:

19  **Q.**  Dr. Santos, I want to make sure I understand a couple of

20  things because chemistry is not my specialty.  Are you with me

21  even though I can't see you?

22            THE COURT:  He's there, Mr. Morris.  You might be able

23  to just change your view to put it on.

24            MR. MORRIS:  Yeah, I'm going to try that.  There he is.

25  Thank you.  Okay.

CROSS-EXAMINATION

BY MR. MORRIS (Continued):

**Q.** Dr. Santos, do you ever quantitate?

**A.** No, that's not my primary role at FCC.

**Q.** Okay.  Okay.  Now, when you talk about making a composite from five tablets which is what you did when you did these tests; is that right?

**A.** Yes.

**Q.** You crush them up together?

**A.** Yes.

**Q.** So when you find something, you can't tell if that whatever it is you found was in one pill but not in the other four or vice versa; is that right?

**A.** That's correct, because we don't do -- we have -- we will have -- in order to do that we have to do the individual testing of the tablet.

**Q.** Which you could have done but did not do?

**A.** Correct.

**Q.** All right.  So pill number one could have something in it, two three or four might not have anything in it?

**A.** Yeah, that may be correct.

**Q.** Could just be a random finding, as it were?

**A.** Yes.

**Q.** Okay.  You found some unknown peaks in your testing; correct?

**A.** Yes.

1  **Q.**  And some of them were never identified; is that fair?

2  **A.**  That's correct.

3  **Q.**  Okay.  And so they could have been some of the items that were

4  listed on the labels, you just didn't look for them; correct?

5  **A.**  Yeah, if they're not in the protocol that we use, most likely

6  we're not going to identify.

7  **Q.**  So the answer to my question is yes, some of the items listed

8  on the label could well have been there, you didn't look for them?

9  **A.**  Yes.

10  **Q.**  Okay.  The telephone call on January of -- strike that.  The

11  telephone call in November of 2016 -- I'm sorry.  That's wrong.

12  Strike that.

13      Your testing that was done in January of 2017 that is

14  reflected in your reports of January 30, again you're still using

15  composites on each of these tests; correct?

16  **A.**  Yes.

17  **Q.**  When you reported the results of your findings from your

18  testing --

19  **A.**  Yes.

20  **Q.**  -- did Mr. Kriplean ask if the steroids were DHEA?

21  **A.**  Typically there's no communication.  I generated the report,

22  he gets the results.  There is no discussion after that.  There's

23  no further discussion between me and the investigator.

24  **Q.**  We know there are e-mails among and between Mr. Kriplean, Dr.

25  Brueggemeyer and yourself; correct?

**A.**   A communication between my supervisor and the agent.  I just received the communication -- in that case he generated an e-mail and sent it to me.

**Q.**   Well, you are copied on the e-mail; correct?

**A.**   The e-mail he sent it to me.  He create an e-mail and then he sent it to me.  Just -- I spoke just -- I just spoke with Special Agent.

**Q.**   In any communication via telephone, e-mail, in person or otherwise, did Agent Kriplean ever ask if these ingredients included DHEA?

**A.**   No, not that I know.

**Q.**   Did he ask at any time if any of the results you found were legal compounds as opposed to illegal?

**A.**   No.

**Q.**   You identified something called -- I'll refer to it as epi. Do you know what I'm talking about?

**A.**   Yes.

**Q.**   Did Agent Kriplean ever ask if epi was a legal compound?

**A.**   Is he still there?

**Q.**   I'm here.

**A.**   No, he did not.  When I submit my report, it is generated, it is sent to the agent.  So there's no way for the agent to communicate with -- in that case with me or the analysts that have done the analysis to start asking is this legal or this not illegal.  There is no direct communication between the agent and

1  myself in this particular case.

2  **Q.**  Are you aware of any such --

3        THE COURT:  Just one second.  Just one second.  Viola, I

4  think you didn't really miss anything.  There was a pause and

5  there was no talking, so I don't think you missed anything.

6  CROSS-EXAMINATION

7  BY MR. MORRIS (Continued):

8  **Q.**  To your knowledge, was there any communication between Dr.

9  Brueggemeyer and Agent Kriplean in which Agent Kriplean asked or

10 discussed whether what was found was legal?

11 **A.**  I have, you know, the three exhibits, at any moment -- yeah,

12 they didn't discuss, you know -- I assume -- well, they are

13 talking about to identify the non-schedule.  The non-schedule that

14 I report of course was most likely legal.

15 **Q.**  Okay.  And did Agent Kriplean, to your knowledge, ask what are

16 they?

17 **A.**  At that point no, because the -- if you go through the

18 communications at any given time, because the protocol that we

19 have in place, we cannot release the name of what -- what we are

20 really finding in the sample.  If you noted the communications we

21 are filing non-schedule.  There is not -- there's no way to

22 specify which steroid we are finding.  We just in general terms

23 it's just non-schedule and scheduled.

24 **Q.**  I understand exactly what you said.

25        THE COURT:  Mr. Morris, I think we've been over this.  I

1  mean, Dr. Santos, did you ever speak on the phone or in person to

2  the special agent?

3         THE WITNESS:  No.

4         THE COURT:  We know you did speak on the phone the one

5  time; right?

6         THE WITNESS:  Yeah, that is the only time that I spoke

7  to him, but the sole -- the purpose was to basically ask him do

8  you need quantification, yes or no.

9         THE COURT:  Right.

10         THE WITNESS:  If you don't need, we have to close the

11  case now.  That's it.

12         THE COURT:  So you spoke to him one time on the phone

13  and then there's a couple of e-mails.  Did you ever have any other

14  communication with him?

15         THE WITNESS:  No communication at all.

16         THE COURT:  Mr. Morris, let's move on.

17         MR. MORRIS:  I can be very quick, Judge.  I just want to

18  know a couple of things.

19  CROSS-EXAMINATION

20  BY MR. MORRIS (Continued):

21  Q.  In any of the communications with Mr. Kriplean, did he ever

22  ask at any point whether the amounts of the steroids that you

23  found were so small that they could be accidental or unintended?

24  A.  Yes, it's in one of the communications.

25  Q.  And you told him you couldn't tell?

**A.**   I stated to my supervisor that yeah, they are low levels, in that case the scheduled ones.

**Q.**   And that was back in 2016?

**A.**   Yes.

**Q.**   Thank you.

MR. MORRIS:  That's all I have.

THE COURT:  All right, any redirect, Mr. Jones?

MR. JONES:  Yes, Your Honor.  Just on a couple of points.

REDIRECT EXAMINATION

BY MR. JONES;

**Q.**   Dr. Santos, so after you do your qualitative analysis via LC-MS, are you the one who also does the quantitative analysis on those same substances?

**A.**   Nope.

**Q.**   In this case do you know who did the quantitative analysis on those substances?

**A.**   My co-worker Marie Jackson.

**Q.**   Day to day in your role as a chemist for FCC, are you ever called upon to do quantitative analysis?

**A.**   Only once.

**Q.**   Once in your eight-year career there?

**A.**   Yes.  But because what happen is you take a competency test, but then in order to continue you have to do what is called a proficiency test and it was -- I didn't go about it.  So my

1  primary role at FCC is to do qualitative analysis.

2  **Q.**  So you were never deemed proficient by FCC to do quantitative

3  testing; is that right?

4  **A.**  Quantitative testing, yes.

5         MR. LEACH:  This went really well.  He couldn't deny it.

6  It was right there in front of his face.

7         MR. MORRIS:  Art, you're not on mute.

8         MR. LEACH:  Sorry.  Give me all of my analysis.

9  REDIRECT EXAMINATION

10 BY MR. JONES (Continued):

11 **Q.**  Okay.  You were asked about trace amounts during the

12 cross-examination.  So what is your understanding of what

13 constitutes a trace amount?

14 **A.**  That they are present in very low levels.

15 **Q.**  Does trace amount mean less than predominant?

16 **A.**  Yeah, definitely.

17 **Q.**  Does trace mean a specific quantity of a substance?

18 **A.**  No.

19 **Q.**  And so would -- would a -- would the chemist responsible for

20 quantifying be in a better position to determine whether a

21 substance was a trace amount or not?

22 **A.**  Yes, correct.

23 **Q.**  Now, looking back at Government's Exhibit 4 which you received

24 a few questions about, actually that may be the wrong one.

25 Government's Exhibit 5, excuse me.  At this point, when

1  quantitation is being discussed with Mr. Kriplean, there have been

2  no quantification of steroids at this point; is that right?

3  **A.**   That's correct.

4  **Q.**   So you hadn't communicated, you or anyone else had not

5  communicated to Agent Kriplean the quantity of steroids in the

6  compounds; correct?

7  **A.**   Yes, correct.

8  **Q.**   At any point, whether at this e-mail or prior, had anyone

9  communicated to Agent Kriplean the quantity of Schedule III

10  steroids?

11  **A.**   Yes, that's correct.   Nobody has communicated with him.

12          MR. JONES:  If I could have one moment, Your Honor.

13          THE COURT:  Sure.  And it just occurred to me when we

14  started this yesterday, I was like we're not going to talk about

15  trace amounts, are we?  And I got everybody to agree except for

16  Bruce.  I think maybe he might have said he'd have some questions,

17  and look at us now.  4:19 p.m.

18          MR. MORRIS:  And we're saving lots of time at the Franks

19  hearing.

20          MR. LEACH:  Assuming D'Juan will rest, I'm going to

21  rest.  I will not take the invite to go back again on trace.

22          MR. JONES:  One last question.  Maybe one and a half.

23  REDIRECT EXAMINATION

24  BY MR. JONES (Continued):

25  **Q.**  So with respect to the communications between Agent Kriplean

1  and FCC as a whole, is it fair to say that Dr. Brueggemeyer was

2  kind of the main one to communicate with Agent Kriplean?

3  **A.**   Yeah, that is the -- he likes to handle the communication with

4  the investigations.

5  **Q.**   And with respect to the results of testing, was the primary

6  way to communicate with Agent Kriplean via the case summary

7  reports?

8  **A.**   The official way is the summary report, yes.

9           MR. JONES:  Nothing further, Your Honor.

10          MR. LEACH:  Pass.

11          MR. MORRIS:  Pass.

12          THE COURT:  All right.  Dr. Santos, thank you so much

13  for your time.  I would ask you not to talk to anybody about the

14  case or your testimony.  Not that you want to talk to anybody

15  about it after today.  But just keep it to yourself.  If for some

16  reason you need to talk about the facts of the case, talk to Mr.

17  Jones, but for the most part just keep it to yourself if you

18  would, okay?

19          THE WITNESS:  Thank you.

20          THE COURT:  Thank you so much.  You can be excused.

21          THE WITNESS:  Thank you.

22          THE COURT:  All right.  What's next, people?  We got to

23  keep going.

24          MR. JONES:  If we could have a short break just to get

25  the next witness on the line.

```
 1              THE COURT:  Who is it going to be?

 2              MR. JONES:  Mangrum.

 3              THE COURT:  Okay.

 4              THE DEPUTY CLERK:  Is everyone else back, Judge?  Are

 5   you ready to start?

 6              THE COURT:  I can't tell if Art is here.

 7              MR. LEACH:  Good to go, Judge.

 8              THE COURT:  Art's here.  I don't know about Jack.  He

 9   might be on mute.  Ms. Connors, are you doing the direct?

10              MS. CONNORS:  I am, Your Honor.

11              THE COURT:  This is a government witness; right?

12              MS. CONNORS:  Yes, it is.

13              THE WITNESS:  Are we going to say the word trace?  Are

14   we going to have a drinking game?

15              MS. CONNORS:  No, we're not.

16              THE WITNESS:  I think Angela is already playing.

17              THE DEPUTY CLERK:  Mr. Mangrum, if you would raise your

18   right hand and be sworn for us.  Do you solemnly swear or affirm

19   that the testimony you shall give in this matter now pending

20   before the court shall be the truth, the whole truth and nothing

21   but the truth so help you God?

22              THE WITNESS:  Yes, I do.

23              THE DEPUTY CLERK:  If you would place state your full

24   name for the record and spell it for us.

25              THE WITNESS:  Sure.  My name is John, J-O-H-N, Bradley,
```

1  B-R-A-D-L-E-Y, Mangrum, M-A-N-G-R-U-M.

2          THE COURT:  I've got the first question for you.  Well,

3  the first one is, are you doctor or are you mister?

4          THE WITNESS:  Doctor, please.

5          THE COURT:  Okay.  Doctor.

6          And is that a corona beard or is that how you always

7  look?

8          THE WITNESS:  No, no.  This started in March.

9          THE COURT:  What about your hair, did you cut your hair?

10          THE WITNESS:  I've done it once.  I was going to go back

11  for another one and then the second round hit.  So...

12          THE COURT:  Okay.  Let the record reflect that Dr.

13  Mangrum has an excellent corona beard.  I'll leave -- it's late in

14  the afternoon, Mr. Mangrum.  I've been hearing about chemistry for

15  two days.  I've -- I've gotten a little punchy.  I've leave it to

16  the lawyers now.  Thank you.

17          THE WITNESS:  Sorry.  Okay.

18          MS. CONNORS:  He asked me if he needed to shave it, and

19  I told him no, definitely not.

20                          ******

21                  JOHN BRADLEY MANGRUM,

22          having been sworn, testified as follows:

23                          ******

24  DIRECT EXAMINATION

25  BY MS. CONNORS:

1  **Q.**  But Dr. Mangrum, can you please tell the Court where you're

2  currently employed?

3  **A.**  I'm currently employed at the FDA through the Center of Food

4  Safety and Applied Nutrition.

5  **Q.**  Okay.  Is that referred to as CFSAN?

6  **A.**  CFSAN, yes.

7  **Q.**  And how long have you been with FDA?

8  **A.**  2015.

9  **Q.**  And what is your current position at FDA?

10 **A.**  I'm a chemist within the method development branch which falls

11 under the Division of Analytical Chemistry which also falls under

12 the Office of Regulatory Science.

13 **Q.**  And broadly speaking, what are your responsibilities in -- in

14 your section?

15 **A.**  So the method development branch we're responsible for

16 developing new methods.  We actually revise older methods and we

17 put out some of these methods for the scientific community and our

18 FCC labs and our field labs because some of these methods have

19 been around for 20 or 30 years, and since that time new

20 instrumentation has been developed to get much better sensitivity

21 and much better detection limits.  So these need to be revised

22 from time to time.  So we are in a group to where we push those

23 revisions out if we can.

24 **Q.**  So just so I can make sure I'm correct when you're talking

25 about methods, you're talking about scientific testing methods?

**A.**   Yes, correct.  So if a field lab has an issue to where they're having problems detecting a certain analyte, we have the personnel and capability here to work on that while they're all doing other things.

**Q.**   Okay.  And Dr. Mangrum, can you give us an idea of your educational background?

**A.**   Sure.  I graduated from Longwood University with a B.S. in chemistry and B.S. in biology.  I went on to Virginia Commonwealth University to do my dissertation -- to do my PhD work in chemistry.  My dissertation was on looking at platinum anti-cancer drugs interacting with biomolecules, studied by mass spectrometry. I then graduate -- well, actually while I was a post PhD student there, I also was interim director for the mass spectrometry resource center for the university.

    Upon graduating, I took a post doc at the RNA Institute at the State University of New York in Albany where I did ultra-high resolution ion cyclotron resonance mass spectrometry on HIV derived RNA structure.

    I did a second post doc back in Virginia Commonwealth University in the department of pharmaceutics where we looked at using new biomarkers for like quantitative analysis.  And so I would grow a cancer cell line, fetus cancer cell line, a labeled isotope amino acid; that amino acid would be incorporated into the cancer cell line after several iterations.  Now, that isolated amino acid became a peptide which then became a fully labeled --

1  isotope labeled protein.  And we would use that protein for

2  biomarker analysis.  During that time I interviewed for a position

3  here at the FDA and accepted that position here in 2015.

4  **Q.**  Okay.  And Dr. Mangrum, throughout your work experience have

5  you been using mass spectrometry?

6  **A.**  Yes.  I've been -- I've used mass spectrometry for the past 20

7  years.

8  **Q.**  And Dr. Mangrum, have you authored any articles that were then

9  published in professional or scientific journals?

10 **A.**  Yes.  So we just recently published one here at the FDA with a

11 colleague of mine, to where she was looking at milk powder from

12 international and domestic for nitrates.  We took those milk

13 powders and did an isotope mass spectrometry analysis on those and

14 that's just been published this year in the Journal of Food and

15 Agriculture.  And so what we were able to determine was by using

16 the RMS, the cows that were producing the milk in Europe, those

17 were mostly free-range grass-feeding cows so that milk showed a

18 high preference towards a C3 diet.  Now, the milk samples that

19 were produced here from the U.S., those milk powders showed a very

20 high C4 diet.  We know that corn is mostly fed to those American

21 cows.

22 **Q.**  Okay.  And Dr. Mangrum, we're definitely going to get into

23 some of these about C3, C4 values in a little bit.  In addition to

24 that one specific article, I don't need any other descriptions for

25 articles, but have you published other articles during your

 1  career?

 2  **A.**   Yes.  I think we're at about 21 now.

 3  **Q.**   Okay.  Thank you.  And Dr. Mangrum, I will go ahead and start

 4  moving into some of the technical -- the technical stuff.

 5  **A.**   Sure.

 6  **Q.**   So I think you've already alluded to it, but are you familiar

 7  with the C13 isotope ratio mass spectrometer?

 8  **A.**   Yes, yes, we have one here and we purchased one for FCC as

 9  well.

10  **Q.**   Okay.  And when you say you purchased it, are you talking

11  about the instrumentation?

12  **A.**   Yes.  So since we are in method development we did a

13  procurement about three years ago to where we purchased a new

14  instrumentation for them and an exact duplicate for us.  So if any

15  methods need to be developed, we would have the exact same

16  instrumentation here.

17  **Q.**   Okay.  And have you received training on using IRMS technology

18  or instruments I should say?

19  **A.**   Yes.

20  **Q.**   Okay.  So in regards to this testing, why is the C-13-IRMS

21  testing being done?

22  **A.**   For this particular case?

23  **Q.**   Actually, first I'd like you just to say generally and maybe I

24  need to rephrase that.  Essentially, what are you trying to find

25  out by doing this testing, this type of test?

1  **A.**  Sure.  So RMS it's an abbreviated, like a hyphenated

2  technique.  So often you'll hear the term EA-RMS or LC-RMS, or

3  GC-RMS.  So the RMS in general is just the mass spectrometer

4  that's actually doing the detection of the ions.  So there has to

5  be a way to get the ions into the mass spec.  And so that's what

6  is considered EA, the elemental analyzer.  So, like, for brevity,

7  I'll just refer to RMS and everything in this discussion will be

8  referred back to EA-RMS.

9  **Q.**  Okay.

10  **A.**  So RMS is useful for looking at stable isotopes.  So atoms or

11  elements such as carbon, sulfur, nitrogen, hydrogen and oxygen are

12  the main species that we look for in RMS.  And it's because those

13  isotopes are stable.  Okay?  So we'll keep everything down to the

14  carbon-12 and carbon-13, because that's kind of where everything

15  is centered around here.

16      So carbon-12 and carbon-13 exist in nature.  Carbon-13 is

17  roughly 1.1 percent of the total carbon content.  So the other

18  98.9 percent is carbon-12.  So it's a very small percentage of

19  carbon-13 that we are actually monitoring.  And so RMS in a

20  nutshell is very -- is very good, and it's one of the only

21  instrumentations that can monitor a carbon-12 to carbon-13 ratio.

22  And so --

23  **Q.**  Okay.

24  **A.**  -- we can go through the entire work flow, if you would like.

25  **Q.**  Yes.  So before we go into how the testing is actually

1  performed, can you give the court an idea, you're talking about

2  the C13, the C12 values, you know, what exactly is a C13 value?

3  Is it just the type of carbon?

4  **A.**  Yeah.  So that's the carbon-13 and carbon-12 isotope.  And so

5  that exists in nature.  So that's where we're actually monitoring,

6  is carbon-12 and carbon-13.

7  **Q.**  Okay.  And how can that C13 value that you get from an IRMS

8  test, how can that be used to analyze different compounds or

9  substances?

10  **A.**  So -- so this particular instrumentation has been around since

11  the '50s.  RMS has been applied to numerous food products.  It's

12  been applied to drugs.  So what you're doing is you're monitoring

13  any specific changes.  All right?  So let's say that we're looking

14  at honey.  Like, we do a lot of honey research here.  Honey is one

15  of the top five most fraudulent foods.  Okay?  So it turns out

16  that when you have pure honey, you have a specific C13 carbon-12

17  ratio.  And it was determined some time ago that people are

18  introducing corn syrup into honey.  And now corn syrup is

19  colorless, it's odorless and it's tasteless.  You can't determine

20  physically that a honey has been introduced with corn syrup.  But

21  corn syrup has a specific carbon-12 and carbon-13 ratio.  And so

22  any -- if you have a pure honey that's been diluted with a pure

23  corn syrup, now what you see is a shift in value for where you

24  expect that pure honey to be.  RMS is very good at food

25  authentication.

**Q.**  So that is one way that you use that particular testing in your capacity with the FDA is for that authentication?

**A.**  Yes, exactly.

**Q.**  And in terms of you're talking about the -- in the honey example that there would be honey -- there would be corn syrup. I'm sorry.  And so are you kind of looking at what's the difference in between?

**A.**  Yes.  So it's a sliding scale.  So you have a grouping of all of the honey.  They're going to have a certain value which is usually around minus 26, minus 27 per mill.  All right?  All the honey is that way because they're derived from a C3 plant.  Corn is a C4 type photosynthetic pathway plant and that has a very high, like, around minus ten value.  So when that starts getting introduced into that very negative minus 27 per mill value of honey, now when you start testing this that scale slides up.  So an impure honey may show up around minus 20, may show up around minus 19, and that's indicative of a C4 with sugar being introduced into a pure product.

**Q.**  Okay.  So in the honey/corn syrup example, that would tell you it's no longer just honey?

**A.**  Right.  And for us the definition of honey is a pure product made by bees.  So I also sit on, like, the USB Honey Board, and that's one of the things what we write into, like, the codecs.

**Q.**  And Dr. Magnum, you mention that the C13 IRMS, that this methodology has been around for this purpose of authentication for

1  quite some time?

2  **A.**   Yes.  The first -- I think the '70s they started looking at

3  plants and differentiating plant species based on, like, C4 versus

4  C3 photosynthetic pathways.

5  **Q.**   And in your capacity with FDA, have you had the opportunity --

6  you seemed to talk about the honey example.

7  **A.**   Yes.

8  **Q.**   Is it correct that this is something that you commonly review

9  is this C13 IRMS data?

10  **A.**   Yeah.  So probably in the past two years we've reviewed about

11  15 analytical packets from FCC and third parties that have tested

12  honey analysis for us.

13  **Q.**   Okay.

14  **A.**   And so we review those packets, yes.

15  **Q.**   Okay.  And what about are there -- has it been used for other

16  purposes other than just honey?

17  **A.**   Well, the FCC also looks at maple syrup.  And for us

18  specifically, like nitrate powders we have done some oysters.

19  There's also a project we had a student and she was working on

20  hair samples.  So it's used for many different devices.

21  **Q.**   Okay.  And in regard I think you've already somewhat given the

22  information, but I just want to make sure that the Court is clear

23  and that everybody is clear, you mentioned a C13 plant in relation

24  to your honey example, and also C4 related to a corn plant.  Can

25  you kind of unpack that for us, explain that a little bit more?

1  **A.**   Sure, sure.  Most of the world's flowering plants are

2  categorized under a C3 photosynthetic cycle.  Only a very small

3  percentage are categorized as a C4 synthetic pathway.  And because

4  you have two different like photosynthetic pathways, now you have

5  two different carbon isotope signatures.  So that 90 percent of

6  the flowering population which includes things like rice, it

7  includes like your flowering plants, trees, fruits, those all have

8  a specific range of delta carbon-13 values.  And those values

9  stretch roughly from about minus 35 per mill to about minus 22 per

10 mill.  All right?

11     Then you have the C4 plants which includes corn and sugar

12 cane.  Now, those values when they analyze those and they group

13 those together, those values range from about minus 20 to about

14 minus 9 per mill.  So two specific photosynthetic-like pathways

15 produce two very different carbon-12 carbon-13 ratios.

16          THE COURT:  I want to stop you for a second.  I think

17 we've lost Bruce Morris, one of the defense counsel.  Let's just

18 give him a second.  He'll dial back in.  Go ahead, Ms. Connors.

19          MS. CONNORS:  Thank you, Your Honor.

20 DIRECT EXAMINATION

21 BY MS. CONNORS (Continued):

22 **Q.**  Dr. Mangrum, you just mentioned this -- essentially these

23 plants can then generate this carbon isotope signature; am I

24 summarizing that correctly?

25 **A.**   Yes.  So it's basically they're taking in like the CO2 from

1 the atmosphere and that $CO_2$ gets processed differently in the two

2 photosynthetic pathways and that results at either an abundance of

3 carbon-13 or a deficiency in carbon-13.  So you have like a very

4 negative number.  That means you have a very deficient carbon-13

5 value versus a more positive number.  Then you have a more

6 positive -- like a higher value type of a C13.

7 **Q.**  Okay.

8 **A.**  That's what -- that's what those two discrepancies come from.

9 **Q.**  Okay.  And so it is this carbon signature on an item that

10 you're looking at when you do the C13 IRMS testing?

11 **A.**  So the way it works is you're going to take your sample and

12 you're going to put it into a tin capsule.  And we're talking

13 about 150 micrograms of material.  So like a very, very small

14 amount of material.  This goes into a tin capsule which gets

15 folded up.  It's a very tight package.  It's about the size of a

16 half of grain of rice.  So that's your actual sample.  This gets

17 put into a carousel and spun around until the time that it's ready

18 for that injection.  This drops into a glass capillary that is

19 held at 1,000 degrees Celsius that's packed with chromium oxides.

20 So as the thing falls into this heated oven, there's a small pulse

21 of -- of pure oxygen.  And this creates a combustion.

22     So what you're doing is you're taking your intact molecule and

23 you're burning this down to the basic carbon dioxide, nitric

24 oxide, water and some sulfur oxide, if you have sulfur in your

25 solution.  So now you have this burnt-like combusted product that

1  it's now gaseous.  This gets cleaned up on the column.  There's a

2  helium transfer gas which moves these gaseous molecules over a bed

3  of reduced copper that gets rid of the oxygen.  So now what you

4  have is a $CO_2$ gas and a nitrous oxide that's been converted to

5  nitrogen gas.

6     This goes further up the chain until it gets to a water trap.

7  This pulls out the excess moisture from the combustion, then it

8  gets put on a smaller GC column which actually separates out the

9  $CO_2$ gas from the nitrogen gas.  This goes to what's called a

10 conflow system, which picks a very small of the gas out.  So it's,

11 like, a small capillary.  That gets introduced into the IRMS.  Now

12 you've gone from the EA to the IRMS system.  So at this point you

13 have a gaseous state.  This runs into a heated source.  The source

14 then hits that $CO_2$ gas with a pulse of electrons.  Now you have a

15 charged $CO_2$ ion and it's that ion state which can now be

16 controlled in the mass spec.  So that charged $CO_2$ now gets

17 deflected into the instrument.  And so there's a very strong

18 electromagnet that guides that $CO_2$ into the actual detector.  So

19 the magnet will divert a light carbon-12 and a heavy carbon-13

20 into two specific cups, and those two cups that are detecting the

21 carbon-12 $CO_2$ which is a mass 44 and a carbon $CO_2$ which is a mass

22 45.  And it's that difference that you're actually monitoring.

23 **Q.**  Okay.  And then you're using those findings to be able to look

24 at the authentication case of an item?

25 **A.**  So -- so that's the first step, yes.  The IRMS is like a very

1  like step-wise process.  With every IRMS you have a tank of CO2

2  sitting beside you.  That CO2 serves as your reference, so that

3  all of your samples are referenced to one standard CO2 gas or like

4  a nitrogen gas, all depends if you're doing nitrogen or CO2.  So

5  that in-house reference serves as what's called your delta

6  carbon-13.  So it's like your sample versus the standard CO2 gas.

7  So it's that delta, that's your difference.

8  **Q.**  Okay.

9  **A.**  Okay?  So, but the problem is my tank of CO2 may be a little

10  bit different than a tank of CO2 in Italy.  So those results

11  aren't comparable.  So I have a value.

12      Now, what I have to do is I have to have a standard reference

13  material.  All right?  And so to do IRMS correctly, we actually

14  purchase these standard reference materials from the International

15  Energy Anatomic Association or we purchase those from Mist.  And

16  these come certified and are purified with the value that we

17  should obtain if we run these correctly.  And so what you're going

18  to do, you're going to pick a value that is somewhere on your

19  scale, like where you think your sample is going to show up.  So,

20  for instance, like you may pick like sucrose, that has a very

21  high -- like, around minus ten value.  But -- and you're also

22  going to pick -- like gluconic acid which is around minus 26.  So

23  you're starting -- you're going to fill out your scale.  Okay?  So

24  those are reference standards.  So like we know where those should

25  show up.  What we do is we run those and we get the values that we

1  have for our reference gas.  Now what we do is we normalize

2  everything based on those two references.  So then if the sample's

3  run in Italy versus a sample run here in Maryland, we have the

4  same reference standard that gets normalized.  So now we can now

5  start comparing data that results should be the same regardless of

6  what instruments we actually run those on.

7  **Q.**  Okay.  Dr. Mangrum, I do want to get into the specifics about

8  this case, and the IRMS testing.  So are you aware of whether the

9  FDA lab, the forensic chemistry center is -- I'm sorry, if they

10 performed the C13 IRMS testing related to this particular case?

11 **A.**  They did.

12 **Q.**  Okay.  And do you recall who conducted that testing?

13 **A.**  I believe the operator, the analyst on the IRMS was Kevin

14 Kubicek (phonetic).

15 **Q.**  And does the FCC lab identify testing samples by a FACTS

16 number?

17 **A.**  They do.  So the FACTS system stands for, it's a sulfur

18 platform that collects all of the documentation that goes into an

19 investigation, any documentation that contains a sample, a sample

20 like analysis or it contains even the investigative reports.

21 **Q.**  Okay.  And so in respect to this case, the C13 IRMS testing

22 was completed for FACTS number 828197, item one --

23 **A.**  That's correct.

24 **Q.**  -- concerning a product labeled Choledrene?

25 **A.**  That's correct.

1  **Q.** And do you know why this testing was completed?

2  **A.** It appears that there was a concern that there was an -- an

3  abundance of biosynthetic lovastatin in this red yeast rice

4  product.

5  **Q.** Okay. And so the testing was done to determine the presence

6  of the synthetic lovastatin?

7  **A.** Yes. It was actually done to determine if a product was not

8  pure.

9  **Q.** Okay. And you mentioned red yeast rice product. By that are

10 you referring to the monacolin K?

11 **A.** That's correct.

12 **Q.** And have you had an opportunity to review the IRMS data for

13 the testing of this particular item?

14 **A.** Yes, I have.

15 **Q.** Okay. Is that something that is common for you as part of the

16 method development that you reviewed testing data from other

17 chemists?

18 **A.** So we get the occasional packet to review like the honey like

19 I mentioned that is done by the IRMS, which include the exact same

20 profile that I have seen here in this case. So we get called in

21 if a sample is close to being outside of the margins of passing or

22 a sample that may be going to be retained and they just want

23 someone else to review the data to make sure that everything is

24 hitting spec.

25 **Q.** So it is something that you have done before being able to

1  review the C13 IRMS data completed by a different chemist, not

2  yourself?

3  **A.**  Yes.  Correct.  Yeah, I think I've gone through about 15

4  packets so far.

5  **Q.**  Okay.  And do you review that data, the testing procedures to

6  determine if that testing appears to have been done correctly?

7  **A.**  That's correct.  Just to make sure everything was followed as

8  far as like the numbers that are reported and to make sure that

9  there are no abnormalities with the instrumentation and how those

10 are performed.

11 **Q.**  Okay.  And in regards to this -- this Choledrene that was

12 analyzed, did you -- was there anything in the test data that

13 raised concerns for you about the correctness of the testing?

14 **A.**  In like as far as the actual application of the sample, the

15 instrument and everything seemed to be in order.

16 **Q.**  Okay.  And in regards to the IRMS testing that was done for

17 the Choledrene, that would be the same process that you just

18 discussed regarding the honey and corn syrup example?

19 **A.**  Yes.  So it appears that when they ran -- they have a number

20 of standards that they process.  So aside from the instrumentation

21 being calibrated and everything working correctly, they ran a

22 standard of monacolin K and a standard of lovastatin.

23     Now, the actual monacolin K was showing up at around minus 27,

24 I believe, and, like, the lovastatin was a much more positive

25 value.  So what they've shown is when they actually ran the item

1   one, this was showing up at a much lower value, I mean a much

2   higher value than even the pure lovastatin.

3   **Q.**   Okay.

4   **A.**   So if this product was a pure monacolin K derived from a rice

5   fermentation, that would have incorporated the same carbon-13

6   signature as the rice.  And that would show up at a much lower, a

7   more negative delta carbon-13 value.  All right?  Now, from what I

8   understand about biosynthetic process of lovastatin, that's

9   usually produced in a vat probably with the addition of glucose

10   which is derived from a starch and, also, corn -- like cornstarch.

11   So that's going to be like the more C4 side of things.  So that

12   biosynthetic process is going on, that fungi is going to

13   incorporate the carbon-13 and 14 signature from that energy source

14   from that corn derived energy like sugar.  So like a pure

15   lovastatin would have a very positive value, a pure monacolin

16   derived from rice would have a very negative value.  What they've

17   shown here, the sample they isolated had a very positive value on

18   that sliding scale.

19   **Q.**   Okay.  And Dr. Mangrum, do you remember the exact C13 value

20   from the Choledrene?

21   **A.**   Can I look it up really quickly?  I have it right here.

22   **Q.**   Yes.  I will say is it -- just so we know what document you

23   would be looking at, are you able to look at Government's Exhibit

24   14 that had been previously sent around?

25   **A.**   Yes.  Yes, I have that right here.

1  **Q.**  Okay.

2  **A.**  Yeah, so the monacolin K standard that they had run is minus

3  27.5.  The lovastatin standard that they procured and ran is minus

4  19.5.  And the item one isolate is minus 17.9.

5  **Q.**  Okay.  And so after you reviewed these test results, reviewed

6  the C13 values for the pure monacolin K versus the pure

7  lovastatin, what conclusions were you able to draw?

8  **A.**  Well, as I mentioned earlier, the way the IRMS and the EA

9  work, so what you're dealing with is a combustion taken all of

10  your product down to like a single carbon source.  Okay?  So even

11  if I have two specific compounds that are in that, once it gets

12  through the actual combustion, it's going to be a mixture.  So you

13  can't specifically say that you have one or the other or a mix.

14  What you're going to end up saying is this doesn't look like a

15  pure compound.  So I expect a pure monacolin K compound and what

16  I'm getting is something that's off the scale.  So based on that

17  analysis, it looks like the sample that was introduced by them

18  doesn't show up where a pure monacolin K should show up.

19  **Q.**  Okay.  So just to confirm, so your opinion is that it is not

20  only monacolin K?

21  **A.**  That's correct.  And like the way the IRMS works, it doesn't

22  give you a molecular signature.  It doesn't say yes, I have

23  monacolin K and I have this other compound.  That's the issue

24  with -- with IRMS.  It's not a normal mass spectrometry technique

25  where you have an intact complex to say let's say I have glucose,

1   that's like a mass charge ratio to get a mass of 181.  All right.

2   That's comprised of C681206.  All right.  So an IRMS isn't going

3   to tell you that you have C681206.  It's not going to give you the

4   intact structure.  That's going to tell you that you have $CO_2$ and

5   that's it.  So from that aspect you can't tell like molecular

6   signature from the IRMS, but you can tell that you don't have a

7   pure product.

8   **Q.**   Okay.  And Dr. Mangrum, if you identify the value that was

9   referenced in regards to the pure lovastatin, is the value of the

10  Choledrene product closer to the lovastatin standard than it was

11  to the monacolin K standard?

12  **A.**   Yeah.  It's actually more positive than the lovastatin

13  standard.  And if we refer back to any sort of publication that

14  was done in the past couple of years, you see the lovastatin

15  values they -- they fluctuate, and it's probably based on the type

16  of media that these fungi are actually grown in.  So, like,

17  specific manufacturers would have a tailored -- like, growth

18  media.  They're going to be roughly the same but may have certain

19  sort of variability.  And so that variability and those -- that

20  energy source like that sugar that they're feeding the -- the

21  fungi for this biosynthetic lovastatin is going to vary a little

22  bit.  And that's why you see some values that are minus 16, some

23  values are going to minus 18.  That's going to be dependent on

24  manufacturer.

25          THE COURT:  Ms. Connors, I'm just looking at the motion

 1  that was filed by the defendants and it seems like their focus is

 2  that this witness relied on the FDA tests that were faulty.

 3  Mr. Mongiello, is that the basis of your motion, and can we maybe

 4  limit the testimony?  I know -- I'm sure some of this is relevant

 5  somehow, but I feel like -- I think what they have is a pretty

 6  straightforward motion saying we don't like those tests and if you

 7  relied on those tests and I think part of your argument is they

 8  relied on more than the test.  So maybe if we could focus on, I

 9  mean a little bit of English.  I don't think they're challenging

10  his ability to use these tests which I can't really repeat what

11  they are.

12          MS. CONNORS:  Sure.

13          THE COURT:  Mr. Mongiello, if you would kind of frame it

14  for me this might move things along.  Are you challenging his

15  ability to figure out the carbons?  I know that's not the right

16  question.  You know what I'm saying.

17          MR. MONGIELLO:  The government has the burden of showing

18  that what we've been calling the Perini method is viable and

19  reliable to support a differentiation based on the carbon ratios.

20  But to the extent of --

21          THE COURT:  Are you all challenging -- are you going to

22  challenge this witness on that point?  I mean yes, it's their

23  burden but you don't have to make them do it.  I mean if your

24  point is you relied on these tests and the tests are faulty.

25          MR. MONGIELLO:  And that's the other --

1          THE COURT:  We can do this all day.  But if you're not

2    really -- if you're not going to put up somebody -- honestly, I'm

3    not sure all what he's talking about and unless you're going to

4    come up with somebody that says all that is garbage or not

5    reliable, I don't think we need to do it.  I mean, I don't want to

6    shut you down, but tell me what is the basis of your motion, for

7    example?  I mean, surely that's their -- they have to do that if

8    you challenge it and there's a basis to challenge it.

9          MR. MONGIELLO:  Well, there's two things.  There's -- we

10   cited in the motion there is a communication from one of the

11   chemists who said they were not able to distinguish between

12   monacolin K and biosynthetic lovastatin that I would like to ask

13   Dr. Mangrum about.  And then there is also a second test, there's

14   a 2013 test which we would like to ask about whether or not that

15   is even able to distinguish between biosynthetic lovastatin and

16   monacolin K.

17         THE COURT:  And is that it?  I mean, that's not

18   something -- I'm sure that's something but --

19         MR. MONGIELLO:  It's not going to be a lengthy, if

20   that's the question, Your Honor.

21         THE COURT:  Well, it's really how much -- how much does

22   Ms. Connors and Dr. Mangrum have to do?  I know it's their burden

23   to put them up first and then you guys come and cross.  But I

24   would like to narrow it, if we could, to what you care about.

25         MR. MONGIELLO:  We can narrow it.  I think -- I mean, I

1  could also offer to begin now, and if the government wants more

2  leeway on a redirect, if necessary, if I'm going outside of the

3  scope of what they did, but I don't necessarily think we will

4  other than as I mentioned we cited to that communication saying

5  that the FDA chemist did not believe that they could distinguish

6  between the two substances.

7          THE COURT:  Well, Ms. Connors, if you don't want to --

8  I'll sit here with you guys all night.  So just so you know,

9  Dr. Mangrum, before you feel like I'm not paying attention, it's

10  all going to be written in a transcript.  I'm going to be able to

11  read it and sit down with the benefit of their arguments so I'm

12  not -- I'm not following what you're saying really at all.  That

13  doesn't mean that I couldn't with guidance from the lawyers and

14  the transcript so -- but if we don't have to do all of it, I'd

15  just as soon do the piece that is relevant.  So with that,

16  Ms. Connors, I'll just turn it back to you.

17          MS. CONNORS:  Yes, Your Honor, and I will say I was just

18  about to wrap up.  So you're not shorting me very much at all.

19  But I will point out that they had challenged that this was a new

20  methodology so part of our point was to make that clear to the

21  court that it was not.

22  DIRECT EXAMINATION

23  BY MS. CONNORS (Continued):

24  Q.  So Dr. Mangrum, you indicated your opinion is that the

25  Choledrene product that was tested based on that IRMS data did not

1  only contain monacolin K?

2  **A.**   That's correct, and that's strictly because it doesn't fall

3  within the range of where a monacolin K would be derived by --

4  from rice.

5  **Q.**   And you talked about that there is this range of value between

6  the pure monacolin K and the pure lovastatin?

7  **A.**   Yes.  So a pure monacolin K derived from rice would exhibit

8  the same carbon-13 carbon-12 ratio as that rice, because that's

9  its energy source.  So that's what it's uptaking, is that energy

10  from the rice.  Okay?  So any conversion would take place in a

11  biosynthetic pathway would be a rice-derived carbon.

12  **Q.**   Okay.  And in regards to drawing this conclusion related to

13  the Choledrene products, then is that consistent with how the C13

14  IRMS data has been used to analyze other substances such as your

15  example with the honey and corn syrup?

16  **A.**   Right.  So with the honey specifically, yes.  And so we'll

17  look at where the honey samples show up and we expect them to show

18  up in a very narrow range.  And if they don't show up in that

19  narrow range, we assume that they are diluted with some sort of

20  sugar.

21     Now, we can't say that sugar is corn syrup and we can't say

22  that sugar is by sugar cane because, like, they're both C4.  So

23  IRMS doesn't make that distinction.  It doesn't say that you have

24  one or the other.  It just says you don't have a pure product.

25          MS. CONNORS:  Okay.  Thank you, Dr. Mangrum.  That's all

1  I have right now.

2  CROSS-EXAMINATION

3  BY MR. MONGIELLO:

4  **Q.**  Hi, Dr. Magnum.  My name is Jeffrey Mongiello, I represent

5  Hi-Tech in this matter.  I really only have a few questions for

6  you about this.

7      First, when were you retained and brought in as an expert in

8  this matter?  Approximately when if you don't know.

9  **A.**  Yeah, I think it was about the middle of last year if I'm not

10  mistaken.

11  **Q.**  All right.  So around the summer of 2019?

12  **A.**  I think around there, yes.

13  **Q.**  Okay.  And have you spoken with John Rodden (phonetic) about

14  this matter?

15  **A.**  No.

16  **Q.**  Did you assist in the preparation of any declarations by Mr.

17  Rodden?

18  **A.**  No, I didn't.

19  **Q.**  Did you -- did you have discussion with any other FDA FCC

20  chemists in this matter?

21  **A.**  I know -- I know Kevin personally because we actually have a

22  joint project now.

23  **Q.**  I'm sorry.  I didn't mean to interrupt.  I was just asking in

24  connection with this matter.

25  **A.**  Yes, I have talked to Kevin.

1  **Q.**  Okay.  And who -- who else did you speak with to prepare for

2  today's hearing?

3  **A.**  That's it.

4  **Q.**  And what materials did you review in preparation for this

5  hearing?

6  **A.**  So I have -- I have all the FACTS worksheets that were run by

7  the FCC.

8  **Q.**  Okay.  So would you agree that lovastatin is a prescription

9  statin?

10 **A.**  Yes.

11 **Q.**  And are you aware it's used to lower or manage cholesterol?

12 **A.**  Yes.

13 **Q.**  And would you agree that it's derived from a natural fungus,

14 lovastatin?

15 **A.**  Yes.  Yes.

16 **Q.**  And would you say monacolin K is the same molecule and

17 compound as lovastatin?

18 **A.**  Monacolin K is the same complex like with the same molecular

19 formula, yes.

20 **Q.**  So would they have the same molecular weight?

21 **A.**  Same.

22 **Q.**  And the same -- same combination of atoms?

23 **A.**  Except for the C12 carbon-13 ratio, yes, but the same -- yes.

24 **Q.**  Would we expect monacolin K and lovastatin to have the same

25 effect in the human body?

1  **A.**  If they're the same molecule derived from the same source,

2  yes.

3  **Q.**  Okay.  And monacolin K is present in fermented red yeast rice;

4  correct?

5  **A.**  That's correct.

6  **Q.**  And would you agree red yeast rice products are sold without a

7  prescription as dietary supplements?

8  **A.**  That is my understanding.

9  **Q.**  Okay.  If I may, do you have the government exhibits in front

10 of you?

11 **A.**  Yes.

12 **Q.**  Can you turn your attention to Government's Exhibit 14, page 1

13 and just for the record this is also Defense Exhibit 9.  And I

14 take it what you're looking at is it a December 20, 2013 lab

15 report just to make sure that we're all on the same --

16 **A.**  Yes.  It's a one-page report?

17 **Q.**  Yes.  December 20, 2013.  Okay.

18    Did you consider this document in coming to your opinions in

19 this matter?

20 **A.**  This particular one doesn't concern IRMS.  It looks like it

21 was just an LC run to determine the actual concentration of the

22 lovastatin that was detected.

23 **Q.**  Okay.  So this -- to confirm, this 2013 test did not use

24 carbon isotype testing?

25 **A.**  According to this document, no.  It's an analytical test to

1   perform screening for drugs using liquid chromatography mass

2   spectrometry and quantitated is liquid chromatography ultraviolet

3   detection.

4   **Q.**   And to your knowledge, does that testing method, can that be

5   used to distinguish between biosynthetic lovastatin and naturally

6   occurring monacolin K?

7   **A.**   No.  By using mass spectrometry what you're going to see is

8   one isolated peak and so you're looking at it -- a compound that's

9   the same molecular weight, it's going to have the same interaction

10  with the column.  That's only going to isolate a species that can

11  be lovastatin pure or monacolin K pure, or it can be a mixture of

12  both.  So because the structure of the compound is the same for

13  both lovastatin and monacolin K, those are going to interact with

14  an LC column the exact same way.

15  **Q.**   Okay.  Thank you.  And if -- Your Honor, I would like to share

16  something.  I don't know if I need permission to do so.  I would

17  just like to show you this has been marked Defense Exhibit 8 and

18  it is -- can everybody see that?  Just wanted to confirm it's the

19  Perini article, article written Matteo Perini.  Are you able to

20  see that, Dr. Mangrum?

21  **A.**   Yes.

22  **Q.**   Did you consider this article in coming to your opinions in

23  this matter?

24  **A.**   Yes.  Yes.  That's -- that's one of the -- like one of the

25  initial authentications that -- that we saw.  As was mentioned

1  earlier, IRMS has been around for a long time.  It being applied

2  to red yeast rice and lovastatin is a fairly new process.

3  **Q.**  Okay.  Thank you for that.  I'm going to ask some questions

4  about that momentarily.  But just to confirm, this is -- what year

5  was this article published, for the record?

6  **A.**  2017.

7  **Q.**  Okay.  And to your knowledge is this a peer-reviewed article

8  or a peer-reviewed journal?

9  **A.**  Yes it is.

10  **Q.**  Okay.  I would like to turn your attention to page 2.  I'm

11  going to read you a sentence and I just want to know whether you

12  agree with Perini's summary of it.  For the record it's page 2

13  about three-quarters of the way down on the left-hand column.

14  Perini says -- or the article says for the first time in this

15  study, we investigated the possibility of distinguishing monacolin

16  K through lovastatin using stable isotope ratio analysis.  Do you

17  agree with Perini's summary of that?

18  **A.**  Yes.

19  **Q.**  Okay.  And then would you also agree with his assessment of

20  the then existing analytical approaches, that it was not possible

21  to determine if the statin is natural monacolin K or the

22  biosynthetic lovastatin?

23  **A.**  It's --

24  **Q.**  If you're looking at the screen it is right next to the hand.

25  Would you agree --

445

1  **A.**  Which approach is he referring to?  Because he says the limit

2  of this approach but he's obviously referencing a technique.

3  **Q.**  If you read earlier in the paragraph, he is referring to

4  chromatographic chemical profiling?

5  **A.**  Yes.  By running an HPLC what you're going to get is one peak

6  that can be associated with either monacolin K or lovastatin.

7  **Q.**  Just to clarify then, you agree that that approach is not

8  possible to determine the difference between the two?

9  **A.**  So the LC -- the chromatogram isn't going to tell you a

10  difference between species, no.

11  **Q.**  Okay.  Did you conduct any further literature searching in

12  preparation for this matter beyond Perini?

13  **A.**  Just basic background search on what is like lovastatin

14  because I'm not in the department of dietary supplements.

15  **Q.**  That's fair.  Do you know if other -- there are any other

16  articles that either replicate the work of Perini or if there are

17  any other articles that critique or accept the Perini method as

18  far as you know?

19  **A.**  Not to my knowledge, no.

20  **Q.**  Okay.  So you -- you briefly -- you described how the Perini

21  method purports to distinguish between biosynthetic or

22  biosynthetic lovastatin and -- let me back up for a second.  The

23  method that you described earlier for carbon-13 isotope ratio

24  testing, that is mentioned in the Perini article; right?

25  **A.**  Yes.

1   **Q.**   Okay.  Just for shorthand is it fair to -- if I call it the

2   Perini method at least with respect to Lovastatin/monacolin K?

3   **A.**   Sure.

4   **Q.**   Just so we're on the same page.  Okay.  So did Perini

5   determine a hard and fast carbon-13 value or ratio that draws the

6   line between what is biosynthetic lovastatin and naturally

7   occurring monacolin K?

8   **A.**   So by running the amount of standard or the amount of samples

9   that he ran, he came up with an average that says, I think it was

10  16, like, lovastatin, and I can't remember the exact number of

11  monacolin Ks.  So based on the number of samples that he ran, he

12  has an average and says that this is where normal -- lovastatin

13  would, like, reside on a test, and this is where the monacolin K

14  would reside on the test.

15  **Q.**   Okay.  So then there is not a specific -- there is no line of

16  demarcation then, so to speak, between the two?

17  **A.**   So if you look at some of his numbers there's like -- some

18  variability between the manufacturers.  And that's going to be all

19  related back to how they actually prepared their lovastatin.

20  **Q.**   Sure.  I guess what I'm trying to get at, I mean, is this a

21  point is there a carbon-13 ratio point at which something either

22  becomes -- goes from monacolin K to lovastatin or from lovastatin

23  to monacolin K?

24  **A.**   So you're asking is there a difference between a pure

25  lovastatin and a pure monacolin K value?

1    **Q.**  The question is more of -- like when you're referring to

2    honey, for example, you used the word sliding scale to

3    distinguish.  And I'm just asking, is that -- for monacolin K and

4    lovastatin, is it a sliding scale approach, or is there, you know,

5    a set and definite number that distinguishes between lovastatin

6    and monacolin K?

7    **A.**  So I think at this point it would be, like, premature to say

8    that we have one defined number just based on the fact

9    that -- that the samples that were run are limited in scope.  Like

10   there's roughly 16 to have a range and there's roughly 8 or 9 that

11   have a range; correct?  So to say that something will shift over

12   to one species or the other I think maybe a little difficult to

13   like to discern.

14   **Q.**  And does -- again going on your example of honey, does

15   honey -- honey have a specific point like that?

16   **A.**  So with honey it's either pure or it's not pure.

17   **Q.**  Okay.

18   **A.**  So, basically, there's -- there's a method in honey where it

19   says if it looks like this particular honey had a 7 percent,

20   that's our threshold, like, 7 percent C4 adulteration.  So the

21   FDA -- anything below 7 percent adulteration gets passed; anything

22   above 7 percent adulteration gets flagged.

23   **Q.**  And so it sounds -- I don't want to put words -- it sounds

24   like there is a line for honey at which point you would not

25   classify it as pure.  I think you mentioned it might be premature

1  for that in monacolin K and lovastatin, but is there an -- even if

2  undefined a theoretical line between the two or not yet defined,

3  so to speak?

4  **A.**   That I don't know.

5  **Q.**   Okay.  You acknowledged that the - using stable isotope ratio

6  analysis was new for this in this field for lovastatin and

7  monacolin K.

8  **A.**   Yeah.

9  **Q.**   How long has it been used for honey, approximately?

10  **A.**   For honey, since the 1980s.

11  **Q.**   Okay.  And what about for maple syrup?

12  **A.**   That may be a little bit later.  I'm not quite sure of the

13  dates on like maple syrup.

14  **Q.**   Is it fair to say maple syrup wouldn't be as recent as 2017?

15  **A.**   Right.  It's much earlier than that.

16  **Q.**   I would like to show you another document.  This is Defense

17  Exhibit 17.  Doctor, I just want to confirm, can you see the

18  exhibit on the screen?

19  **A.**   Yes.

20  **Q.**   Okay.  And then for the record, it's an April 2018 FCC

21  telephone log.  And were you aware that Dr. -- or I don't know if

22  it's Doctor or Mr. Rodden stated that the FDA chemists could not,

23  quote, would not be able to draw a conclusion on whether or not it

24  was synthetic lovastatin or plant based monacolin K?

25  **A.**   I see it now.  It's in relation -- it looks like it's a

1  different sample number.  I wasn't present on this phone call.  I

2  don't know what he's referring to as far as the sample.

3  **Q.**  I believe you said you had no conversations with John Rodden.

4  Did you have any conversations with Special Agent Tolma about this

5  matter?

6  **A.**  No.

7  **Q.**  Did you have any conversation with Special Agent Kriplean

8  about this matter?

9  **A.**  No.

10  **Q.**  Last Exhibit I'm going to show you, it's Government's Exhibit

11  14, page 2.  It's the September 4, 2018 tests that the government

12  referenced earlier.

13  **A.**  Okay.

14  **Q.**  I'm not going to share it on the screen.  You have it in front

15  of you; correct?

16  **A.**  Correct.

17  **Q.**  Did you rely on this document in coming to your opinions?

18  **A.**  Yes, so this was -- the part of the - well, this came with the

19  FACTS sheet.  So we've seen -- this document tell us the actual

20  numbers like that they -- they recorded.

21  **Q.**  Okay.  Do you know when you first saw this document

22  approximately?

23  **A.**  No.  No, I do not.

24  **Q.**  Okay.  And then to confirm, this is the isotope ratio testing

25  performed by the FCC chemist; correct?

**A.**   That's correct.

**Q.**   And that's what the method being discussed -- the method being used is what Perini discussed in the article; correct?

**A.**   I believe they reference him.  I don't know if they do in this -- I don't think this document actually references Perini.

**Q.**   But the isotope -- carbon isotope ratio testing is the subject of the Perini article?

**A.**   Yes, that's correct.

**Q.**   Okay.  You had mentioned that there were new procurements of equipment.  Does that include the machine that was used for this September -- September 2018 test, do you know?

**A.**   In September 2018 I think it should have been up and running at that point.

**Q.**   Okay.

**A.**   Like they just replaced an older instrument with a new one.  I don't know when they exactly switched over during their FCC work on that instrument.

**Q.**   Okay.  Do you know when the instruments used to conduct this test were last calibrated before the analysis?

**A.**   No.

**Q.**   Do you know when any were last cleaned?

**A.**   No, I do not.

**Q.**   Okay.  Do you know how many previous times Mr. Rodden conducted isotope ratio testing?

**A.**   No.

1  **Q.**  Are you aware of any other isotope ratio testing done on the

2  Choledrene products?

3  **A.**  No, this is the only one here.

4  **Q.**  Okay.  Thank you, Dr. Mangrum.

5           MR. MONGIELLO:  Your Honor, I have no more questions.  I

6  don't know if Mr. Morris does, but that's it on my end.

7  CROSS-EXAMINATION

8  BY MR. MORRIS:

9  **Q.**  Dr. Mangrum, I would admit I know very little about chemistry

10  so help me here.  I think you testified that there would be

11  variability in the isotope ratio based upon the way the

12  manufacturer prepared the product; is that right?

13  **A.**  So it would be under the assumption that if the lovastatin is

14  acquiring the carbon from the growth media, any changes in the

15  growth media would probably result in a change in those carbon

16  isotopes.

17  **Q.**  Okay.

18  **A.**  And that's pure speculation because I don't have access to

19  what type of growth media they're actually using for this.

20  **Q.**  Okay.  And do you agree that the test will come out at

21  different ratios based upon the way the product is manufactured?

22  **A.**  Well, I think the Perini article pretty much shows that based

23  on those manufacturers are each -- each one is a little bit

24  different but within range.

25  **Q.**  But different; right?

1   A.   Correct.

2   Q.   Okay.  And now Perini -- Perini if I understand it, his method

3   came into existence in 2017?

4   A.   That's when the publication was run, yes.

5   Q.   In 2013, do you know of any Perini type test that was

6   available to show the isotope ratio?

7   A.   Well, so I was not employed at the FDA before then, but our

8   method has been around in -- in 2013 as well.  So there is nothing

9   instrumentally has changed between now and 2013.

10  Q.   But if I understood your testimony though -- sorry, I didn't

11  mean to interrupt.

12  A.   Go ahead.

13  Q.   If I understood your testimony when you were looking at the

14  Perini article, I thought you said that before Perini's method it

15  wasn't possible to distinguish?

16  A.   So if someone had chosen to use an IRMS in 2013, they very

17  well could have applied it to the lovastatin like in question now.

18  Q.   Correct me if I'm wrong, the standard didn't exist before

19  Perini in 2013; correct?

20  A.   The standards -- from what my understanding was just monacolin

21  K standard and lovastatin standard so I don't know when those were

22  manufactured.

23  Q.   Well, if they're manufactured before the Perini method in

24  2017, there was no way to apply the Perini method, was there?

25  A.   Well, the standards are just pure compounds.  So if a pure

1    monacolin K compound existed in 2013, that's what you're basing it
2    on.
3    **Q.**  No, I'm asking about the testing -- I'm asking about the
4    process.  I think you said the Perini process came about in 2017;
5    is that right?
6    **A.**  So Perini applied IRMS to study this lovastatin issue in 2017.
7    **Q.**  Okay.  And before that it wasn't applied as far as you know?
8    **A.**  As far as I know no one had looked at IRMS with lovastatin.
9    **Q.**  Okay.  So before Perini became known in 2017, there was no way
10   in the United States in 2013 to figure that out, is there?
11   **A.**  Unless it's not published data.  That I don't know.
12   **Q.**  You don't know of any?
13   **A.**  In my limited research I don't recall seeing an IRMS method
14   for lovastatin used.
15   **Q.**  Okay.  Have you ever run an IRMS on a product for lovastatin
16   or monacolin K?
17   **A.**  No, I have not.
18   **Q.**  So anything that you're testifying about is from somebody
19   else's work that you're looking at?
20   **A.**  Yes.  So the work that was presented before me like on the
21   lovastatin is based on documentation that I'm reading.
22   **Q.**  Okay.  Anything else you were relying on besides the
23   documentation you've testified about?
24   **A.**  Just my general understanding of IRMS and my own personal use
25   of IRMS toward other products.

1  **Q.**  But never on monacolin K, lovastatin or red yeast rice?

2  **A.**  That's correct.

3  **Q.**  And to this day have you ever run IRMS on lovastatin,

4  monacolin K or red yeast rice?

5  **A.**  No, we actually have a project that's been awarded a grant

6  here at the FDA to study this exact problem.

7  **Q.**  That's terrific.  Thank you, sir.  That's all I have.

8       MS. CONNORS:  Your Honor, I just have a few questions

9  for redirect.

10  REDIRECT EXAMINATION

11  BY MS. CONNORS:

12  **Q.**  So Dr. Mangrum, you're not an expert on quantity of lovastatin

13  in a product; is that right?

14  **A.**  That's correct.

15  **Q.**  Okay.  Do you know anything about whether a quantity of

16  lovastatin in a product would then mean that the lovastatin was

17  biosynthetic or otherwise?

18  **A.**  No.

19  **Q.**  And you're not offering an opinion related to quantity of

20  lovastatin and any -- anything that that quantity would reflect;

21  is that right?

22  **A.**  That's correct.

23  **Q.**  And -- and I think that some of the terminology potentially

24  got a little jumbled, so I just want to clarify because Mr. Morris

25  was asking you about the Perini article and referring to this as

1   a -- a new process.  And I know that Mr. Mongiello kind of

2   explained he was going to call this the Perini method.  But just

3   to clarify, IRMS methodology, as you already testified, is

4   something that has been in existence for quite some time?

5   **A.**   Correct.  IRMS has been around since the '50s.  It's just

6   picking different applications to use IRMS towards.

7   **Q.**   Okay.  So that is the only thing that, you know, potentially

8   is added to or maybe something that is more recent is strictly the

9   application of this IRMS process; is that correct?

10  **A.**   That's correct.

11          MS. CONNORS:  Thank you.  I have nothing further, Your

12  Honor.  Thank you, Dr. Mangrum.

13          THE WITNESS:  Thank you.

14          THE COURT:  All right.  Anybody else?

15          MR. MORRIS:  Not I.

16          THE COURT:  Oh, my God, Dr. Mangrum, you got off so easy

17  with this crowd.  I think being last really worked to your

18  advantage today.

19          THE WITNESS:  It may have been the seven-hour wait.

20          THE COURT:  Yeah.  It was better to be waiting than to

21  be in it, I can tell you.  So if you would, just don't talk to

22  anyone about your testimony.  We want to make sure that everybody

23  is testifying from their own recollection and not by having any

24  conversations.  If for some reason you need to talk to someone

25  about your testimony, just run it past your lawyers first and they

1  will help you know whether that's something you should do or not,
2  but you probably don't want to talk about this right now anyway so
3  I'm giving you permission to not talk about it with anybody.
4  Okay?  Do you have any questions?
5          THE WITNESS:  No, Your Honor.
6          THE COURT:  You're -- you're free to leave.  I'm going
7  to talk to the lawyers for a few minutes.  Thank you for your
8  time.  We all really appreciate it.
9          THE WITNESS:  Thank you.
10          THE COURT:  Well, so well done, Jeff and Kelly.  Y'all
11  get the prize.  Nothing against the rest of you people but that
12  was excellent.  What's up next?  I guess we have to go to Friday.
13          MR. WENIK:  We have no more government witnesses if
14  memory serves and I think we have our two folks which would be
15  Dr. Bannister and Dr. Hoyer.  Certainly I, you know, unless the
16  government goes really over the top with the cross-examination I
17  think we can finish those two people certainly in one day, I would
18  venture to guess maybe half a day.  I do not know if they're
19  available tomorrow.
20          THE COURT:  I'm not available tomorrow.  So Friday is
21  our day.
22          MR. WENIK:  I think they're -- I'm pretty sure they're
23  available Friday.  I know we moved things around.  I'll confirm
24  that with them.  My guess would be if we schedule things, I don't
25  know 9:30, 10 o'clock Friday morning we could knock those two

1    witnesses out.

2            THE COURT:  Do you agree, Mr. Kitchens?

3            MR. KITCHENS:  That certainly sounds reasonable to me.

4    I don't anticipate the cross is -- would be something that would

5    carry over to yet another day.  I think we can certainly get it in

6    on Friday.

7            THE COURT:  Let's try to get it in Friday morning.

8            MR. KITCHENS:  I'm with you on that.

9            THE COURT:  Okay.  And I do -- I mean, this has been

10   informative.  You know, I'm not sure -- again I really am planning

11   to sit and study this at a time other than right now, so I can't

12   really say it seems like we have a lot of real scientists

13   testifying with real methodologies that don't sound crazy to me.

14   I know crazy is not the standard, so I would ask everybody to be

15   thinking about your motions and, you know, what you've

16   accomplished through this and whether there is a way to narrow the

17   motions or even maybe, you know, let some of them go.  Just think

18   about it.  I'm just throwing it out there.

19           MR. WENIK:  We will definitely have a conversation with

20   Mr. Kitchens and his team, Judge.

21           THE COURT:  Okay.  Y'all are welcome to talk to each

22   other.  I would -- something that would be very helpful to me and

23   I don't know maybe it's in advance of the next hearing but is a

24   timeline with respect to all of the -- really what you did, Art, I

25   thought was good.  I wasn't paying close enough attention.  I

1  should have been taking notes but I didn't.  But if somebody could

2  put together like a legit timeline like with references to the

3  exhibits, not argumentative, but just something that kind lets me

4  now know how -- and this doesn't have anything to do with the

5  methodologies but this has to do --

6          MR. MORRIS:  What they knew and when they knew it.

7          THE COURT:  What they knew and when they knew it, and

8  what they told Judge Vineyard.  Right?  So that I am interested

9  in.  You know, I've been directed by the district judge to look at

10  that and so we will look at that, but I think a timeline that

11  that, you know, but not argumentative, just super basic that is

12  easy to follow and references the different exhibits clearly would

13  be helpful.

14          MR. LEACH:  When do you want that?

15          THE COURT:  Are these other witnesses -- are we going to

16  be -- I think we're kind of done with that.

17          MR. LEACH:  No, no.  The timeline is separate and apart

18  from those people and Jack has both of those witnesses.  So

19  conceivably, I mean, if I needed to, I might be able to get it to

20  you by Friday.

21          THE COURT:  I don't know.  It probably doesn't have

22  anything to do with what we're doing now.  So right now I'm

23  actually having surgery on Wednesday so I'm going to be out of

24  pocket for awhile, which is why I'm rescheduling.  I sent you that

25  e-mail.  You all know I did it during the hearing.  I was like I

1   guess I shouldn't have sent that while listening intently to the

2   testimony.  So I'm not going to be doing anything too much on this

3   for the next couple of weeks.  But that would be helpful to me

4   unless we were going to do more of that today because I was

5   getting lost in the timeline.  And I think the judge -- I think

6   that Judge Totenberg raised an issue about the misdemeanor thing.

7           MR. KITCHENS:  That's right.

8           THE COURT:  Which is -- and the way I think of it and

9   you all can put a finer point on it, but if -- if there was -- you

10  know, if it's a strict liability misdemeanor violation whether you

11  intended to or not is that enough to support, you know, probable

12  cause.  So I don't want a ton on that.  And it's -- I don't know

13  if there is any law on it.  But I would like that at some point.

14  Maybe I would like the timeline and anything else that y'all want

15  to put together -- now that we have some real evidence -- I mean,

16  I know we don't have Agent Kriplean yet and we don't have the

17  other doctor.  Are you guys going to try to get the other doctor

18  at the hearing?

19          MR. LEACH:  Yes, Your Honor.

20          MR. MORRIS:  Brueggemeyer, we would like Brueggemeyer

21  there.

22          THE COURT:  So we don't have them, but we have a lot of

23  other stuff and even though I haven't paid super close attention,

24  I could follow that.  So it might be worthwhile for you all to

25  kind of -- in advance of that hearing to kind of say here's what

1  we know.  And I don't need, you know, really long things.  I don't

2  know -- I don't know who on your team is the most best at

3  synthesizing and being straight.

4          MR. WHEAT:  I am, Your Honor.

5          MR. WENIK:  Jared, our client Jared Wheat.

6          THE COURT:  Oh, Mr. Wheat.  But you know what I mean,

7  something that's kind of, you know, pedestrian, here's what we

8  know and here's why.  So I think that would be helpful too to kind

9  of summarize what we learned here that is relevant to that and

10  that will kind of beg the question what do we need to hear from

11  these other two people.  And are you guys opposing them

12  calling -- I thought I heard a little bit of a debate about

13  whether Brueggemeyer --

14          MR. KITCHENS:  Brueggemeyer.

15          THE COURT:  Mr. Burgermeister, is that his name?

16          MR. KITCHENS:  There was a debate about whether there

17  was any reference to Dr. Brueggemeyer's testimony for purposes of

18  the Daubert hearing.  Our argument obviously was not since he's

19  not going to be a testifying expert and they would have an

20  opportunity as, you know, as we obviously have done and the Court

21  has heard plenty of to examine the actual witnesses who conducted

22  the test, about those communications that Brueggemeyer forwarded

23  to them.  So that was the source of the disagreement was regarding

24  that proceeding.  We honestly had not had a discussion

25  between -- with Hi-Tech as to their intentions and how they -- you

1  know, witnesses that they contemplated for the Franks hearing.  So

2  this is my -- when you asked, Judge, that was my first time

3  hearing that they were interested in bringing him as well.  So

4  that's something.

5          THE COURT:  I didn't mean to suggest it.  It seemed

6  pretty obvious from where things were.  I would want to call him.

7          MR. KITCHENS:  We have not discussed it.  We, you know,

8  purely discussed it in the context of the Daubert hearing.

9          MR. LEACH:  That was me, and I raised it just because I

10 knew about all these communications and everything is flowing

11 through Brueggemeyer, so that's why I raised it at the outset of

12 the hearing.  But I do agree with Nathan that it's more relevant

13 to Franks than it is to what we're dealing with here.  I just

14 wanted to get it on the radar because of what we're looking at in

15 the documents.

16          THE COURT:  And Art, I feel like all of your arguments

17 are more relevant to Franks and to a jury argument, it seems, than

18 to Daubert.  But if y'all want to get into the carbon and the -- I

19 don't even know what Dr. Mangrum just talked about, if we're going

20 to get into that and try to say that he's unreliable, you can do

21 it.  But I just --

22          MR. MORRIS:  He's just a man with a beard.

23          THE COURT:  I think your time and my time and my

24 patience will all be better served focusing on where it needs to

25 go.  Not that my patience is something that you have to worry too

1  much about, but think about that.

2          MR. LEACH:  Judge, we just need a little time where we

3  can confer and then we'll circle back with Nathan.  This would

4  have to be in agreement.  We need a little bit of time.  Obviously

5  Mr. Wheat has been here throughout the hearing, he certainly has

6  your impressions and we just need to meet.  We can't speak without

7  talking to him.

8          THE COURT:  Of course.  And we can't really be doing

9  anything until we get a transcript either, and it's going to take

10  her a while to get the transcript.  I'm going to be out of pocket.

11  So I don't think we have to make any decisions for several weeks

12  till well after the holidays.  So I'm not asking for that.

13          I will say, Nathan, did you guys decide about whether or

14  not your motion to compel is moot or you would withdraw it?

15          MR. KITCHENS:  Here's kind of the issue that we have.

16  We -- of course, I think based on the representations that I think

17  is made either withdrawing any effort to admit that the testimony

18  or evidence that Avomeen has, I think that removes basically a

19  large part of our concern.  I think the only concern remaining is

20  based on the testimony that Mr. Hillyer provided that he reviewed

21  those results and of course his testimony was, you know, after

22  reviewing them, it did not change his opinions.  The concern that

23  we have and this is why we think it's still a reliability issue

24  and something that theoretically also may come up and be at issue

25  on cross is we -- obviously at this point we don't know the nature

1 of the testing that was done by Avomeen or what those results

2 show.  That's been obviously closely guarded by Hi-Tech and they

3 haven't provided that information.

4        But just to give a couple examples of how that could be

5 relevant, if -- obviously, Mr. Hillyer, based on what we heard

6 from his testimony is planning to opine that -- the way that the

7 FCC conducted its testing was flawed, for lack of a better word.

8 To give just an example, you know, noted, you know, you could have

9 done this one pill examination rather than doing a composite.  If

10 Avomeen had conducted testing of the same substances doing that

11 one tablet method and found the same results, it would, I think,

12 go to Mr. Hillyer's reliability if he said he saw the same results

13 despite the change of methodology and it's still, in his view --

14 the FCC was fraud by just doing a composite rather than a one

15 tablet test.

16        To give another example, if Avomeen is -- what they may

17 have been charged to do would be, let's say, if they did a

18 stability study of DHEA or the hormones and tried to make a

19 determination of could it be possible that DHEA degraded over time

20 or, you know, submitted to, you know, oxygen, whatever.  I can't

21 remember all the different factors he mentioned that could degrade

22 a product, if Avomeen actually conducted that -- that testing, and

23 then concluded based on our results it either did not degrade or

24 it did not degrade and create the specific anabolic steroids that

25 we see here and cannot explain the presence of the anabolic

1    steroids.  If Mr. Hillyer then testifies that he reviewed -- that

2    he reviewed those results and it did not change his opinion as to

3    whether -- whether degradation could account for what he called

4    the impurities here, that certainly goes to his reliability and

5    credibility as the witness.

6            So the context really, and you know, where it's a

7    different situation I think created by kind of the way that

8    Hi-Tech has designated this and shared the information of one of

9    their experts, it's very -- you can't really unring that bell.  I

10   think it would only be relevant as a potential ground for

11   cross-examination of Mr. Hillyer.  I don't think it's anything

12   that the government would use affirmatively in this case.  But as

13   a way to question Mr. Hillyer's credibility or even in the Court's

14   gatekeeping rule in determining the reliability of some of these

15   opinions, it certainly seems that those test results are very

16   relevant in that and that Hi-Tech has put it -- basically made it

17   relevant based on sharing that information with Mr. Hillyer.

18           MR. WENIK:  Well, needless to say I disagree with

19   virtually everything that Mr. Kitchens says, and in particular I

20   think what's really important is that Mr. Hillyer said that he

21   came to his opinions before he saw anything from Avomeen.

22           THE COURT:  He did say that.  I think he said he decided

23   everything before he saw those documents.

24           MR. WENIK:  Yes.  So you know, at the end of the day --

25           THE COURT:  I mean, can the lawyers -- you know, you

1  guys know the timeline.  Is that accurate?  I mean, I'm going to

2  ask you to stand in your place and can you look back through your

3  records and see if that timeline is accurate?

4         MR. WENIK:  I will.  I'll confirm it then.  I was the

5  one that was sharing most information with the team of experts and

6  I'm pretty confident that that is the truth, that he came to his

7  opinions which were certainly in the disclosure, I forget the

8  Government's exhibit number, but --

9         THE COURT:  Well, see if it's something that -- if you

10  can't, you can't.  But if it's something that you could look at

11  and based on what you see, make a representation to me that would

12  give me comfort that what Mr. Kitchens is saying probably didn't

13  happen, that would be helpful.  If you can't do it, or you just

14  can't piece it together or you don't know, that's fine also, but

15  you might be able to tell me that.

16         MR. KITCHENS:  The difficulty, Your Honor, just again to

17  clarify, is if he did form the opinion before receiving the

18  Avomeen results, and let's say he received Avomeen results that

19  would contradict, you would assume for some experts would

20  contradict the opinions he wants to offer.  If then in his view

21  that is not a relevant consideration, then that again goes to his

22  reliability and credibility as a witness if getting contrary

23  evidence from a lab hired by Hi-Tech can undermine his conclusions

24  he'd reach, then that certainly would be a relevant inquiry for

25  him.

1          MR. WENIK:  That's how expert testimony works.  The

2     experts always wear two hats when they testify in a consulting

3     capacity.  To the extent he consulted with us in any way, shape or

4     form with Avomeen and what utility it has and what our strategy is

5     has nothing to do with his opinions he formed prior to any

6     exposure of that.  If they're not going to withdraw the motion,

7     we're going to have to do additional briefing because, you know,

8     there's just no way that we think that that material is relevant

9     in any way, shape or form to the case.

10          The only -- as Mr. Kitchens concedes, they can't use

11     that affirmatively.  We don't have a Fifth -- we have a Fifth

12     Amendment right and a Sixth Amendment right to investigate various

13     avenues of defense without a rehoc -- rehash everything we put in

14     our papers.  But we were put in a position to withdraw all that

15     expert testimony, you know, you were saying we couldn't put in

16     piecemeal and that's what we did, and I think that ends the

17     matter.  But if we have to, you know -- you know, put in

18     additional, you know, briefing on the subject, I will.  I mean,

19     candidly I think if we had to withdraw Hillyer as an expert we

20     would, but I don't think we have to.

21          MR. KITCHENS:  For my purposes, again, it's not that

22     Hi-Tech was put in this position, it's that Hi-Tech put themselves

23     in this position based on the decisions they chose to make,

24     including, of course, you know, sharing the information with Mr.

25     Hillyer.  We, obviously, don't have an interest in going into any

 1   sort of strategy and getting to, you know, what results were

 2   provided to him.  It goes purely to his credibility and

 3   reliability as a witness with the opinions that he would offer.

 4   If Hi-Tech chooses to scale back what they would intend to offer

 5   with Mr. Hillyer -- and I think as the court may recall from our

 6   motions, we note how cumulative many of those opinions are.  It

 7   may be the case that Mr. Hillyer's opinions do not need to be

 8   offered through Mr. Hillyer.  It could be offered through an

 9   alternative witness that they designated, five or six witnesses to

10   offer the same exact opinions.

11            THE COURT:  But we don't know which of those opinions

12   might be relevant to the information.

13            MR. KITCHENS:  That's a problem for the Court and us,

14   you're right, we don't know.

15            THE COURT:  Okay.  Let's all think about that over a

16   glass of wine tonight.

17            MR. WHEAT:  I'm not going to withdraw Hillyer, Kitchens,

18   so that's not an option.

19            MR. LEACH:  We'll have a discussion.

20            THE COURT:  All right.  I thought Hillyer was a good

21   witness.  He's -- he can speak very --

22            MR. WHEAT:  Yeah, I'm not going to let the government --

23            THE COURT:  -- clearly and plainly.

24            MR. WHEAT:  -- intimidate me into -- I already made a

25   concession to not use the Avomeen test results.  You're not going

1   to strong-arm me into not using one of my witnesses.

2           THE COURT:  Maybe we can figure out a way -- let's all

3   think about it and see if we can find an amicable solution to

4   this.  I would like an amicable solution to this, if we can come

5   up with it.  So let's just think about that.  Let's reconvene 9:00

6   a.m. on Friday and our first witness will be who?  I guess y'all

7   don't know.  Share that information with the group when you figure

8   out a good schedule.  Let's plan for the first witness to start at

9   9:00, and the second witness to start at 11:30.  Fingers crossed

10  or something like that.  All right?

11          MR. WENIK:  Yes, Your Honor.

12          THE COURT:  All right.  See you all on Friday.

13          MR. WENIK:  Thank you, Judge.

14          MR. MORRIS:  Thank you, Your Honor.

15          (Whereupon the hearing concluded at 2:16 p.m.)

16

17

18

19

20

21

22

23

24

25

1                         C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT

4    NORTHERN DISTRICT OF GEORGIA

5

6        I do hereby certify that the foregoing pages are a true and

7    correct transcript of the proceedings taken down by me in the case

8    aforesaid.

9        This the 4th day of January, 2020.

10

11

12

13

14                        /s/ Viola S. Zborowski_____
                          VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
15                        OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25