```
1                   UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
2                        ATLANTA DIVISION

3
UNITED STATES OF AMERICA, )
4            PLAINTIFF,    )
                          )
5    -VS-                  ) DOCKET NO. 1:17-CR-00229-AT-CMS
                          ) VOLUME III
6  JARED WHEAT, JOHN BRANDON )
   SCHOPP AND HI-TECH      )
7  PHARMACEUTICALS, INC.,  )
                          )
8            DEFENDANTS.   )
   _____

9
                 TRANSCRIPT OF DAUBERT PROCEEDINGS
10          BEFORE THE HONORABLE CATHERINE M. SALINAS
                 UNITED STATES MAGISTRATE JUDGE
11                 FRIDAY, DECEMBER 18, 2020

12  APPEARANCES:

13  ON BEHALF OF THE GOVERNMENT:

14       KELLY KATHLEEN CONNORS, ESQ.
         D'JUAN B. JONES, ESQ.
15       NATHAN PARKER KITCHENS, ESQ.
         Assistant United States Attorneys
16

17  ON BEHALF OF THE DEFENDANT HI-TECH PHARMACEUTICALS, INC.:

18       ARTHUR W. LEACH, ESQ.

19  ON BEHALF OF THE DEFENDANT JARED WHEAT:

20       BRUCE HOWARD MORRIS, ESQ.
         FINESTONE MORRIS & WHITE
21
         JACK WENIK, ESQ.
22       JEFFREY MONGIELLO, ESQ.
         EPSTEIN BECKER & GREEN, P.C.
23

24           VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
                    OFFICIAL COURT REPORTER
25               UNITED STATES DISTRICT COURT
                      ATLANTA, GEORGIA
```

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MARVIN A. HEUER, M.D. | 473 | 514 | 550 | |
| STEVE J. BANNISTER | 554 | 594 | 623 | 629 |

UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT

```
 1                    (HELD VIA ZOOM AT 9 A.M.)
 2              THE COURT:  We're back on with United States versus
 3   Wheat, 1:17-CR-229.  We've got several lawyers present.  Most
 4   notably, I guess for today's purpose, Nathan Kitchens for the
 5   government, looks like Kelly Connors is here, as well as D'Juan
 6   Jones.  We've got Jack Winek, Art Leach, Bruce Morris here
 7   for -- well, let's see.  Bruce Morris is here for Mr. Wheat
 8   personally.  Art Leach and Jack Winek, I think, are here for
 9   Hi-Tech.  Is that right?
10              MR. WENIK:  That's correct.
11              THE COURT:  I don't see Mr. Wheat here.  Is Mr. Wheat
12   present, also?
13              MR. WHEAT:  Yes, ma'am.
14              THE COURT:  Good morning.
15              MR. WHEAT:  Good morning, Your Honor.
16              THE COURT:  Okay, so who is starting us off today?
17              MR. WENIK:  I will be conducting the direct examination,
18   Your Honor.
19              THE COURT:  All right.  Of Marvin Heuer, M.D.?
20              MR. WENIK:  Correct.
21              DR. HEUER:  Yes, hello.
22              THE COURT:  Good morning.  Anything we need to do before
23   we jump in?
24              MR. WENIK:  Not that I'm aware of, Judge.
25              MR. KITCHENS:  No, Your Honor.
```

1          THE COURT:  Let's jump in with both feet.

2          THE DEPUTY CLERK:  If you would raise your right hand to

3    be sworn for us.

4          Do you solemnly swear or affirm that the testimony you

5    shall give in this matter now pending before the court, shall be

6    the truth, the whole truth, and nothing but the truth so help you

7    God?

8          THE WITNESS:  Yes.

9          THE DEPUTY CLERK:  All right, if you would state your

10   full name for the record for us and spell your full name.

11         THE WITNESS:  Marvin A. Heuer.  M-A-R-V-I-N, A as in A,

12   Heuer, H-E-U-E-R.

13         THE DEPUTY CLERK:  Thank you.

14         THE WITNESS:  Yes.

15         MR. WENIK:  All right.  May I inquire, Judge?

16                    ******

17              MARVIN A. HEUER, M.D.,

18       having been previously sworn, testified as follows:

19                    ******

20   DIRECT EXAMINATION

21   BY MR. WENIK:

22   **Q.**  Good morning, Doctor.  Can we start off by having you tell the

23   judge how you're currently employed, what you currently do?

24   **A.**  Yeah, I'm currently employed by my own company, one is HMD

25   Research, another one is HMD Consulting, and I have a Heuer M.D.

1   Research, another company under the umbrella of HMD Research.  I,

2   basically, do 80 percent now of clinical trial work for

3   pharmaceuticals and some nutraceuticals.  I'm doing studies on

4   severe psoriasis, severe psoriatic arthritis, severe COPD, asthma,

5   moderate and severe lupus, a variety.  My studies change.  I've

6   done probably maybe a hundred clinical trials mainly on pharma

7   over the last 20 some years.

8       I also work part-time consulting with the Disney Company.

9   That is just a job for consulting for their occupational health.

10  I help them out, basically, when they're swamped with internal

11  needs and their doctors are busy.

12      At Disney it's mainly employees that we take care of.  So if

13  an employee gets a cut or a saw injury or falls or fractures an

14  ankle or even gets sick, like with the current virus, the

15  occupational health people will look at them.  I haven't worked at

16  Disney since mid-April because of COVID.

17      I also do consulting with new nutraceutical companies in

18  formulating different supplements, labels, clearing labels, FDA

19  regulations, possibly 483s, consumer complaints, product tampering

20  and so on.  I've worked 20 some years in the pharmaceutical

21  industry on the pharma side of the industry, and there I worked on

22  development and -- and -- and sale and FDA approval of

23  pharmaceutical products.  So that's kind of a capsule of what I'm

24  doing.

25  Q.  All right.  Let me unpack some of this a little bit for the

1  court.

2      So I want to talk a little bit about the HMD Consulting that

3  you mentioned in passing, and you talked about some of the work

4  that you do for that.

5      So does that involve providing consulting services to

6  companies or entities in the dietary supplement industry?

7  **A.**  Yes, it does.

8  **Q.**  All right.  And as part of that consulting work, are you

9  involved at all with product design or manufacturing?

10 **A.**  Yes, definitely.

11 **Q.**  Can you describe a little bit about what sorts of things you

12 do to help dietary supplement companies regarding product

13 manufacturing and design and that sort of thing?

14 **A.**  I work with them a lot on their initial formulas.  I have some

15 patents on ingredients and some patents on pure formulas and on

16 process in the dietary supplement area.  I help them when they

17 decide on their product formula.  I help them find raw material

18 suppliers that I know are confident and that I have inspected.  I

19 help them then take their formula and look at the regulations and

20 their doses and make sure they're compliant with FDA and FDC as

21 far as claims and as far as registering supplements and beginning

22 to sell it.

23 **Q.**  All right.  Now, you mentioned about helping them select

24 suppliers.  Do you also help dietary supplement companies select

25 contract manufacturers?

1    **A.**   Oh, yes, all the time.

2    **Q.**   And what does that involve?  What sort of services do you

3    provide?

4    **A.**   Well, looking at the type of ingredients and whether the

5    product might be a powder or tablet or so on.  My expertise in the

6    industry -- I've worked since about 2003 in -- in dietary

7    supplements, in nutraceuticals.  I worked with probably most of

8    the larger, medium to large manufacturers in the U.S. and in

9    Canada.  And so I will look at their formula, look at issues they

10   may have with formulation, and -- and try to find a manufacturer

11   that I know that I maybe inspected myself that could make their

12   product best.

13   **Q.**   And you mentioned that you sometimes do these inspections.

14   Have any of those been with either suppliers or contract

15   manufacturers abroad?  Can you tell the court a little bit about

16   that?

17   **A.**   Yes.  I've gone to most of the large ingredient suppliers in

18   China, some in Canada, most of the ones in the U.S.  They're

19   mainly in the Northeast, but I -- when I worked at a company

20   called Iovate, MuscleTech, I basically went to look at the sources

21   of all their major raw materials to make sure that they were clean

22   and made according to a good manufacturing process.  So at that

23   time I spent a lot of time, four to five visits a year trying

24   to -- lots of visits in Canada and lot of visits in the U.S.

25   **Q.**   All right.  So a couple of things you mentioned, what I'll

1  call terms of art.  I just want to make sure that you get on the

2  record what these mean for the court.

3      You mentioned, I believe, just now good manufacturing process.

4  Has that -- is that something that goes by the shorthand of GMP?

5  **A.**  That is GMP, yes.

6  **Q.**  And what are GMPs just in the broadest sense?  What are GMPs

7  when they apply to dietary supplements?

8  **A.**  Well, the GMPs are basic kind of guidelines that the

9  government has put out, that your personnel are trained -- they

10  started in, like, 1978 and have kind of involved mainly in pharma

11  first and now in dietary supplements.  But they mean your

12  personnel are trained, your equipment is up to standard, your

13  lines are not contaminated, there is no cross airflow between

14  lines, things that could affect the final product.  They also have

15  some -- some testing that you need to do with your raw material

16  and with your final product.  So mainly guidelines.

17      A lot of companies do GMP audits, like I did for the

18  university, and we've just got to make sure everything in the

19  plant is up to par for today's standards.

20          (Break taken requested by the court reporter.)

21          THE COURT:  All right, we're back.  Let's keep going.

22  Thank you.

23  DIRECT EXAMINATION

24  BY MR. WENIK (continued):

25  **Q.**  All right.  Where were we?  Okay, so we talked about GMPs.  I

1  think you had mentioned something, Doctor, if I heard you

2  correctly, about five minutes ago, you mentioned a term a 483.

3  Could you tell the judge what a 483 is and how that relates to the

4  dietary supplements?

5  **A.**  Yes.  483 is -- is sometimes issued after the government has

6  inspected certain facilities, whether they're raw material

7  manufacturers or whether they're final product manufacturers.

8      A 483 is a list of possible deficits or deficiencies that were

9  found by the investigators.

10 **Q.**  And does part of your consulting practice assist dietary

11 supplement companies in responding to or dealing with 483s?

12 **A.**  Yes, it does.

13 **Q.**  Okay.  Let me talk a little bit about your educational

14 background.

15     Can you just briefly summarize for the court what your

16 educational background is?

17 **A.**  Okay.  I'm a -- a bachelor's degree in science, specialty is

18 chemistry and mathematics with a psych minor.  Medical training

19 from the University of Minnesota.  Practiced -- family practice

20 since 1974, and continue to do that to this day.

21     I've also worked several years in the pharmaceutical industry

22 for multiple companies.

23     I am a fellow of the American Academy of Family Physicians way

24 back to 1975 when they were initially formed.  So, basically, my

25 medical degree is what I use today, and -- I don't know if you

1  want my industry list now or later?

2  **Q.**  Let me follow up with that.  Can you talk a little bit about

3  your experience in the pharmaceutical industry and, in particular,

4  how that involved chemistry and synthetic chemistry and process

5  chemistry and manufacturing?  Can you talk a little bit about

6  that?

7  **A.**  Yes.  Well, I first worked at SmithKline & French in 1980,

8  early 1980s.  And there -- when I got into the industry, I took on

9  a compound called auranofin, which is now on the market as

10  Ridaura, an organogold compound.

11     So while I was shepherding that compound and the data in that

12  compound to the FDA, we reviewed all of the chemistry, all of the

13  back history of that organogold compound and talked to FDA, an FDA

14  chemist about isolation, identification, metabolites and so on.  I

15  had basically the -- the chemistry department on that compound and

16  the pharmacology department on that compound under my view at

17  SmithKline & French.

18     I've also worked in Carter-Wallace.  At Carter-Wallace I had

19  about 50 bench chemists that worked under me every day.  They were

20  working on a variety of organic compounds, and mainly at that time

21  synthesizing pulmonary active compounds.  I not only did the

22  chemistry, I reviewed the chemistry and all of the compounds.  We

23  met weekly on the metabolites that they discovered and so on.

24     I also worked a bit when SmithKline merged later with Beecham

25  on Zantac, which had been an early SmithKline product.  And in

1  Zantac we were, of course, looking for metabolites and looking for

2  other similar compounds that could be either as active or more

3  active than Zantac.  And Gladstone was coming -- happened to find

4  one more active that we had not patented at that time.

5      I continue to work now on chemical compounds in my clinical

6  research today.  I have COPD compounds or mainly monoclonal

7  antibodies, but investigators in the clinical trial have to look

8  at what are called investigative brochures, which are data from

9  the very initiation of the chemical all the way through the

10  pharmacology, the pathology, the toxicology up until now under

11  Phase II, which is an earlier clinical trial, and Phase III

12  clinical trials in humans.  So I daily look at new compounds in

13  asthma, COPD, arthritis, lupus, and mainly severe diseases.  So

14  what I'm practicing today is still my family practice, but these

15  are more critically ill patients.  And we're looking at chemicals

16  that can affect certain receptors in the body or -- or certain

17  chemical processes within the cells.  So even today there's

18  complex chemistry and physiology involved in what I do.

19  **Q.**  Now, when you're at these various pharmaceutical companies

20  that you described, you mentioned SmithKline and Wallace and what

21  have you, did any of that work involve the detection and/or

22  analysis of impurities that might get into pharmaceutical

23  products?

24  **A.**  Yes, it did, to a great degree.  What I did -- I mentioned

25  Ayerst.  When I was at Ayerst, I headed their Premarin and birth

1    control division.  You are aware probably that Premarin comes from

2    pregnant mares' urine.  We found through analysis that there are

3    multiple components of the pregnant mares' urine, and also as we

4    collected the urine, we had to go through and look for impurities

5    to -- to get those out of that product.

6        We also sold birth control pills with estradiols and

7    progestins, and once again, we had to look at impurities.

8    **Q.**  All right.  And just a couple more minutes on your background

9    before I move on to some of the more substantive things.

10       You mentioned that you worked at Iovate.  Could you describe

11   what kind of company Iovate was and what sort of work you did with

12   them?

13   **A.**  Iovate is a nutraceutical company.  They approached me when

14   GMP was coming into effect, and product safety recording and so on

15   was becoming more and more important to the dietary supplement

16   area.

17       Iovate, when I started there, was about a $50 million a year

18   company.  By the time I left, it was a $500 million a year

19   company.  Their concept was to hire a chief science officer, which

20   I was, basically their chief medical officer, to get all their

21   formulas right, make sure their raw materials were right, make

22   sure their final product and manufacturing was right, and also to

23   start a safety division for safety reporting.

24       The safety reporting had been required in the pharmaceutical

25   industry since about 1980, but had just come into kind of being

1   more mandatory in the nutraceutical in the early 2000s when I

2   started at Iovate.

3       So I set up -- since I had set up a system for the safety

4   reporting aspect at SmithKlein & French when I started there,

5   where we collected adverse events from around the world, I went

6   around the world, set computers in different countries' offices so

7   that when I would come in at SmithKline in the morning, I could

8   just check in and see if any adverse event had happened anywhere

9   in the world.  Iovate wanted to use that same system.

10      So I began to set up that same safety system for Iovate's

11  nutraceutical products, and eventually were able to, once again,

12  detect any adverse event or severe adverse event reported on an

13  Iovate product within 24 hours.

14  **Q.**  All right.  And just lastly to wrap this piece up, if you

15  will.

16      When you were at Iovate, did your responsibilities include

17  selecting contract manufacturers?

18  **A.**  Yes.

19  **Q.**  Okay.  Let's talk about GMPs for a little bit.

20      What is a GMP certificate?

21  **A.**  A GMP certificate is something that can be given to a company

22  after they've had at least an unofficial visit and check by

23  companies like NFS or by some individual examiners that say they

24  do GMP.  Sometimes a company can have one of their -- their staff

25  who is trained to do their own GMP, and issue that as of this

1   year, or whatever, they passed their GMP examination.

2   **Q.**   All right.  Now, you mentioned I think in your answer that

3   this is quote, unquote unofficial.  Are there government-issued

4   GMP certifications that are given to companies?

5   **A.**   I'm sorry?

6   **Q.**   Let me rephrase it.

7        Are there official government certifications that are given to

8   dietary supplement companies?

9   **A.**   Not in the U.S. There are some that I believe the Chinese

10  government and the Indian government do issue.  I'm not sure they

11  mean a lot, because we don't know what the inspection was.  But

12  the U.S. is not a mandatory thing to have a GMP certificate.  It's

13  liked in the industry because it means that you at least meet some

14  quality standards.

15  **Q.**   And are there accepted or rather model guidelines for these

16  GMP inspections or do they vary depending on what company or

17  individuals are conducting them?

18  **A.**   There are just the guidelines that I mentioned that the FDA

19  initially issued, but they're really just guidelines.  There's no

20  checklist or this must be included or that must be included.  They

21  can vary by the company depending on what they're doing and, you

22  know -- raw material company will maybe have a little different

23  type of inspection than a final manufacturer which may be, you

24  know, a more complete list.

25  **Q.**   So these certificates you referred to, these GMP certificates

1  that we're talking about, are those issued by the FDA or some

2  government agency or are they issued by these various, to use your

3  term, unofficial inspectors or entities that do these kind of

4  unofficial inspections?

5  **A.**   They can be issued by -- like, the NSF, which has their own

6  certification.  Some of the -- the -- the pharmaceutical or the

7  nutraceutical companies that are mainly industry leaders may issue

8  a standard for -- for their own group of -- of -- of supplement

9  companies.  The company can also issue their own.  They're not

10  official government certificates, they're not issued by the U.S.

11  government, and there's a document but it is not available.

12  **Q.**   And do you, in your experience, have you seen examples of GMP

13  certificates?

14  **A.**   I've seen GMP certificates from basically around the world,

15  and some companies have several of them.  I know one company I

16  visited in China had a Chinese one, but they also had NFS come in

17  and they had also done their own.  That's more rare, but I've seen

18  lots of them.

19  **Q.**   All right.  Do these certificates vary in content and format

20  and appearance?

21  **A.**   Yeah.  Mainly, the certificate that I've seen doesn't include

22  the audit, the list of everything that is done, it's just a

23  certificate saying the plant on this date or these dates met our

24  requirements for being certified GMP.

25  **Q.**   All right.  And have you seen in the course of your career,

1  the experience that you described both when you were at Iovate and

2  when you're consulting, GMP inspection reports, have you seen

3  these sorts of documents?

4  **A.**  Yes, I have.

5  **Q.**  And do these vary in format and content as well?

6  **A.**  They do somewhat, yes, exactly.

7  **Q.**  All right.  Is there a standard government inspection report

8  or form or do these vary depending on what entity or company is

9  doing it?

10 **A.**  I'm -- I've not seen a standard government form.  Their 483

11 form allows a lot of flexibility.

12 **Q.**  Okay.  I want to get your mind back to the time period of 2011

13 to 2012.  And based on your experience, I think you mentioned

14 earlier in your testimony you've been dealing with dietary

15 supplements since about 2003.  What was the state in the dietary

16 supplement industry of the implementation of GMP standards?  What

17 was the general state of affairs in the industry back about eight

18 or nine years ago?

19 **A.**  In those days like 2003, 2004, the governance for supplements

20 had been open first for questionings and then they began to

21 implement.  So it was kind of like the Wild West.  People were

22 trying to do things they didn't know what had to be done.  They

23 were all, you know, kind of asking each other and even asking the

24 government what -- what do you need on this?  So it was a lot of

25 loose stuff in those days.

1  **Q.**  All right.  I just want to make sure I kept this time period.

2  I know you said you've been around since 2003, but these GMP

3  standards, do you remember, roughly, when they were first are

4  promulgated in the Federal Register, when these first came out?  I

5  assume it was later than 2003?

6  **A.**  In dietary supplements I believe it was 1998 when the first

7  GMPs were issued, and those allowed a lot of exclusions.  Like,

8  some small companies didn't have to meet them on the first

9  deadline and so on.

10  **Q.**  And was 2007 also a significant year for GMPs as applied to

11  the dietary supplement?

12  **A.**  2007 is when they added more items, yes.

13  **Q.**  All right.  And in 2011 and 2012, again, what was the state of

14  affairs in the dietary supplement industry as far as adopting GMPs

15  and getting GMP certifications and inspections and those sort of

16  things?

17  **A.**  Well, everybody was trying to figure out what was needed, what

18  would be sufficient.  There were companies coming in and offering

19  to do them.  I don't think NSF was one of the first ones, but some

20  of the companies there offered them -- as I said, some of them was

21  being phased in.  People weren't sure that the smaller companies

22  didn't have to be up to super par first, and things such as safety

23  reporting and so on were just coming into -- into being.

24  **Q.**  All right.  I want to turn your attention to your experience

25  in selecting contract manufacturers.  So again looking back in

1  2011 and 2012, what was your understanding of what a contract

2  manufacturing customer in a dietary supplement would be looking

3  for, what factors would they be looking for in selecting a

4  contract manufacturer?

5  **A.**  Well, in that time I think people were asking that plants meet

6  GMP.  I don't think it was mandatory at that time, but, you know,

7  they wanted to make sure that the laws were received correctly,

8  that the raw materials were measured correctly, that the personnel

9  at the plant were trained in GMPs.  That safety precautions were

10 taken when -- when a visitor came to the plant and so on.

11 And -- and, also, to make sure that there was some sort of testing

12 after the initial manufacturing lease for identification.  So it

13 was still coming into being but it was firming up.

14 **Q.**  All right.  So when you say that companies were looking for

15 their contract manufacturers to be GMP, how would they verify

16 that?  Would they rely on the GMP certificates that you were

17 talking about earlier or would they take other steps to validate

18 this, if you will, or verify?

19 **A.**  Well, a lot of them would look for a GMP certificate.  It

20 wasn't mandatory at that time.  People didn't demand them.

21 And -- and so I think like -- like Iovate, the company

22 that -- that wanted to do everything right, I went out and

23 inspected them or we sent internal inspectors to a plant and made

24 sure they met what our list of GMP items would be.  I don't think

25 it was mandatory in those days to have a GMP certificate.

1  **Q.**  And your dietary supplement experience in consulting and what

2  have you, is this a fairly common practice that contract

3  manufacturing customers will conduct their own inspections of

4  potential contract manufacturers?

5  **A.**  Yes, definitely.  On audits or -- looks for several

6  companies -- actually, since I left Iovate, that's where I did the

7  majority of my inspections, overseas.  But I have for other

8  companies done inspections and tours of facilities.

9  **Q.**  All right.  And what about these 483s that you mentioned

10  before with the dietary supplement, contract manufacturing

11  customers, based on your experience, look to these sort of things

12  to see what sort of contract manufacturers that they would be

13  selecting?

14  **A.**  Yeah.  If I was looking for a manufacturer, first I, you know,

15  would look at those I thought were qualified.  But then I always

16  do run a check to see if they've had any 483s.  483 isn't

17  necessarily a kill thing.  You have to look at the 483 and what

18  it's for and the corrected actions.  And companies that do

19  corrective actions and so on, are, basically, fine to work with

20  them.  So we would search for 483s, we would search for any GOP

21  certificate we could find.

22  **Q.**  All right.  Now, even as we sit here in 2020, are you aware of

23  any requirement that a dietary supplement company or a dietary

24  supplement contract manufacturer has to have a GMP certificate to

25  conduct business?

1   **A.**   No, I'm not aware of any requirement like that.

2   **Q.**   Okay.  All right.  Let me shift your attention, if you will,

3   to what I'll call the steroids issue in the case.

4        Have you had the opportunity to review various FDA chemists

5   testing reports and related documents?

6   **A.**   Yes, I have.

7   **Q.**   Okay.

8             THE COURT:  Mr. Wenik, can I just interrupt for just a

9   second?

10            MR. WENIK:  Sure can.

11            THE COURT:  I know that he's being offered for a lot of

12   opinions.  It wasn't clear to me -- or is the government

13   challenging his ability to make all of those opinions or just

14   certain ones?  And if it's just certain ones, I would like to

15   limit it to those opinions.  So I would like to hear from Mr.

16   Kitchens on that.

17            MR. WENIK:  Sure.

18            MR. KITCHENS:  Yes, Your Honor.  We certainly were

19   challenging his opinion in the contract manufacturing.  I think we

20   don't have a sense of the basis yet for some of the opinions that

21   are being offered, the scientific opinions in terms of the -- you

22   know, what I think Jack is about to get into in terms of what he's

23   intending to opine about the presence of the steroids found in

24   these products.  So those are subject to the government's

25   challenge as well.

1           THE COURT:  Is there any part of his opinion that you're

2    not challenging the -- I know you have other challenges regarding,

3    you know, too many witnesses on the same topic.

4           MR. KITCHENS:  Sure.

5           THE COURT:  But is there anything that we can carve out

6    that you're not challenging the basis of his opinion?

7           MR. KITCHENS:  I'm trying to see --

8           MR. WENIK:  Let me say this, Judge.  I certainly am, and

9    my intention is to be more streamlined than I was with Mr.

10   Hillyer, because I sensed that you have the gist, if you will, by

11   now of, you know, the defense's view of the steroids issue, but I

12   do want to take it for some of it.  I don't want to take it from

13   every single report and what have you.

14          THE COURT:  I really do want to limit it to what the

15   government is challenging.  You don't need to put on your whole

16   direct examination with me.  I know that is tempting, but I don't

17   need that.  I really only need -- I think I really only need the

18   science, and -- so is there any part we can carve out?

19          MR. KITCHENS:  I think our challenge is really based on

20   some of the testimony that's already been provided, and, again, I

21   think, you know, the explanation for the presence of the

22   impurities, I think, is the focus of our challenge.  I was just

23   trying to go through -- review very quickly the disclosures in my

24   notes to see if there is anything else that --

25          THE COURT:  I mean, wasn't he going to be one of the

1    ones that said it won't have a -- it won't really affect you at

2    this low level?  I think he was one of the ones that was going to

3    offer that opinion.

4              MR. KITCHENS:  Yes, and we've challenged that on

5    multiple grounds, not just reliability.

6              THE COURT:  Okay.  What are your challenges to that

7    argument, to that opinion?

8              MR. KITCHENS:  That it's, you know, certainly not

9    relevant in terms of the elements that the jury has to look at for

10   determining whether a felony was committed here.

11             THE COURT:  Okay.

12             MR. WENIK:  I mean, I don't think issues like relevance

13   and cumulativeness and those sort of things are really within

14   your --

15             THE COURT:  No, I don't think so either.  So we don't

16   have to go through that then.

17             MR. KITCHENS:  And that's our view.  Again, we're not

18   challenging the reliability of that particular opinion I don't

19   think at this point.

20             THE COURT:  So you don't basically disagree that these

21   amounts were essentially -- had no effect on the people that took

22   them?  You don't -- you don't -- you don't -- you're not

23   challenging his ability to make that, like, the science behind

24   that, if he's allowed to make it, if Judge Totenberg allows him to

25   make it?

1          MR. KITCHENS:  I think I would phrase it as we take no

2   position on it one way or another, because in our view it's

3   totally irrelevant to the jury's consideration.  So that's

4   something that we've briefed, the parties have briefed.  We're not

5   presenting that as something that needs to be addressed in this

6   Daubert hearing.

7          THE COURT:  Okay.  I don't know if that helps at all,

8   but...

9          MR. KITCHENS:  I tried.  Sorry.

10          MR. WENIK:  No, Judge, it helps a little.  It eliminates

11   a few questions.

12          THE COURT:  Well, I know it's something that the

13   defendants think is a big deal and, you know, I think the man on

14   the street would think it's important, but if the government

15   doesn't need to do that, let's not do that.  So let's just take

16   that out.  We can put a pin in it.  You can assume I know it and I

17   get it, you don't need to do it just for my purposes.  So I didn't

18   mean to interrupt.  I just thought maybe there was something else

19   like that.

20          All right, we can keep going.  Thank you.

21          MR. WENIK:  Okay.

22   DIRECT EXAMINATION

23   BY MR. WENIK (continued):

24   Q.  One question before I move on to what I'll call the steroids

25   area of your opinions.

1    You were talking before about these 483s and the

2   self-inspections, if you will, by the potential contract

3   manufacturing customers.  Is there any one factor that is more

4   important than the others or...

5   **A.**  Not really.  I mean, I think it's always helpful to have SOPs,

6   it's really good to have trained personnel and to make sure that

7   there are reports and that the reports are signed and issued, and,

8   you know, there are other things that are minor, like, whether you

9   wear a cap in the line and so on, you know, we like all that.  But

10  I think the main things are trained personnel, quality equipment,

11  and good SOPs and good testing before and after.

12  **Q.**  Okay.  Let me try to get something on screen here.  I want to

13  try to avoid going over everything.  I think if I could just

14  select a couple of key documents, we could move through this

15  pretty quickly.  Bear with me a moment.

16          THE COURT:  Mr. Kitchens, can I ask you another question

17  as I'm thinking about it?  Is whether or not the defendant

18  intentionally put it in there, that -- that's relevant, right, to

19  your -- you would consider that a relevant question?

20          MR. KITCHENS:  I think, yes.

21          THE COURT:  Is this a strict liability case?

22          MR. KITCHENS:  It's not a strict liability.

23          THE COURT:  This has nothing to do with you.  Dr. Heuer,

24  you can take a drink of coffee real quick.

25          THE WITNESS:  Okay, yes.  Thanks.

1        MR. KITCHENS:  No, it's not a strict liability case

2   based on the fact that these are felony offenses that have been

3   charged.  I think under the FDCA, there are violations that can be

4   a strict liability offense, you know, if they've been charged as

5   misdemeanors.  There is no requirement that there be knowledge or

6   willfulness by the party in putting the substances in there.  We

7   think the standard in terms of, for example, the Controlled

8   Substances Act, is whether there was knowledge and whether there

9   was knowingly an effort to distribute these products knowing that

10  there were steroids contained within them.

11        THE COURT:  Do you have evidence that the defendants

12  knew that the steroids was in them?

13        MR. KITCHENS:  We do, Your Honor.  I don't think this is

14  something we need to discuss --

15        THE COURT:  Okay.

16        MR. KITCHENS:  -- at the Daubert hearing stage.

17        MR. WENIK:  We're innately curious, but...

18        THE COURT:  Yeah.  I know the defendants have been

19  screaming about this for three years.

20        MR. KITCHENS:  Sure.  And it's definitely an issue,

21  obviously, for trial.

22        THE COURT:  Okay.  Okay.

23        MR. WENIK:  You know, Judge, at the end of the day, I

24  mean, I don't know if it's, again, a scientific or a relevance

25  objection to our whole expert attack on the intentionality issue.

1   You know, obviously, I think it's relevant, and I think it's based

2   on science, but, you know, I'm not so sure that Mr. Kitchens --

3   when I read the briefs, I'm not so sure if it's really an attack

4   again on the reliability of what our experts are saying, talking

5   about some of the things that Mr. Hillyer highlighted or whether

6   he thinks that it's just not something that's for an expert, which

7   is more to me a relevance-type objection.

8          THE COURT:  All right.  I mean, if there is an e-mail

9   saying, let's slip a little controlled substance into these

10  things, I mean, that's one thing.  But if it's all going to be

11  based on the science, then I guess it is going to be, you know --

12  I don't know.  I mean --

13         MR. KITCHENS:  Yeah.

14         THE COURT:  Judge Totenberg said you're going to have to

15  show her, you know, I guess a few months before trial how you plan

16  to --

17         MR. KITCHENS:  Or give us an opportunity to note whether

18  or not that's required, which again, I think, Your Honor, you've

19  obviously looked at the statute, too, and formed your opinions

20  about what is required under the statute as well.

21         THE COURT:  All right.  Interesting.  All right.  Let's

22  keep going.

23         MR. WENIK:  Okay.  Hang on a moment here.  Angela, could

24  you allow me to screen share?  I'm getting a host disabled to

25  screen share function.

1          THE DEPUTY CLERK:  Yes, hold on one moment.

2          Okay, you should be good to go now.

3          MR. WENIK:  Give me a moment.  Let me see if I can

4    figure this out.  Okay.  All right.

5    DIRECT EXAMINATION

6    BY MR. WENIK (continued):

7    Q.  I want to try to, Doctor, move through this as succinctly as

8    we can.  I put on the screen Defense Exhibit 2.  Is this a

9    document you've seen before in coming to your opinions?

10   A.  Yes, I believe it is.

11   Q.  Okay.  So I just want to point out -- again, I'm not going to

12   go through every single report, but I want to highlight a couple

13   of quick points for you here.

14      So do you see on this document there's a FACTS number up here

15   that tracks the sample 984260?  Do you see that, where I'm

16   indicating?

17   A.  Yes.

18   Q.  And these samples, would you agree with me here, it says they

19   were received in October of 2016?

20   A.  Yes.

21   Q.  Okay.  So give me a moment.

22          MR. WENIK:  I'm having trouble getting up the screen.

23   Q.  Do you have Exhibit 5 in your notebook in front of you,

24   Defense Exhibit 5?

25   A.  I should have.  The July 17, 2018 letter?

1  **Q.**  Yes.

2  **A.**  Yes, I have it.

3  **Q.**  Okay.  And I'm just showing you Exhibit 5.  Do you see the

4  same sample number in this report that the samples were tested

5  again in July of 2018; do you see that?

6  **A.**  Yes.

7  **Q.**  All right.  So I showed you before that Defense Exhibit 2

8  indicated that the samples that were tested had been received in

9  October of 2016, and I'm showing you now Defense Exhibit 5 which

10 shows some that further testing took place on these samples in

11 July of 2018.

12    So let me talk to you a little bit about the concept of

13 degradation.  What is degradation, Doctor?

14 **A.**  Degradation happens to raw materials and also happens to

15 finished product and various chemicals.  When they're exposed to

16 possible hydrolysis, possible oxidation, possible microbial

17 contamination, possible mold contamination, these chemicals once

18 exposed even to the slightest of any of those items, start to

19 degrade.  So if you have a molecule -- here we're looking at

20 androstenediol, which basically those have four ring structures

21 and oxygen and hydrogen off of them.  These are pretty complex

22 structures, and if they're allowed to have hydrolysis or

23 oxidation, things are going to happen.  A methyl is going to fall

24 off, a hydrogen could fall off, a ring can break apart.  We don't

25 know what the degradation is, but once they're exposed to any of

1    these things, it's possible they're going to degrade to multiple

2    other chemicals that will also be detected or could be detected

3    when examined.

4    **Q.**   And the passage of time here, the fact that the products were

5    received in the laboratory sometime in 2016 and now we have them

6    being tested in 2018, is that a factor in the degradation, the

7    passage of time between when you test a product, test a sample?

8    **A.**   In my expert opinion, I think that's -- that's a big

9    possibility that that could be happening.  The minute you have a

10   product -- I mean, products come sealed, hopefully.  And even in a

11   sealed bottle, these things will degrade.  But once you break that

12   seal and have opened that unit, you've added many factors to a

13   rapid degradation possibility.

14       So it appears to me in their initial report when they log

15   these items in, they open the bottles.  I mean, they don't exactly

16   say that, but they say they're a blue pill with polka dots and

17   they're a red unscored pill or whatever.  How would they know that

18   without opening the bottles?  And so then once they broke that

19   label, I'm assuming they did, then they waited a month to test

20   them, they stored them, it sounds like, in a refrigerator.

21       I know DHEA itself is not super stable.  DHEA from certain raw

22   material suppliers, they're going to recommend you store them in a

23   minus 80 freezer or even store it in a liquid-like DMSO, something

24   to protect it, and once again, in a minus 20 freezer, or they're

25   going to degrade rapidly.

1  **Q.**  And can that degradation be an explanation for some of these

2  compounds that, for example, we're seeing here on the screen in

3  Defense Exhibit 5?

4  **A.**  I feel in my expert opinion, absolutely.  These things, if you

5  remember, I think it was Dr. Santos' very first examination in

6  November, about a month after these came in-house, showed nothing.

7  And -- and showed nothing clinifiable (sic), and basically it was

8  a negative LC mass spec.  It wasn't until later that they began to

9  see these things.

10  **Q.**  All right.  And so you looked at some records of Dr. Santos'

11  testing of the products?

12  **A.**  Yes, I was given, I believe, most of the reports.  There's a

13  long report by Brueggemeyer, or whoever is the head of the FCC,

14  and he itemized when things came in and when various testing was

15  done.

16  **Q.**  All right.  So the fact that multiple testing of the products

17  was done, if I understand what you're saying, that means that the

18  bottles were opened multiple times over the course of the FDA

19  chemist testing?

20  **A.**  That would be my understanding.  They were left open and then

21  each time they would take a sample of five pills per their SOP, I

22  assume, and so they would have to open it, they have to take out

23  pills, whether they shake them onto a sterile counter or a

24  contaminated counter, we don't know.  But usually these chemists

25  will shake out pills and will pick them up, hopefully with gloves

1    on their hands or with forceps, and put them in a mortar and

2    pestle and grind them up.  All of that is a chance for

3    contamination.  And plus the fact that there is, of course, a

4    bottle opened during that time or has been opened again.

5    **Q.**  Okay.  Let me go back to Defendant's Exhibit 2 which we saw a

6    few moments ago, and, hopefully, you have it on the screen now.

7    **A.**  Yes.

8    **Q.**  And so what we have here is items one, two, three; three

9    different products.  We see the first page androdiol, and 1-AD

10   anabolic and 1-testosterone; do you see that?

11   **A.**  Yes.

12   **Q.**  And if we look at the second page, do you see a table here

13   that lists the results for testing those three products, items

14   one, two and three; do you see that?

15   **A.**  Yes, I do.

16   **Q.**  All right.  I'm not going to go through all of these reports,

17   but for now let me just point out a couple of things to you and

18   ask you how these affect your opinions, if at all.

19       So if we look here, for example, on this report, in this

20   middle second from the top bracket, we see the 4-andro and 5-andro

21   and it's detected in only item one; do you see that?

22   **A.**  I do, yes.

23   **Q.**  All right.  So what implications or opinions do you draw based

24   on your opinions and expertise from the fact that different

25   products acquired at the same time had different test results as

1  far as whether certain substances could be detected or not?  What

2  implications does that have to your opinions?

3  **A.**  Well, part of my thinking when I looked at it is that this

4  chart appears to be almost random, like, you know, some products

5  tested positive and then I think in later ones, that product

6  tested negative and another product tested positive.  I think this

7  is randomness, and I don't think the FDA had the techniques down

8  initially, maybe they do now, I doubt it.  If you look here on

9  the -- on item four indicates a DEA steroid, and then you look at

10  the script on the products, and then you look at two and three

11  cannot be differentiated.  So you've two, actually, three and four

12  and what are they testing?  It can't be differentiated.  They

13  didn't know what they tested.  So my thinking is that this is

14  random and we're getting degradation.

15  **Q.**  Okay.  And some of these substances -- is it your

16  understanding that some of these substances listed here are not

17  part of Schedule III, not illegal steroids?

18  **A.**  Yes, exactly.

19  **Q.**  All right.  What implications do you draw from the fact that

20  as denoted by the examiners here or the scientists here, that the

21  steroids that they're detecting, Footnote 4, the, quote, Schedule

22  III steroids, were not the most predominant steroids in the

23  sample, what does that say to you?

24  **A.**  Well, once again -- once again, I think it goes to the methods

25  used, and I think they're showing randomness.  I think they had

1  other peaks, and I have seen other examinations where they had a

2  lot of unknown peaks.  All of those could make -- making this

3  chart nearly impossible.  So once again, I think

4  they're -- they're picking peaks that they might be able to

5  identify or something and working in the dark, and I think this

6  doesn't indicate anything positive.

7  **Q.**  And what do you draw from this last line here about the

8  special agent saying that no quantification of these -- based

9  on -- rather communication with the special agent, no

10  quantification of these steroids were performed, how did that

11  factor into your opinion looking at some of these reports?

12  **A.**  It really didn't factor into my opinion.  I think the chart is

13  self-explanatory.  This is randomness.  The fact that Brian

14  Kriplean is involved in a lot of the phone conversations, kind of

15  tells me the FDA and FCC here didn't have SOPs.

16      I would think as a regular drug company or pharmaceutical

17  company if a possible contaminated product came in, you would

18  identify that, you would -- with FCC initially following up on

19  things.  So I guess on someone's advice, they went ahead and he

20  did LC mass spec with nothing.  Someone did two more on GC-MS

21  specs, finally came up with some things.

22      But I would think there would be a procedure that says you do

23  this test, followed with this one, and don't ask outsiders, who I

24  don't think Brian Kriplean is a chemist.  But FDA should have

25  procedures for this.  I can't believe that they have someone

1  advising them, and it's not even the department chairman.

2  **Q.**  Okay.  This first one here, is this -- that's on the chart, is

3  this a thing -- also a synonym for 4-DHEA?

4  **A.**  Yes.

5  **Q.**  And these various steroids, based on your experience as a

6  scientist, if you will, how do these chemical structures relate to

7  one another?  Are they -- particularly the Schedule III ones

8  who -- what I'll call the legal ones, the 4-DHEA or the third one,

9  the epiandrosterone, you know, how closely, if closely related,

10  are these structures?

11  **A.**  They're all fairly closely related.  All of these compounds

12  are four basic rings in the chemical structure, and -- and then

13  they have different attachments, whether it was a double bond

14  oxygen or an OH group or multiple hydrogen groups.  So they're all

15  somewhat similar.  And, you know, if you start with one of them

16  and you have any kind of degradation, you know, hydrogen group is

17  going to go off, there's going to be some oxidation, there's going

18  to be some hydrolysis because air in the lab or -- especially if

19  they store it in a refrigerator, has humidity, these things are

20  going to change.  So what started out as 4-androsten-3ß-ol-17-one,

21  is going to 1-androsterone, is going to 5-androstenediol

22  eventually because these things all degrade, and, you know, nature

23  is going to take them all back to carbon, hydrogen and oxygen in

24  time.

25  **Q.**  Hang on one moment.  All right, let me -- I do want to go

1 through a little bit of what you talked about before about the

2 agent's communications.  Let me try to find another document to

3 get on the screen here.

4     All right, are you seeing an e-mail exchange in December of

5 2016 --

6 **A.**  Yes.

7 **Q.**  -- on your screen?

8     Is this one of the things that you looked at?

9 **A.**  Yes, it was.

10 **Q.**  Okay.  Now, you mentioned you had some concerns about

11 communications between the agent and the scientist.  What were

12 some of those concerns?  How did that play into your view as a

13 scientist looking at these things?

14 **A.**  Well, my concern as I just mentioned, the FCC didn't seem to

15 have a procedure.  If something comes in, maybe the agent would

16 say I suspect this or could say just check in general.  But then

17 the FCC should have a procedure to do an initial test or more

18 testing, if necessary or warrants it.  Here it appears that the

19 agent knew nothing about the -- what their SOPs are for agents.

20 But here's -- I think the agent has -- has, you know, said to do

21 certain tests or to do more testing, and at one point, I don't see

22 it right here, this was mention of -- of grand jury, you know,

23 within a week or ten days or something, and to me that sounds,

24 like, some pressure on the chemist.  You know, to analyze these

25 things is complex.  The -- you know, if you have these peaks, or

1  saw, you have to decide what the peaks are.  You have to try to

2  get a standard of what you think the peak is so you can run that

3  compared to your sample, and it takes time.  I don't think you can

4  do it all if there were multiple peaks, as I think there were.  I

5  don't think you could do it all in, like, ten days before a grand

6  jury.  And I don't know why there was pressure put on.

7  **Q.**  All right.  Is this what you're referring to, the grand jury

8  reference?

9  **A.**  Yes, that's the grand jury reference that I had seen.

10  **Q.**  Okay.  And so these testing methods that the -- that FDA

11  chemist used, is there, you know -- if I understand what you're

12  saying, it takes a certain amount of lead time to set up the

13  equipment and perform the tests and what have you; is that right?

14  **A.**  It takes a lot of lead time.  And, you know, to get those

15  standards, you have to compare it to someone outside of you and

16  maybe make some of the standards.  Some of them are available

17  readily, but then to even set up the equipment is time-consuming

18  and technical.  So if you change the equipment by a half a degree

19  or -- or pressure by a tiny amount, you're going to get possible

20  different results.

21  **Q.**  Okay.  So I showed you one example of a report, and again I

22  want to try to streamline this and not go through all of their

23  reports, but I showed you one example where they tested multiple

24  products and got different results.

25       Did you see examples of the reports that you looked at of the

1  same type of product being tested from different lots at different

2  times and different results coming -- coming out in the reports?

3  And if you did see that, how would that affect your opinion or how

4  does that add to your opinions?

5  **A.**   Yeah, I did see at least a couple different lots.  Once again,

6  the testing was not consistent, and -- and to me, I think we're

7  running with small amounts and random testing and people still

8  looking for the correct method to test.

9  **Q.**   And did these methods that were used, vary in -- in

10 selectivity, and for lack of a better word, thoroughness?

11 **A.**   I'm not sure about thoroughness, because I haven't seen the

12 lab reports on how these technicians actually did it.  I know

13 Santos has been with the division a long time, I think probably

14 does very good work.  I think there's just some unknowns.  You

15 have an unknown from the field, you ran an LC-MS spec, which is

16 okay for a quick scan.  It was basically negative.  What's the

17 procedure that said do, actually, two more GC-MS, each one

18 probably slightly different?  Did the field agent tell them that

19 or did they have that FCC or OCI, Criminal Investigation SOP, or,

20 you know, why?  Then all of a sudden they detect a little bit, and

21 even then one of the reports said even the first GC-MS spec done

22 by, I think it was Agent Kelley, was kind of nonspecific.

23     So where are the SOPs?  Where are the lab books that show what

24 they did, why they decided what pressure and temperature and

25 everything to do and what they were looking for?

1    **Q.**  Okay.  I just want to return to this exhibit for a moment

2    here, which is Defendant's 5, and I don't want to spend too much

3    time on this given the judge's admonition to try to be streamlined

4    here, but I wanted to ask you a couple of questions about the

5    quantities that we're talking about that were ultimately -- at

6    least purportedly found in these reports, the quantities of these

7    steroids.

8        You mentioned that you have experience with manufacturing and

9    contract manufacturing with Iovate.  How difficult would it be to

10   intentionally put such small quantities of an ingredient into a

11   product?  Is this something that's easy to do, such small

12   quantities, to have that added, so it's going to appear in

13   different tablets of the product?

14   **A.**  It would be very difficult to get that small amount.  You

15   know, you have big vats of the powders that come in and you

16   measure kilograms of each ingredient.  In order to get even the

17   largest quantity there, the .519, it would be nearly impossible.

18   You know, you have to lean over the vat and sprinkle half a

19   teaspoon or something into these large, large, large vats.

20   It's -- I don't think -- you know, it's not feasible.  It's not

21   something that makes any sense whatsoever.

22   **Q.**  Okay.  Putting this degradation aside and putting these -- the

23   fact that this is not feasible and makes no sense, let's assume

24   for argument's sake, for your expert opinion, giving you a

25   hypothetical, that the testing is accurate and that the government

1  scientists really did detect these very, very small quantities of

2  steroids in the products could these -- these steroids been the

3  result of some sort of issue with the manufacturing process as

4  opposed to have been intentionally added?

5  **A.**   Well, I examined a lot of laboratories and a lot of raw

6  material manufacturers in China and Canada and around the world.

7  When I went out to inspect these places, I went to look at their

8  big chemical vats and, you know, their processes and their lines

9  and look at how clean they were, if I could find that.  I would

10 also go into the retains, which is something -- after each batch

11 you usually put in a glass vial and seal it, a certain amount of

12 chemicals so that you can test that later or know exactly

13 what -- what was made there.  When I looked at retains in at least

14 one company, likely more, I noticed that on lines where we were

15 getting just a pure bamboo extract, they had made steroids in

16 earlier batches.  And I, basically, rejected that plant.  But it

17 came to mind, that unless we recently checked all of this stuff, I

18 mean, you don't know what those vats are used for -- even in the

19 glass.  I mean, people make different things in each vat.  And you

20 don't know what the cleaning procedures are, you don't know how

21 scrubbed they were.  There's no, like, water test after scrubbing

22 it to see if it's got .5 of androsten or whatever, it's just not

23 done.

24     So -- I mean, the vats that were -- clean vats are baking only

25 the chemical you want to import, but -- but the other second best

1   is, you go and inspect and make sure they're not going --

2           THE DEPUTY CLERK:  Counsel.  Hold on just a moment.

3   Judge Salinas got kicked off.  So she's going to have to rejoin.

4           Sorry.  It's hard to tell who is on and who is off when

5   we're on this view.

6           THE COURT:  Sorry about that.  I'm back.  I don't know

7   what happened.

8           MR. WENIK:  No worries.  I don't know how much you

9   missed, but let me ask a couple of questions to make sure we cover

10  it.

11  DIRECT EXAMINATION

12  BY MR. WENIK (continued):

13  **Q.**  So let me kind of backtrack a little bit, Doctor.

14      So I was asking you, assuming as an expert that the government

15  scientists testing, whatever its flaws, accurately found some of

16  these very small quantities of steroids.  Assume for argument's

17  sake that the testing is accurate.  And what I want to ask you is:

18  Can there be an explanation as part of the manufacturing

19  process -- and when I say manufacturing process, I'm focusing on

20  the manufacturing of the raw materials, the DHEA, if you will,

21  that are being imported by a company like Hi-Tech -- can there be

22  an explanation as part of that manufacturing of these raw

23  ingredients like DHEA, that would explain the presence of these

24  steroids rather that an intentionally spiking?

25  **A.**  Yes.  As I just mentioned, it's possible to have the vats

1   contaminated by something that was made previously.  Most of the
2   workers don't always change their clothes, they could have made
3   something on a whole different line, they come over and measure
4   out those powders and whatever in this line.  And, also, I believe
5   that most DHEA today is fermented, and there you're letting a
6   bacteria or an algae decide what they're making.  And so you put
7   in the raw materials to make DHEA, and you let the bacteria or the
8   fungus ferment it and you add on the hydrogens and the oxygen and
9   all that, and they make all of these structures, because plants do
10  make all of these chemicals.  And then, you know, that's separated
11  and they hope to get all of the pure DHEA and put it in the big
12  chemical vat to get rid of solvents and whatever else.  But even
13  in that initial fermentation, you can have these products made.
14  **Q.**  And have you actually seen issues when you've inspected these
15  raw material suppliers abroad, from China, what have you, have you
16  seen issues like this where there's issues as to whether the vats
17  have been properly cleaned or what have you as you've described?
18  **A.**  Yes, absolutely.
19  **Q.**  And when a -- based on your experience at Iovate and what have
20  you, and in the dietary supplement consulting, when a dietary
21  supplement company imports a raw ingredient like DHEA, is it going
22  to receive any analyses or documentation typically that would
23  report an impurity so small as we've seen in many some of these
24  test results?
25  **A.**  Probably under the best GMP you're not going to find those.

1  Often what happens is that raw is tested in the country of origin

2  before it is shipped.  They assume identity, probably an infrared

3  scanner, they point at it and detect DHEA, they want the main

4  chemical.  When it comes into the U.S., Customs probably will open

5  some of the tubs within the batch and do a quick scan and say,

6  yup, DHEA.  They're not looking for every little minor peak that

7  could be there in the process.  They know things happen.

8      Then it comes into the company and under GMP it would be

9  scanned, and it says DHEA.  It's not going to say plus five other

10  minuscule things.

11  Q.  So even if the customer who is importing something is going to

12  do their own quality control, would it be the practice in the

13  industry that -- use testing methods that are going to find such

14  small, you know, micrograms, if you will, that we're seeing in

15  some of these reports, would that be a practice in the industry?

16  A.  It's not a practice in the industry, and it's probably

17  technically not feasible to test for every possibility.

18  Q.  Okay.  I just want to circle back to a couple of things you

19  said in your answer about five or ten minutes ago.

20      So you were talking about the involvement of the agent and the

21  selecting of the different techniques to test the samples and

22  about SOPs.  Do you recall testifying about that just a few

23  minutes ago?

24  A.  Yes, I do.

25  Q.  All right.  So when you're -- I think when -- I just want to

1  make sure I understand that the court understands what you're

2  referring to.

3     Are you referring to SOPs about how the chemist, you know,

4  should set up their equipment, or are you referring to there

5  should be some sort of SOP to determine how the scientist

6  interacts with the agent and who has the authority to select what

7  testing methods?  Is that what you're referring to, that sort of

8  thing?

9  **A.**  I think both of those, but mainly I would think there would be

10 an SOP when it comes in, no matter who sent it or who's making

11 comments.  Here's what the chemist should do in the first one:  Do

12 this test, if you get nothing then either stop it or do it the

13 next test by a SOP.  I did notice when I was reading some SOPs by

14 the OCI or FCC, they did have a procedure, TO41, that basically

15 said -- the title was examining steroids when they first come in,

16 or some such thing like that.  And I wondered why they didn't do a

17 scan like that or some other SOPs, but, yeah, I'm looking for how

18 to handle it, not who tells you to handle it, you know, not even a

19 division chair.  There should be something that says, here's how

20 we test.

21 **Q.**  And lastly, I don't want to go into this in too much detail,

22 but again, I'm going to ask you to the extent that it affects your

23 opinions as to whether this presence of the small amounts of

24 steroids were intentional or not, and whether or not there are

25 other explanations, the quantities that you were seeing and I put

1  up on the screen before, these steroids, that again assume for

2  argument's sake that the testing was accurate and, actually,

3  detected that, would that have added any benefit to the finished

4  product or alter the effect of the finished product in any way,

5  those quantities?

6  **A.**  Those miniscule amounts of what they say they detected, would

7  have no effect, no physiologic effect, in my opinion, on human

8  beings.

9          MR. WENIK:  Okay.  I tried to streamline as much as I

10  could, Judge, and I think I feel comfortable passing the witness

11  on.  I don't know if Mr. Morris wants to ask any questions.

12          MR. MORRIS:  I'm good with where we are.

13          THE COURT:  All right, Mr. Kitchens, do you want to

14  go -- do you want to take a little break first or do you want to

15  go for a few minutes and then take a break?

16          MR. WENIK:  I wouldn't mind five minutes to use the

17  restroom myself, Judge.

18          THE COURT:  That's Mr. Wenik's constant reframe.  He

19  always wants five minutes to use the restroom.

20          MR. LEACH:  Judge -- Judge, when you get to be our age,

21  a comfort break is always --

22          THE COURT:  I know.  I was in a deposition one time

23  where I was the junior person and I was with the partner who was a

24  very difficult woman and we were going and we had been going for

25  awhile and the opposing counsel said, Allison, I need to go to the

1  bathroom.  And Allison paused and she said no, I've got a flight
2  to catch and she kept going.  I stood up and said, we're taking a
3  break, but I will never forget that.  And so now Mr. Wenik's made
4  me into Allison.

5          So let's take a break.  Let's take a ten-minute break.
6          MR. LEACH:  Thank you.
7          MR. WENIK:  Thank you, Judge.
8          (Whereupon a break was taken.)
9          THE COURT:  All right, Mr. Kitchens.
10         MR. KITCHENS:  Thanks, Your Honor.

11 CROSS-EXAMINATION

12 MR. KITCHENS:

13 **Q.**  Dr. Heuer, I'm Nate Kitchens.  I'm one of the prosecutors in
14 this matter, but good morning.  I just have a few questions first
15 about your experience.

16     You've already covered that you're a practicing physician and
17 essentially have been from 1974 to the present day; correct?

18 **A.**  That's correct.

19 **Q.**  Okay.  And that's a family practice?

20 **A.**  It's a family practice, but now mainly clinical research.

21 **Q.**  Okay.  Great.  Let's talk a little bit about some of that
22 clinical search experience.

23     During one of the periods when you were not practicing as a
24 physician, I think there were a couple periods where you took
25 about a decade off from having an active medical practice; is that

1  accurate?

2  **A.**   No, that's not true.

3  **Q.**   Not accurate, okay.

4       So were you a practicing -- you had a practicing medical

5  practice from, let's say, 1980 to 1991?

6  **A.**   Yes.

7  **Q.**   And where was that?

8  **A.**   Cooper Hospital, Camden, New Jersey.  Pharmaceutical companies

9  typically let their staff take a day to a day and a half not paid

10  but to work in a facility, mainly free care.  This happened to be

11  a women's health clinic and watching -- you know, doing babies and

12  deliveries.

13  **Q.**   Okay.  So you worked at a women's health clinic between 1980

14  and 1991; is that accurate?

15  **A.**   That's right.  It was a family practice, Cooper Hospital.

16  **Q.**   And we'll talk about this a little bit, too, but I did not see

17  on your resume any listing of a medical practice from 2003 and

18  2014.

19  **A.**   I don't believe I listed it, but I think I made a comment I

20  practiced every year all the time since I was first certified.

21  **Q.**   Okay.  Where were you practicing as a physician between 2003

22  and 2014?

23  **A.**   2003?  I still had a research center in Gainesville, Florida,

24  and I ran that from a distance.  And I was in Canada.  I couldn't

25  practice there, but did see some patients, and -- and along with

1    other doctors, but mainly had a center still going in Gainesville,

2    Florida.

3    **Q.**   And I understand, I'm not trying to confuse you, but I

4    understand you had a clinical research center, right, during this

5    period?

6    **A.**   In Gainesville, Florida?

7    **Q.**   In Gainesville, Florida, yes.  I understand you have the

8    clinical research.  My question was just were you practicing, a

9    practicing physician outside of that clinical research center

10   during -- between 2003 and 2014?

11   **A.**   The research center was mainly just women's health.  It wasn't

12   just research studies.  Yes, I did.  And I still did long distance

13   consulting with Dr. Morris Notelovitz, and I had worked earlier

14   with an implant company where we fertilized eggs and helped

15   infertility, and I still consulted and did some medical consulting

16   with them.

17   **Q.**   Okay.  Thanks.  That fills in some gaps in your resume.  So

18   thank you.

19   **A.**   The main thing was the research.

20   **Q.**   Now, between 1980 and 1991, as you testified, you worked for a

21   series of pharmaceutical companies; correct?

22   **A.**   That's correct.

23   **Q.**   And in those roles you were doing research and development,

24   product development, things like that?

25   **A.**   Research and development department, yes.

1   **Q.**   Did you work between 1980 and 1991, on any dietary

2   supplements?

3   **A.**   Yes.  SmithKline & French did have an LTC Division, so they

4   had I believe Diatec and a couple others.  It's a long time ago,

5   but, yes, we -- I sat on committees reviewing the dietary

6   supplements, and we reviewed, also, the problem reports that came

7   in, reviewed new products.

8   **Q.**   Okay.  So you were reviewing the reports coming out from the

9   dietary supplement division; is that right?

10  **A.**   From the research division, yes.

11  **Q.**   Okay.  Were you directly working on dietary supplement

12  manufacturing development at SmithKline?

13  **A.**   No.  Not initially, no.

14  **Q.**   When you say not initially, did you at some point work on

15  dietary supplement development at SmithKline?

16  **A.**   When I left and went away, I came back to SmithKline Beecham.

17  They had dietary supplements.

18  **Q.**   And you worked on the development of dietary supplements?

19  **A.**   Right, in the U.K., at Novus in U.K. and in Philadelphia.

20  **Q.**   Okay.  Did you work directly on anabolic steroids?

21  **A.**   In Ayerst Laboratories, yes, I did.

22  **Q.**   And can you describe that experience?

23  **A.**   In Ayerst, first of all, I was responsible for a plant making

24  Premarin in northern New York, Rouses Point.  And so I was

25  responsible for the input to that, which was part of the mares'

1  urine, responsible for the separation of the multiple components

2  and steroids structures in the pregnant mares' urine, isolating

3  them.  Premarin at the time had three major components, but a lot

4  of minor components.  We tested to make sure all of those were

5  proper.  And we also searched for on new compounds, because, once

6  again, I mentioned plants do it.  Even through a tube, when you

7  have a chemical, it's broken down into a lot of other chemicals

8  quickly.

9  **Q.**  Okay.  And in all of these roles -- and this was also, again,

10 clinical research that you were doing at Ayerst?

11 **A.**  I headed their medical department which -- SolFox Marketing, I

12 headed up their research and development, yes.

13 **Q.**  Okay.  And then you mentioned earlier, I think your clinical

14 research lab, this was the Heuer M.D. Research; is that right?

15 **A.**  Yes.

16 **Q.**  Let's talk specifically about your experience at the dietary

17 supplement industry itself.  You worked at -- you already

18 testified you mentioned you worked at Iovate; is that correct?

19 **A.**  Yes.

20 **Q.**  And that was from 2004 to 2008?

21 **A.**  Yeah, 2008 or 2009.  Yeah, it was a five-year contract,

22 actually.

23 **Q.**  Okay.  And you were a chief scientific officer there?

24 **A.**  That's correct.

25 **Q.**  And so you're managing the entire R & D team?

1   **A.**   Yes.

2   **Q.**   That's a large team, presumably?

3   **A.**   It was not a very large team, no.

4   **Q.**   How large was it?

5   **A.**   The team that I had under me was about six.

6   **Q.**   Okay.  And Iovate, did it have -- how many employees were at

7   Iovate at the time that you were working there?

8   **A.**   I think at the time that I was there, it started small, but I

9   think it was by the time I left, it might have been 190 or

10  something like that.

11  **Q.**   And did Iovate have a dedicated sales team?

12  **A.**   Iovate did have that, yes.

13  **Q.**   Were you ever a member of that sales team?

14  **A.**   No.

15  **Q.**   And was that sales team responsible for communicating with

16  customers of the end products?

17  **A.**   Yes.

18  **Q.**   Was there also a regulatory person at Iovate?

19  **A.**   Yes.  He reported to me.

20  **Q.**   Reported to you.  Okay.

21  **A.**   Yup.

22  **Q.**   And then I may have missed it, but in your testimony you may

23  have mentioned it but I just wanted to make sure, aside from

24  Iovate, you also worked in -- Iovate is from 2004 to 2008,

25  according to your resume.  In 2017 you worked for a few months at

1  BlueOcean NutraSciences?

2  **A.**  I was CEO, yes.

3  **Q.**  And that was also a dietary supplement company?

4  **A.**  Yes.

5  **Q.**  Did that also have a dedicated sales team?

6  **A.**  No.

7  **Q.**  How many employees -- how big was BlueOcean?

8  **A.**  With the board of directors and there were maybe four outside

9  employees, four directors, I believe was basically five people.

10  **Q.**  All right.  Now, I do want to talk about some of the materials

11  you reviewed in forming your opinions this morning, that you spoke

12  about this morning.

13     Now, you -- I think you already mentioned you reviewed the FDA

14  test reports; right?  And we went over those this morning?

15  **A.**  Yes, the ones that were referred to me, yes, I reviewed those.

16  **Q.**  And beyond what you saw this morning, did you review

17  additional FDA reports?

18  **A.**  I think I did from the Choledrene case, where several reports

19  were sent on a different case -- or part of this case, I guess.

20  **Q.**  Okay.  I think your opinions mentioned -- speaking of the

21  Choledrene, that you reviewed literature regarding red yeast rice?

22  **A.**  Oh, yes, lots over the years and lots for this, yes.

23  **Q.**  And what was that literature you reviewed in forming your

24  opinion on the red yeast rice?

25  **A.**  Well, as part of my expert opinion, I've used years of

1  research.  I researched red yeast rice for many years for many

2  people in the industry.  As part of this case, I reviewed a couple

3  of manufacturing methods, and I reviewed just some general papers

4  on red yeast rice in the diet.

5  **Q.**  So you reviewed a couple manufacturing methods?  Can you

6  explain that?

7  **A.**  I did not review a manufacturing method for red yeast rice for

8  this.

9  **Q.**  I'm sorry, I might have misheard you.  I thought you said you

10  reviewed a couple of manufacturing methods.  You're saying you did

11  not review?

12  **A.**  I reviewed a sheet from the manufacturer.  I did not review

13  their process.

14  **Q.**  You reviewed a sheet from a manufacturer?

15  **A.**  Yes.

16  **Q.**  Okay.  What was that sheet from?

17  **A.**  It was I believe Shubi Chemical Company (phonetic), and it was

18  just their sales sheet.

19  **Q.**  And did you locate that yourself?

20  **A.**  No.

21  **Q.**  Who did you -- who provided that to you?

22  **A.**  I'm not sure where I got that, maybe another expert when we

23  were talking or something.  I'm not sure where I got it.

24  **Q.**  Okay.  You mentioned, also, reviewing some articles related to

25  red yeast rice and providing your opinions, forming your opinions?

1  **A.**  Just some general things about a diet and so on, yes.

2  **Q.**  Do you have a list of those articles that you reviewed?

3  **A.**  Yes.  Um-hum.

4  **Q.**  And those are materials that you can provide?

5  **A.**  Yes.

6  **Q.**  Did you see -- review any test reports from -- related to the

7  products in this case from anyone other than the FDA?

8  **A.**  For this case, no, I don't believe so.

9  **Q.**  Did you ever see a report from a company called Avomeen?

10 **A.**  Oh, yes, I did see that.  Yes.

11 **Q.**  You did see a report?

12 **A.**  I did see the Avomeen report.

13 **Q.**  Okay.  And what specifically did you see?

14 **A.**  It was analysis, but that's all I recall.  I didn't review it

15 for -- for today.  But I saw it a long time ago.

16 **Q.**  You saw it a long time ago?

17 **A.**  Yeah.

18 **Q.**  What was it relating to, what products?

19 **A.**  I think Choledrene.

20        MR. WENIK:  The same objection that I had yesterday.

21 Candidly, I don't recall sharing anything about Avomeen with Dr.

22 Heuer.  But again, I didn't elicit anything from Dr. Heuer that

23 involved any reliance or anything from Avomeen.

24        THE COURT:  In light of Mr. Kitchens' explanation

25 yesterday, I'm going to let him ask a few questions

1  about -- about -- similar to what we did yesterday, but not

2  getting into the -- trying -- trying to be careful in this area.

3           MR. KITCHENS:  Understood, Your Honor.

4  CROSS-EXAMINATION

5  BY MR. KITCHENS (continued):

6  **Q.**  And so you recall reviewing Avomeen results on Choledrene?

7  **A.**  Yes, some time ago.

8  **Q.**  Do you recall reviewing Avomeen results related to the

9  prohormone products?

10 **A.**  I don't recall that, no.

11 **Q.**  Okay.  What about did you review any studies from the Center

12 for Advanced Isotope Studies?

13 **A.**  Never heard of that, no.

14 **Q.**  And those Avomeen results that you reviewed, did you consider

15 those reports in forming any of your opinions that you're

16 providing?

17 **A.**  No, I really -- it's been at least a year and a half since

18 I've reviewed them.

19 **Q.**  You say, no, not really.  Can you explain?

20 **A.**  They're not involved in my expert opinion in this case.

21 **Q.**  They're not involved?

22 **A.**  Yes.

23 **Q.**  Okay.  So you reviewed them but you're not relying on those

24 opinions -- those materials in forming your opinions?

25 **A.**  I reviewed them a long time ago.  I don't even recall the

1  results, and I'm definitely not relying on those results for any

2  decision here.

3  **Q.** Okay.  Thanks.

4     Is there any other literature, materials, anything else that

5  you reviewed that we have not discussed?

6  **A.** Yes.  I can give you a list of all of the -- I have reviewed

7  some of the chemical compounds, some of the steroid manufacturing,

8  and I have a few articles on those that I can include.

9        MR. KITCHENS:  Okay.  And, Your Honor, we would

10  certainly request that -- that list.  We, you know, believe based

11  on -- we believe that should have already been provided, but we

12  certainly would want that list.

13        MR. WENIK:  Let me just address that for a minute, Your

14  Honor.  Yesterday Mr. Kitchens raised with Mr. Hillyer about

15  materials reviewed.  There was an expert disclosure in this case

16  back in September of 2018.  I don't know how it got into Mr.

17  Leach's lap, because I was handling the experts.  But at any rate,

18  you know, at that time, in 2018, you'll see later, Government's

19  26, which is a list of materials used by Dr. Bannister, that

20  document included some materials reviewed for some of the experts,

21  Dr. Lee and Dr. Levin, what have you.  There was a subsequent

22  expert disclosure, that was Government's 21, September 2019, which

23  added some experts and some explanations.  What was supposed to

24  happen on our end, there was an attorney named David Mark that

25  worked in my firm, he was supposed to supplement the expert

```
 1  disclosures and provide materials, reviewed lists for all of the
 2  experts for the government.  He left my firm, there was a few
 3  month hiatus --
 4            MR. KITCHENS:  I think Mr. Wenik froze.
 5            THE WITNESS:  It appears that way.
 6            MR. WENIK:  I explored this yesterday --
 7            MR. KITCHENS:  Mr. Wenik, you cut out a few seconds ago.
 8  I'm sorry.
 9            MR. LEACH:  Jack, you stopped at the point where you
10  said there was a three-month hiatus.
11            THE COURT:  I think I know where we're going.  Will you
12  guys supplement your expert disclosures?
13            MR. WENIK:  The bottom line is, I regret the
14  inconvenience this has caused to Mr. Kitchens or the court.  It
15  was supposed to be provided, it fell through the cracks.  We will
16  provide updated reference lists.  You can even see in Government's
17  Exhibit 23 which is a June letter, I say I want to bring to your
18  attention two articles to add to the reference list for Drs.
19  Hillyer and Bannister.  I had no idea that the reference list
20  hadn't been -- been supplemented.
21            THE COURT:  Okay.
22            MR. WENIK:  So, yes, I'll supply all that to Mr.
23  Kitchens.  He's entitled to it.  You don't have to engage in any
24  motion practice.  It fell through the cracks.  We had some
25  turnover, and that's what happened.
```

1          THE COURT:  Let's just try to get that done before any

2   briefing is due.

3          MR. WENIK:  Absolutely.  We raised that yesterday with

4   the experts, and, hopefully, we'll get that out next week.

5          MR. KITCHENS:  We appreciate that and thank you, Mr.

6   Wenik.  I understand, obviously, oversights can happen.  So no

7   problem.  We appreciate it, and we look forward to getting that

8   timely.

9   CROSS-EXAMINATION

10  BY MR. KITCHENS (continued):

11  **Q.**  So with that understanding that you're going to provide the

12  list of materials that you reviewed, that will have a

13  comprehensive list, Dr. Heuer, of the materials you reviewed in

14  forming these opinions?

15  **A.**  Yes, you'll get a comprehensive list.

16  **Q.**  All right, thank you.

17      Let's talk about some of your opinions themselves.  And for

18  that, I want to bring up -- are you aware of the fact that Hi-Tech

19  provided a disclosure summarizing your opinions in this matter?

20  **A.**  Yes.

21  **Q.**  If we can bring up Government Exhibit 21.  I'll bring up the

22  cover page first.  Let me try to see if I can share this, Dr.

23  Heuer.  I'm not sure you have it in front of you, so I'll try to

24  share my screen.  Okay?

25      All right, Dr. Heuer, are you able to see this document?

**A.**   Yes.

**Q.**   Okay.  I'm going to flip to page 4 of Government Exhibit 21, this September 2019 disclosure.  And I want to focus your attention on kind of the five points that are raised right in the middle of this page.  Do you see those?

**A.**   Yes.

**Q.**   And Dr. Heuer, do you have -- I see you're looking down.  Are you trying to locate a copy of it?

**A.**   I do have a copy.  It will make it a little easier to read.

**Q.**   I'll give you a minute, if you have it, to grab it just so you have it in front of you.

**A.**   Yes, I have it.

**Q.**   Thanks, Dr. Heuer.  I want to go through these and make sure I understand the bases for each of these opinions you're offering regarding these five explanations.  All right?

**A.**   That's good.

**Q.**   And if we -- just to set the frame and make sure I understand this right, this is a disclosure discussing five possible explanations that you would offer regarding the presence of what is described as impurities in Hi-Tech products?

**A.**   That's correct.  At that time, September 2019.

**Q.**   Okay.  And you note fairly, you know, that was at this time, when I -- when I discuss these, if any of these you're no longer offering this opinion, just let us know and we'll move on.  Okay?

**A.**   Sure.

1  **Q.**  This first one, raw material source from China already

2  contained a trace amount of impurities which would not be revealed

3  in ordinary ingredient identity testing.

4      Does that accurately state your opinion?

5  **A.**  Yes, that's, basically, what I talked about just a few minutes

6  ago, that things can happen in the manufacturing of the raw

7  material.

8  **Q.**  And, sir, is that based on your experience in the dietary

9  supplement industry?

10  **A.**  Dietary supplement and pharmaceutical manufacturing industry.

11  **Q.**  Okay.  Did you review any literature on this topic?

12  **A.**  I don't think I have recently.  I don't recall any literature

13  for that.

14  **Q.**  You don't recall reviewing the literature for this opinion?

15  **A.**  No.

16  **Q.**  Okay.  What about did you review documents explaining where

17  Hi-Tech received its raw materials?

18  **A.**  No, I don't recall that at all.

19  **Q.**  Now, this says raw materials sourced from China.

20      Do you have an understanding of whether Hi-Tech received the

21  raw materials and these products from China?

22  **A.**  No, I don't know where Hi-Tech received -- in this -- at that

23  time, I said China but I think that was all we were talking about,

24  but I have seen this happen in India and even in Canada.  So it's

25  not just China.

**Q.** Just so I understand the full basis of this opinion, is this based on your experience in the dietary supplement industry?

**A.** It is.  It's on my experience and my own audits and my people's audits of -- of various plants and facilities.

**Q.** Based on your experience, people's audits of facilities, other than that, is there any other basis for this opinion?

**A.** I think over the years, and I've been doing this consulting for many years, I'm sure I've seen 483 orders, some contamination was mentioned.  I'm sure I've seen other internal reports where -- where these were examined.  I don't recall them, because it would have been over the course of many, many, many years and I don't keep copies of that.

**Q.** Again, based on your experience in the industry, you've seen reports about impurities in raw materials?

**A.** Experience, yeah.  My expert opinion based on experience in the industry, my reports, other reports I've seen and discussing with other personnel, also.

**Q.** All right.  Is there -- just again, to put a fine point in it, is there anything else that served as a basis for this opinion?

**A.** Not that I recall right now.

**Q.** Let's talk about the second opinion here.

You talk about the testing method could have resulted in inadvertent interconversion of illegal steroids from DHEA in the products.

Does that, also, accurately state your opinion?

1  **A.**   Yes, it does.

2  **Q.**   And can you just explain what that -- what interconversion,

3  it's in quotes, what that means to your understanding?

4  **A.**   Yeah, sure.  You know, the testing has less variables in it.

5  HPLC, which was the first test done, has lost variables as far as

6  pressure, because the pressure is high pressure, and the movement

7  of whatever you've eluded -- you know, dilution by dissolving --

8  you crush them up, they're going to, you know, do a water solvent,

9  they're going to do a harsh -- more solvent, they may even do acid

10  solvent, and they're going to put that in a machine.  And the

11  machine is hot, it has high pressure.  So as you push even the

12  tiniest molecule through an HPLC or the other machines that we

13  discussed, that molecule can change.  As I mentioned before,

14  degradation can take off hydrogen, but the pressure and the heat

15  and the testing could take off oxygen, it could break a ring, it

16  could do many things with that sample.  So, yeah, there's a chance

17  there, and I think in all of the reports even Brueggemeyer

18  mentioned that possibility.

19  **Q.**   So is that -- just so I understand it, you say the testing

20  method used by the FDA.  Which specific testing method could, in

21  your opinion, have caused this interconversion?

22  **A.**   The HPLC, GC-MS mass spec.  They did another GC-MS mass spec.

23  They did HPLC-UV, I don't know why, all of those have the

24  possibility for interconversion.  HPLC-UV which they did towards

25  the end when the product is two years old, you use very

1   specific -- and you need a certain slit for the light to come

2   through and you have to always use the same frequency of that

3   light and, you know, the temperature and everything has an effect.

4   The longer you set up the machine, the hotter it's going to get.

5   So, you know, all of their equipment I've seen mentioned today.

6   **Q.**  And just to make sure I didn't miss it, are you also opining

7   that the LC-MS technique could have resulted in the

8   interconversion?

9   **A.**  The LC-MS, yes.

10  **Q.**  And what is the basis for this opinion?

11  **A.**  It's just knowing this equipment, reading reports of this

12  equipment, reading the scientific -- people that have done various

13  studies, done various compounds using this equipment.

14  **Q.**  I understand, but when you say reading reports on this

15  equipment, are you referring to the FDA's reports about this

16  specific equipment that was used for these specific tests?

17  **A.**  No, they haven't furnished me with the specific equipment, nor

18  the setup nor the lab notes on this specific equipment.

19  **Q.**  So you're talking about general literature?

20  **A.**  Yes, general literature on this type of equipment.

21  **Q.**  And these will be materials that you'll provide --

22  **A.**  Yes.

23  **Q.**  -- on that list of materials considered?

24  **A.**  Yes.

25  **Q.**  So just so I get it again, general literature on the use of

1  these techniques, your experience with using these techniques

2  served as a basis for this opinion; is this anything else that was

3  a basis for this opinion?

4  **A.**   Well, my experience goes back many years when I mentioned in

5  the pharmaceutical with Ayerst, and now ^ , over 50 I dealt with

6  these people running all of this equipment and more technical

7  equipment, and listened to their problems, their issues, and

8  learned the operation of this equipment and what is needed.  It's

9  a very sensitive testing system.

10  **Q.**   And that -- again, as you described it, that is based on your

11  experience; correct?

12  **A.**   That's right.

13  **Q.**   So aside -- again, leaving aside your experience and general

14  literature that you reviewed regarding the instruments and the

15  methodology, was there any other basis for this opinion?

16  **A.**   Not that I recall right now, no.

17  **Q.**   Can we go to the next one.  You state that a possible

18  explanation is questionable use of unproven analytical techniques

19  by FDA scientists.

20      Does that accurately state your opinion?

21  **A.**   Yes, it does.

22  **Q.**   Just so I get an understanding of this first, when you say

23  unproven analytical techniques, what specifically is the technique

24  you're describing?

25  **A.**   Well, I don't know any of these scientists working there.  I

1    don't know their position or how many times they've used any of

2    this equipment.  So, you know, I don't know their procedure for

3    setting up equipment.  I had a couple of SOPs sent to me on the

4    UV, but I don't know how this technician set it up.  I don't know

5    the capability.  I didn't see the time that the machine was

6    warming up.  I didn't see on the UV exactly what spectrum they

7    used and so on.  So a lot of time in this industry you get

8    questionable results because an operator is not very experienced.

9    **Q.**  And thank you, Dr. Heuer, I just want to make sure.  I think

10   you were describing -- if I can split it up into two parts,

11   because it appears to me and you kind of, you know, anticipated my

12   question.  I was going to ask what was your opinion about a

13   questionable use.  Is that what you just described?

14   **A.**  What was your question again?  I'm sorry.

15   **Q.**  I asked what were the unproven analytical techniques.  So if I

16   can split this in two parts, and let me know if this isn't fair,

17   you're suggesting on one end there were unproven analytical

18   techniques and you're also suggesting that there was questionable

19   use of those techniques.  It sounded to me as if you were

20   explaining what you view as a questionable use.  I wanted to try

21   to get a sense of what was an unproven analytical technique in

22   your view.

23   **A.**  Well, my opinion is, basically, based on a presumption, and I

24   don't know, this is something that -- that I suspect when I'm

25   doing any analysis.  So -- so the whole thing is -- is the SOP

1  right?  A detailed proper note, that would need a lab notebook to

2  tell.  Is the operator qualified to do that test and come up with

3  these conclusions?  I don't know that.  I'm just assuming and

4  postulating here that this is certainly a possibility.

5  **Q.**  So you're assuming or postulating that some of the techniques

6  could have been unproven?

7  **A.**  Or the operator could not be experienced.

8  **Q.**  You're not suggesting that LC-MS is an unproven analytical

9  technique?

10  **A.**  No, not at all.

11  **Q.**  You're not suggesting GC-MS or HPLC-UV is an unproven

12  analytical technique?

13  **A.**  Not for the main analysis, but for the unknown -- unknowns

14  that they showed in their spikes, yeah, it might be difficult.

15  **Q.**  And you're assuming or postulating that it could be difficult?

16  **A.**  It could be difficult or the technique could have been wrong.

17  These are possibilities that could affect results likely sought.

18  **Q.**  And I think you've explained some of the basis of this, but

19  just to, you know, make sure I understand, this is, again, based

20  on your experience in clinical research?

21  **A.**  Based on my experience in clinical research, years of

22  consulting, talking to lots of scientists that do lots of detail

23  LC-MS spec, GC-MS spec, LC-UV, GC-UV, infrared, anything.  I've

24  talked to lots of operators of this equipment.

25  **Q.**  And did you review -- is this based on any literature or

1  documents that you reviewed?

2  **A.**   I'll have to look at my list.  I believe there were a couple

3  of documents that I reviewed on this.

4  **Q.**   Okay.  And can you describe what those documents were?

5  **A.**   I think I've scanned some documents on LC mass spec, UV and GC

6  mass spec, UV, and tried to ascertain which may or may not be

7  better.

8  **Q.**   And you did not review any documents about the specific use of

9  the instruments in this case by the FDA scientists; correct?

10  **A.**   I don't have that information.

11  **Q.**   Okay.  So you're assuming or postulating this based on your

12  experience?

13  **A.**   That's correct.

14  **Q.**   If we go to the fourth one, another explanation that you have

15  throughout is, there are serious issues with the chain of custody

16  and storage of the materials tested and preserved or sent for

17  testing.

18       I think you talked about this a little bit this morning, and

19  correct me if I'm wrong -- well, first, does this accurately state

20  your opinion?

21  **A.**   Yes.  At that time, yes.  In 2019.

22  **Q.**   Well, you say at that time in 2019.  Has your opinion on this

23  changed?

24  **A.**   No, I haven't received additional information about my

25  opinion.  I reserve the right to change it if I do receive more

1  information.

2  **Q.**  All right.  Well, let's go right there.  What was the

3  information you received that allowed you to form this opinion?

4  **A.**  Well, I noticed in one of the early receipts -- it said that

5  the agent in the field put an extra bag in three or four of the

6  sample bags that were collected.  That's not GMP and you have to

7  wonder about contamination.  I'm concerned because I saw, but I

8  haven't had anybody document, I saw the color of the pills that

9  they described, and, obviously, they broke the label.  Where is

10  the procedure for breaking the label?  And so I don't know.  I

11  don't know how they, you know, spread out the product to look at

12  it.  I don't know how they handled it.  I really don't know the

13  temperature and humidity of where this was stored.  Who stores

14  this in a regular refrigerator?  We have specific lab

15  refrigerators that have a specific humidity.  Not good for any

16  product.  So those -- that's what went into my decision.

17  **Q.**  Okay.  And so in short, based on the material you reviewed,

18  you really don't know the conditions in which this was stored or,

19  you know, maintained in custody?

20  **A.**  No.  I'm seeing, you know, initially one major breach of GMP,

21  and then I need to know if they opened all of the bottles, it

22  appears they did in their report.  That would be another breach.

23  You know, these things we sell, drugs and supplements have an

24  expiration date, but owner beware, you break that label, that

25  expiration date doesn't mean anything.  Just like you opened

1  something in your refrig, yeah, I have an expiration date best by,

2  but you open it and within three days it could be rancid.  So once

3  they broke the label, they began, I think, to have problems.

4  **Q.**  And based on material you reviewed, when did the FDA break the

5  label?

6  **A.**  I don't know.  I have to assume it was when that report that

7  describes the pills came out.

8  **Q.**  Okay.  Do you assume by the time -- certainly by the time that

9  the report came out, that the label had been broken?

10  **A.**  Well, they had to break the label to do their report.  Their

11  report was probably a few days later.  Some of the reports are

12  weeks later, and I don't know why that happened either.

13  **Q.**  So this is another fact that we just don't know?

14  **A.**  Right.

15  **Q.**  You're able to make assumptions on this, and this is what

16  you're assuming based on your experience?

17  **A.**  Based on my expert experience, these things raise a level of

18  concern.

19  **Q.**  You're again postulating that this is a possibility, a

20  scientific possibility based on your experience?

21  **A.**  That these all are and all could interrelate, and as I say,

22  maybe more if we get more information.

23  **Q.**  Okay.  You need more information to potentially move on and

24  reserve your right to change your opinion about this?

25  **A.**  Yeah, or reserve my right to change my opinion, but I don't

1  see any chance because things have already happened that can't be

2  retracted.

3  **Q.** Well, let me -- I think kind of a similar point on this, you

4  spoke about it's not specifically I don't think described in this,

5  but you spoke about degradation being another -- I think you

6  postulated as another possibility.  Is that fair?

7  **A.** Yeah, that's based, I think, on the handling, but yeah, that's

8  something that likely is happening in this opened product.

9  **Q.** Okay.  And your opinion, just so I understand it again, this

10 seal, whenever it was broken, at a date that is unknown to you,

11 that there could have been degradation resulting in the presence

12 of these purities; is that accurate?

13 **A.** As I just mentioned, it's a possibility depending on the

14 handling.  When you break a seal on a product or your milk or

15 whatever, you, basically, start that expiration date right then,

16 that various things are happening to this.  As soon as that seal

17 is broken and the cap taken off, the internal seal had to be

18 broken, you know, they describe the pills, they had them out to

19 lab air, I don't know, lab humidity.  They should have a

20 temperature and humidity check daily that people can look at, one

21 that is not zero.  They were put into, what I saw, once was their

22 refrigerator.  Because they said they took the samples out of the

23 refrigerator.  They don't say they were stored, but that's where

24 they said they took them.  Refrigerators generally have high

25 humidity.  Lab refrigerators are controlled.  Ours yesterday was

1  37 percent humidity.  It's a controlled lab, probably like theirs,

2  it's a two to six degree refrigerator with, you know, lab minus

3  80, which would have been a better way to store them.  So lots of

4  things that's just telling me, that stuff starts to change.

5  **Q.**  Okay.  And on your opinion about degradation about stuff

6  starting to change, what's the basis for that opinion?

7  **A.**  That's my experience of multiple years in the pharmaceutical

8  and multiple years in the dietary supplement, manufacturing the

9  raw material and control.

10  **Q.**  Do you recall basing it on any articles or literature?

11  **A.**  I'm sure over the years I've read thousands and thousands of

12  articles.  In the pharmaceutical industry -- I mean, their

13  requirement is that a product they make retain 95 percent of the

14  API for five years.  It's different in the nutraceutical because

15  they don't specify that, but -- so pharmaceuticals know that that

16  product is degrading from day one.  They allow five percent as a

17  more technical standard.  Nutraceuticals, I have never seen a

18  standard, but I know that once you manufacture, close the

19  bottle and seal it, it's starting to age.

20  **Q.**  Okay.  I should have asked a more precise question, Dr. Heuer.

21  What I was going to get at is, you're going to compile this list

22  of materials reviewed, are any of those materials reviewed, did

23  you review them in forming this opinion that degradation could

24  have caused the presence of these steroids?

25  **A.**  Yes.

1  **Q.**  Okay, and can you describe what those were?

2  **A.**  The ones I looked at were degradation of various steroids,

3  DHEA, testosterone7 (audio disruption).  I looked at estrogens,

4  estradiol, estrone, estriol.  So, you know, I have articles on

5  degradation more recent.  I know them, basically, from my industry

6  days, but I have more articles.

7  **Q.**  So you reviewed articles of degradation of DHEA?

8  **A.**  Yes.

9  **Q.**  And that's going to be included in your list that you're

10  providing?

11  **A.**  Yes.

12  **Q.**  Did you personally test, conduct any tests or review tests on

13  degradation of DHEA?

14  **A.**  No, my laboratory doesn't do that.

15  **Q.**  And did you review or test anything about degradation as of

16  the specific Hi-Tech products here?

17  **A.**  I don't have the capability to do that testing.

18  **Q.**  And have you, just so I understand, and I realize we don't

19  have this material in front of us, but is it your testimony that

20  the literature regarding the degradation of DHEA, states that DHEA

21  will degrade and form the steroids that are alleged in the

22  indictment?

23  **A.**  No, it doesn't say that.  It says these products can degrade,

24  and all products, you know, can do that or do that.  That's all

25  that says.

1  **Q.**  Are you forming an opinion regarding when DHEA degrades, what

2  it could degrade into?

3  **A.**  Not an opinion specifically on DHEA, but on molecules and

4  especially big molecules like these with four massive rings with

5  lots of attachments, my history and my experience, my talking with

6  other experts tells me this will degrade from day one.

7  **Q.**  Okay.  So just so I understand again your opinion, you're not

8  offering an opinion that DHEA could degrade and result in the

9  presence of the specific steroids found?

10  **A.**  No, I'm offering an opinion that DHEA can degrade and can go

11  back to these various forms.  And you saw in one of the lab

12  reports they mention they couldn't separate a couple of the spikes

13  because of coelution.  That tells me that these things are

14  changing, they're -- you know, whatever it was changed and maybe a

15  hydrogen went off on some of the molecules but not all of the

16  molecules.  So now you have two different things in there so close

17  you can't separate them.  So yes, these things change, is what I'm

18  saying.

19  **Q.**  And so I'm just trying to get -- make sure I understand.  Is

20  it your suggestion that the finding of coelution means that that

21  is showing that there is degradation?

22  **A.**  It shows it as a big possibility, yes.

23  **Q.**  Can you -- are you opining that the coelution found in this

24  case shows that there was degradation?

25  **A.**  Yes, that is one of the possibilities that we're seeing in the

1  random results.

2  **Q.**  Okay.  You're assuming or postulating that could be one of the

3  possibilities?

4  **A.**  Yes.

5  **Q.**  I think -- again, I just want to try to make sure I understand

6  the opinion because I wasn't sure I got it.  Are you saying

7  specifically that you're opining that DHEA could have degraded and

8  formed, for example, the 4-andro or the 5-andro or the Androdiol

9  in this case?

10        MR. WENIK:  Objection.  This question has been asked at

11  least a half a dozen times to this point, and I've been sitting

12  here patiently, but at some point I think we need to move on to

13  something else, Judge.

14        THE COURT:  All right, that's overruled.  If you can

15  answer the question, please do it.

16  CROSS-EXAMINATION

17  BY MR. KITCHENS (continued):

18  **A.**  I'm sorry, can you repeat that question?

19  **Q.**  I'll try to.

20        Is it you're opinion that the DHEA or are you offering the

21  opinion that the DHEA degraded and formed the specific steroids

22  detected here, the Androdiol, the 4-andro, the 5-andro, the

23  Boldione?

24  **A.**  Yes, that's my expert opinion that that is certainly a

25  possibility.  That -- my opinion is that the DHEA is changing and

1  most likely degrading.

2  **Q.**  Okay.  And again just so I understand, that is based on your

3  experience and your review of the literature that you will provide

4  to us?

5  **A.**  That's right.

6  **Q.**  Even though the literature that you'll provide to us does not

7  state that the DHEA will degrade into these specific steroids?

8  **A.**  I will have to re-look at my literature, but, you know, it's

9  also based on my expert opinion based on multiple years of

10  experience, multiple years of reading research, multiple years of

11  talking to experts.

12  **Q.**  And those multiple years of experience and multiple years of

13  talking with experts, did you see DHEA degrading into Androdiol,

14  4-andro, 5-andro or Boldione?

15  **A.**  I've definitely seen DHEA degradation.

16  **Q.**  That was not my question, Dr. Heuer.  My question was:  In

17  your multiple years of experience and multiple years of talking

18  with experts, did you see DHEA degrade into 4-andro, 5-andro,

19  Boldione and I'm forgetting the other steroid that was detected?

20  **A.**  I have not seen it degrading into those exact steroids, but we

21  don't know what exact steroids it was.  Nobody has a reason to

22  test DHEA and spend all of the time and effort on the degradation

23  or the breakdown.  Although, it will break down into multiple

24  products.  Probably you might see those, but these guys also have

25  seen other peaks, unknown, unknown, unknown.  It breaks down into

1  a lot of things.

2  **Q.**  So is it fair to say there is a lot of unknowns here?

3  **A.**  A lot of unknowns in DHEA breakdown, yes.

4  **Q.**  Let's move on.

5     Your last, the last opinion offered here is that bias by FDA

6  technicians in running and interrupting the tests, may be an

7  explanation for the presence of the steroids.  Does that

8  accurately state your opinion?

9  **A.**  At that time, yes.

10  **Q.**  Again, you state at that time.  Has your opinion changed?

11  **A.**  I haven't seen any more about what was done by these

12  technicians.  I haven't seen all of the communications.

13  Obviously, I was given some select communications.  Based on what

14  I saw, it's possible that at least an outside agent has an

15  opinion, and I don't know about the internal agents, but the

16  outside opinion seems to be slanting the testing and the

17  requirement for a time for having something done for a grand jury,

18  makes me concerned that they may be trying to please someone.  I

19  don't know.  I don't know the internal.  I haven't seen all of the

20  internal notes.  But it raises a question in my mind, because I

21  have seen things like this happen, where there's an error based on

22  someone wanting a result.

23  **Q.**  And the basis -- I think you described that e-mail that we saw

24  I think on your direct testimony, are you basing it on that e-mail

25  where there was a reference to a grand jury?

1   **A.**   Yes.   That one for the timing, but also the Kriplean telephone

2   notes and so on, and notes in the record that basically say call,

3   he wants this, he doesn't want quantitative, and a year later he

4   wants quantitative.   It's just strange.

5   **Q.**   Okay.   So those communications.   Any other basis for this

6   opinion?

7   **A.**   No other basis for the point of this knowledge, no.

8   **Q.**   And is it your opinion that all of the FDA technicians were

9   biased?

10  **A.**   I have no idea.   I'm just postulating that's a possibility.

11  But I don't know anything about them.   Like I said, I don't have

12  their lab notes, I don't have their comments, but somebody is

13  directing and it's not OCI or FCC, in my opinion.

14  **Q.**   And that's a fair point.   You're only being able to form an

15  opinion based on the materials that you've reviewed; correct?

16  **A.**   That's correct.

17  **Q.**   And what you're showing here, you're postulating various

18  possibilities; right?

19  **A.**   Yes.

20  **Q.**   You're speculating about some things that could have caused

21  explanations here?

22  **A.**   Things that I have seen happen in the past and may affect my

23  expert opinion on what could happen in this case.

24  **Q.**   And that -- that speculation about these possible causes is

25  based on, as you're describing, your experience?

**A.** My experience as an expert and expert witness, yes.

**Q.** Was there any other basis for the opinions provided, one through five, other than what we've discussed?

**A.** Not that I recall, no.

**Q.** All right. I think this is the same disclosure. Just to take the court's point, we'll skip over a few of these opinions that you've offered here, and we'll go directly to the opinions again that we challenge in our motions.

This last paragraph, does this describe -- can you just have an opportunity -- I'll give you an opportunity to read this first, Dr. Heuer, and just let me know when you're finished.

MR. WENIK: The last paragraph right before William Bruto; is that correct?

CROSS-EXAMINATION

BY MR. KITCHNES (continued):

**Q.** That's correct. I should have noted that. You see the paragraph that begins "finally" at the top of the second full paragraph on page 5, Dr. Heuer?

**A.** Yes, yes I do.

**Q.** Just take a moment to review that.

**A.** Okay.

**Q.** Okay. I'm not going to ask you to restate it. I think you talked about it, of course, this morning. I wanted to make sure this was an accurate description of your opinion that you're planning to offer?

**A.**   That is a description especially as of that time, yes.   I

believe that's true.

**Q.**   Okay.  And I want to make sure I understand, you know, the

meaning again of contract manufacturing customers.

Is it correct that it's -- it's a business that manufactures

components or materials that are used in the production of a

dietary supplement?

**A.**   The contract manufacturers, discussing them here, are those

that received the API or raw material from outside suppliers.

They don't make it -- they receive these, they follow a formula

under good manufacturing processes to measure, and you need two

people looking at the weight and everything and measure all the

components to the new -- call it supplement they're going to make,

and then blend it to specifications and then make tablets and so

on and so forth.  So these are the people taking raw materials

from various providers and blending them all together.

**Q.**   Okay.  And so that is your understanding of contract

manufacturing customers?

**A.**   For -- well, for tablets.  But you also contract with API,

with someone making the raw material in China or something else,

you also contract with those.

**Q.**   Okay.  And just to make sure everyone gets it, this is, I

guess, if you have to draw a comparison between or to draw a

contrast and really kind of explain what the contract

manufacturing customers are, that's different from an end-use

1  customer that is buying an already manufactured product; correct?

2  **A.**  Would you repeat that?  I'm not sure I got the point.  I'm

3  sorry.

4  **Q.**  I'm just trying to make sure I understand it.  The contract

5  manufacturing customer is, as you've described it, you know,

6  someone kind of involved in the manufacturing process.  Is that

7  different from an end-use customer that is buying an already made

8  manufactured product?

9  **A.**  No, it's actually not different because you still want to look

10 how they blend and mix, you want to see their batch records and

11 everything.  Even if it's pre-blended and you're buying something

12 that's been made by someone else.

13 **Q.**  I think my question was confusing and sorry it was long.

14    My question was:  If a customer is buying an already

15 manufactured dietary supplement, okay, is that a contract

16 manufacturing customer?

17 **A.**  Yes.

18 **Q.**  It is?  Can you explain that?

19 **A.**  You need to know the exact same thing that you do if you tell

20 them what to make.  You need to know what went into it, you need

21 to see the C of A from the raw material API, you need to see their

22 batch records, how they measured and everything.  Because you just

23 can't take it and then say, you know, it must be made right

24 because they're already selling it.  You need to check it.

25 **Q.**  I guess I'm a little confused.  If I were to buy a dietary

1  supplement from GNC or whatever, am I a contract manufacturing

2  customer?

3  **A.**  If you're to buy it to resell or for personal use?

4  **Q.**  Does -- does it make any difference?

5  **A.**  A big difference.  If you're a consumer, you have a different

6  requirement.  If you're going to buy a thousand units and

7  reselling them on your website, you want to know the GMP, whether

8  it's GNC or anybody.  So if you're a seller, different.  You would

9  want to know how that is made, you want to know what you're

10  selling.  If you're a consumer, consumers, basically, read the

11  label and trust it.  But it's different if you're in the industry.

12  **Q.**  So if you're in the industry, if you're someone like GNC, a

13  distributor or something like that, those are the people that, as

14  you described it, you're going to be looking at the GMPs, wanting

15  to know how it's manufactured?

16  **A.**  Those people will look.  You know, they have multiple sign

17  them.  They will check, and they will even send people out to

18  check a manufacturing line.  They're responsible.  Anybody in this

19  chain is responsible for checking that.

20  **Q.**  Okay.

21       MR. KITCHENS:  I'll take one moment, Your Honor.

22  CROSS-EXAMINATION

23  BY MR. KITCHENS (continued):

24  **Q.**  Dr. Heuer, at various points, I think when you were describing

25  kind of the basis for your opinions, you described consulting

1  with, you know, other experts at various points.  Do you recall

2  that?

3  **A.**  Yes.  Over the years, yes, definitely.

4  **Q.**  As you said over the years, I just wanted to make sure, did

5  you consult with other experts in this particular matter?

6  **A.**  No, I have not.

7  **Q.**  You have not consulted with Dr. Bannister?

8  **A.**  No, I have not.  I don't know who they are.  I'm sorry.

9  **Q.**  Have you consulted with Gregory Hillyer?

10  **A.**  No.

11          MR. KITCHENS:  All right.  I think those are all my

12  questions, Your Honor.

13          THE COURT:  Thank you.

14          THE WITNESS:  Thank you.

15          THE COURT:  Any redirect, Mr. Wenik?

16          MR. WENIK:  Yes, just one question.

17  REDIRECT EXAMINATION

18  BY MR. WENIK:

19  **Q.**  Dr. Heuer, when you were asked in multiple questions by Mr.

20  Kitchens, he would use the phrase "are you speculating" or "is

21  this speculation" or what have you.

22     I just want to ask you generally, the opinions you're

23  offering, these possibilities, are they speculation or are these

24  things that you think are realistic possibilities based on all of

25  the information that you reviewed and your knowledge and

1  experience?

2  **A.**   They're not speculation.   That's my expert opinion based on

3  what I've seen, and I have seen all of these in any one product at

4  different times.   So it's based on my opinion, years and years of

5  experience and in several industries.   So it's an expert opinion.

6          MR. WENIK:   I have nothing else, Judge.

7          THE COURT:   Mr. Morris?

8          MR. MORRIS:   Thank you, Your Honor.   I'm good.

9          THE COURT:   Mr. Kitchens, anything else?

10          MR. KITCHENS:   Nothing further, Your Honor.

11          THE COURT:   All right, thank you, Dr. Heuer.   I think

12  you're free to go.   It sounds like you don't know any of the other

13  witnesses in the case, but please don't discuss your testimony

14  with anyone.   If you feel the need, if someone asks you a question

15  or you need to talk about it, just check with the lawyers first.

16  For the most part, just keep it to yourself if you would, okay?

17          THE WITNESS:   All right, Your Honor.   Thank you very

18  much.

19          THE COURT:   Thank you, you can go.

20          THE WITNESS:   Thank you.

21          THE COURT:   How do you guys feel about taking our lunch

22  break now from 11:30 to 12:30?   Does anybody have strong

23  objections to that?   That would be my preference, unless you have

24  a strong objection.

25          MR. WENIK:   I'm fine with that, Judge.   The only other

1  point I would make before we break is the last witness, Dr.

2  Bannister, you know, candidly you will hear much of what you heard

3  from Mr. Hillyer and in part from Dr. Heuer. So, you know, I know

4  you made it a point of streamlining this. I just don't know how

5  essential his testimony is. Sure, there are nuances to what he's

6  going to say and what have you, but, you know, I'm not going to

7  exaggerate and say he has dramatically different opinions on these

8  steroids issues that -- a lot of them you just heard. There's

9  certainly going to be a different gloss on it, different nuances

10 and what have you. I just put that out there. So...

11           THE COURT: I look forward -- I look forward to every

12 minute of it. I just really -- that's something I wanted, some

13 nuances. Are you okay with taking the break now?

14           MR. WENIK: Yes.

15           MR. KITCHENS: Yes.

16           THE COURT: So the day is kind of shot anyway. Let's

17 just go ahead and take a whole hour. We'll come back at 12:30 and

18 start with our last witness; right?

19           MR. WENIK: Certainly from me, yes.

20           THE COURT: Okay, we'll see everybody back at 12:30

21 then.

22           (Whereupon a break was taken.)

23           THE COURT: All right. We'll just go back on the

24 record. All right, we're back after lunch and now we're going to

25 proceed with the examination of Dr. Steve Bannister. I think Mr.

1  Wenik is going to do that direct.  You can go ahead and take it

2  from here.

3          THE DEPUTY CLERK:  Judge, real quick, before we get

4  started, a housekeeping note.  If there were any exhibits that

5  were used during this hearing period, the court reporter needs

6  them.  Just making sure do I have all exhibits even if they

7  weren't admitted for names and different things she requested?

8          MR. WENIK:  I'm pretty sure from the defense side, we

9  sent over everything that is marked.  I'm pretty sure.

10          MR. LEACH:  One thing, Your Honor.  There were two

11  impeachment exhibits that I utilized.  I think they were 19 and 20

12  yesterday.  So I will forward, what, them to you and you'll send

13  them to Viola?  How do you want to do that?

14          THE DEPUTY CLERK:  Yes, that will be great.

15          MR. LEACH:  Okay, I can do that while Dr. Bannister is

16  talking.

17          THE DEPUTY CLERK:  Okay, thank you.

18          MS. CONNORS:  And, Angela, you have everything from the

19  government.

20          THE COURT:  Okay, perfect.  Thank you.

21          THE DEPUTY CLERK:  Dr. Bannister, if you would please

22  raise your right hand to be sworn for us?  Do you solemnly swear

23  or affirm that the testimony you shall give in this matter now

24  pending before the court, shall be the truth, the whole truth and

25  nothing but the truth so help you God?

1          THE WITNESS:  I do.

2          THE DEPUTY CLERK:  Would you please state your full name

3    for the record and spell your last name for us.

4          THE WITNESS:  My full name is Steve J. Bannister.  Last

5    name is spelled B-A-N-N-I-S-T-E-R.

6          THE DEPUTY CLERK:  Thank you.

7          MR. WENIK:  May I proceed, Judge?

8                        ******

9                   STEVE J. BANNISTER,

10         having been previously sworn, testified as follows:

11                        ******

12   DIRECT EXAMINATION

13   BY MR. WENIK:

14   **Q.**  All right.  I guess it's good afternoon.  Good afternoon, Dr.

15   Bannister.  Thank you for joining us.  Can we start off by you

16   telling the court what your current activities are.  How are you

17   currently employed?

18   **A.**  I'm employed as an independent consultant.  I work on drug

19   product developments.  I work on some dietary supplement product

20   developments.  My clients include drug companies that need

21   capabilities that I might provide to them or drug companies that

22   can do what I do, they just don't have the capacity to do it.

23       I work solving a lot of analytical quantitative and

24   qualitative analytical problems, and work on solving stability

25   problems and formulation design, formulation development.  Another

1    part of my consulting practice is litigation support, and I

2    currently have this case and two other civil cases.

3    **Q.**  All right.  Does some of your consulting work involve helping

4    dietary supplement companies improve their formulations?

5    **A.**  Yes, it has.  I have worked with two or three dietary

6    supplement manufacturers on improving their formulations.

7    **Q.**  Okay.  Will you tell the court a synopsis of your educational

8    background with an emphasis on explaining your knowledge of

9    chemistry.

10   **A.**  My undergraduate degree is in pharmacy, where I was taught the

11   fundamentals of drug actions and drug delivery.  The fundamentals

12   of -- of drug formulations.  I got an optional clinical term when

13   I was an undergraduate.  My pharmacy degree is a Bachelor of

14   Science in Pharmacy, not a Pharm M.D., but I did do the optional

15   clinical term.

16       My knowledge of chemistry was reinforced, taught in my

17   postgraduate doctoral program.  I have a Ph.D. -- a Master's and

18   Ph.D. in Pharmaceutical Chemistry, which is a rigorous program in

19   physical and analytical chemistry applied to drug product

20   development.

21   **Q.**  And as part of that training in the academic setting, did that

22   involve, among other things, identifying chemical compounds and

23   identifying impurities and those sort of things?

24   **A.**  Yes, it did.  My training included the tools to do that.  My

25   experience has included a lot of that.

1  **Q.**  Okay.  Let's move into that.  I guess I should ask you, how

2  long have you been a consultant, as you described, where you

3  consulted in a pharmaceutical and dietary supplements space, how

4  long have you been doing that?

5  **A.**  I have been an independent consultant since 2008.

6  **Q.**  Okay.  Can you tell the court about some of your occupational

7  experience prior to 2008, again, with an emphasis on your work

8  with chemistry.

9  **A.**  I began my pharmaceutical industry career in 1983, and

10  established an analytical laboratory function to support drug

11  product development at Key Pharmaceuticals in Miami, Florida.

12  Since that time, I have had a variety of responsibilities, but I

13  have never moved away from analytical chemistry applied to drug

14  substances or drug products or drug devices or dietary

15  supplements.

16      I have worked in innovative pharmaceutical companies, that is,

17  those companies that discover new drugs and develop them, and I

18  have worked in generic drug companies, those companies that

19  produce products that are shown to be equivalent to the initially

20  introduced innovator products.  But again in all cases, my

21  responsibilities have included analytical chemistry.

22  **Q.**  In any of those companies that you worked in in the

23  pharmaceutical space, did any of your duties involve synthetic

24  processes and manufacturing processes of compounds?

25  **A.**  Yes.  Particularly at NaPro BioTherapeutics in Boulder,

1  Colorado, a small drug company that focused on the identification

2  of drugs in biological systems, particularly identifying drugs

3  coming out of plants.  Take the lead from the molecule found in

4  the plant and make modifications of that compound to become a -- a

5  drug.  One of our activities was that the extraction, isolation

6  and purification of a complex natural product from a plant

7  material.  We also developed a semi-synthetic process, which was a

8  multistep process to use a starting material which came from a

9  plant to add all of the functional groups which would make it the

10  drug of interest.  That was a culmination of many steps of

11  synthetic organic chemistry.

12  **Q.**  All right.  Again, looking back on your career in the

13  pharmaceutical field in these companies, did you have occasion to

14  work with various instruments that detect and differentiate

15  compounds?

16  **A.**  Yes, indeed.  I have throughout my career worked with

17  instrumental analysis, particularly chromatographic systems, that

18  is, those systems that separate molecules from a liquid or a -- or

19  a sample made into a vapor, a gas, and, also, have worked with a

20  variety of spectroscopic systems, including particularly mass

21  spectrometry which has the ability to distinguish one molecule

22  from another.

23  **Q.**  Just to round this out to throw out a couple of acronyms at

24  you of different things we've heard over the past three days, have

25  you had familiarity or the use of HPLC?

1  **A.**   I began my -- my use of HPLC in graduate school, continued to

2  develop my HPLC skills between my master's and my Ph.D. when I

3  worked for -- for a scientist named Lloyd Snyder, who is one of

4  the gurus, was one of the gurus of HPLC -- HPLC standing for high

5  performance liquid chromatography.  But I have used HPLC from the

6  beginning of my training through today.

7  **Q.**   Okay, just a couple of more.  What about GC-MS, have you had

8  experience with that particular technique or instrument?

9  **A.**   I have had problems that were solved by the use of GC-MS using

10  contract laboratories or service laboratories to perform the

11  analyses.  Also had responsibility for a lab myself that had GC-MS

12  capabilities.

13  **Q.**   Lastly, LC-MS, have you had experience using that technique?

14  **A.**   I have used liquid chromatography, mass spectrometry.  I have

15  a publication in LC-MS in which we used that instrument

16  combination to determine very low levels of a particular drug in

17  biological samples.  But in my consulting practice, I have dealt

18  with LC-MS data, interpreted those data and used those data to

19  solve problems.

20  **Q.**   All right.  Have you authored any articles on the topic of

21  detecting contaminants in any LTCs or drugs or other things?

22  **A.**   I don't have publications on impurities.  I have publications

23  on trace level compounds in biological fluids or biological media.

24  **Q.**   Okay.  What about have you written anything about Zantac and

25  carcinogens being possibly included in Zantac?

1  **A.**   Yes, I have.   The paper that was published was a letter to the

2  editor to Chemical Engineering News and it shows a proposed

3  mechanism by which ranitidine hydrochloride, the over-the-counter

4  drug, would be -- in which a series of reactions could occur which

5  would produce an dimethylnitrosamine.

6  **Q.**   Okay.   All right.   Let me ask you some general questions about

7  compounds and drugs of dietary supplements.

8       So in the context of either a drug or a dietary supplement,

9  what is an active ingredient?   What are we referring to when we

10  are talking about something being an active ingredient?   What does

11  that mean?

12  **A.**   Active ingredient refers to the compound that you added

13  intentionally to the product.   The compound, also referred to as

14  the drug substance, which would be there to have some action.   As

15  an example, the active ingredient in an aspirin tablet is aspirin,

16  a specific chemical entity.

17  **Q.**   Okay.   Do drugs typically contain substances beyond their

18  active ingredients?

19  **A.**   Always.   There are no chemicals which are absolutely pure.   If

20  you look closely enough, you will find impurities in everything.

21  So again, using the example of aspirin, aspirin contains a

22  detectible quantity of salicylic acid.   All drugs contain some

23  impurities.   All substances added to dietary supplements will

24  contain impurities.

25  **Q.**   Okay.   Have you been doing any work in the course of either

1   your consulting career or in the course of your occupational

2   career that involves steroids?

3   **A.**   This case has had me look into -- into the chemistry of

4   steroids extensively.  I can't -- I can't remember every project

5   I've been involved in, but steroids are -- are organic molecules

6   that have physical and chemical properties similar to the wide

7   variety of molecules that I have worked with.

8   **Q.**   All right.  Have you researched some of the steroids in this

9   case that are at issue in this case?

10  **A.**   Yes, I have.

11  **Q.**   Have you researched a compound known colloquially as DHEA?

12  **A.**   Yes, I have.

13  **Q.**   All right.  The -- you have in front of you in your notebook

14  Defendant's Exhibit 1, which is the indictment in this case.

15  **A.**   I have it opened in front of me.

16  **Q.**   All right, if you would look at pages 14, 15, and 16, they

17  list different steroids that the government alleges were present

18  in certain Hi-Tech products.  Do you see that?

19  **A.**   I'm scrolling to page 14?

20  **Q.**   14, yes.

21  **A.**   I'm on page 14, and I see the table.

22  **Q.**   All right.  Have you looked into these steroids here?  I'm not

23  going to mangle their pronunciations, but things like 4-andro and

24  5-ando and what have you?

25  **A.**   Yes, I have.

1  **Q.**  Can you tell the court generally -- actually, before I get to

2  that, Boldione, if I'm pronouncing that right, B-O-L-D-I-O-N-E, is

3  that known by any other synonyms?

4  **A.**  Boldione is also known an as androstadienedione.

5          MR. WENIK:  I'm sure Viola is going to have trouble

6  spelling that, but we'll work on that later.

7  **Q.**  So these compounds, how do these relate structurally to one

8  another that we're seeing here in these pages of the indictment?

9  **A.**  All of these compounds share the same basic structure which

10 includes four carbon rings, a total of 17 carbons in those rings,

11 19 carbons overall, and the position of those carbons and

12 substantially all of the hydrogens and oxygens are the same for

13 these molecules.  They differ in subtle ways.  Placement of a

14 hydrogen, for instance, or absence of a hydrogen, but these

15 molecules have very significant similarity, as they are all built

16 on the basic structure known as an androstane.

17 **Q.**  All right, bear with me a moment.  I just want to see if I can

18 call something up on the screen here.

19     All right.  Are you seeing a chart or rather a graphic that

20 we've marked previously as Defense Exhibit -- I believe it's 18.

21 I'll just scroll down to the number.

22 **A.**  It is 18.

23 **Q.**  18.  Okay.  Have you seen this before?

24 **A.**  Yes, I have.

25 **Q.**  Does it depict some of the structures of some of the steroids

1  that we're talking about?

2  **A.**   It depicts the structures of the active ingredients, that is,

3  those compounds which were intentionally added to the products at

4  issue in this case, and it also then -- those are depicted in

5  green on the left.  It also depicts some of the compounds alleged

6  to be present by the FDA.

7  **Q.**   Now, let me ask you a couple of questions about this.

8      So we're looking at things that have these -- different rings

9  that you've described and what have you.

10      Can you tell the court what the concept of molecular weight

11  is?

12  **A.**   Molecular weight is the total weight essentially per molecule

13  of all of the atoms present in the molecule.  You add up the

14  atomic weights of all the carbon, all the hydrogen and all the

15  oxygen.  Molecular weight is, therefore, a characteristic of a

16  molecule.

17  **Q.**   Do some of these DHEA starting or rather targeting

18  ingredients, if you will, or active ingredients have similar

19  molecular weights to some of the steroids at issue in this case?

20  **A.**   I'm looking --

21  **Q.**   And it may not be just the three that are depicted here.

22  **A.**   There are many steroid molecules that share molecular weights.

23  I'm looking at this particular slide to look at the actives versus

24  the impurities.  And there may not be a direct correlation of

25  molecular weight of these impurities with the actives.

1  **Q.**  All right.  When something has the structures that are this

2  similar, does that present challenges for a chemist, such as

3  yourself, in differentiating between them when you're using these

4  instrumentalities that we spoke about earlier?

5  **A.**  It does present a challenge.  The selectivity of the system,

6  that is, it's ability to find one molecule in a mixture of

7  closely-related molecules, is related to the -- in the case, for

8  instance, of liquid chromatography mass spectrometry, the liquid

9  chromatographic system separates molecules physically.  The mass

10  spectrometric system identifies molecules based on intact

11  molecular weight or fragmentation pattern, but the development of

12  a specific -- a selective analytical technique using liquid

13  chromatography or gas chromatography, has to be done very

14  carefully and prior to use of such a method.  It would have to be

15  demonstrated to be appropriately selected.

16  **Q.**  All right.  You know, you used terminology about the method

17  and instruments.  What is -- is there a distinction between an

18  analytical method versus using instruments that you've been

19  talking about?

20  **A.**  There -- there is a distinct difference.  The instrumental

21  technique refers to the hardware.  It refers to the, for instance,

22  a combination of liquid chromatography and mass spectrometry.

23  That's an instrumental technique.  An analytical method is the

24  full description of all the steps that must be taken to get a -- a

25  sample, a tablet, a capsule, a liquid, a lotion prepared so that

1  it's -- it's in an appropriate form to introduce into the

2  instrument.  And so the analytical method is a series of steps of

3  sample preparation, it's a series of steps of introducing the

4  prepared sample into the instrument, and it's a series of steps

5  which include interpretation of the data that comes from the

6  instrument.

7  **Q.**  If any of these steps that you're describing is performed

8  inappropriately, could that affect the results that one is seeing?

9  **A.**  Certainly.  If the sample is prepared incorrectly for the

10  instrumental technique, it could result in analytical artifact.

11  If the instrument technique is not fully developed, the

12  chromatographic system is not properly developed for this sample

13  of interest, it could result in analytical artifact.  If the

14  instrument data are inappropriately interpreted, it can result in

15  analytical artifact.

16  **Q.**  All right.  What about how the samples are stored and handled,

17  how could that play into what you're describing?  Could that

18  create -- actually, let me back up.

19      When you talk about an artifact, that sounds like a term of

20  art to me.  Does that mean an error, for lack of a better word, or

21  something else?

22  **A.**  That would be a good description.  It would be, for instance,

23  the -- an inappropriate measurement.  You get the quantity wrong

24  or you get the identity wrong.  Artifacts could be either

25  qualitative or quantitative.

1   **Q.** All right.  Now, let me return to my next question.

2       How about how a sample is stored or handled, how could that

3   affect what you're discussing, these processes?

4   **A.** The samples we're talking about, dietary supplement products,

5   are complex chemical systems.  They're combinations of -- of often

6   many raw materials which themselves can be complex chemical

7   mixtures, and the -- the result is a product which is subject to

8   various degrading reactions which would change the identity or

9   change the quantities of materials present.

10      An analytical practice accounts for the stability of the

11  sample, and good analytical practice would say that you would

12  analyze the sample upon receipt to know that your analytical

13  results are properly connected to the product that you describe,

14  the product that you've listed.

15  **Q.** Have you heard the term, if I'm using it correctly, a

16  reference standard?

17  **A.** Yes, I have heard the term.

18  **Q.** What is a reference standard?

19  **A.** Reference standard is used in -- reference standards are used

20  in both qualitative analysis, that is, those analyses which seek

21  to identify a compound, and are used in quantitative analyses,

22  that is, those analyses that are intended to measure how much of a

23  compound might be present.  A reference standard in a qualitative

24  analysis would be used to generate a pattern of data

25  representative of a particular molecule.  The reference standard

1    data pattern would be -- would be compared to the sample, the

2    unknown analytical data pattern.  In quantitative analyses,

3    reference standards are used to -- as a critical component of the

4    quantitation process, you apply the analysis to the reference

5    standard, you get a certain signal, you apply the analytical

6    method to the unknown sample, you get a certain signal by knowing

7    the concentration of the reference standard, knowing the two

8    signals that come from the analyses, you can calculate the

9    quantity of the material of the sample being analyzed.

10   **Q.**  So if I understand what you're saying, you need to have a

11   known example of what you're trying to identify or quantitate

12   against to make the comparison with the sample; is that right?

13   **A.**  That's correct.  A reference standard must be well

14   characterized.  It must be of known purity.  It must -- it must

15   have a traceable structural identification process.  So you

16   have -- you really have to know with -- with a high level of

17   certainty what it is and how pure it is.

18   **Q.**  Now, for this matter you're testifying in, did you review the

19   reports and workpapers of the FDA chemists?

20   **A.**  Yes, I did.

21   **Q.**  And did the FDA chemistry lab obtain reference standards for

22   the steroids that are at issue here?

23   **A.**  They record the use of reference standards for the compounds

24   at issue, yes.

25   **Q.**  Now, were those reference standards, if you recall, I know you

1    looked at a lot of materials, but do you recall whether the

2    chemistry lab, the FCC chemistry lab, for lack of a better

3    expression, already have those in-house or did they have to go out

4    and purchase them or obtain them from some other source?

5    **A.**   I recall that some of them are recorded as FCC, that is

6    Forensic Chemistry Center compounds.  I take that to mean that

7    they were prepared by the -- by the FDA lab.  Many of the

8    reference standards were acquired from commercial sources.

9    **Q.**  Now, you mentioned something about five minutes ago that the

10   reference standard should be of a certain purity.  Are reference

11   standards 100 percent pure, in your experience, to your knowledge?

12   **A.**  As I said, everything has impurities.  That leads to the

13   conclusion that nothing is absolutely 100 percent pure.

14   **Q.**  And can impurities present in the reference standards affect

15   the results that the chemists are seeing from their

16   experimentation?

17   **A.**  Certainly the presence of the impurities could affect the

18   qualitative interpretation of its samples.  Impurities present in

19   the reference standard would change the qualitative pattern that

20   you could get from a reference standard.  But very significantly,

21   impurities in the reference standard would tell you that the

22   standard is not 100 percent pure, it is less than 100 percent.

23   And the use of a reference standard which is not 100 percent in a

24   quantitative analysis, requires the use of the actual assay, the

25   actual purity of that reference standard in the calculations of

1  the quantitative result.

2  Q.  And was that done in this case, do you know, when the FCC

3  chemists were quantitating, did they use the actual assay or

4  reference standard?

5  A.  When I looked at the workpapers that document the --

6  documented the preparation of reference standard solutions, I did

7  not see inclusion of reference standard purity, that is, assay

8  results.

9  Q.  And did you see any documentation as to the purity level of

10  whatever reference standards were being used by the FCC chemists?

11  A.  I did not see that.

12  Q.  All right.  Let me talk to you for a minute or two about the

13  instruments themselves.

14     Can you describe for the court a little bit about -- you

15  talked about the liquid chromatography and the gas chromatography

16  and the HPLC.  What sort of instruments are involved in these

17  things?

18  A.  Chromatography is a general description of systems that use

19  physical properties to separate mixtures of molecules.  In the

20  case of liquid chromatography, the sample is made into a solution

21  that could be done by fully dissolving the sample, or it could if

22  the sample was a solid, or it could be done by extracting the

23  compounds of interest out of a sample.  But in some fashion the

24  compound you care about is transferred from a solid, or if it's a

25  liquid you've already got it there, it is somehow put into liquid

1  form.  The liquid chromatograph involves injecting that prepared

2  solution into what's referred to as the chromatographic column.

3  The chromatographic column is packed with very finely divided

4  particles which have a certain surface chemistry.  As the injected

5  sample being carried along by a liquid called the mobile phase, as

6  the injected sample travels through this column of finely divided

7  particles, the different species in the sample interact to a

8  different extent with the chemically-modified surface of the

9  particles of the packing.  If a compound interacts significantly

10 with the packing, it's -- it's progress through the column

11 is -- is slowed down so it comes out later.  If a compound in the

12 mixture interacts to a small extent with the surface of the

13 packing particles, it comes out more quickly.

14    So the chromatographic process physically separates components

15 of a mixture.  In the gas chromatographic process, the sample is

16 put into a liquid which is immediately volatilized, made into a

17 gas, in which the same chromatographic process occurs.  As the

18 carrier gas moves the injected sample through a column, which

19 again has a chemically-modified surface with which the components

20 of the mixture passing through the column interact, a physical

21 separation is -- is accomplished.  The -- the compounds in a

22 well-developed chromatographic system come out of the column as

23 separate bands and can be detected by various means.  But it

24 is -- it is important that it is a physical separation based on

25 the interaction between the molecule and the packing or the gas

chromatographic column, and it is a system that when -- in order
to work properly, has to be properly developed accounting for the
physical properties of the molecule or molecules of interest, and
accounting for the physical properties of any other molecules that
might be present, i.e., those molecules that you want to separate
the compounds of interest from.

**Q.** So I want to focus on the last part of your answer.

If the equipment in question, these columns that you inject
the samples into, if this equipment is not properly cleaned
between uses or properly calibrated, could that affect the
results?

**A.** It would affect the result.  Cleaning is a big issue.  The
possibility of interference peaks coming from -- from improper
cleaning of the equipment is real.  The possibility of carryover
between samples is real.  Calibration is the -- calibration in
chromatographic systems can refer to making sure and adjusting
the -- the, for instance, the liquid flow going through the column
is exactly what you set it at.  The wavelength of any detector, if
you're using a spectrometric detector, must be properly calibrated
to get a -- a meaningful result.  In gas chromatography, the flow
of the carrier gas must be calibrated and be what you -- what you
set it at.  So cleaning and calibration are both significant
issues with regards to the performance of analytical methods,
chromatographic analytical methods.

**Q.** And did you see records of cleaning and/or calibration that

1  covered the periods of all the testing that was done in -- in this

2  matter?

3  **A.**   I saw some -- some records of calibration and preventive

4  maintenance.  I saw that -- I saw records that covered intervals.

5  I -- I looked for a map of -- of calibration in preventative

6  maintenance activities across the entire span of analyses, and I'm

7  not certain that I saw full coverage of the full span of -- of

8  analytical application of the instruments.

9  **Q.**   So would it be -- is it your opinion that improper calibration

10 or cleaning could be a potential issue in this case?

11 **A.**   It's possible.

12 **Q.**   All right.  I want to talk to you about the concept of

13 validating a method.  What do we mean by validating a method?

14 **A.**   Validating is -- is -- I validate a method.  It's used as a

15 verb.  In fact, what we're talking about is demonstrating the

16 validity of a method.  You challenge the method in various ways to

17 make sure that all of the steps are the steps of sample

18 preparation, the steps of instrument adjustment, the steps

19 of -- of data reduction are all appropriate for the expected --

20 for the desired analytical result.

21    In the case of quantitative analyses, you would want to have

22 clear understanding of the accuracy of the method, and that would

23 include the ability of the method to separate the compound of

24 interest, separately determine the compound of interest from other

25 compounds that might be present, and to measure that separated

1    compound accurately.

2       You would want to properly characterize the precision of a

3    method, that is, the uncertainty that might be associated with the

4    result from that method.  You would want to -- you would want to

5    characterize these -- not just for the instrumental technique, but

6    for the entire analytical method that is -- that I described

7    earlier, the steps of sample preparation, the steps of

8    introduction into the instrument, and the steps of data reduction

9    from the instrument, and all of these -- particularly, the early

10   steps, the sample preparation and introduction into the

11   instrument, must include knowledge, knowledge ahead of time of the

12   sample, that is, the product tablets or capsules to be analyzed.

13   **Q.**  All right.

14            MR. WENIK:  Sorry, Judge?

15            THE COURT:  Well, I just -- I mean, are they going to

16   challenge -- I think they're going to say you don't have the

17   evidence of any of that happening, it's all speculation.  That's

18   what I'm guessing.  Are we going to challenge the method -- I

19   mean, do we have to do all this, Ms. Connors?  I mean, Ms. Connors

20   is going to tell me what she's going to challenge from this

21   witness.

22            MS. CONNORS:  Your Honor, we are challenging the

23   reliability of his opinion.  We're also --

24            THE COURT:  I mean, his opinion is that if you don't

25   clean the thing right, it can mess up the test.  Okay?  I mean,

1 you're challenging that?  Are you going to say there is no

2 evidence that they didn't clean the thing right?

3          MS. CONNOR:  I think it's really both, Your Honor.  I

4 mean we are challenging that.

5          THE COURT:  And, Dr. Bannister, I don't mean to insult

6 your testimony by making it super basic, I want to make sure we're

7 doing something that is -- that you're really going to get in -- I

8 mean, he's in the weeds about how you have to clean things and

9 prepare it right?  Are you going to challenge that?  Are you going

10 to say it's -- I mean, I think you're going to have a different

11 challenge to it that there is no evidence that they didn't do it

12 that way, but I mean -- I guess if we have to keep going, we can

13 keep going.  I just can't believe that we're going to challenge

14 that.  So... but I guess you're not saying we're not, so just keep

15 going.

16          MS. CONNORS:  That's right.

17          MR. WENIK:  Sorry, Judge I'll wrap up this piece with

18 alacrity.

19 DIRECT EXAMINATION

20 BY MR. WENIK (continued):

21 **Q.**  Dr. Bannister, did you have an opportunity to review the

22 labels for the various Hi-Tech products at issue here?

23 **A.**  I did look at the labels.

24 **Q.**  All right.

25 **A.**  I looked at the labels from the images that were in the FDA

1  documentation.

2  **Q.**  All right.  Do these products purport to contain multiple

3  components and compounds?

4  **A.**  Yes, they do.

5  **Q.**  All right.  Do they contain or purport to contain multiple

6  steroids or steroid-like compounds?

7  **A.**  Yes, they do.

8  **Q.**  I wanted to focus back on the last piece of the answer before

9  Judge Salinas made some comments.

10     So you were talking about that you want to validate something

11  in advance.  Did you see anything in the records that you reviewed

12  that the FCC chemists had developed any sort of reference points

13  or standards for the Hi-Tech products?

14  **A.**  I didn't see that the analytical methods were validated

15  specifically for the Hi-Tech products.  I saw that there were

16  procedures that were applied to the screening of samples

17  that -- that were thought to contain steroids.  I saw general

18  procedures, but I didn't see specific validations with regards to

19  accuracy, for instance, specifically connected to the Hi-Tech

20  products.

21  **Q.**  And is that an issue?

22  **A.**  It could be an issue, yes.

23  **Q.**  Why is that?  Why could it be an issue?

24  **A.**  The -- for instance, in the quantitative results, the

25  possibility of one of the components of the product masquerading

1   as the impurity being measured, would add to the result.

2   **Q.**  All right.  And to your answer a few moments ago, when you say

3   these products had steroids in it or to your point just

4   masquerading as steroids, you're talking about legal steroids,

5   right, steroids that aren't Schedule III?

6   **A.**  Compounds that were intended to be in the product were legally

7   there.

8   **Q.**  Okay.  Let me move on to the testing that was done in 2016.

9   And I'd like you to take a look at Defendant's Exhibit 11, which

10  is the declaration you filed in this matter back in May of 2018.

11  **A.**  I have the document open.

12  **Q.**  I just want to ask you a couple of questions about this.  I

13  mean, the document already is obviously in the record, but I do

14  want to ask you a couple of questions.

15      So if you look at page 6 of that declaration, you describe in

16  a table certain analyses that were done in late 2016.  Do you see

17  that?

18  **A.**  I see the table in paragraph 20, yes, and in paragraph 21 and

19  in subsequent paragraphs.

20  **Q.**  Okay.  Great.  And you base this table on your analysis -- did

21  you base this table on your analysis of the workpapers of the FCC

22  lab that have been disclosed?

23  **A.**  I'm sorry, could you repeat the question?

24  **Q.**  These columns where you have a date, a technique and the

25  results, did you glean that information from the workpapers that

1    you reviewed of the FDA chemists?

2    **A.**   Yes, I did.

3    **Q.**   All right.  I just want to understand what -- a couple of

4    phrases here.

5        So the third one down where it says that something was tested

6    on December 2016 and said no control substance, you have something

7    listed as GC-MS under derivatized?

8    **A.**   Underivatized.

9    **Q.**   Underivatized.  Can you just explain what that means?  What

10   was GC-MS underivatized?

11   **A.**   Sure.  That is a technique in which you prepare the sample and

12   inject the sample without chemical modification into the gas

13   chromatographic system.  The gas chromatographic system is

14   followed by a mass spectrometric system.  So it's shown as a

15   combination of GC-MS.

16   **Q.**   And then beneath it you talk about it being derivatized.  So

17   what does that mean, when something is GC-MS derivatized?

18   **A.**   Some compounds do not pass through the gas chromatographic

19   column particularly well.  They -- some of the functional groups,

20   particularly, some of the oxygen, there are nitrogens of a

21   molecule might interact with a GC column.  Derivatization is a

22   process by which you essentially neutralize or cover up those

23   offending molecular substituents to improve the way the compound

24   will go through the gas chromatographic column.

25   **Q.**   All right.  Now, in addition to these testings that were done

1  in 2016, were there other analyses that you saw done in 2017 and

2  2018 by the FDA chemists?

3  **A.**   For the Androdiol, sample lot C750, you can see that, yes,

4  there was testing done in -- there was testing done in January of

5  '17, January 4 and January 19 of '17, yes.

6  **Q.**   All right.  And the next page we see results for 1-AD, and

7  were there also testings done in 2017?

8  **A.**   Yes.

9  **Q.**   And 1-testosterone, which is in paragraph 22, we see different

10  results for 2016 and 2017?

11  **A.**   Yes.

12  **Q.**   All right.  So let me direct your attention -- I don't want to

13  go through every single report to belabor this, but I want you to

14  take a look at Defendant's 2, which is a January 30, 2017 report

15  which tested or purports to test, rather, of Androdoil 1-AD and

16  1-testosterone.  Do you have that document in front of you?

17  **A.**   I have the document open, yes.

18  **Q.**   All right.  And if we look at the FACTS number, you see 984260

19  up there on the first page in the upper column?

20  **A.**   Yes.

21  **Q.**   Looking back at 11, your declaration, you had that same FACTS

22  number describing the sample and what was done in 2016; is that

23  right?

24  **A.**   11, Androdiol --

25  **Q.**   Do you see that, 984260 up there in paragraph 20?

**A.**   Yes.

**Q.**   Okay.

**A.**   FACTS number 984260.

**Q.**   Yeah.

**A.**   Item number one, yes.

**Q.**   All right.  So can you tell the court how did the, for lack of a better word, sensitivity of these methods evolve, or did the sensitivity of the methods evolve as these samples were put through different rounds of testing in 2016 and 2017?  And if you look at your, just as an example, Defendant's Exhibit 6, you'll see an example of something that was tested in 2018.  How did the -- how do these methods evolve, if you will, in terms of selectivity or sensitivity?

**A.**   The FCC chemists used a variety of chromatographic mass spectrometric combinations, some of which were -- were very significantly higher in selectivity than others.

**Q.**   And what does that mean when something is higher in selectivity?

**A.**   If the -- if a method is very, very selective, it defines that method as one which can see the difference between one compound and a closely-related compound.  As the selectivity of a method goes up, the limit of detection of the compound in a complex matrix goes down.  We very often use the term sensitivity, but the -- but the real characteristic, method characteristic which determines how low you can go, is selectivity.

1  **Q.**  And when we look at the testing, the selectivity, I take it

2  that was employed, increased over time, the methods increased in

3  selectivity?

4  **A.**  That's -- that's my perception, yes.

5  **Q.**  Okay.  So let me keep you on for a moment or two on Exhibit 2,

6  Defendant's Exhibit 2, which is one of the test reports reflecting

7  what was done in January of 2017.  And I want to point your

8  attention to the first page, items one, two and three.  Do you see

9  that?

10 **A.**  I do.

11 **Q.**  All right.  Does the report list various ingredients from the

12 labels of the products in what's described as items one, two and

13 three?

14 **A.**  Yes.

15 **Q.**  All right.

16 **A.**  The label as was quoted in this -- in this sample description.

17 **Q.**  Okay.  And do these -- do any of these label descriptions that

18 we see here describe DHEA or a DHEA variant?

19 **A.**  They do.  Looking at item one which contains 4-androstenediol

20 3ß-ol-17-one decanoate, forgive me for the jargon but that's the

21 description, that would be a chemical modification of what could

22 be known as 4-DHEA.

23 **Q.**  All right.  And looking at the second page of the report, we

24 have this table here that lists five different items under steroid

25 name and then alternate name and then you see identified as items

1  one, two, and there, do you see that?

2  **A.**  Yes.

3  **Q.**  All right.  That first item there, the 4-androsten, whatever,

4  I can't replicate how you say these things, is that a variant of

5  DHEA described there?

6  **A.**  Yes, it is.

7  **Q.**  All right.  And we know -- I'll point your attention to the

8  footnotes, Footnote 4, it says -- it indicates a DEA Schedule III

9  steroid; do you see that?

10  **A.**  I do.

11  **Q.**  Looking at the report, I want to direct your attention to the

12  second column there where it talks about or second grid where it

13  talks about 4-andro and 5-andro and then there's an "X" saying it

14  was identified in item one, which was the Androdiol but not

15  identified in the 1-AD and the 1-testosterone; do you see that?

16  **A.**  I do.

17  **Q.**  All right.  In looking through these various reports, did you

18  see similar instances to this pattern here where something would

19  be detected in one of the Hi-Tech products obtained at the same

20  time and not the others?  Did you see instances of that in these

21  reports?

22  **A.**  Yes, the tables in the various lab reports very frequently

23  have this pattern.

24  **Q.**  And what does that pattern suggest to you as a chemist and

25  scientist as to what might be one potential explanation for the

1   presence of these compounds in the product?

2   **A.**   One potential explanation is that these impurities, which were

3   found in the product, were impurities in the raw materials used in

4   the product, and that the -- the levels of these impurities were

5   quite low between the different raw materials was different.

6   **Q.**   All right.   Turning your attention to -- just a moment.   It

7   was here a minute ago.

8        Exhibit -- Defendant's Exhibit 4, can you take a look at that

9   one?

10  **A.**   I have it up.

11  **Q.**   All right.   So Exhibit 2 we saw that the product 1-AD, item

12  two, didn't have 4-andro and 5-andro in it or it wasn't detected

13  rather in that study.   Do you see that?

14  **A.**   Yes.   I recall that's what the table said.

15  **Q.**   Now I'm looking at Exhibit 4, all right, and this one has a

16  different FACTS number, 1022792, do you see that on page 1 of this

17  exhibit?

18  **A.**   Yes.

19  **Q.**   And it talks about the -- part of the sample being obtained or

20  received by the lab, rather, in August of 2017?   Do you see that?

21  **A.**   Yes.

22  **Q.**   And in this report, 1-AD is item four on the first page?

23  **A.**   Yes.

24  **Q.**   All right.   And if I go to page 2 of the report, we see a

25  similar grid that we saw in Exhibit 2.   Do you see that, page 2?

582

**A.**   I do.

**Q.**   All right.  Now in this report, the FDA chemist reports are

detected, 4-andro and/or 5-andro in the 1-AD, while in the prior

sample of the same product but a different lot, they did not.

Did you see patterns of this sort of thing, detecting things

in one lot of the product and not detecting something in another

lot tested sometime down the road?

**A.**   Yes.

**Q.**   What does that say to you, that as to a possible explanation

for how these steroids got into the products?  The fact that

different lots of the same product tested differently at different

points.

**A.**   It suggests that -- that the raw materials were somewhat

variable, and that very commonly products made over a period of

time will be made with different lots of raw material, and one

explanation could be that the impurities originated in the raw

material, and the raw material lots were variable.  So different

lots of raw material used in different lots of product would show

different quantities of impurities.

**Q.**   As a chemist, assuming hypothetically something had been

intentionally added, some illegal substances had been

intentionally added, would you expect to see varying results like

this of different tests for different products at different times?

**A.**   As a -- as a -- as a drug product development, dietary

supplement product developer, as a pharmacist, I would expect

1  that -- that intentional spiking would be done to improve the

2  performance of the product in the hands of the consumer, and you

3  would spike to -- for instance, these products which are promoted

4  for bodybuilding, would assume that spiking would be done to cause

5  the product to -- result in -- in bodybuilding changes that the

6  consumer would notice.  Spiking one lot of a product but not

7  spiking another lot of the product, would be completely

8  inconsistent with that.  So to me, as a -- as a -- as a product

9  guy, it doesn't make any sense.

10 **Q.**  Okay.  Let me ask you to take a look at Exhibit -- Defense's

11 Exhibit 6, which is a report done in July of 2018.  Do you have

12 that in front of you?

13 **A.**  I do.

14 **Q.**  Now, when we looked at the other two lab reports that I showed

15 you, Defense Exhibits 2 and 4 from January and then September of

16 2017, was there any effort to quantitate the amount of the

17 steroids that were purportedly being detected in those analyses?

18 **A.**  In the analyses reported that we just looked at, no, there was

19 no effort to quantitate.

20 **Q.**  All right.  And now we're looking at Exhibit -- you're looking

21 at Exhibit 6, is the results of this chemical testing an attempt

22 to quantitate the amount of steroids?

23 **A.**  That is what is reported, yes.

24 **Q.**  All right.  So let me just ask you a general question now.

25 Are you familiar with the concept of degradation?

1  **A.**   Yes, of course.

2  **Q.**   Could you explain to the court what degradation means.

3  **A.**   Degradation would be a change in a chemical substance.

4  Degradation could occur due to other compounds that might be

5  present.  Degradation could occur even as a result of interaction

6  with the atmosphere, reaction with oxygen in the atmosphere,

7  reaction with water.  Degradation would be a change in the

8  chemical from one molecular species to another.

9  **Q.**   Now, we looked before at Exhibit 2, those materials, those

10 samples were obtained it said there in October of 2016 and Exhibit

11 4 they were obtained in August of 2017.  The passage of time of

12 one, one and a half, two years or more between receiving a product

13 and testing it for or quantity or quantitated, does that factor

14 into the potential for degradation that something has been, for

15 lack of a better word, hanging around in the lab for a year or two

16 before you bother to quantitate?

17 **A.**   The sample could have degraded, yes.

18 **Q.**   And based on what you've seen in the workpapers, were these

19 samples, these bottles, were they opened and -- to extract

20 capsules or tablets to experiment with on more than one occasion?

21 **A.**   Yes.

22 **Q.**   Is that something that could lead to degradation?

23 **A.**   It could if the product was -- was initially sealed by the

24 manufacturer with some kind of occlusive packaging and the sample

25 was opened, it could change the way the product would degrade.

**Q.**  Is degradation a possible explanation for some of the results

that we're seeing here, particularly, those results in July of

2018 which attempt to quantitate?

**A.**  It's a possibility.  I did not look at specific chemistry that

would lead to degradation, with one possible exception.  One of

the compounds quantitated at a very low level is Boldione, you

mentioned it before, also known as androstadienedione.  Boldione

is known to be a product of microbial biochemistry.  So the

possibility exists that if the product had mold or bacteria growth

after opening, the possibility exists that Boldione could have

been produced by microbial action.  Other compounds may have been

produced the same way, but I found specific references to the

microbial production of Boldione.

**Q.**  One second.  All right, looking back at your declaration

that's Exhibit 11 and at paragraph 20.

**A.**  Scrolling down.  Okay, I'm at paragraph 20.

**Q.**  All right.  So I'm looking at the first five results you

listed there, there was no controlled substances; is that right?

**A.**  Yes.

**Q.**  And then we see in the very last -- trace level 4-andro and/or

5-andro.  Do you see that?

**A.**  Yes, I do.

**Q.**  All right.  Was there a difference between the methodologies

used between those negative results and the one we see here where

a trace level was detected?

**A.** Yes.  The -- the trace level was detected with a combination of liquid chromatography and multiple stage mass spectrometry.

**Q.** Let me just see if I could -- what is that triple -- triple spec, can you tell us what that is, what that means?

**A.** Mass spectrometry is a process in which the instrument -- a mass spec could look at the intact molecule.  The instrument could add energy to the molecule and fragment the molecule and get a pattern of fragments.  The instrument could choose one of those fragments and add energy to it and look at the fragments of the fragment, or the instrument could look at the fragments of a fragment of a fragment, and each -- each time you add another -- another stage of mass spectrometry, the selectivity goes up.

**Q.** All right, one second.

So this triple spec mass spectrometry -- mass spectrometry -- I'm having trouble pronouncing these things, mass spec, is that something that's a common instrument for labs to have or is that something that's rather uncommon?

**A.** It is becoming more and more common.  The -- the performance of -- of mass spectrometers as a result of instrument development, has been a continuous process, but multistage mass spectrometry, so-called MS to the N, is common now.

**Q.** Okay.  I put back up on the screen the graphic we had before which showed what you called the target compounds for some of the impurities.  Do you see that?

**A.** I am.

**Q.** I want to take you through for a minute or two back to an explanation you had before where I think you said something on the order of the -- that the manufacturer of the raw materials could be one explanation for the steroids that we're seeing as impurities.

Could you describe -- maybe referring to this chart helps -- how that could come about? How it could come about that in -- try to make either 4-DHEA or 5-DHEA, you could wind up with some of these I'll call them impurities or steroids?

**A.** Sure. The synthesis of the compounds of interest, that is, the manufacture of the raw materials of particular steroid-like molecules, doesn't start from pure carbon, pure hydrogen and pure oxygen. It -- it starts with a molecule that has a very substantial portion of a molecule that you want to make, and the processes that are used make -- make relatively subtle changes in that starting material. If you look, for instance, at the compounds listed in green, they -- they all have the same ring structure, they all have the same double bonded oxygen at the top right of the molecule. They differ in some double bond structures throughout the compound. This suggests that they were synthesized, they were manufactured from a -- a closely-related molecule, and chemical reactions were used to come up with a compound of interest.

None of those chemical reactions, no chemical reaction goes

1  from starting material to pure end product without impurities.

2  Every reaction produces some level of related substance

3  byproducts.  And so given -- you start from a closely-related

4  molecule, you use what might be a series of chemical reactions to

5  make the changes necessary to get to the molecule you want.  Each

6  of those changes could result in impurities, and the other thing

7  that can happen is some of the starting material could be left

8  behind.  So the final product ends up being a complicated mix.

9  The possibility of these impurities showing up in substances that

10 were -- were intended to be present, is not surprising at all.

11 But chemistry would -- would lead to that.

12 **Q.**  So what you described is something that happens even in the

13 manufacture of pharmaceuticals?

14 **A.**  It does happen in the manufacture of pharmaceuticals.

15 Pharmaceutical drug substances are always characterized with

16 regard to impurities, and in my experience, I have not seen any

17 drug substance which is completely free of impurities.

18 **Q.**  So do you have an opinion as to whether or not it -- the

19 impurities associated with the manufacture of these starting

20 materials is the explanation for the presence of these steroids?

21 **A.**  I did look at -- at synthetic schemes for making the compounds

22 of interest.  I use a particular tool to do that.  I use a tool

23 produced by the American Chemical Society, Chemical Abstracts

24 Service called SciFinder.  It allows me to put in a molecule and

25 ask for a series of reactions, which would result in that

1  molecule.  And I did that for the -- the various impurities.  I

2  did that for the various compounds of interest and found chemistry

3  that would explain the presence of these impurities, yes.

4  **Q.**  Okay.  Let me switch gears to the last topic that I have for

5  you.  I want to ask you some questions about lovastatin.

6       What is lovastatin?

7  **A.**  Lovastatin is the accepted generic name of a drug substance.

8  That drug substance is also known as monacolin K.  It is a

9  fermentation product of a -- of a fungus.

10 **Q.**  Now, monacolin K, to your knowledge is that a component of

11 certain dietary supplements?

12 **A.**  Yes, it is.

13 **Q.**  What type of dietary supplements?

14 **A.**  Those dietary supplements which result from the fermentation

15 of rice to produce what we refer to as red yeast rice will contain

16 monacolin K and other monacolins.

17 **Q.**  All right.  And the monacolin K from the red yeast rice, does

18 that have the same molecular weight as lovastatin?

19 **A.**  It has the exact same molecular structure, and it is by

20 virtually all techniques, completely indistinguishable.

21 Lovastatin and monacolin K are indistinguishable.

22 **Q.**  Okay.  I want you to take a look at what we've marked as

23 Defense Exhibit 9.  Can you take a look at that in your notebook

24 or on your screen?

25 **A.**  I'm looking at it.

1  **Q.**  And is this one of the documents that you looked at in coming

2  to your opinions in this matter?

3  **A.**  Yes, it is.

4  **Q.**  And looking at the first page, and it talks about analyzing a

5  sample that was received on August 20 -- August 30, 2013; do you

6  see that?

7  **A.**  Yes.

8  **Q.**  All right.  And it talks about -- it looks like an expiration

9  date of 2014.  Do you see that?

10  **A.**  Yes.

11  **Q.**  All right.  And then they have reports and conclusions, sample

12  one active constituent lovastatin.  Do you see that?

13  **A.**  Yes.

14  **Q.**  All right.  My question to you is -- or a couple of questions.

15     What method of analysis, as best you can tell from looking at

16  this report, did the FDA chemist use to come to their results and

17  conclusion section?  What did they do?

18  **A.**  As it says, they used a screening method using liquid

19  chromatography, mass spectrometry and a quantitative method using

20  a different variant of liquid chromatography, this time with

21  ultraviolet detection.

22  **Q.**  All right.  Those methodologies that are described in the

23  report here, did those methodologies have the capacity to

24  distinguish monacolin K from lovastatin?

25  **A.**  No.

1  **Q.**   Why not?

2  **A.**   Because even with the mass spec method, the fragments of

3  lovastatin that might be detected in a pattern of mass spectrum,

4  are identical to the fragments that would be detected in a -- a

5  mass spectral pattern from monacolin K.

6  **Q.**   Okay.  Let me ask you to take a look at what we've marked as

7  Exhibit -- Defense Exhibit 8, which is an article by Perini.

8  **A.**   Yes.

9  **Q.**   Have you seen this document before?

10  **A.**   Yes, I have.

11  **Q.**   And what -- I don't know if it's professor or doctor, but what

12  did Mr. Perini describe, just generally, that he did in writing

13  this article?  What was his scientific achievement here?

14  **A.**   Perini and his co-authors did a very careful examination of

15  monacolin K, lovastatin from two different sources:  One, red

16  yeast rice fermented by one microbe, monacolin K, and another

17  lovastatin which would be fermented by a different microbe.  And

18  they used the very subtle difference, very small difference in the

19  content of a particular carbon isotope -- remember, I said that

20  the -- the chemical structure of monacolin K and lovastatin,

21  chemical structures are identical.  But as it turns out, there

22  is -- there can be a difference in the content of one isotope of

23  carbon between monacolin K produced by one fermentation and

24  lovastatin produced by a different fermentation.  And Perini says

25  it, for the first time they have found a discriminating method to

1  see the difference between monacolin K and lovastatin.

2  **Q.**  Based on what you've looked at and your understanding of the

3  state of the science, was this application of this method that

4  Perini discusses to lovastatin and monacolin K, was -- was that

5  something that was out there in the scientific world prior to

6  their writing this article or was this truly an innovation?

7  **A.**  It was an innovation to the extent that it was applied to

8  monacolin K and lovastatin.  The instrumental technique existed,

9  but as Perini and his co-authors say, on paragraph -- on page 229,

10  paragraph in about the middle of the left column, for the first

11  time in this study, we investigated the possibility of

12  distinguishing monacolin K from lovastatin using stabilized

13  isotope analysis for the first time.

14  **Q.**  All right.  So you referred a couple of times to lovastatin

15  and monacolin K being indistinguishable.  So would that be

16  something like, just to make it clear for the judge, like vitamin

17  C, that you could get synthetic vitamin C in a vitamin tablet

18  versus vitamin C from orange juice, that if you put both through

19  testing they would be the same?

20  **A.**  I can't say specifically if -- if you apply isotope ratio mass

21  spectrometry to vitamin C that you could or could not see

22  differences, but the vitamin C in orange juice is chemically

23  identical molecularly -- molecular structure is identical to that

24  which you would get in any other source of labeled vitamin C.

25  It's the same molecule.

1  **Q.**  Okay.  Now, what Perini did, when you talked about an isotope

2  of carbon, what exactly is it that applying this method, this

3  instrument that you described it, that they're detecting that you

4  would see in monacolin K but not see in the biosynthetic

5  lovastatin?  What is that they're seeing?  You've mentioned

6  carbons, a certain types of carbon or a certain amount?

7  **A.**  It is a certain type of carbon, and I'll apologize to the

8  judge before I say this, because it's going to get down into the

9  weeds a little bit, atoms are made up of -- of subatomic particles

10  in the nucleus and electrons which spin around the nucleus.

11  Carbon can include isotopes which have different weights of the

12  nucleus.  And different isotopes of carbon, both are chemically

13  indistinguishable, different isotopes of carbon will have

14  different atomic weights.  They're referred to as isotopes.  And

15  Perini used a very subtle change in the carbon 13 to carbon 12,

16  two different isotopes of carbon, the ratio of carbon 13 to carbon

17  12, subtle difference in that between monacolin K synthesized by

18  one fermentation and lovastatin biosynthesized by another

19  fermentation.

20  **Q.**  All right.  Last question or two, and then I'll be ready to

21  pass you on to another lawyer.

22      Did you review some articles, one written by Wen, an overview

23  of monascus fermentation processes for monacolin and another

24  written by -- I'm going to spell it R-A-J-A-S-E-K-A-R-A,

25  Rajasekara, I guess, biofortification of red yeast rice, did you

1  read those two articles?

2  **A.**  I did look at those two articles, yes.

3  **Q.**  Did those articles suggest any sort of process by which the

4  carbon atoms that you've described might be increased in the

5  monacolin K?

6  **A.**  The carbon 13 to carbon 12 ratio could be changed in

7  fermentation producing monacolin K, because different sugars which

8  might be added to the fermentation broth would have different

9  ratios of C13 to C12.  And if you then add a particular sugar

10  to -- as a nutrient to the reaction, the fermentation, you could

11  change the carbon 13 to carbon 12 ratio from what is -- you could

12  move it, that ratio toward a ratio characteristic of lovastatin.

13          MR. WENIK:  Judge, that's all I have for this witness on

14  direct, and I would pass him on.  I don't know if Bruce has

15  anything.  If he doesn't, maybe we can take a break before cross?

16          MR. MORRIS:  I'm good and happy to take a break.

17          THE COURT:  All right.  Let's take a ten minute break.

18          MR. WENIK:  Thank you, Judge.

19          (Whereupon a break was taken.)

20          THE COURT:  We're in the home stretch.  Ms. Connors,

21  let's get it done.

22          MS. CONNORS:  I will certainly try, Judge.

23          THE COURT:  Okay.

24  CROSS-EXAMINATION

25  BY MS. CONNORS:

1  **Q.**  Dr. Bannister, my name is Kelly Connors.  I'm one of the AUSAs

2  in the office that's prosecuting the case.  Nice to meet you.

3  **A.**  Good to meet you, ma'am.  How are you?

4  **Q.**  I'm good.  How are you?

5  **A.**  Doing very well, thanks.

6  **Q.**  Dr. Bannister, I know you talked a lot about your background,

7  so I'm not going to go over any of that information again.  I did

8  just want to confirm a few things.

9      I believe you mentioned consulting for two or three dietary

10  supplement companies before; is that correct?

11  **A.**  That's correct.

12  **Q.**  But you have never worked in -- for a dietary supplement

13  company; is that correct?

14  **A.**  I have never work -- never been employed as a -- inside a

15  dietary supplement company, that's correct.

16  **Q.**  Okay.  Have you ever developed any lines for a dietary

17  supplement company?

18  **A.**  I have worked on dietary supplement formulations, yes.

19  **Q.**  Okay.

20  **A.**  Projects -- projects that I have done have included that.

21  **Q.**  All right, and that would be part of that two or three

22  companies that you consulted for?

23  **A.**  That's correct.

24  **Q.**  Okay.  And Dr. Bannister, I do want to try to get some

25  clarification on some of the materials that you have reviewed.  I

1   can tell you that defense counsel let us know there are some

2   additional materials that they're going to be sending us, but I

3   just want to try to see as much as possible what information I can

4   get from you.  I know you may not remember all of the article

5   names, but to the extent you can help me try to figure out what

6   areas at least, because it sounds like during your direct you

7   mentioned a few different times reading materials and articles

8   that I don't think --

9   **A.**   Yes.

10  **Q.**   -- we were previously aware of.

11       So I am going to see -- now, there had been some -- some of

12  the information, is it correct, that you reviewed was the Forensic

13  Chemistry Center's tests and their results?

14  **A.**   Yes, I did.

15  **Q.**   And also their workpapers?

16  **A.**   I reviewed documents which -- which fell in the range of Bates

17  numbers from about FDA Lab 1 through probably almost 1100.

18  **Q.**   Okay.  And then you mentioned reading two articles on

19  monacolin K.  Mr. Wenik asked you about that towards the end of

20  your direct testimony, the Wen article and I'm not going to say

21  the name correctly either, Rajasekara?

22  **A.**   Rajasekara, that's correct.

23  **Q.**   Any other -- what were -- again, during your testimony it

24  appears there were some other articles that you've reviewed in

25  preparation for your testimony.  Do you remember any of those?

**A.**   I don't remember the specific citations of all of them.   But as I mentioned, I -- I used a literature search tool from the American Chemical Society to pull information from a variety of articles.   Sometimes I used the information just pulled by Chem Abstracts, which was a detailed discussion of the chemistry without going to the entire article itself.   But the tool I used was Chem Abstracts' SciFinder.

**Q.**   Okay.   And correct me if I'm wrong, but I believe on direct you indicated you don't have any specific experience with any of the steroids at issue in this case; is that correct?

**A.**   I have not formulated these materials before, that's correct.

**Q.**   Okay.   But you did review some of these articles to form your opinion?

**A.**   I did review some articles, including articles that -- that I could find that talked about doses of the impurities found, the Schedule III impurities, doses of those compounds that might have biological effects in humans, and there were, I think, three of those.

**Q.**   Okay.   And I know you mentioned using the SciFinder tool, so in terms of all of these materials that we just discussed, obviously, aside from the FCC lab materials, were the articles located by you?

**A.**   In some cases, yes.   But in most cases, no.   SciFinder pulls out all of the relevant chemistry, the conditions of the reaction, the byproducts of the reaction, and I used that information

1   directly from SciFinder.

2   **Q.**   Okay.  And what about the Wen and Rajasekara articles?

3   **A.**   I have copies of those and have read the articles.

4   **Q.**   But did you locate those two articles or were those provided

5   to you?

6   **A.**   I believe I located those.

7   **Q.**   Okay.  And based on testimony earlier in this case, my

8   understanding is that you provided some of these documents to

9   Gregory Hillyer?

10   **A.**   Yes, I did, or I -- I provided them to -- to counsel, Mr.

11   Wenik and his associates, or they may have gone to Mr. Hillyer

12   that way.  But I'm trying -- Ms. Connors, I'm -- I'm -- I'm trying

13   to decide -- I'm trying to remember if I communicated directly

14   with -- with Mr. Hillyer on these articles or not.  I may not

15   have.

16   **Q.**   Okay.  So whether it was regarding the articles or -- or your

17   expert opinion, did you have any other discussions with Mr.

18   Hillyer?

19   **A.**   I had some discussion with Mr. Hillyer some time ago about

20   chemical syntheses and reactions that would lead to the impurities

21   that were found.

22   **Q.**   Okay.  And was that -- were you providing an explanation to

23   him on that or, like, what -- or were you trying to get additional

24   information from him?

25   **A.**   We were discussing the possibility of particular --

1            MR. LEACH:  Before we do that, can we clarify whether

2    counsel was present during these discussions?  I'm just worried

3    that it was privileged.

4    CROSS-EXAMINATION

5    BY MS. CONNORS (continued):

6    **Q.**  Dr. Bannister, do you want to advise if counsel was present

7    during those?

8    **A.**  Counsel was not present during those conversations about

9    chemistry.

10            MR. LEACH:  Okay.

11            THE COURT:  Okay.  And I'm not sure that talking to an

12   expert -- I'm not sure of what privilege you're talking about,

13   but -- just off the top of my head, but it sounds like it's not an

14   issue.  We don't have to deal with it.

15   CROSS-EXAMINATION

16   BY MS. CONNORS (continued):

17   **Q.**  And, Dr. Bannister, did those conversations with Dr. Hillyer,

18   was any of that information used to form your opinions that you've

19   offered today?

20   **A.**  It -- it was used to form opinions about the -- the

21   probability, the possibility of some of the byproduct producing

22   reactions, yes.

23   **Q.**  Okay.  And can you explain in what way?

24   **A.**  Mr. Hillyer is an experienced organic chemist, and we talked

25   about particular chemical reactions that I had found in -- through

1  my SciFinder searches that would lead to the impurities that were

2  found.

3  Q.  Okay.  And so that was information that you were not

4  previously aware of through your own experiences and education?

5  A.  I was looking for confirmation of what I had found.  These

6  were not necessarily reactions that I had run myself.  I have

7  designed reaction schemes, so I'm familiar with the concepts

8  of -- of -- of that, but I had not run the reaction to produce

9  a -- one of the impurities from one of the starting materials.  I,

10  like every chemist, rely on information from the literature.

11  Q.  Okay.  And it was one particular starting material that you

12  were trying to get information on?

13  A.  I looked at all of the labeled active ingredients in the

14  Hi-Tech products at issue, and I looked at all of the impurities

15  at issue, and looked for chemistry that would lead -- chemistry

16  that would lead to the compound of interest with the possibility

17  of producing the impurity that was found.

18  Q.  Okay.  So let me see if I can clarify this.  So you mention a

19  starting material but then you're also referencing a labeled

20  ingredient in the product.  How -- are those two things

21  synonymous?

22  A.  No.  I'm sorry, I didn't mean to be confusing.

23      The starting material which I refer is -- would be a commonly

24  available bulk commodity chemical, a steroid-like molecule that

25  could be modified to become the compound of interest which then

1  became a raw material in the Hi-Tech products at issue in this

2  case.  So my starting material, I mean a synthetic starting

3  material by -- I may have said finished product, I meant to refer

4  to a raw material as a finished product.  A chemical sequence is

5  used to change a starting material into a compound of interest,

6  and that chemical process has the very high probability of

7  producing byproducts along the way.

8  **Q.**  Okay.  I have a couple more questions regarding that as we go

9  along with some of the information.

10     Before I go through some of your specific opinions, I do want

11  to confirm, did you perform any testing on any of the products at

12  issue in this case?

13  **A.**  I did not.  Let me think, did I do any by contract?  No, I did

14  not direct any analyses.

15  **Q.**  Is it correct that the FCC test reports on these products are

16  the only ones that you have reviewed?

17          MR. WENIK:  Can I hear that again?

18          MS. CONNORS:  Are the FCC lab reports the only ones that

19  he has reviewed in terms of testing.

20          THE WITNESS:  Yes.

21  CROSS-EXAMINATION

22  BY MS. CONNORS (continued):

23  **Q.**  Okay.  So you did not review any test results from a company

24  called Avomeen?

25  **A.**  I did not see the Avomeen results.  I'm aware that they did

1  testing.  I did not see the results.

2  **Q.**  Are you aware of what the results are?

3  **A.**  No, not in detail.  Not -- I'm not aware of them.

4  **Q.**  Okay.  So let me -- I just want to make sure that we're clear.

5  So it sounds like you did not review any Avomeen test reports; is

6  that correct?

7  **A.**  That's correct.

8  **Q.**  Okay, but you have had some conversations regarding Avomeen

9  testing?

10  **A.**  I was aware.

11        MR. WENIK:  I object to the extent that any of his

12  conversations were with the lawyers in a role of consulting with

13  the lawyers for any sort of litigation strategy.  He can testify

14  as to any conversations, if there are any, I doubt it, that he had

15  without lawyers.

16        THE WITNESS:  I did not have any conversations that

17  mention any Avomeen testing --

18        MS. CONNORS:  Okay.

19        THE WITNESS:  -- that did not include lawyers.

20        MS. CONNOR:  Your Honor, I do think it's fair for us to

21  know if he is aware of the test results.  I do not --

22        THE COURT:  I agree.  I agree.  Of course, I don't know

23  what the test results are and you don't, but I want to know if he

24  knows.  I would like to know that.

25        THE WITNESS:  Your Honor, I do not know the test results

1  that were generated.

2          THE COURT:  Well, you said you didn't know in detail.

3  So do you know, like, the big picture, green light, red light kind

4  of results, or do you not know, you have no idea?

5          THE WITNESS:  I know that Avomeen did some testing in

6  relationship to the red yeast rice product.  I do not know the

7  results of that testing.

8          THE COURT:  Okay.  Thank you.

9          MS. CONNORS:  Thank you.

10  CROSS-EXAMINATION

11  BY MS. CONNORS (continued):

12  Q.  Okay.  Dr. Bannister, do you have a copy of the government's

13  exhibits as well?

14  A.  I do.

15  Q.  Okay.  I am going to direct you -- let's see which exhibit

16  this is -- this is going to be Government's Exhibit 21.

17      I am going to put it on the screen, but I just want to make

18  sure that you've pulled that up first, because I'm going to scroll

19  down to the relevant sections.

20  A.  I do have it.

21  Q.  Do you have that?  And it's a letter from defense counsel

22  regarding expert disclosures dated December 3, 2019.

23  A.  Yes.

24  Q.  Okay.  And on page -- I'm going to share this with you.  And

25  Dr. Bannister, are you able to see the -- see that letter?

1  **A.**  I can see the screen, yes.

2  **Q.**  Okay.  And Dr. Bannister, again, this is related to

3  information about your opinion -- the opinions that you intend to

4  offer in this case.  So I want to go ahead and bring your

5  attention to the -- I think I've scrolled too far.

6      You can see it says that Dr. Bannister is anticipated to

7  testify as to the chemical structure, functionality and synthesis

8  of certain androstane derivatives, including substituted and

9  unsubstituted 1-DHEA, 4-DHEA, 5-DHEA and 1,4 DHEA?

10 **A.**  Yes.

11 **Q.**  He will compare these properties to those of the illegal

12 steroids described in the superseding indictment?

13 **A.**  Yes, I see the line which begins with DHEA and 1,4 DHEA.  I

14 can't see the lines above that.

15 **Q.**  Oh, let me see if I can fix that for you.  Okay.

16      Are you able to see that?

17 **A.**  I do.  Above the page break ends with --

18          MR. LEACH:  You have to go up a little bit more because

19 you're in the footnotes.

20          MS. CONNORS:  Sorry, I apologize.

21          THE WITNESS:  There we go.  Thank you.

22 CROSS-EXAMINATION

23 BY MS. CONNORS (continued):

24 **Q.**  There is a large space.  I was trying to see if you could see

25 it all at once, but that apparently is not possible.

1     Okay?

2  **A.**   Okay.

3  **Q.**   Okay.  And so I wanted to make sure I understand the opinion

4  that you're offering.  So what is it that you're concluding based

5  on this comparison?

6  **A.**   I'm concluding that chemical reactions that lead to these

7  compounds, the ones referred to as legal steroids, chemical

8  reactions will lead to byproducts which can very, very likely

9  include the impurities that were found by FDA and flagged as

10  Schedule III controlled substances.

11  **Q.**   Okay.  And what exactly is your basis for this opinion?

12  **A.**   Again, looking at -- at chemistry.  SciFinder has a tool in

13  which you put in the compound you want to synthesize, and it will

14  give you a sequence of reactions which will lead to that -- to

15  that compound.  It will -- it will identify a starting material,

16  and the chemistry that will get you to the compound of interest.

17     I also used some information that was provided to me, I -- I

18  forgot to mention, forgive me, that I have seen some reaction

19  sequences that the raw material suppliers used to produce the

20  compounds of interest.  These are dietary supplement ingredients,

21  raw material suppliers that provided these compounds 1-DHEA,

22  4-DHEA, 5-DHEA, 1,4 DHEA, and some chemical derivatives of them.

23  I have seen some of the reported chemical schemes that were used.

24  I investigated the chemistry, each of those steps, looked for side

25  products that might be formed, and combined that into my opinion.

1  **Q.**  Okay.  So let me make sure I am understanding which materials

2  you're referring to.

3      Are you -- when you say raw materials, or I'm sorry, materials

4  provided by the raw material suppliers, are you talking about

5  specific suppliers for these Hi-Tech products at the time that

6  those were produced?

7  **A.**  They were presented to me as -- as being that, yes.

8  **Q.**  Okay.  And when you refer to chemical schemes that are used,

9  what do you mean?  Who is using those?

10 **A.**  The -- we're talking about raw materials that went into

11 Hi-Tech products.  Those raw materials are chemical substances

12 which had to be synthesized.  The synthetic scheme that I'm

13 referring to is one that was provided by -- provided to me as

14 coming from the -- the company that did the synthesis and provided

15 the raw material to Hi-Tech.

16 **Q.**  And when you are -- when you are doing the SciFinder, you said

17 you're trying to get to the compound of interest.  So -- so what

18 exactly are you doing step by step in this process?  How -- first

19 of all, what's the first thing that you put into SciFinder?

20 **A.**  I put in either the final synthetic product, for instance,

21 1,4 DHEA and ask SciFinder to tell me how can this be synthesized?

22 What steps would be necessary to get to 1,4 DHEA?  I then also use

23 the sequence of chemical reactions that were given to me,

24 identified as coming from a company that actually did the

25 chemistry, and put into SciFinder the individual chemical steps,

1  finding information that described the side products which might

2  be formed in any of those chemical steps and then matched side

3  products with the compounds identified by FCC.

4  **Q.**  Okay.  And in regards to this information that you're

5  referring to, these chemical schemes, the raw material supplier

6  information, those are materials that you relied on in making your

7  opinion?

8  **A.**  In part, that's correct.

9  **Q.**  And those -- all of your workpapers on that information have

10  been provided to defense counsel?

11         MR. WENIK:  I don't know if I have it all, but if I

12  don't, you'll get it.

13         MS. CONNORS:  Okay.

14  CROSS-EXAMINATION

15  BY MS. CONNORS (continued):

16  **Q.**  Okay.  And were there any other materials that you relied on

17  for this opinion?

18  **A.**  I looked at a number of journal -- journal articles.  I didn't

19  necessarily rely on every one of them to form an opinion.  I might

20  have been looking for a particular bit of information, scanned

21  through a journal article and discarded it not without

22  finding -- without finding what I was looking for.  I'm sorry, I'm

23  not trying to be vague.  I'm trying to describe as accurately as

24  possible what I went through.

25  **Q.**  Okay.  Anything else that you reviewed aside from what we've

1  already discussed?

2  **A.**  Yes, and -- and I want to correct something I said about

3  Avomeen test results.

4      I did see Avomeen test results of the steroid-like materials

5  of the Hi-Tech steroid-like products.  I'm aware of the fact that

6  Avomeen tested products related to monacolin.  I did not see the

7  monacolin data.  I did see the Avomeen test results for the

8  steroid-like products.

9  **Q.**  Okay.

10          THE COURT:  Thank you for clarifying -- thank you for

11  that.

12  CROSS-EXAMINATION

13  BY MS. CONNORS (continued):

14  **Q.**  And is it -- so is it accurate to say that your opinion is

15  also based on your review of those Avomeen test results?

16  **A.**  Yes.

17  **Q.**  Did you also have an opportunity to review test results from

18  the -- from CAIS?

19  **A.**  I did not see the results from CAIS.

20  **Q.**  Okay.  And just to be clear, are you familiar with what CAIS

21  is or -- because I almost forgot what the name was.

22  **A.**  My understanding is that it's a service laboratory at the

23  University of Georgia.

24  **Q.**  Okay.  I just wanted to make sure.  I was trying to flip my

25  notes to make sure I knew what the CAIS stands -- stood for.

1      Okay, and, Dr. Bannister, I'll bring you back to the screen.
2  I want to make sure I can go through this.  So let's see.
3      So continuing on in that same paragraph, it states he will
4  further explain how the manufacturing process for the legal
5  steroids -- there's a parenthetical, can result in the presence of
6  trace amounts of contaminants such as the illegal steroids
7  described in the superseding indictment.  Is that correct?  I'm
8  sorry, does that accurately state your opinion?
9  **A.**  Yes.
10 **Q.**  And what is the basis for this opinion?
11 **A.**  This is what I've been describing before, that the -- the
12 manufacturing process for legal steroids referenced there is to
13 the manufacturing process of the raw materials which went into
14 Hi-Tech products, manufacturing process being chemical synthetic
15 schemes that would convert a bulk commodity to the compound of
16 interest.  And it is my opinion that those synthetic schemes would
17 produce as impurities the compounds, so-called illegal steroids
18 described in the superseding indictment.
19 **Q.**  Okay.  And -- so is it your opinion that the -- so you're
20 saying the specific ones in the indictment, you believe that those
21 would be produced?
22 **A.**  That's correct.  I found plausible chemistry for the
23 production of all of those molecules.
24 **Q.**  Okay.  And in terms of the basis for that opinion, is that the
25 same materials and information you previously identified?

1  **A.**   That's correct.

2  **Q.**   As well as the Avomeen test results?

3  **A.**   That's correct.

4  **Q.**   And just to confirm, have you ever been involved in the

5  manufacture of DHEA products?

6  **A.**   No, I have not.

7  **Q.**   Have you ever been involved in the development of products

8  with the particular anabolic steroids identified in the

9  indictment?

10  **A.**   Meaning, the controlled substances?

11  **Q.**   Yes, the androstanedione, 4-andro, 5-andro, Boldione?

12  **A.**   No, I am not.

13  **Q.**   Are there any other articles or materials that also -- that

14  assisted in your -- in rendering that opinion?  That you can

15  recall.

16  **A.**   Not specific articles that I can recall, but SciFinder is

17  capable of producing information from a wide range of literature

18  into specific descriptions of chemistry, and I relied on

19  SciFinder.

20  **Q.**   Okay.  And, Dr. Bannister, before we move on, I just want to

21  try to confirm, you indicated that there were specific steps in

22  the manufacturing process or the synthesis process.  Are those

23  steps that you essentially went through on SciFinder or is that

24  information that you received from anyone?

25  **A.**   That's information that I -- that I obtained through

1  SciFinder.

2  **Q.**  Okay.  And then I believe you also said the chemical schemes,

3  that those were provided by the raw materials supplier; is that

4  correct?

5  **A.**  Some of them were provided.  Some of them I looked for the

6  most likely scheme to produce the raw material substance in

7  SciFinder.  I received some of the -- the schemes from the raw

8  material suppliers.

9  **Q.**  Okay.  And Dr. Bannister, it goes on to indicate, Dr.

10  Bannister will offer several additional possible explanations for

11  the purported detection of trace amounts of illegal steroids in

12  Hi-Tech products.  And then it goes on to -- and I'm sorry, this

13  is on the next paragraph.  Then it goes on to identify some of

14  these.  So I do want to go through these, in particular, so that I

15  understand your opinion.

16      So one indicates -- one explanation that is identified is

17  inadequate cleaning, sterilization of laboratory equipment, and I

18  believe on your earlier testimony, my understanding was that you

19  stated that it's possible?

20  **A.**  It is possible.

21  **Q.**  Okay.  And what is the basis for your opinion, for this

22  particular opinion?

23  **A.**  If -- if a sample at a high level of a particular compound has

24  been injected into an instrument, there is the possibility of some

25  carryover into the next sample.  And that is -- is why I say

1  it's -- it's possible.

2  **Q.**  Okay.  And I understood your earlier testimony to be that you

3  did review the calibration and cleaning logs for the particular

4  instruments at the FCC lab?

5  **A.**  I reviewed the calibration and preventative maintenance logs

6  for some of the instruments.  I did not map it absolutely

7  completely from maintenance to analysis, but my recollection is

8  that there were -- were some gaps in the -- in the mapping of the

9  maintenance and analysis.

10 **Q.**  And just so I understand, when you say you didn't map it out,

11 what do you mean, putting it in sequential order?

12 **A.**  That's correct.

13 **Q.**  Okay.  And so then based on your review of those documents,

14 what -- what precisely are you indicating is inadequate?

15 **A.**  If there are gaps, if there are gaps between the preventative

16 maintenance and the calibration of the instrument and the conduct

17 of analysis, if -- if there are gaps that -- that the instrument

18 wasn't properly maintained during the time of analysis, an

19 analytical artifact is possible.

20 **Q.**  Okay.  So it's possible, that's the testimony?

21 **A.**  It's possible.

22 **Q.**  Okay.  And in regards to the basis for your -- for this

23 opinion, did you -- what did you rely on?

24 **A.**  I relied on my survey of the maintenance records which were

25 provided to me.

1  **Q.**  Okay.  Anything else that a -- that you reviewed or anything

2  else that helped you form the opinion that there was inadequate

3  cleaning or sterilization?

4  **A.**  No, nothing else.

5  **Q.**  Okay.  And then the next rationale identified is that there

6  were impurities in the starting materials, reagents and/or

7  reference standards.  Does that accurately state your opinion that

8  that may be a possibility -- a possible explanation for the

9  steroids?

10  **A.**  That may be a miscommunication of -- of something I said.

11      An impurity in a reference standard has significance to the

12  extent that the reference standard is then known to not be 100

13  percent pure.  I do not mean to say that an impurity in a

14  reference standard would result directly in the detection of that

15  impurity in the sample.

16  **Q.**  And so -- I can clarify.  So then you're stating that the only

17  possible explanation as part of your opinion, is that it

18  could -- the impurities could have been in the starting materials

19  or the reagents?

20  **A.**  The starting materials or reagents used to synthesize the raw

21  material substances which were intended to be in the products at

22  issue.

23  **Q.**  Okay.  And when you say the reagents used to synthesize the

24  raw materials, at what stage would that have happened?  Would that

25  have been with the raw material supplier or would that have been

1  with the manufacturer?

2  **A.**  That would have been at the raw material supplier.

3  **Q.**  And, Dr. Bannister, if you could just confirm what's your

4  basis for this opinion regarding the impurities in the starting

5  materials and the reagents.

6  **A.**  It's the same information that I -- I have previously

7  referenced.  None of these starting materials are absolutely pure.

8  None of the chemical reactions produce a single product.  So there

9  are impurities that begin in the starting material, and, again, I

10  emphasize I'm talking about the manufacture of the raw materials

11  done by the people from whom Hi-Tech acquired the raw materials.

12  **Q.**  Okay.  And how do you -- so I do want to be clear.

13      So how is it that you're able to determine that those

14  impurities would have been in the starting materials and the

15  reagents at that supplier level?

16  **A.**  I couldn't determine that the impurities were absolutely in

17  the starting materials.  This -- I -- I mean to say, the

18  possibility exists that these closely-related impurities could be

19  in the starting materials.

20  **Q.**  Okay.  Let's see.  The next category indicates that there was

21  an undesired reaction during the synthesis process.  Does that

22  accurately state your opinion regarding a possible explanation?

23  **A.**  Yes, it does.  As I mentioned, no chemical reaction goes only

24  from starting material A to ending material B.  Every chemical

25  reaction will produce side products.

1  **Q.**  Okay.  And am I correct that the basis for this opinion is the

2  information that you've already gone over with us today?

3  **A.**  It's the information that I've gone over and it's -- it's my

4  own experience in -- in conducting and reviewing chemical

5  syntheses.

6  **Q.**  And, Dr. Bannister, to confirm again, in regards to this

7  opinion, when you talk about synthesis process, are you talking

8  about at the supplier level?

9  **A.**  Yes, I'm talking at the supplier level.

10  **Q.**  Okay.  Are you, also, talking about the synthesis process at

11  Hi-Tech during the manufacturing?

12  **A.**  I use synthesize in a specific way.

13  **Q.**  Okay.

14  **A.**  Synthesis means the chemical conversion of one substance to

15  another.  Hi-Tech didn't do any syntheses.  Hi-Tech blended

16  products that they acquired from their suppliers.  The suppliers

17  did the syntheses.

18  **Q.**  Okay.  So this only applies to -- so your opinion is that

19  there may have been undesired reactions during the synthesis

20  process at the raw material supplier stage?

21  **A.**  That is correct.  There may have been the probability of -- of

22  side products of any sort, is very high.  As I say, no reaction

23  goes without producing side products.

24  **Q.**  Okay.  And in regards to the materials that you've reviewed

25  from at least the raw manufacturing -- I'm sorry, the raw material

1  suppliers that you have had access to, do you know what synthetic

2  process they used?

3  **A.**   I have sketches of that synthesis, and I recognize the steps

4  in the -- in those sketches.   I then went back and looked for

5  information specific to that reaction.

6  **Q.**   Okay.   And so what exactly, which reactions did you see that

7  were undesired or, perhaps, I should ask, did you see any that

8  were undesired?

9  **A.**   I saw a high probability of producing synthetic byproducts,

10  yes.

11  **Q.**   Okay.   You have indicated that as part of your opinion that

12  producing byproducts is something that, essentially, has to always

13  happen, that's my understanding of what your opinion is, in part?

14  **A.**   Correct.

15  **Q.**   So in regards to an undesired reaction, is there something

16  specifically that is -- that was undesired that you noticed?

17  **A.**   In some of these reactions, I saw specific notation of, if you

18  run this reaction, you're going to get a certain yield of a

19  desired product and you're also going to get a mix of impurities,

20  some of those impurities in those reactions would lead to the

21  impurities found by FCC.

22  **Q.**   Okay.   And are you referring to materials that you have

23  reviewed or specifically from the raw material suppliers of

24  Hi-Tech?

25  **A.**   That would be a combination of the two.

1  **Q.**  Anything else that you relied on in reaching your opinion?

2  **A.**  The opinions about the origin of the impurities?

3  **Q.**  The opinion regarding specifically undesired reactions in the

4  synthetic -- in the synthesis process.

5  **A.**  Not that I can recall.

6  **Q.**  Okay.  Let's see.  And the next one indicates that part of

7  your opinion is that incomplete purification of intermediates and

8  final targets may be a possible explanation.  Does that accurately

9  state your opinion?

10  **A.**  Yes.

11  **Q.**  And what are you referring to here?

12  **A.**  In complex chemical schemes, complex chemical syntheses that

13  are intended to produce a desired final product, in this case a

14  desired raw material to be used by a subsequent product

15  manufacturer, the impurities can be produced along the way.  In

16  some cases, for instances in pharma, it is very common that

17  intermediates would be purified to remove impurities that were

18  formed in earlier steps.  That's in pharma.  My familiarity with

19  cost structure of dietary supplement ingredients relative to that

20  of pharma, would lead me to believe that -- that they don't do the

21  intermediate impurity -- excuse me, the intermediate purifications

22  that would be common in pharma, common in processes intended to

23  produce highly pure substances.

24  **Q.**  Okay.  And so that I make sure I understand, so you're saying

25  that your opinion is that there may not have been complete

1  purification of intermediates and final targets because it's not

2  cost-effective for dietary supplement manufacturers?

3  **A.**   That's correct.

4  **Q.**   Okay.  And is it also part of your opinion that because it's

5  not cost-effective, it's not done, that purification?

6  **A.**   That it's less likely to have been done, yes.

7  **Q.**   Okay.  And so, you know, particularly to this case, then I

8  want to make sure I understand how that opinion ties into

9  the -- ties into Hi-Tech.

10     Are you saying -- would it be Hi-Tech that would have had to

11  do purification of the intermediates in the final targets?

12  **A.**   No.  These are -- these are chemical schemes that are -- are

13  being run by the raw material supplier.

14  **Q.**   Okay.

15  **A.**   And the absence of purification is consistent with -- with the

16  much lower cost of goods of dietary supplement ingredients, and

17  it's also consistent with the -- with the manufacturing process

18  schemes that I was given from the raw material suppliers that show

19  a series of reactions without purification of intermediates.

20  **Q.**   Okay.  Anything else that assisted you in forming this

21  opinion?

22  **A.**   Again, just my experience in -- in doing this kind of work,

23  and my experience in the relative cost of dietary supplement

24  ingredients and pharma raw materials.

25  **Q.**   Okay.  Let's see.  And in regards to this last point for a

1 possible explanation, it indicates subjective interpretation of

2 test results by FDA technicians and staff.  Does that accurately

3 state your opinion?

4 **A.**   In each case where the presence of a compound was detected by

5 a combination of chromatographic and mass spectrometric methods,

6 there had to be a comparison of a -- of a mass spectral data

7 pattern, and the -- the mass -- from the -- from a reference

8 standard and the mass spectral data pattern from the product being

9 analyzed.  The possibility of misinterpretation exists.  I don't

10 know how probable it is.

11 **Q.**   Okay.  And in regards to the information that you did review

12 from the FCC chemist that conducted the testing here, was there

13 some evidence that you saw of subjective interpretation?

14 **A.**   They concluded that each case the spectrum matched.  I'm

15 trying to think if this is anything that I absolutely disagreed

16 with.

17      My experience and -- and education teaches me that

18 closely-related molecules can have closely-related spectra.  So

19 the possibility of -- of this interpretation exists.  I cannot

20 point to -- to a case where I specifically said this was

21 misinterpreted.

22 **Q.**   Okay.  So just so I can clarify.  So -- I mean, is this one of

23 your opinions that there -- that the FDA technicians and staff

24 subjectively interpreted these test results?

25 **A.**   It was included as a possibility rather than a certainty.

1 **Q.** Okay, but is it correct that it is your testimony that you did

2 not see anything that would make you believe that there were

3 subjective interpretations of these test results?

4 **A.** I can't recall finding -- I can't recall that.

5 **Q.** Okay.  Okay.  Let's see, Dr. Bannister, I think that was all

6 for the -- those possibility strains.  I'm going to move on down

7 to the next paragraph.  In this paragraph --

8         MR. WENIK:  How much longer do you have?

9         MS. CONNOR:  Probably -- actually, not too much.  Maybe

10 15, 10, 15.

11         MR. WENIK:  Okay.  I'm older than you so I need to use

12 the restroom occasionally, that's all.

13         MS. CONNORS:  I will say I don't have very much left.

14         THE COURT:  We're going to take a break.  I feel bad

15 after I told my Allison story.  Let's go ahead and take a

16 five-minute break.

17         MR. WENIK:  Thank you, Judge.

18         (Whereupon a break was taken.)

19         THE COURT:  It looks like everybody is back.  Ms.

20 Connors, if you could finish up.

21 CROSS-EXAMINATION

22 BY MS. CONNORS:

23 **Q.** Dr. Bannister, give me a second, I'm going to share my screen

24 again.  Are you able to see that again?

25 **A.** I am.

1  **Q.**  Okay.  So I just wanted to ask a few questions about

2  the -- that next paragraph regarding lovastatin and monacolin K.

3  **A.**  Yes.

4  **Q.**  It indicates that he will explain why concluding that

5  lovastatin was artificially added to a commercial product, based

6  solely on an isotope ratio analysis of isolated monacolin K in the

7  product is insufficient, does that accurately state your opinion?

8  **A.**  The reference I'm making here to commercial product is to the

9  red yeast rice product produced by Hi-Tech using raw materials

10 from -- from raw material suppliers.

11 **Q.**  Okay.

12 **A.**  The isotope ratio analysis cannot by itself say that

13 the -- that lovastatin was added to the commercial product.

14 **Q.**  Okay.  And so I think that was a little bit different than my

15 understanding when I originally read that.  So you are specifying

16 that this would be Hi-Tech's product, and then is it -- am I

17 correct in saying that what you are indicating is that the IRMS

18 testing would not be able to tell if it was intentionally placed?

19 **A.**  That's correct.

20 **Q.**  Okay.  And what is the basis for your opinion regarding that?

21 **A.**  That the IRMS, while it might indicate that lovastatin was

22 present, couldn't say at what point it was added.

23 **Q.**  Okay.  And is that the entirety of your opinion regarding that

24 matter, that the IRMS test itself cannot tell whether the

25 commercial product, anything was added to it intentionally or not

1  intentionally?

2  **A.**   That's correct.

3  **Q.**   And IRMS, to be clear, is -- that is a scientific technique?

4  **A.**   IRMS is isotope ratio mass spectrometry, which goes to the

5  previously discussed ratio of carbon isotopes that might be

6  present in the molecule.

7  **Q.**   Okay.  And do you have experience with IRMS analysis?

8  **A.**   I have experience in instrumental analyses of various sorts.

9  I have not myself conducted IRMS analyses.

10  **Q.**   Okay.  Any experience reviewing, like, the IRMS data?

11  **A.**   Just in relationship to this case.

12  **Q.**   Okay.  And when you say in relation to this case, do you mean

13  the FCC lab report of the IRMS testing?

14  **A.**   That's correct.  And in reviewing that, I looked at -- at the

15  data and looked at Perini to understand the technique.

16  **Q.**   Okay.  And I think in regards to the Perini article on direct,

17  you had commented that that was a very careful examination of

18  products containing monacolin K and lovastatin?

19  **A.**   That's correct.

20  **Q.**   Let's see.  And that -- so back to this particular statement,

21  you indicate it states that IRMS testing would be insufficient.

22  Are you just meaning that the testing alone can't tell whether

23  it's intentionally put in?

24  **A.**   That's correct.

25  **Q.**   Okay.  And just to confirm, anything else that you relied on

1   in rendering this opinion?

2   **A.**   The opinion we are talking about is the concluding that

3   lovastatin was artificially added to a commercial product based

4   solely on the isotope ratio analysis.

5   **Q.**   Yes.

6   **A.**   Nothing else that I -- just general consideration of the fact

7   that -- that lovastatin and monacolin K are both produced as

8   natural products.  Both of them have -- have a wide range of -- of

9   isotope ratios, but my -- my opinion is -- is principally that

10  the -- the IRMS could not tell whether it was intentionally added.

11  **Q.**   Okay.

12          MS. CONNORS:  Give me just one minute.  I want to make

13  sure I don't have anything else.

14          Your Honor, I think I'm done.

15          THE COURT:  Mr. Morris?

16          MR. MORRIS:  I don't think so, Judge.

17          THE COURT:  All right, Mr. Wenik, any redirect?

18          MR. WENIK:  A bit, Judge.

19  REDIRECT EXAMINATION

20  BY MR. WENIK:

21  **Q.**   Dr. Bannister, returning to Government Exhibit 21 and the

22  questions Ms. Connors was asking you about your bases for various

23  descriptions of opinions set forth in that document, if you could

24  pull it up on your display, I don't want to display it, I would

25  rather look at you.

1   **A.**   I have it on my screen.

2   **Q.**   Okay.   So the paragraph describing various explanations for

3   the trace amounts of illegal steroids in Hi-Tech products, and

4   there's a number listed here, including inadequate cleaning and

5   sterilization of laboratory equipment, impurities in the starting

6   materials, et cetera, those series of opinions in that paragraph,

7   the quantities that the FDA testing revealed in the July 2018

8   testing, we looked at one of those on direct, how would that

9   factor in, if at all, as a possible basis to these opinions, the

10  magnitude of the quantities, how would that factor in as a

11  possible basis for these opinions?

12  **A.**   Mr. Wenik, which opinions are we talking about specifically?

13  **Q.**   Well, whether something was due to the cleaning or

14  sterilization of laboratory equipment, where there might have been

15  impurities in the starting materials and the reagents.

16  **A.**   Sure.   Certainly, the extremely low quantities that were found

17  in these products is very consistent -- supports the opinion that

18  it could be impurities in the -- in the reaction scheme, side

19  products produced in the reaction scheme.   If we look at these

20  numbers relative to the quantities of compounds that were

21  intentionally added, we're talking about fractions of a percent at

22  most.   So that's consistent with -- with impurities, side products

23  in the reaction schemes.

24  **Q.**   All right.   And the fact that we went through on direct that

25  there were inconsistent test results between products tested at

1  different times and in different lots, how would that factor into

2  the opinions that are being summarized here in this paragraph,

3  whether these steroids were a result of either starting materials

4  or incomplete reactions or undesired reactions during the

5  synthesis?

6  **A.**   Again, as I mentioned earlier, seeing different results in

7  different batches of the same product, seeing very different

8  results between different products which are all intended for the

9  bodybuilding market, suggests to me very strongly that it was

10  variability in the raw materials, because these raw materials are

11  produced by techniques that will produce side products and

12  produced by schemes of reactions, which are -- are not interrupted

13  by intermediate purifications.  So they're produced in -- in

14  procedures that will have impurities in the -- in the final raw

15  material which was delivered to -- to Hi-Tech and will have

16  variability between batches of the raw material.  So variability

17  would then be in between batches of the product made by Hi-Tech.

18  **Q.**   Is what you're expressing in part based on your own experience

19  in addition to what you're seeing in these lab tests from the FDA?

20  **A.**   It is based on experience.  Different batches of raw materials

21  have different levels of impurities, and that results directly in

22  different level of impurities in finished products that used the

23  different batches of raw materials.

24  **Q.**   I want you to elaborate a little bit more -- again, I'm still

25  on the same paragraph here on Government Exhibit 21, one of the

1  synopses here talks about incomplete purification of

2  intermediates.  And you were, I think, discussing, if I heard your

3  testimony correctly in response to Ms. Connors, that this is a

4  costly endeavor, this purification process.  Can you elaborate

5  some more on that and explain to the judge what this involves?

6  **A.**   Sure.  The least expensive method of making any chemical

7  substance is a string of reactions which are all conducted in the

8  same vessel.  You -- you put a starting material in that vessel,

9  you add some reagents to convert it into an intermediate, then you

10  add some additional reagents to run a subsequent reaction to

11  convert it into something else.  This is referred to as one-pot

12  synthesis, and one-pot synthesis is -- is by far less expensive

13  than running one reaction, purifying the end product of that

14  reaction, putting it in another vessel, adding more reagents,

15  running a second reaction, purifying that, every -- every time you

16  add a purification step, you add very significant costs to the

17  material you're making.

18  **Q.**  And so when you're talking about -- I just want to visualize

19  this for myself and to help the judge, this one-pot, we're not

20  talking about a pot that sits on a stove, right, you're talking

21  about big vats with large quantities of the materials?  Is

22  that -- am I understanding what you're saying correctly?

23  **A.**   That's correct.  The reference to a pot could be a chemical

24  reactor that could hold a thousand gallons of -- of -- of liquid.

25  It could hold many, many kilograms of starting material or

1  intermediates.

2  **Q.**   Okay.  I want to talk a little bit about the opinion in the

3  next paragraph, which is synopsized in my letter, perhaps

4  inartfully drafted, quote, that he will explain why concluding

5  that lovastatin was artificially added to a commercial product,

6  based solely on an isotope ratio analysis of isolated monacolin K

7  in the product, is insufficient.

8     Do you see that phrase that I'm referring to there?  Still on

9  Government 21.

10 **A.**   That's correct.  And -- and --

11 **Q.**   Let me ask you a question first.

12 **A.**   Go ahead.

13 **Q.**   So you described on direct examination having reviewed some

14 literature, one, an article by Wen and another an article by

15 Rajasekara, and what did that literature say about the possibility

16 of monacolin K or no possibility, reflecting a higher C13 output

17 more akin to a lovastatin?

18 **A.**   That literature suggested that if you add nutrients, for

19 instance, sugars, that the carbon of those added nutrients will be

20 incorporated in the monacolin K, and the C13 to C12 ratio of the

21 nutrient would then be contributed to the C13 to C12 ratio of a

22 finished product.

23 **Q.**   So if the supplier of the raw ingredients to Hi-Tech then

24 engaged in that process, could that account for an isotope ratio

25 analysis reflecting a certain C13 ratio rather than this

1 intentional spike?

2 **A.** Absolutely.

3 **Q.** I want to talk to you a little bit about the Avomeen.  All

4 right?  I was a little confused by that testimony.

5    Is it your testimony -- I think you testified something along

6 the lines that you saw the results.  Did you see the actual -- is

7 it your recollection that you saw actual reports or did you see

8 some sort of chart, perhaps, prepared by counsel setting out some

9 results?

10 **A.** Forgive me.  I -- I created confusion in that.  There was

11 testing done by Avomeen in connection to the monacolin/Lovastatin

12 issue, and there was testing done by Avomeen in connection to the

13 steroid-like molecules.  I saw results of the testing done in

14 connection with the steroid-like molecules.

15 **Q.** Did you see that information after you had already formulated

16 your opinions in this matter?

17 **A.** The -- I'm trying to be careful in my answer here.  I may have

18 seen the -- the steroid analytical data after I expressed the

19 opinions that are summarized in this letter.

20 **Q.** All right.  If you had never seen that information, would you

21 be able to come to the same opinions that you have been expressing

22 through your testimony today?

23 **A.** Yes.

24 **Q.** Is there anything that you recall in that information that you

25 had seen at whatever point that would contradict any of the

1  opinions that you offer in your testimony today?

2  **A.**  The Avomeen analyses produced results that were consistent

3  with the FDA quantitative analyses of the products.

4           MR. LEACH:  No.

5           THE COURT:  Mr. Leach, you need to mute your microphone.

6           MR. LEACH:  I'm sorry.

7           THE COURT:  Could you make sure you answer the question

8  fully, that Mr. Wenik asked you.

9  REDIRECT EXAMINATION

10 BY MR. WENIK (continued):

11 **Q.**  I asked you whether the information contradicts any of the

12 opinions that you gave in this case, yes or no?

13 **A.**  It doesn't contradict any of the opinions.

14          MR. WENIK:  I have nothing further, Judge.

15          THE COURT:  Ms. Connors?

16          MS. CONNORS:  Your Honor, I just have one question.

17 RECROSS-EXAMINATION

18 BY MS. CONNORS:

19 **Q.**  Dr. Bannister, you just talked about synthesis of the raw

20 materials related to the Lovastatin/monacolin K products.  That

21 would be Hi-Tech's Choledrene product; is that correct?

22 **A.**  That's correct.

23 **Q.**  Did you review any materials regarding the synthesis of the

24 raw materials that Hi-Tech used in the Choledrene product?

25 **A.**  No, I did not.

1           MS. CONNORS:  Okay.  That's all I have, Your Honor.

2           THE COURT:  Mr. Morris?

3           MR. MORRIS:  No, thank you, Judge.

4           THE COURT:  Mr. Wenik, are we done?

5           MR. WENIK:  I hope so.

6           THE COURT:  All right, Dr. Bannister, you are finished.

7     Thank you so much for your time.  I would ask that you not speak

8     to anyone about your testimony.  If there is anybody that contacts

9     you, wants to talk to you about it, I think you should talk to the

10    lawyers first, but I doubt that anybody is going to be talking to

11    you about it and you probably don't want to talk about it any more

12    than you have already today.  But it is important that we just

13    keep witnesses, you know, keep your testimony clean and pure and

14    not be talking with other people about it.  So you might be

15    testifying at trial, so it's important to keep you pure and not

16    have any impurities in your testimony.

17          THE WITNESS:  Judge Salinas, I appreciate that.

18          THE COURT:  Is my humor lost on this crowd at this

19    point?

20          MR. WENIK:  I would have laughed, but I didn't know

21    whether it was funny or not.

22          THE WITNESS:  Thank you, Judge Salinas.

23          THE COURT:  You can go ahead and leave.  We're probably

24    are going to talk a little bit longer.  If you want to go ahead

25    and jump off, you can.

1           THE WITNESS:  Very good.

2           THE COURT:  All right.  So I've been thinking about the

3     issue with the motion to compel the documents.  And I think -- I

4     think we need to -- I assume the government is persisting in their

5     desire for those documents.  So I think you're going to need to

6     redo the motion.  Wait until you get the transcript, you'll have

7     all the testimony and the defendants are going to want the

8     testimony, too.  I think it's the same issue but it's a little bit

9     different now, because I think now that they're not offering it --

10    you know, they're not trying to use half an expert, it's only

11    going to be for the purpose of cross-examination.  I am -- so I

12    think it's different, and I'd ask if you wouldn't mind, Mr.

13    Kitchens, to maybe even withdraw that one and just start -- start

14    fresh with it and we'll kind of take it up, you know, one step at

15    a time.

16          I'll decide where that winds up in my work flow or in

17    Judge Totenberg's work flow.  I mean, I think we're really getting

18    into the kind of decision that she'll need to make at trial about

19    whether, you know, that information is appropriate for

20    cross-examination.  So we'll have to figure out how to do that.

21          I guess it's possible, but if we were to allow you guys

22    to get that, that maybe there would have to be -- you know, bring

23    back some of those witnesses possibly.  I'm not saying that's

24    what's going to happen, but I think it's enough of an issue that

25    I'd like to see it fresh.  And I think it might be something that

1  I just give to Judge Totenberg in the first -- not that I just

2  give work to Judge Totenberg, but I might suggest that she handle

3  that in the first instance so that we don't have, you know -- kind

4  of like what's the point of me doing it if she's going to do

5  something different, and it's her case and she's very experienced

6  in these sorts of issues.  And I'll be honest, my expert

7  experience is exclusively in a civil context, except for in this

8  case and I think it might be better for her.  I might end up doing

9  an R & R on it, but I think that's what I would like to see.  And

10 I think that once you have the benefit of the transcript, you can

11 really make that a tight, clear motion, and I think the defendants

12 will be able to, you know, cite to what their experts have said

13 and tee that up.  So that's how I would like to handle that.

14         MR. KITCHENS:  Understood, Your Honor, and I agree with

15 you.  I think the basis for seeking that, you know, the disclosure

16 of that report has changed basically the testimony we've heard

17 over the last couple of days of testimony, and, you know, as well

18 as, of course, Hi-Tech's own decision to withdraw Avomeen as a

19 witness.  So we will submit a -- a new motion and, you know, we

20 can withdraw the prior one that we've already briefed as well.

21         THE COURT:  Okay.  That would be great.  And I sent you

22 guys some dates earlier about our next get-together.  Have y'all

23 had a chance to look at those dates?

24         MR. WENIK:  I have not, Judge.  I would like the chance

25 to confer with my colleagues on the defense side to see when we're

1   all available, and I'm sure we'll reach out to Nathan and to you.

2         THE COURT:  So we can do it earlier if we could do it on

3   Zoom, but I kind of assumed everybody was going to want to do that

4   one this person.

5         MR. LEACH:  That is true for us, Judge.

6         THE COURT:  You want to do it in person?

7         MR. LEACH:  Yes, ma'am.

8         THE COURT:  I think I want to do it in person, too.  So

9   it's just going to have to be -- I'm just not going to be able to

10  drive for a month, that's why I'm pushing it a little bit.  So

11  let's do that, and if you guys want, I would like maybe before

12  that, maybe a week before whatever date that is, some kind of a

13  prehearing brief on what we know so far, just from this, even

14  though that wasn't the purpose of this which I screamed about, but

15  then I got interested and there you go.  So anyway, we -- there is

16  some information from this hearing that I think would be relevant

17  to a hearing.  I have -- I'd like to do it in a day.  Look at Art

18  nodding.  You're nodding?

19        MR. LEACH:  You said that throughout, Judge.

20        THE COURT:  I know.  But now -- you know, then I didn't

21  know if y'all wanted to call this other doctor or whatever.

22        MR. LEACH:  We do.

23        THE COURT:  You think we can fit him in?

24        MR. LEACH:  We'll try.

25        THE COURT:  Okay.

1          MR. WENIK:  Judge, I am compelled to raise one other

2   issue based on some of what you just said about how this hearing

3   relates to the other, and candidly I should have raised it

4   earlier.  I do notice Agent Kriplean, and I haven't seen his face,

5   but I do see him logged into these proceedings.

6          THE COURT:  He has been here all day.

7          MR. WENIK:  I am concerned to the extent that I don't

8   know how much he heard of the other witnesses.  You know, Mr.

9   Leach did make clear that we wanted sequestration of witnesses,

10  and I just throw that out there.  I don't know what to do with

11  that.

12         THE COURT:  I saw him here.  He's been here all day.  He

13  wasn't here yesterday, but he's been here all day and nobody said

14  anything.  I assume he's the case agent, and that's why nobody was

15  objecting.  So I didn't -- I didn't raise it.

16         MR. LEACH:  Judge, what I was going to say about it is,

17  we certainly acknowledge the fact that, you know, as the case

18  agent he has the right to be present at the proceedings, but this

19  is slightly different because of the Frank's issue.

20         THE COURT:  The cat's out of the bag now.  Our hearing

21  is over, thank God.  It's Friday afternoon.

22         MR. LEACH:  I do not think that he has been logged on

23  before today.

24         THE COURT:  I think that's right.  I think yesterday was

25  the day when we were talking with the FDA people, you know, about

1   who did what.

2         MR. KITCHENS:  And a little bit on the first day as

3   well.  I think that's right.  There hasn't been any testimony from

4   the two experts today that would at all come into play in terms of

5   the Frank's hearing.  I've also been occasionally looking at the

6   people that have been dialed in, and I have not seen Agent

7   Kriplean in on the first couple of days.

8         MR. LEACH:  And that's my understanding, too, Judge.

9   But here's the point I want to make about it.  Maybe Jack will

10  still go in a different direction, but here's my point.

11        I think the government has to be very careful in the way

12  they prepare Agent Kriplean for the hearing with regard to what

13  has already been presented to this court.  So to the extent that

14  some sort of modified rule of sequestration in this case -- I

15  mean, I obviously don't feel like Nathan needs to be prohibited

16  from discussing facts and details and so forth and putting things

17  together, but to the extent that they're going to hand Agent

18  Kriplean a transcript and say here's what all these people have

19  said, I think that's improper.  So somewhere in the middle is --

20        THE COURT:  Yeah, and I think -- I mean, I think there

21  is no reason why he can't see the exhibits.  And I think,

22  basically, all the people did was testify to those exhibits.  I

23  don't know that there was much more.  Maybe there was a little bit

24  more, but it seems like everybody was just confirming the

25  exhibits.  Do you have a problem with them seeing the exhibits?

```
1              MR. LEACH:  No, no.

2              THE COURT:  All right.  Everybody just needs to be

3    careful.  You know, this is a touchy subject.  It's one that I

4    tried to avoid, but we're here now and so let's just all be

5    careful.  I know that Mr. Kitchens will do an excellent job and,

6    you know, Agent Kriplean will as well.  So let's just try it.

7              But I think if y'all can give me a prehearing brief, I

8    mean, not too long like, you know.  It's a pretty -- you know, who

9    knows what we'll hear.  There will be more facts to develop.  It's

10   a pretty straightforward issue.  Maybe, like, ten pages.  I

11   mean --

12             MR. LEACH:  And, Judge, when do you want the misdemeanor

13   brief?  We don't have a deadline on that one either.

14             THE COURT:  How about at the same time.

15             MR. LEACH:  Okay.  So seven days in advance of the

16   hearing?  So a week before the hearing you want both of those

17   briefs filed?

18             THE COURT:  I think so.  I mean, do y'all have a basic

19   idea of that argument?  I mean, that's not something that y'all

20   raised, it's something Judge Totenberg's raised.  Is there -- if

21   you have it, can you give me your thumbnail argument on it?

22             MR. LEACH:  Well, I mean, Nathan talked about it earlier

23   in his comments to you that the misdemeanor case is not before

24   this court, that's point number one.  Number two --

25             THE COURT:  Well, the question was if there's enough to
```

 1  show a misdemeanor, is that enough to support a search?

 2          MR. LEACH:  Grant it.  But what we will say in the brief

 3  is, that it has to be set up with particularity in the affidavit.

 4  So, for instance, he needs to talk about the fact that you've got

 5  the felony violation, which would be the controlled substances

 6  violation.  You've also got FDA violations, and among the FDA

 7  violations is a potential misdemeanor violation.  None of that

 8  happened.  The only thing discussed in the affidavit is a felony

 9  violation.  So we just think it's not even under consideration

10  based on the affidavit.

11          MR. KITCHENS:  Well, I mean, one -- one small correction

12  on that, of course, is that the affidavit does talk about both the

13  violations of the Controlled Substance Act, as well as the Food,

14  Drug and Cosmetics Act.  But, you know, we, obviously -- I think

15  at this point, Your Honor, I think we're not in a position to give

16  kind of our thumbnail argument overall.  I think we do need to do

17  further research of it.  Obviously, we've got the backdrop

18  principle, that we understand there's probable cause that a crime

19  was committed, and there's no distinction -- it doesn't say

20  probable cause, a felony was committed.  Probable cause that a

21  crime was committed means that we have --

22          THE COURT:  Even if it wasn't a crime that was

23  specifically set out in their affidavit -- I don't know.  I don't

24  want that to be particularly long either, if you would.  I think

25  it's just --

1          MR. LEACH:  You said ten pages, Judge.  So we're limited

2     to ten pages.

3          THE COURT:  Oh, but I think those are different briefs.

4     Right?

5          MR. LEACH:  You said ten pages for both of them; right?

6     In other words, ten pages for the one and ten pages for the other?

7          THE COURT:  Yeah, that will be good.

8          MR. KITCHENS:  Okay.

9          THE COURT:  So that would be helpful.  Y'all pick a

10    date.  I'm not going to schedule anything major between now and

11    whenever y'all get your schedules together and get those briefs

12    and --

13         MR. LEACH:  What you're saying, Judge, is simultaneously

14    filing?  In other words, we're going to file at the same time?

15    Nobody is going first or second?

16         THE COURT:  Yeah, maybe, just file it.  There will be

17    plenty of time for argument.  I'm not going to make any rulings

18    from the bench, you can be sure.  I think that will just help me

19    as opposed to swamp me.

20         With respect to these motions, I would ask everybody to

21    go back now and reread your motion and maybe think about if you

22    want to, you know, maybe not pursue some of the arguments, just

23    kind of see if there is a way that you can tighten it up.  It

24    seems like some of the arguments I don't think there's much of a

25    basis for from the testimony.  I won't give you my opinions about

1 which ones, but I think y'all probably know.  So if you could do

2 that, that would be helpful.  Either, you know, supplement the

3 brief or just not do anything.  You can tell me.  I'm not going to

4 rule -- I'm not going to do an R & R before we get together

5 either.

6          MR. WENIK:  But, Judge, let us try to have a dialogue

7 before you actually set a schedule for post-hearing briefs, let us

8 have a chance to discuss with Mr. Kitchens to see if we can figure

9 that out.

10          THE COURT:  I don't want somebody to write more than you

11 have to.  I know when I have y'all brief stuff, it's a huge amount

12 of work.  And since we are going to get back together, we might

13 even decide we'll spend an hour, you know, just discussing where

14 we are and maybe that will help us narrow some of it down.

15          I think there's, you know, there's points that both

16 sides are trying to make about the other's experts, and some of

17 those points are valid and some of them, you know, are not going

18 to go anywhere.  So just something to think about.

19          We'll get the transcript.  I know you've ordered it.  So

20 y'all will have something to look at over the New Year break or

21 soon after that.  And what else do we need to do?

22          MR. WENIK:  I would just move into evidence -- I don't

23 think we need to move in Exhibit 11, that's already in the case,

24 the declaration of Dr. Bannister.

25          THE COURT:  I don't feel like I've ruled on that many

1  exhibits.

2          MR. KITCHENS:  We didn't.  We had a lot of exhibits

3  shown without admitting them.

4          THE COURT:  Before we do that, because I think I want to

5  go off the record just because God bless Viola and what she's had

6  to go through these few last days, she doesn't need to be part of

7  that.  Is there anything else other than figuring out the

8  exhibits?

9          MR. WENIK:  I can do that with Mr. Kitchens, I think,

10 off-line and we just agree --

11         MR. KITCHENS:  One timing -- I'm sorry, Art, going away.

12         MR. LEACH:  Well, my question is, Judge, I used 19 and

13 20 strictly as impeachment with Mr. Santos, but it seems to me you

14 might want to have them in the package just because he saw them.

15 Are you talking about documents used for purposes even though they

16 weren't tendered?

17         THE COURT:  Well, I know the court reporter had asked

18 for them just because there are so many weird words.

19         MR. LEACH:  I -- I sent them.

20         THE COURT:  I don't know that there was anything that

21 was crazy that we were shown.  I mean, I don't see a problem with

22 just admitting everything if y'all care to.

23         MR. WENIK:  That was going to be my suggestion.

24 Whatever each side showed during the hearing, you could consider.

25 It's not like we're in front of a jury.

1          THE COURT:  What do you think, Mr. Kitchens?

2          MR. KITCHENS:  I agree with that.  I mean, obviously,

3  we, you know, disagree with some of the exhibits, but for purposes

4  of the court's consideration at this stage, we don't have a

5  problem.  I think it's cleaner to have it in the record.  That's

6  fine.

7          MR. LEACH:  I agree.

8          THE COURT:  So let's --

9          THE DEPUTY CLERK:  Can you send me a master list to make

10 sure I have everything?

11         MR. WENIK:  We'll do that.

12         MR. KITCHENS:  Sure.

13         MR. WENIK:  We'll do that.

14         THE DEPUTY CLERK:  That will be great.  Thank you.

15         THE COURT:  Okay, well, I'm just going to say on the

16 record that everything that was shown today will be made part of

17 the record for my consideration, and I'll use my discretion as to,

18 you know, as to what -- what I do with it or don't do with it.

19 The fact that it was admitted into this hearing shouldn't

20 prejudice anybody as to any arguments they might want to make

21 about it.

22         MR. LEACH:  You said today but you meant over the last

23 three days.

24         THE COURT:  Yeah, today, the long -- the long today

25 that's been going on for awhile.

1            All right.  I know I tried to hurry you guys along and
2    at times I spaced out into the atmosphere, but y'all did an
3    excellent job and I appreciate all your hard work.  I know a lot
4    went into this, and let's just all thank Zak Taylor for just
5    smiling his way through these days.  Zak, whenever I was feeling
6    down and blue, I just looked at your smiling picture.  You always
7    looked so fresh.

8            All right.  Well, y'all have a good rest of your holiday
9    for those of you celebrating Hanukkah, and I guess it's over.  And
10   then have a good Christmas for those of you who do that, and
11   everybody have a great New Year.

12           MR. MORRIS:  Judge, happy landings to you with your
13   surgery.

14           THE COURT:  Thanks.

15           MR. KITCHENS:  Happy holidays.

16           MR. WENIK:  Happy holidays.

17           THE DEPUTY CLERK:  Bye everyone.

18           (Whereupon the hearing concluded at 3:54 p.m.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT

4    NORTHERN DISTRICT OF GEORGIA

5

6        I do hereby certify that the foregoing pages are a true and

7    correct transcript of the proceedings taken down by me in the case

8    aforesaid.

9        This the 27th day of December, 2020.

10

11

12

13

14        _____
                    VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
15                  OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25